# United States Court of Appeals
## For the First Circuit

––––––––––––––––––

### No. 25-1638

ÍNARU NADIA DE LA FUENTE DÍAZ; MARU ROSA HERNÁNDEZ; ANDRÉ RODIL; YEIVY VÉLEZ BARTOLOMEI; GÉ CASTRO CRUZ; DENI JUSTE,

Plaintiffs – Appellees,

v.

JENNIFFER A. GONZÁLEZ COLÓN, in the official capacity as Governor of the Commonwealth of Puerto Rico; Dr. VÍCTOR RAMOS OTERO, in his official capacity as Secretary of the Department of Health of the Commonwealth; WANDA LLOVET DÍAZ, in the official capacity as the Director of the Division of Demographic Registry and Vital Statistics of the Commonwealth,

Defendants – Appellants,

––––––––––––––––––

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. María Antongiorgi-Jordán, U.S. District Judge]

––––––––––––––––––

**APPENDIX TO BRIEF FOR DEFENDANTS-APPELLANTS JENNIFFER A. GONZÁLEZ COLÓN, DR. VÍCTOR RAMOS OTERO AND WANDA LLOVET DÍAZ**

**INDEX OF APPENDIX**

| DOCUMENT | PAGE (S) |
|---|---|
| Endorsed Complaint of the case: 3:23-cv-01544-MAJ, Ínaru Nadia de la Fuente Díaz, *et al.* v. Jenniffer González Colón, *et al*, filed on 10/27/23 (Docket Num. 1) | **1-20** |
| Exhibits to Complaint | |
| Instructions for Applicants Residing Outside Puerto Rico Requesting Gender Change (Docket Num. 1-1) | **21-23** |
| June 30, 2023 letter sent to Wanda Llovet, Director, Demographic Registry of the Department of Health (Docket Num. 1-2) | **24** |
| E-mail from Wanda Llovet, Director, Demographic Registry of the Department of Health (Docket Num. 1-3) | **25-27** |
| Statement Under Penalty of Perjury (Docket Num. 1-4) | **28** |
| Statement Under Penalty of Perjury (Docket Num. 1-5) | **29** |
| Statement Under Penalty of Perjury (Docket Num. 1-6) | **30** |

| | |
|---|---|
| Statement Under Penalty of Perjury filed (Docket Num. 1-7) | **31** |
| Statement Under Penalty of Perjury (Docket Num. 1-8) | **32** |
| Statement Under Penalty of Perjury (Docket Num. 1-9) | **33** |
| Summons in a Civil Action (Docket Num. 1-10) | **34-35** |
| Summons in a Civil Action (Docket Num. 1-11) | **36-37** |
| Summons in a Civil Action (Docket Num. 1-12) | **38-39** |
| Civil Cover Sheet (Docket Num. 1-13) | **40-41** |
| Category Sheet (Docket Num. 1-14) | **42** |
| Motion to Request the Entry of a Preliminary Injunction and Brief in Support Thereof, filed on 10/27/23 (Docket Num. 3) | **43-50** |
| Amended Complaint, filed on 10/30/23 (Docket Num. 5) | **51-71** |
| Exhibits to Amended Complaint | |
| Instructions for Applicants Residing Outside Puerto Rico Requesting Gender Change (Docket Num. 5-1) | **72-74** |

| | |
|---|---|
| June 30, 2023 letter sent to Wanda Llovet, Director, Demographic Registry of the Department of Health (Docket Num. 5-2) | 75 |
| E-mail from Wanda Llovet, Director, Demographic Registry of the Department of Health (Docket Num. 5-3) | 76-78 |
| Statement Under Penalty of Perjury, (Docket Num. 5-4) | 79 |
| Statement Under Penalty of Perjury (Docket Num. 5-5) | 80 |
| Statement Under Penalty of Perjury (Docket Num. 5-6) | 81 |
| Statement Under Penalty of Perjury (Docket Num. 5-7) | 82 |
| Statement Under Penalty of Perjury (Docket Num. 5-8) | 83 |
| Statement Under Penalty of Perjury (Docket Num. 5-9) | 84 |
| Second Amended Complaint, filed on 11/15/23 (Docket Num. 12) | 85-105 |

| | |
|---|---|
| Exhibits to Second Amended Complaint | |
| Instructions for Applicants Residing Outside Puerto Rico Requesting Gender Change (Docket Num. 12-1) | **106-108** |
| June 30, 2023 letter sent to Wanda Llovet, Director, Demographic Registry of the Department of Health (Docket Num. 12-2) | **109** |
| E-mail from Wanda Llovet, Director, Demographic Registry of the Department of Health (Docket Num. 12-3) | **110-112** |
| Statement Under Penalty of Perjury (Docket Num. 12-4) | **113** |
| Statement Under Penalty of Perjury (Docket Num. 12-5) | **114** |
| Statement Under Penalty of Perjury (Docket Num. 12-6) | **115** |
| Statement Under Penalty of Perjury (Docket Num. 12-7) | **116** |
| Statement Under Penalty of Perjury (Docket Num. 12-8) | **117** |
| Statement Under Penalty of Perjury (Docket Num. 12-9) | **118** |
| Motion to Dismiss for Failure to State a Claim, filed on 01/22/24 (Docket Num. 17) | **119-140** |

| | |
|---|---|
| Opposition to Plaintiffs' Motion to Request the Entry of a Preliminary Injunction, filed on 03/18/24 (Docket Num. 28) | **141-160** |
| Answer to Second Amended Complaint (Docket No. 12), filed on 03/18/24 (Docket Num. 29) | **161-180** |
| Opposition to Motion to Dismiss, filed on 03/20/24 (Docket Num. 30) | **181-193** |
| Motion for Summary Judgment, filed on 09/06/24 (Docket Num. 36) | **194-211** |
| Opinion and Order, entered on 09/23/24 (Docket Num. 39) | **212-216** |
| Opposition to Plaintiffs Motion for Summary Judgment and Cross Motion for Summary Judgment, filed on 01/10/25 (Docket Num. 52) | **217-250** |
| Exhibits for Cross Motion for Summary Judgment<br><br>Sworn Statement (Docket Num. 52-1)<br><br>Response to Plaintiffs' Statement of Uncontested Material Facts (Docket Num. 52-2)<br><br>Additional Statement of Uncontested Material Facts (Docket Num. 52-3) | **251-254**<br><br>**255-262**<br><br>**263-267** |
| | |

| | |
|---|---|
| Motion for Reconsideration Pursuant to Rule 59 (E) of the Federal Rules of Civil Procedure, filed on 06/27/25 (Docket Num. 61) | **268-286** |
| Motion for Order to Enforce Judgement, filed on 07/01/25 (Docket Num. 63) | **287-288** |
| Notice of Appeal, filed on 07/01/25 (Docket Num. 64) | **289-290** |
| Motion to Stay Proceedings Pending Appeal, filed on 07/18/25 (Docket Num. 68) | **291-303** |

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| Ínaru Nadia de la Fuente Díaz, Maru Rosa Hernández, André Rodil, Yeivy Vélez Bartolomei, Gé Castro Cruz, Deni Juste<br><br>*Plaintiffs*<br><br>vs<br><br>Pedro Pierluisi, in his official capacity as Governor of the Commonwealth of Puerto Rico; Dr. Carlos R. Mellado López, in his official capacity as Secretary of the Department of Health of the Commonwealth; Wanda Llovet Díaz, in her official capacity as the Director of the Division of Demographic Registry and Vital Statistics of the Commonwealth<br>*Defendants* | Civil No.<br><br><br><br>COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEFS |

## COMPLAINT

Come now the above-mentioned plaintiffs, through their undersigned counsel, and respectfully set forth and pray:

### Jurisdiction and Venue

This Honorable Court has subject matter jurisdiction over the instant case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3), as relief is sought under 42 U.S.C. § 1983 for violation of plaintiffs' rights under the Fourteenth Amendment to the Constitution of the United States of America. The District of Puerto Rico is the proper venue as all parties reside in said judicial district, which is also where all relevant facts took place. 28 U.S.C. § 1391(b). Supplemental jurisdiction is hereby invoked, as allowed by 28 U.S.C. § 1367, for claims arising under the Puerto Rico Constitution.

**1**

## Introductory Statement

1. Plaintiffs are nonbinary persons born in Puerto Rico.

2. Defendants are all officers of the Puerto Rico government who are, in the case of the Governor, the ultimate enforcer of the law, as per Article IV of the Commonwealth's Constitution and, in the case of the remaining defendants, they are in charge of running what is commonly the Demographic Registry, and officially known as the "Vital Statistics Registry", a responsibility which should be carried out, not only in compliance with the statutes and regulations pertaining said institution, but also in a manner that does not contravene plaintiffs' constitutional rights.

3. Individual plaintiffs wish to correct their respective Puerto Rico birth certificates to accurately reflect who they are, consistent with their gender identities.

4. In 2018, transgendered people obtained an Order from this Court in case 2017-1557 CCC, directing the Puerto Rico Division of Demographic Registry and Vital Statistics of the Commonwealth (hereinafter the "Demographic Registry") to change the gender that appears in their birth certificates from one gender to another (male or female). *Arroyo González v Rosselló Nevares*, 305 F. Supp.3d 327 (D.P.R. 2018). As a result, now the Registry has a published protocol by which people who so wish may change their gender marker in their birth certificate. [Instructions for Application for Gender Change in Vital Event Certification, Exhibit 1]

5. Notwithstanding, at that time the Registry did not amend their form to include all gender possibilities; instead, it kept the binary system male/female.

6. That decision was based on plaintiffs' constitutional rights to decisional privacy and informational privacy, as well as the Commonwealth of Puerto Rico's ("Commonwealth") public policy that prohibits discrimination by public agencies and instrumentalities based on gender identity [OE-2008-57 of November 14, 2008].

7. Section 1 of the Bill of Rights set forth in Article II of the Commonwealth's Constitution, provides: "The dignity of the human being is inviolable. All men are equal before the law. No discrimination shall be made on account of race, color, sex, birth, social origin or condition, or political or religious ideas. Both the laws and the

2

**2**

system of public education shall embody these principles of essential human equality." Section 19 provides that [t]he foregoing enumeration of rights shall not be construed restrictively nor does it contemplate the exclusion of other rights not specifically mentioned which belong to the people in a democracy."

8. On July 5, 2023, plaintiffs, through Amnistía Internacional Puerto Rico, an organization dedicated to promote equity and justice for humankind, requested in writing an amendment to the Application for Gender Change in Vital Event Certification, so as to include an X option. [Letter, Exhibit 2] On September 8, Secretary Llovet answered through an informal email, denying the request indicating that, lacking a court decision or legislative action, they could not amend the form to include the X marker. [Email from Llovet, Exhibit 3]

9. In the letter to Secretary Llovet, plaintiffs informed that, starting April 11, 2022, the US State Department had recently included the X marker for their passports, as a symbol to reflect their identities as non-binary individuals.

10. To request a change of gender in the Registry, the protocol requires that a person present a passport stating the gender they wish to appear in their birth certificates without requiring any additional documentation, as instructed by Judge Cerezo's order[1]. [See Exhibit 1]

---

[1] The specific order issued by the Court is as follows:

> The Demographic Registry of the Commonwealth of Puerto Rico **SHALL ADOPT** the criteria of the Department of Transportation and Public Work's "Request to Change Transgender Persons' Gender Marker," DTOP-DIS-324 Form, as **the** application form to be submitted by transgenders and which shall be accepted as the first step towards the issuance of their new birth certificates, in compliance with the Court's mandate. *See* Attachment A to the Judgment. The transgender individual shall present the application accompanied by one of the following documents: (1) a passport that reflects a person's true gender, whether female or male, (2) a driver's license that reflects the person's true gender, whether female or male, or (3) a certification issued by a healthcare professional or mental health professional with whom the person has a doctor-patient relationship stating, based on his or her professional opinion, the true gender identity of the applicant, whether female or male, and that it is expected that this will continue to be the gender with which the applicant will identify him or herself in the future. If the applicant has not had any of the documents requested previously issued, a health care professional or mental health professional with whom the applicant has a doctor-patient relationship must certify based on his or her professional opinion that the true gender identity of the applicant is ( ) female or ( ) male and that it is expected that this will continue to be the gender with which the

**3**

11. The United States Constitution guarantees all persons equal dignity, the equal protection of the laws, fundamental rights of liberty and privacy, freedom of expression, and freedom from compelled speech.  Those constitutional guarantees protect personal decisions central to individual dignity and personal autonomy, including intimate decisions that define personal identity, such as a person's gender identity.  Puerto Rico's refusal to provide accurate birth certificates to transgender people that are consistent with their gender identity violates these federal constitutional guarantees.

12. There is no compelling, important, or even legitimate governmental justification to support Puerto Rico's refusal to provide nonbinary people with accurate birth certificates matching their gender identity nor is there any remotely cognizable injury or substantial burden attributable to having the official document reflect the reality of who these citizens are.

13. Moreover, it is arbitrary to allow the identification of transgender people while denying the identification of nonbinary people.

**PLAINTIFFS**

13. Ínaru Nadia de la Fuente Díaz is a nonbinary person living in San Juan. They is studying Law at the UPR and is an activist through La Sombrilla Cuir. They have a US passport that identifies they with an X marker as their gender. [Exhibit 4]

14. Maru Rosa Hernández is a nonbinary person living in San Juan. They is currently employed. [Exhibit 5]

15. André Rodil is a nonbinary person living in San Juan, who works and study part time. [Exhibit 6]

16. Yelvy Vélez Bartolomei is an nonbinary person living in San Juan. They is currently employed. [Exhibit 7]

---

applicant will identify him or herself in the future. *See* Part B of DTOP-DIS-32 Form, which is included as Attachment A to the Judgment.

*Arroyo González*, 305 F. Supp.3d at 334 (emphasis in the original)

4

17. Gé Castro Cruz is a nonbinary person living in San Juan. They is currently employed. [Exhibit 8]

18. Deni Juste is a nonbinary person living in Moca. They is currently employed. [Exhibit 9]

## DEFENDANTS

17. Defendant Gov. Pedro Pierluisi Urrutia (Gov. Pierluisi) is sued in his official capacity as Governor of the Commonwealth of Puerto Rico. In his capacity as governor, Gov. Pierluisi executes the laws of the Commonwealth, including the Vital Statistics Registry Act of Puerto Rico (hereinafter the "Vital Statistics Registry Act"), and supervises the official conduct of all executive and ministerial officers who implement and enforce the Vital Statistics Registry Act. Gov. Pierluisi has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from living consistently with their gender identity, including correcting the gender marker on their birth certificates. Gov. Pierluisi is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state or territorial law at all times relevant to this Complaint.

18. Defendant Dr. Carlos R. Mellado López ("Secretary Mellado") is sued in his official capacity as Secretary of the Department of Health of the Commonwealth of Puerto Rico. Pursuant to 24 P.R. Laws Ann. § 1231, Secretary Mellado's duties include, among others, "prepar[ing], caus[ing] to be printed, and furnish[ing] to the keepers of the Registers, all books, printed matter and forms to be used for the registration of births […] occurring or taking place in the Commonwealth of Puerto Rico." Further, pursuant to 24 P.R. Laws Ann. § 1231, Secretary Mellado "prepare[s] and distribute[s] such detailed instruction . . . as may be necessary for the uniform application [of the Vital Statistics Registry Act]." Secretary Mellado also supervises and manages the Commonwealth's Director of the Division of Demographic Registry and Vital Statistics, Defendant Wanda Llovet Díaz. Secretary Mellado ensures compliance in all of these functions with the relevant Commonwealth laws, including those that bar transgender persons born in Puerto Rico from correcting the gender markers on their

birth certificates. Secretary Mellado is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state or territorial law at all times relevant to this Complaint.

19. Defendant Wanda Llovet Díaz ("Ms. Llovet") is sued in her official capacity as the Director of the Division of Demographic Registry and Vital Statistics of the Commonwealth (hereinafter the "Demographic Registry"). In her official capacity, pursuant to 24 P.R. Laws Ann. § 1071, Ms. Llovet is "in charge of all matters connected with the registration of births, marriages and deaths which may occur or take place in Puerto Rico." Ms. Llovet also ensures compliance in all of these functions with the relevant Commonwealth laws, including those that bar transgender persons born in Puerto Rico from correcting the gender markers on their birth certificates. Ms. Llovet is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state or territorial law at all times relevant to this Complaint.

## STATEMENT OF FACTS

20. Moments after a child is born, the general practice in this country is for a physician to assess visually the newborn's genitalia and assign the newborn's sex as "male" or "female" on that basis. Sex, however, is much more complex.

21. "Humans are socially conditioned to view sex and gender as binary attributes. From the moment we are born—or even before—we are definitively labeled 'boy 'or 'girl'"[2].

22. Individuals whose gender identity falls within these traditionally recognized confines of "male" and "female" are "binary." Both cisgender people (those whose gender identity matches the sex they were assigned at birth) and transgender people (those whose gender identity does not match the sex assigned at birth) can have a binary gender of male or female.

---

[2] Amanda Montañez, *Beyond XX and XY: The Extraordinary Complexity of Sex Determination*, SCI. AM., Sept. 2017, 50–51, *available at* https://www.scientificamerican.com/article/beyond-xx-and-xy-the-extraordinary-complexity-of-sex-determination/.

23. But hundreds of thousands of Americans have a gender identity that is neither male nor female.[3] " [S]cience points to a much more ambiguous reality … The more we learn about sex and gender, the more these attributes appear to exist on a spectrum."[4]

24. The terms "nonbinary" and "gender-neutral" recognize this reality. Indeed:

> Determination of biological sex is staggeringly complex, involving not only anatomy but an intricate choreography of genetic and chemical factors that unfolds over time. Intersex individuals—those for whom sexual development follows an atypical trajectory—are characterized by a diverse range of conditions … [T]he gender with which a person identifies does not always align with the sex they are assigned at birth, and they may not be wholly male or female.[5]

25. Transgender people are people who have a gender identity (the innate knowledge of own gender that all people have) that is different from the gender they were assigned at birth. Many transgender people are men or women that is, their gender identity is male or female. Many other transgender people are nonbinary that is, their gender identity is neither male nor female. For people who are not male or female, the appropriate gender marker is a gender-neural designation, typically an "X".

26. Nonbinary individuals may or may not use the singular form of "they/them/their" or other gender-neutral pronouns. They may describe themselves using the term "nonbinary"; use more specific gender-neutral terms such as "agender," "genderqueer," "gender fluid," "Two Spirit," "bigender," "pangender," "gender nonconforming," or "gender variant"; or not identify with any gender at all.[6]

---

[3] Andrew R. Flores et al., Williams Institute (UCLA), "How Many Adults Identify as Transgender in the United States" (2016), https://williamsinstitute.law.ucla.edu/wp-content/uploads/How-Many-Adults-Identify-as-Transgender-in-the-United-States.pdf, at 3 (1.4 million, or 0.6%, of U.S. adults identify as transgender); Sandy E. James et al., NAT'L CTR FOR TRANSGENDER EQUALITY, THE REPORT OF THE 2015 U.S. TRANSGENDER SURVEY (2016),
https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf, at 45 & Fig. 4.2 (hereinafter TRANSGENDER SURVEY) (35% of adult transgender population identifies as nonbinary). Currently, the NAT'L CTR FOR TRANSGENDER EQUALITY is gathering data for their 2022 survey.
[4] Montañez, supra n.2.
[5] Id. (footnote omitted).
[6] TRANSGENDER SURVEY, supra n.3, at 44 & Fig. 4.1.

**7**

27. "Intersex" means having been born with variations in sex characteristics that do not fit typical definitions for male or female bodies. Of the more than 490,000[7], adults in the U.S. with nonbinary gender identities, most were not born intersex.[8]

28. In fact, at this moment the Demographic Registry does not have a marker to properly identify intersex-born babies, denying both the newborn and their families a viable option to register these births.[9]

29. Gender identity—a person's core internal sense of their own gender—is the primary factor in determining a person's sex. Every person has a gender identity. There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to a person's health and well-being.

30. The incongruence between a transgender person's gender identity and sex assigned at birth can sometimes be associated with gender dysphoria. Gender dysphoria is a serious medical condition recognized in the *American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders*, Fifth Ed. (2013) ("DSM-V"), and by the other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association.

31. Gender dysphoria refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth. If left

---

[7] *See id.* at 45 & Fig. 4.2 (35% of adult transgender population identifies as nonbinary); Flores, *supra* n.3, at 3 (1.4 million transgender adults in U.S.).

[8] TRANSGENDER SURVEY, supra n.3, at 44 & Fig. 4.1. See also Intersex Soc'y of N. Am., "How Common Is Intersex?", http://www.isna.org/faq/frequency (citing studies: "[A]bout 1 in 1500 to 1 in 2000" children are "born [with] noticeably atypical in terms of genitalia," "[b]ut a lot more people than that are born with subtler forms of sex anatomy variations, some of which won't show up until later in life.").

[9] Courts that have addressed requests of relief from intersex plaintiffs have pointed that "Sexual development in cases of intersex persons makes the gender classification at birth inconclusive. It is at maturity that the gender of such persons, like respondent, is fixed. [...] To him belongs the human right to the pursuit of happiness and of health. Thus, to him should belong the primordial choice of what courses of action to take along the path of his sexual development and maturation https://www.icj.org/wp-content/uploads/2012/07/Republic-of-the-Philippines-v.-Jennifer-Cagandahan-Supreme-Court-of-the-Philippines-Second-Division.pdf

untreated, gender dysphoria may result in psychological distress, anxiety, depression, and suicidal ideation or even self-harm.

32. The gender change policy maintained by the US State Department for the last decade reflects an understanding that the Department should identify people not according to preconceived notions about gender but according to their actual gender, that is, the gender that individuals know themselves to be, receive appropriate treatment related to, and are generally known as. This understanding mirrors the medical consensus that when a person's sex-related traits do not all align with their gender identity, the person should be treated in accordance with their gender identity. Beyond reflecting a medical consensus and addressing an important community need, policies that acknowledge people's actual gender  best serve government interests in accurately identifying individuals.

33. All the reasons for adopting this policy for transgender women and men also apply to nonbinary people. A consensus among leading medical organizations and experts in transgender health acknowledges that people have a range of gender identities, with male and female only two of many possibilities. See e.g. American Psychological Association, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People* 834 (2015)  ("Gender identity is defined as a person's deeply felt, inherent sense of being a girl, woman, or female; a boy, a man, or male; a blend of male or female; or an alternative gender"); *DSM-V* at 451 ("Gender identity...refers to an individual's identification as male, female or, occasionally, some other category other than male or female").

34. Like for anyone else whose sex-related traits do not all align with their gender identity, the medical consensus is that nonbinary people should be treated in accordance with their gender identity. See Brief of Amici Curiae Am. Acad. Of Pediatrics, Am. Psychiatric Assoc., Am. College of Physicians, and 17 Additional Medical and Mental Health Organizations in Support of Respondent, *Gloucester Cty. School Bd. v. G.G.*, 2017 WL 1057281 The international medical consensus regarding treatment for gender dysphoria is to assist the patient to live in accordance with his or her gender identity, thus alleviating the distress. Research has demonstrated that failing to treat transgender people, including nonbinary people, according to their gender identity

9

**9**

can cause significant harms; meanwhile, when transgender people are able to live according to their gender identity, their health, safety, and wellbeing is substantially improved. See American Medical Association, LGBTQ Change Efforts Issue Brief (2019), https://www.ama-assn.org/system/files/2019-03/transgender-conversion-issue-brief.pdf. In fact, one study found a drastic reduction in suicide attempts for transgender people, including nonbinary transgender people, who had even just one identity document that accurately reflected their gender identity. Greta R. Bauer, et al. "Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada" 15.1 *BMC Pub. Health* 525 (2015).

35. The government's interest in accurately identifying people also supports recognizing people by the gender they know themselves to be and generally express to others. For many nonbinary people, everyone in their personal and professional lives know them as nonbinary. It is for these reasons that twenty one states and the District of Columbia now acknowledge nonbinary genders on driver's licenses[10].

---

[10]**ARKANSAS** Driver Services Instructions, https://transequality.org/sites/default/files/docs/id/AR%20Drivers%20License%20gender%20change%20guidance.pdf; **CALIFORNIA** Gender Recognition Act, SB 179, https://leginfo.legislature.ca.gov/faces/billCompareClient.xhtml?bill_id=201720180SB179; See **COLORADO** Department of Revenue, Change your Sex, https://www.colorado.gov/pacific/dmv/change-your-sex; **INDIANA**, See NBC News, Hoosier ally? Pence's home state quietly begins issuing nonbinary IDs (Mar. 12, 2019), https://www.nbcnews.com/feature/nbc-out/hoosier-ally-pence-s-home-state-quietly-begins-issuing-nonbinary-n982106; See **MAINE** Gender Marker Form, https://www1.maine.gov/sos/bmv/forms/GENDER%20DESIGNATION%20FORM.pdf; See **NEVADA** Department of Motor Vehicles, Name Changes, http://www.dmvnv.com/namechange.htm; **MARYLAND**, See SB 196, 2019 Gen. Assemb., Reg. Sess. (Md. 2019) http://mgaleg.maryland.gov/2019RS/bills/sb/sb0196T.pdf; See MN Driver and Vehicle Services Self-Designated Descriptors, **MINNESOTA**, https://dps.mn.gov/divisions/dvs/Pages/self-designated-descriptors.aspx; **OREGON** Driver & Motor Vehicle Services Instructions, https://www.oregon.gov/ODOT/DMV/Pages/driverid/chg_gender_designation.aspx; **VERMONT** DMV Press Release (Mar. 13, 2019), https://dmv.vermont.gov/press-release/new-license-id-will-allow-third-gender-option-starting-this-summer; **DC** Gender Self-Designation Form, https://dmv.dc.gov/sites/default/files/dc/sites/dmv/publication/attachments/DC%20DMV%20Form%20Gender%20S elf-Designation%20English.pdf; **CONNECTICUT**, See Ned, Lamont (January 27, 2020). "Connecticut Governor Lamont Announces DMV Now Including 'Non-Binary' as Gender Option for Driver's Licenses and ID Cards". *Office of the Governor*. Retrieved 4 January 2020; **HAWAII**, See Herreria, Carla (2019-06-27). "Hawaii Adds Third Gender Option For State-Issued IDs". *HuffPost;* **NEW JERSEY**, See Romine, Taylor (April 20, 2021). "New Jersey Adds 'X' Gender Marker on Driver's Licenses and Other State Identification". *CNN*. Retrieved May 16, 2021; **NEW MEXICO**, See https://static1.squarespace.com/static/61b8c0da4a7ea57834ca0af6/t/61e9da0c6191791b2480af81/1642715677520/Name&GenderChangeNMEng.pdf.

36. Seventeen states and New York City now acknowledge nonbinary genders on birth certificates[11]; and several municipalities[12] and at least sixteen countries[13] do the same. See https://thehill.com/changing-america/respect/diversity-inclusion/3507206-here-are-the-states-where-you-can-and-cannot-change-your-gender-designation-on-official-documents/

37. After this Court's decision in 2018, the Demographic Registry's policy allows change of gender only for transgendered binary people, but denies it to transgendered nonbinary people. This arbitrary decision in violation to the rights guaranteed by the US and the Commonwealth's Constitutions has caused and will continue to cause distress to plaintiffs and will further discriminatory treatment against them. This unlawful act can and must be stopped by this Court.

---

[11] California Gender Recognition Act, SB 179; https://leginfo.legislature.ca.gov/faces/billCompareClient.xhtml?bill_id=201720180SB179; CT Dept. of Public Health Testimony on Senate Bill 388, (Feb. 25, 2019), https://www.cga.ct.gov/2019/PHdata/Tmy/2019SB-00388-R000225-Department%20of%20Public%20Health-TMY.PDF; Nev. Admin. Code § 440.030, https://www.leg.state.nv.us/Register/RegsReviewed/$R066-16A.pdf; New Jersey Babs Siperstein Law, https://www.njleg.state.nj.us/2018/Bills/A2000/1718_R2.PDF; See SB 20, 2019 Leg., 54th Sess. (N.M. 2019), signed March 2019, https://legiscan.com/NM/text/SB20/id/1978653; Oregon Health Authority House Bill 2673 Information Sheet, https://www.oregon.gov/oha/PH/BIRTHDEATHCERTIFICATES/CHANGEVITALRECORDS/Documents/OHA-2673.pdf; Washington Wash. Admin. Code § 246-490-075 , http://app.leg.wa.gov/WAC/default.aspx?cite=246-490-075; NBC News, Utah among growing number of states issuing gender-neutral IDs, (Mar. 18, 2019), https://www.nbcnews.com/feature/nbc-out/utah-among-growing-number-states-issuing-gender-neutral-ids-n984326; New York City Health Code Article 207, https://www1.nyc.gov/assets/doh/downloads/pdf/notice/2018/noa-amend-article207-section207-05.pdf.

[12] These municipalities include major cities like **CHICAGO**, Elaine Chen, Who Will Benefit From the Chicago Municipal ID?, (Nov. 28, 2017), https://southsideweekly.com/will-benefit-chicago-municipal-id/, **NEW YORK CITY**, , Matthew Rodriguez, New York City Now Has a Third Gender Option on Its ID Cards, (Jan. 15, 2019), https://www.out.com/news-opinion/2019/1/15/new-york-city-offers-third-gender-option-city-issued-idnyc-cards; and **PHILADELPHIA**, A.D. Amorosi, Gender-free municipal ID cards are close to becoming reality in Philly, (Feb. 28, 2019), http://www.epgn.com/news/14312-gender-free-municipal-id-cards-are-close-to-becoming-reality-in-philly.

[13] Countries include Nepal, India, Malta, Denmark, Bangladesh, Australia, New Zealand, Argentina, Austria, Canada, Colombia, Germany, Iceland, Ireland, the Netherlands, Pakistan and Brazil. See https://www.newsweek.com/which-countries-recognize-third-gender-option-passports-1643167. Aaron Macarow, These Eleven Countries are Way Ahead of the US on Trans Issues, (Feb. 9, 2015), https://archive.attn.com/stories/868/transgender-passport-status; Argentina, Westfall, Sammy (22 July 2021). "Argentina rolls out gender-neutral ID". The Washington Post, Brazil, "Justiça da BA publica provimento permitindo a inclusão de gênero "não binário" no Registro Civil". *Arpen Brasil - Saiba Mais* (in Brazilian Portuguese). 2022-05-11; and

## CAUSES OF ACTION

### COUNT I – DEPRIVATION OF EQUAL PROTECTION
### IN VIOLATION OF THE FOURTEENTH AMENDMENT
### OF THE UNITED STATES CONSTITUTION
### 42 U.S.C. § 1983

38. The Fourteenth Amendment to the United States Constitution, enforceable pursuant 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.  Puerto Rico is subject to the equal protection guarantee.  Simply put, "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike".  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

39. All individuals born in Puerto Rico are equally situated in the sense that the state mandates that a record be created reflecting the basic facts about their lives but plaintiffs belong to a protected group whose actual gender identity is not accurately memorialized in the official record.

40. Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex—including gender, gender identity, transgender status and nonconformity with sex-based or gender-based stereotypes—as well as discrimination based on transgender status, is presumptively unconstitutional and subject to heightened scrutiny.

41. Puerto Rico's Birth Certificate Policy facially and intentionally discriminates against the Individual Plaintiffs and other transgender persons based on sex-related considerations.  The sex that the government lists on a person's birth certificate is a government classification of a person's sex.  In the case of transgender individuals, like the Individual however, this classification reflects a sex contrary to their true sex, as determined by their gender identity, causing harm as a result.

42. Puerto Rico's Birth Certificate Policy treats nonbinary persons differently than cisgender and other transgender persons who are similarly situated.

**12**

43. Under Puerto Rico's Birth Certificate Policy, cisgender persons and transgender binary persons can have birth certificates that accurately reflect their sex and that are consistent with their gender identity, but nonbinary persons are deprived of birth certificates that accurately reflect their sex and that are consistent with their gender identity.

44. Because Puerto Rico's Birth Certificate Policy deprives transgender persons born in Puerto Rico of their right to equal dignity, liberty, and autonomy by stigmatizing them and branding them as second-class citizens, it denies transgender persons born in Puerto Rico of the equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.

45. Moreover, the officers' actions of denying to include the marker X in the birth certificate runs afoul to the instructions given to citizens, where they state that with a US passport the Registry will change the registered sex. If Plaintiff Ínaru Nadia de la Fuente Díaz presents his US Passport with the form to change his registered sex, the Registry would be unable to comply, thus, creating a gap between the reality presented in the passport and the reality presented in the Registry.

46. Accordingly, Defendants are liable for their violation of the Fourteenth Amendment rights of the Individual Plaintiffs under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Puerto Rico's Birth Certificate Policy unconstitutional and enjoining its enforcement.

47. <u>Discrimination Based On Sex</u>. Defendant's Policy discriminates against Plaintiff on the basis of sex, both facially and as applied, by barring Plaintiff from obtaining an accurate U.S. passport with a gender marker other than "M" (male) or "F" (female). For example, if Plaintiff were male, Defendants would have issued Plaintiff a passport.

48. Discrimination against an individual who is neither male nor female as such, just like discrimination against a woman as such, is discrimination based on sex. In denying a change in the Registry, P.R. officials relied upon sex-based considerations. Because of the Demographic Registry's rigid sex-based classification, Plaintiffs, a person who is neither male nor female, is precluded from obtaining birth certificate with a marker

that properly indicates Plaintiff's sex. If Plaintiff were intersex and also identified as either male or female, Plaintiff would qualify for and be issued a a corrected document.

49. Defendants' Policy is also impermissibly premised on assumptions, expectations, stereotypes, or norms about the nature of sex as a binary characteristic, either male or female.

50. The Demographic Registry nonbinary people from changing their registered sex because they fail to conform to the sex-based stereotype that individuals are all clearly male or female. That is, the Registry relies on an inaccurate assumption that sex is binary and that individuals cannot fall along (or outside of) a sex continuum, i.e., the false belief that all people are either exclusively men/male or exclusively women/female.

51. All sex-based classifications must be supported by an exceedingly persuasive justification and be substantially related to the achievement of that underlying objective.

52. The exclusion of individuals who are neither male nor female unless they falsely describe themselves as exclusively male or female, cannot survive the heightened scrutiny required for sex-based classifications. Indeed, the Policy is not even tailored to further any legitimate interest at all.

53. Discrimination Based On Status As Neither Male Nor Female. On its face, Defendants' Policy denies an accurate birth certificate to the class of United States citizens whose sex is neither male nor female. Thus, in addition to being discrimination based on sex, Defendants' Policy also targets people who do not fit in a male or female sex classification as a group.

54. The United States Supreme Court has not yet determined the level of scrutiny applicable for laws that classify persons for adverse treatment based on their status as people who cannot identify as male or female or their status as intersex. At the very least, such classifications must be rationally related to a legitimate government interest. Here, Defendants' Policy lacks even a rational relationship to a legitimate interest.

14

**14**

55. <u>Discrimination Based on Transgender Status Warrants Heightened Scrutiny</u>. Transgender persons have suffered a long history of extreme discrimination in Puerto Rico and across the country, and continue to suffer such discrimination at present.

56. Transgender persons are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender persons have largely been unable to secure explicit local, state, and federal protections to safeguard them against, and provide remedies for, discrimination.

57. A person's transgender status bears no relation to a person's ability to contribute to society.

58. Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

59. Gender identity generally is fixed at an early age and is highly resistant to change through intervention.

60. For the foregoing reasons, discrimination based on gender identity and transgender status is entitled to heightened scrutiny under the equal protection clause of the Fourteenth Amendment, and Plaintiffs are entitled to relief against Defendants on that basis as well.

COUNT II – DEPRIVATION OF DUE PROCESS
IN VIOLATION OF THE FOURTEENTH AMENDMENT
OF THE UNITED STATES CONSTITUTION
42 U.S.C. § 1983

61. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1.  Puerto Rico is subject to the Due Process Clause.

62. The Due Process Clause of the Fourteenth Amendment places limitations on state action that deprives individuals of life, liberty, or property.

63. The substantive protections of the Due Process Clause[14], as well as other constitutional provisions, give rise to a right to privacy, protecting the integrity of information that is highly personal and intimate, which includes information that could lead to bodily harm upon disclosure.

64. The substantive protections of the Due Process Clause also protect the right of every person to the possession and control of their own person, and to define and express their identity. These protections extend to personal decisions central to individual dignity and personal autonomy, including intimate decisions that define personal identity as a person's sex.

65. The fundamental protections of an individual's autonomy forbid the state from interfering with the right of a transgender person to self-determination with regard to his or her gender identity and to live in accordance with that identity. Such a decision is among the most intimate imaginable, relating to matters that all people are uniquely positioned to understand and define for themselves.

66. The government's refusal to recognize a person's sex not only denies a transgender person equal dignity and respect by undermining, indeed denying, their very identity and existence, but it also authorizes and invites other public and private entities to similarly discriminate and deny recognition.

67. By enforcing Puerto Rico's Birth Certificate Policy, Defendants unduly burden and unconstitutionally interfere with the fundamental right to autonomy in one's person and identity that all transgender persons born in Puerto Rico have.

68. There is no compelling, or even important or legitimate interest in the government to interfere with the rights of transgender persons to self-definition and autonomy in

---

[14] The difference between procedural and substantive due process rights is best explained as follows:

As distinguished from its procedural cousin, then, substantive due process inquiry focuses on "what" the government has done, as opposed to "how and when" the government did it. And although the yardstick against which substantive due process violations are measured has been characterized in various ways, we are satisfied that, before a constitutional infringement occurs, state action must *in and of itself* be egregiously unacceptable, outrageous, or conscience-shocking.

*Amsden v. Moran*, 904 F.2d 748, 754 (1st Cir. 1990) (emphasis added)

one's person and identity. This being the case, we are before a deprivation of liberty that clearly meets the "shocks the conscience" threshold that has been applied to substantive due process claims.

69. Accordingly, Defendants are liable for their violation of Plaintiffs' Fourteenth Amendment rights under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Puerto Rico's Birth Certificate Policy unconstitutional and enjoining its enforcement.

COUNT III – ABRIDGEMENT OF FREE SPEECH
IN VIOLATION OF THE FIRST AMENDMENT
OF THE UNITED STATES CONSTITUTION
42 U.S.C. § 1983

70. The First Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983 and applicable to the states through the Fourteenth Amendment, provides that a state "shall make no law . . . abridging the freedom of speech." Puerto Rico is subject to the First Amendment.

71. The freedom of speech protected by the First Amendment is multifaceted. The First Amendment prevents the government from prohibiting speech, as well as from telling individuals what they must say. Compelled statements are equally proscribed by the First Amendment. A claim of compelled speech requires speech to which the speaker objects that is compelled by some governmental action.

72. By forcing transgender persons to identify themselves through their birth certificate with a sex that was incorrectly assigned to them at birth, Puerto Rico's Birth Certificate Policy violates the First Amendment by compelling nonbinary individuals to identify with a sex and identity inconsistent with who they are. The Birth Certificate Policy also prevents nonbinary persons from accurately expressing their identity. There is no clearer example of unconstitutional forced speech than that which forces an individual to self-identify as male or female where their sexuality does not conform to that norm.

73. Similarly, by forcing transgender people to disclose through their birth certificate private, sensitive, and personal information about their transgender status, gender

identity, or medical condition, Puerto Rico' Birth Certificate Policy violates the First Amendment by compelling transgender persons to disclose private, sensitive, and personal information that they may not want to be publicly known or that may expose them to an invasion of privacy, prejudice, discrimination, harassment, distress, humiliation, and violence.

74. There is no compelling, important, or even legitimate interest in the government compelling transgender persons to identify with a sex and identity that was incorrectly assigned to them at birth, nor is there a compelling, important, or even legitimate interest in the government forcing transgender persons to involuntarily disclose to third parties a conflict in their official documents whenever they present third parties with their inaccurate birth certificates.

75. Accordingly, Defendants are liable for their violation of the First Amendment rights of the Individual Plaintiffs and of the transgender members of Puerto Rico Para Tod@s under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Puerto Rico's Birth Certificate Policy unconstitutional and enjoining its enforcement.

COUNT IV:<br>WRIT OF MANDAMUS

76. Plaintiffs hereby incorporate by reference and reallege paragraphs 1-36 of this Complaint as though fully set forth herein.

77. Plaintiff's claims—as set forth above— are clear and certain.

78. Pursuant to 22 U.S.C. § 211a, the Defendants Mellado has the power to grant and issue birth certificates, and to cause these documents to be granted by those acting under him.

79. Defendants' duty to adjudicate Plaintiff's birth certificate and issue Plaintiff a birth certificate is nondiscretionary, ministerial, and free from doubt.

80. Plaintiff has exhausted any administrative remedies that may exist, and no other adequate remedy is available to Plaintiffs.

**18**

81. Pursuant to 28 U.S.C. § 1361, Plaintiff is entitled to mandamus relief compelling Defendants to process Plaintiffs' application for a birth certificate that accurately reflects Plaintiffs' nonbinary gender.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter Judgment in their favor and against Defendants on all claims as follows:

a. Enter a declaratory judgment that the actions of Defendants complained of herein, including the enforcement of Puerto Rico's Birth Certificate Policy, are in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and the Free Speech Clause of the First Amendment to the United States Constitution; as well as the Constitution of the Commonwealth of Puerto Rico.

b. Enter a preliminary injunction and permanently enjoin Defendants, their agents, employees, representatives, and successors, and any other person acting directly or indirectly in concert with them, from enforcing Puerto Rico's Birth Certificate Policy, including from refusing to provide birth certificates to transgender nonbinary persons that accurately reflect their sex, consistent with their gender identity;

c. Permanently restrain or enjoin Defendants from relying upon its male-or-female, binary-only gender marker policy;

b. Order Defendants, their agents, employees, representatives, and successors, and any other person acting directly or indirectly in concert with them, to permit transgender nonbinary persons born in Puerto Rico to correct their birth certificates to accurately reflect their true sex, consistent with their gender identity, in accordance with the practice delineated in 24 P.R. Laws Ann. § 1136;

c. Order Defendants to immediately issue corrected birth certificates to Plaintiffs Daniela Arroyo González, Victoria Rodríguez-Roldán, and J.G. accurately reflecting their true sex, consistent with their gender identity, in accordance with the practice delineated in 24 P.R. Laws Ann. § 1136, and without adhering to the practice delineated in 24 P.R. Laws Ann. § 1231 of using a strike-out line to change one's name,

**19**

or otherwise including any information that would disclose a person's transgender status on the face of the birth certificate;

d. Issue a writ of mandamus compelling Defendants to process Plaintiff's Application for Gender Change in Vital Event Certification on an individualized, nondiscriminatory basis;

e. Award Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees; and

f. Grant such other and further relief in favor of Plaintiffs as this Court deems just, equitable and proper.

Submitted, in the city of San Juan, Puerto Rico, this 27th October, 2023.

## CERTIFICATE OF SERVICE

It is hereby certified that true and exact copy of the foregoing will be served on the defendant along with the service papers.

S/ *Johanna M. Emmanuelli Huertas*
JOHANNA M. EMMANUELLI HUERTAS
USDC-PR #210506 Email: jmeh@poalaw.com
94 Calle Ponce, San Juan, PR 00917
Tel.: (787)342-6499

**20**



GOBIERNO DE PUERTO RICO

**EXHIBIT 1**

Departamento de Salud

Entry ID: 6750029

Date Filed: 09/10/2025

Page: 28

Document: 0118338811

Case: 25-1638

**INSTRUCTIONS FOR APPLICANTS RESIDING OUTSIDE PUERTO RICO REQUESTING GENDER CHANGE**

1. Complete the application provided by the Demographic Registry titled APPLICATION FOR GENDER CHANGE IN VITAL EVENT CERTIFICATION.

2. Must submit <u>only one</u> of the following documents:
   - ✓ Driver's license showing change in gender.
   - ✓ Passport showing change in gender.
   - ✓ Certification issued by a health professional or behavior professional who has a Physician-Patient relationship with the applicant. For those professionals practicing in the United States, the Demographic Registry of Puerto will verify they are legally authorized to practice as such.

3. Money order for the amount of $20.00 payable to the Secretary of the Treasury or a $20.00 Internal Revenue Stamp sold by Secretary of Treasury in Puerto Rico.

4. Must submit a copy of a valid ID such as Passport, Driver's License or Non-driver's ID from any state or U.S. territory.

5. In order to obtain a copy of new birth certification the applicant must submit the APPLICATION FOR PUERTO RICO BIRTH CERTIFICATION, which has to be completed in all its parts. All certifications requested by the applicant must include their corresponding payment. For more information please follow the instructions within the application.



**APPLICATION FOR GENDER CHANGE IN VITAL EVENT CERTIFICATION**

Please complete all the information requested below.

**Part A: Applicant Information**

Must submit <u>only one</u> of the following documents:

- Driver's license showing change in gender.
- Passport showing change in gender.
- Certification issued by a health professional or behavior professional who has a Physician-Patient relationship with the applicant. For those professionals practicing in the United States, the Demographic Registry of Puerto will verify they are legally authorized to practice as such. (Part B of this document)

If the applicant can't provide one of the documents listed above, a health professional or behavior professional must complete Part B of this form.

_____   _____   _____   _____
Name            Initial       First Last Name        Second Last Name

_____
Identification number- must be the same presented

_____   _____
_____   _____
_____   _____
Physical Address        Mailing Address

By this means, I request the issuance of my birth certification with the gender selection below:

◯ Female    ◯ Male

Therefore, I, _____, under penalty of perjury, certify; this request obeys exclusively to my interest that my birth certificate issued to me by the Demographic Registry, be in accordance with the gender with which I identify myself. So, I declare this request is not made with the intention of defrauding or committing any illegal act.

_____       _____
Signature of the applicant            Date (mm/dd/yy)

**Part B: Information of the Clinical Professional who Evaluated the Applicant**

_____   _____   _____
Name of the Clinical Professional     Initial       Last Names

_____
Title of clinical evaluator (Psychologist, Clinical Therapist, Social Worker, Physician or Clinical Counselor)
Phone Number _____

_____   _____
_____   _____
Physical Address        Mailing Address

For all relevant purposes and based on my professional opinion, I certify that the gender identity for the person named above is:

◯ Female    ◯ Male

And that it can be expected that this will continue to be the gender identification of the applicant in the future. I certify under penalty of perjury that the information provided is true and real.

_____   _____   _____
Signature of the Clinical Professional   Professional License   NO.    Date (mm/dd/yy)

Warning: All information and / or statements provided in this vital event request will be subject to verification. Any false representation, conscious omission or false information may be grounds for disqualification to issue this certification. It may also be criminally prosecuted by Articles 211, 213 to 217, 271, 272, 275 of the Penal Code of Puerto Rico, Act No. 146 of 2012, as amended.
Rev. 01/2019

**22**

GOBIERNO DE PUERTO RICO

Departamento de Salud

PUERTO RICO DEPARTMENT OF HEALTH
DEMOGRAPHIC REGISTRY

APPPLICATION FOR PUERTO RICO BIRTH CERTITIFICATION

M RD 225
Revised 02/ 2019

## PART I: REGISTRANT INFORMATION

1.Full Name:

| Last Name | Mother's Last Name | First Name | Middle Name |

2.Date of Birth: (mm/dd/yyyy)                3.Place of Birth: (Country)

4.Father's Name:                5.Mother's Name:

6.Purpose:                7.Number of Copies

## PART II: APPLICANT INFORMATION

1.Full Name:
( A person ordering his or her own certification should enter "SELF" in this space.)

2. RELATIONSHIP TO PERSON LISTED ABOVE ( PART:1)

| Last Name | First Name | Middle Name |

3.Mailing Address: (Address where you will receive the document)

Address 1:

Address 2:
    City    State    Zip Code

4.Contact Information:

Telephone:

Email:

5.Include ID:

☐ Driver's License        ☐ Passport
☐ State ID        ☐ Others

6.Requester Signature:

7. Date

### IMPORTANT INFORMATION OBTAINING A BIRTH CERTIFICATION:

**Who can obtain a copy?**
- Registered person with 18 years or older
- Parents of the registered person
- Children of the registered person (must be 18 years or older, if not born in Puerto Rico must submit a copy of their birth certificate to validate kinship)
- Legal guardian appointed by the court house (must submit copy of judicial order)

**Cost of Certificate**
- In order to minimize the unlawful use of a privileged document which has facilitated criminal behavior such as identity theft and fraud each registered person has a limit of 3 copies within a 12 month period which is counted from the first form time requested.
- First copy within the 12 month period will have a cost of $7.00. The second and third copy within that same 12 month period will have a cost of $12.00 (both amounts already include the $2.00 service charge per copy)
- **Applicants over 60 years of age residing in Puerto Rico:** first copy within the 12 month period will be of no cost (free). The second and third copy within the same 12 month period will have a cost of $12.00 (service charge is already included per copy)
- **Veterans residing in Puerto Rico:** first copy within the 12 month period will be of no cost (free). The second and third copy within the same 12 month period will have a cost of $12.00 (service charge is already included per copy). **Form DD-214** must be included (Circular letter number OPVELA-2015-02)

**Acceptable payment methods**
- Money Order payable to the **SECRETARY OF TREASURE.** Other forms of payment will not be accepted. <u>DO NOT SEND cash nor personal checks.</u>
- The applicant must send the exact amount of money to cover the cost of the certification and service charges. All requests require a search in our data base therefore fees are non-refundable.
- If record is not found a certified *Not Found Statement* will be issued.

**Acceptable forms of identification (include copy on both sides)**
- All identifications must be unexpired and must include the applicant's signature
- If you use your married last name in your ID please provide a copy of your marriage certificate to confirm the maiden name
- Driver's License from any state or U.S. territory
- Passport
- Non-driver's ID from any state or U.S. territory

**SHIPPING INSTRUCTIONS**
- Please include a stamped pre-addressed envelope
- Postal Address: **Registro Demográfico**
    **PO Box 11854**
    **Fernández Juncos Station San Juan, Puerto Rico 00910**

For additional information or questions, please call at: *(787) 765-2929 Ext. 6100* or email: *regdem@salud.pr.gov*

**23**

**EXHIBIT 2**



30 de junio de 2023



Lcda. Wanda I. Llovet
Directora Registro Demográfico de Puerto Rico
Departamento de Salud de Puerto Rico
Edificio Metro Center, Urb. Pérez Morris
Calle Mayagüez #5, Esquina Calle Cidra
San Juan, Puerto Rico 00917

**A la mano**

Estimada Lcda. Llovet:

Para cumplir con la decisión emitida en el caso <u>Arroyo González v Rosselló</u>, 305 F. Supp.3d 327 (D.P.R. 2018), en julio del 2018 el Registro Demográfico que usted dirige emitió la Carta Circular Núm. 3-18. A tenor con las instrucciones de la Jueza Cerezo y con el estado legal del momento, el Registro Demográfico enmendó sus políticas y emitió un formulario de solicitud para cambio de género, mediante el que se permite el cambio de sexo/género que aparece en el Registro si la persona presenta los siguientes documentos: 1) un pasaporte, o 2) un certificado de nacimiento con el género con el cual se identifica o, a falta de estos, 3) una certificación emitida por un profesional de la salud. Según la Jueza Cerezo, su determinación se basó en los principios de derecho aplicables, el formulario para cambio de sexo/género del DTOP ya en uso, y las prácticas en otros estados y por el Departamento de Estado de EE.UU.

A pesar de que el Registro Demográfico ha permitido el cambio de sexo/género desde el 2018, la agencia se ha mantenido en el binario de femenino/masculino y no ha sido proactiva en incorporar la alternativa "X" para las personas intersexo o de género no conforme que ya desde el 2021 es parte del formulario para solicitar pasaporte en el Departamento de Estado de EE.UU. Esto significa que, a partir del año pasado, ciudadanas puertorriqueñes tienen un pasaporte que les exime de encasillarse en el binario F/M.

Esta omisión del Registro no solo viola la política pública de Puerto Rico, sino que crea una situación anómala para aquellas personas que completen la solicitud de cambio de género del Registro y presenten sus pasaportes con género X, ya que esa alternativa no aparece en el formulario que tienen que llenar para consignar su cambio. Por

---

Amnistía Internacional Sección Puerto Rico • Calle Humacao #994 - 1A Río Piedras, PR 00925 • (787) 763 – 8318
www.amnistiapr.org



**24**

# Exhibit 3

**From:** Liza Gallardo   zaga ardo@amn st apr.org
**Subject:** Re: Respuesta de Departamento de Sa ud- Reg stro Demográfico
**Date:** September 11, 2023 at 6:05 PM
**To:** Johanna Emmanue   jmeh2010@gma .com, Johanna Emmanue   jmeh@mac.com, johanna.emmanue  huertas@upr.edu,
naru.de afuente@gma .com, Ange  Gabr e  correo.ange .gabr e @gma .com, Margar ta Mora  es  march.mora es15@gma .com,
D versxs AIPuertoR co  d versxs@amn st apr.org

LG

---

**Liza Gallardo** <lizagallardo@amnistiapr.org>                         5 53 PM (11 minutes ago)

to Wanda, Agnes, Miguel, Ramon   ▼

Saludos,
Confiada que se encuentra bien. Agradecemos su respuesta. Estaremos en comunicación para próximos pasos.
Atentamente,
Liza Gallardo Martín

On Fri, Sep 8, 2023 at 9:51 AM Wanda Llovet Díaz <WLlovet@salud.pr.gov> wrote:

Saludos y mis escusas por no haberle respondido antes sobre la respuesta a nuestra consulta sobre cambio de género en los certificados de nacimiento para añadirle
la alternativa X por parte de los asesores legales del Departamento de Salud. En la respuesta a nuestra consulta, el pasado 21 de agosto de 2023, se nos respondió
que ni la Asamblea Legislativa ni la reciente jurisprudencia se han expresado sobre esos efectos.

Aunque el Departamento de Salud entiende la importancia de que las personas no binarias tengan métodos para poder sentirse identificados, no obstante, el Registro
Demográfico se ve imposibilitado en este momento, de acceder a incluir como alternativa para el cambio de género la X.

Sin otro particular.

Gracias,

## Wanda del C. Llovet Díaz

Directora Ejecutiva

Registro Demográfico

Departamento de Salud

(787) 765-2929 Exts. 6103,6104,6106 y 6129

Edificio Metro Center Calle Mayaguez #5 Esquina Cidra

San Juan, Puerto Rico 00917



**25**

Greetings,
I trust that you are well. We thank you for your answer. We will be in touch for next steps.
Sincerely,
Liza Gallardo Martín

Greetings and my apologies for not having answered before regarding the response to our consultation about change of gender in the birth certificates to add the X alternative from the legal advisors of the Department of Health. In the response to our consultation, on this past August 21 of 2023, it was stated to us that neither the Legislature nor the recent jurisprudence has addressed it.

Even though the Department of Health understands the importance of nonbinary people having ways to be able to feel identified, nevertheless, the Demographic Registry finds itself unable at this moment, to agree to include the X as an alternative for the change of gender.

With nothing further.

Thanks,

**26**

CERTIFICATE OF ACCURACY OF TRANSLATION

I, G. D. Prosper-Sánchez, certify that I have prepared this translation, and that it is a true, accurate and complete translation of the original text in Spanish that was provided to me.

I am a translator who, having approved Phase 1 of the FCICE, is in compliance with Rule 5 (c) (2). I also have a Ph. D. in Hispanic Linguistics.

_____
G. D. Prosper-Sánchez, Ph. D.
gdprospersanchez@gmail.com

October 24, 2023

**27**

**EXHIBIT 4**

STATEMENT UNDER PENALTY OF PERJURY

I, Ínaru Nadia de la Fuente Díaz, of legal age, provide the following certification:

1. My legal name is Ínaru Nadia de la Fuente Díaz.

2. I am a resident of San Juan, Puerto Rico.

3. At present, I work and study.

4. My gender identity is non-binary.

5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.

6. At present I have a US passport.

7. My US passport identifies my gender as X.

8. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Ínaru Nadia de la Fuente Díaz, et. al. v Pedro Pierluisi, et. al.

_____

Ínaru Nadia de la Fuente Díaz

___October 15th, 2023_____

Date of Signature

**28**

STATEMENT UNDER PENALTY OF PERJURY        **EXHIBIT 5**

Entry ID: 6750029    Date Filed: 09/10/2025    Page: 36    Document: 00118338811    Case: 25-1638

I, Maru Rosa, of legal age, provide the following certification:

1. My legal name is Soanely, but I identify as Maru.
2. I am a resident of San Juan.
3. At present, I work.
4. My gender identity is non-binary.
5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.
6. At present I have/do not have a US passport.
7. When I finally request my US passport, I will identify my gender as X.
8. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Inaru Nadia de la Fuente Díaz, et. al. v Pedro Pierluisi, et. al.

Maru Rosa

Oct/12/23

**29**

**EXHIBIT 6**

STATEMENT UNDER PENALTY OF PERJURY

I, <u>André Rodil Rivera</u>, of legal age, provide the following certification:

1. My legal name is <u>Paola A. Rodil Rivera</u>, but I identify as <u>André Rodil Rivera</u>.

2. I am a resident of <u>San Juan, PR</u>.

3. At present, I work and study

4. My gender identity is non-binary.

5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.

6. At present I have a US passport.

7. My US passport identifies my gender as F.

8. When I finally renew my US passport, I will identify my gender as X.

9. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Ínaru Nadia de la Fuente Díaz, et. al. v Pedro Pierluisi, et. al.


André Rodil Rivera]


16 oct 2023
_____

[Fecha]

**EXHIBIT 7**

STATEMENT UNDER PENALTY OF PERJURY

I, <u>Yeivy Vélez Bartolomei</u>, of legal age, provide the following certification:

1. My legal name is <u>José Gabriel Vélez Bartolomei</u>, but I identify as <u>Yeivy Vélez Bartolomei</u>.

2. I am a resident of <u>San Juan, Puerto Rico</u>.

3. At present, I work.

4. My gender identity is non-binary.

5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.

6. At present I have a US passport.

7. My US passport identifies my gender as M.

8. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Ínaru Nadia de la Fuente Díaz, et. al. v Pedro Pierluisi, et. al.

<u>Yeivy Vélez Bartolomei</u>

[Nombre]

<u>16/octubre/2023</u>

[Fecha]

**31**

**EXHIBIT 8**

STATEMENT UNDER PENALTY OF PERJURY

I, Gé Areidawani Castro Cruz, of legal age, provide the following certification:

1. My legal name is Génesis Mariangelys Castro Cruz, but I identify as Gé Areidawani Yaha Castro Cruz.
2. I am a resident of San Juan, Puerto Rico_.
3. At present, I work as a bartender.
4. My gender identity is non-binary.
5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.
6. At present I have a US passport; and the gender marked is F; which I don't identify with.
7. When I finally request my US passport, I will identify my gender as X.
8. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Ínaru Nadia de la Fuente Díaz, et. al. v Pedro Pierluisi, et. al.

Gé Areidawani Castro Cruz

16/octubre/2023

**32**

**EXHIBIT 9**

Entry ID: 6750029    Date Filed: 09/10/2025    Page: 40    Document: 0118338811    Case: 25-1638

## STATEMENT UNDER PENALTY OF PERJURY

I, Denise Joan Salas Pitre (Chosen name: Deni Juste), of legal age, provide the following certification:

1.  My legal name is Denise Joan Salas Pitre, but I identify as Deni Juste.

2.  I am a resident of Moca, Puerto Rico.

3.  At present, I work as a teacher.

4.  My gender identity is non-binary.

5.  I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.

6.  At present I do not have a US passport.

7.  When I finally request my US passport, I will identify my gender as X.

8.  I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Ínaru Nadia de la Fuente Díaz, et. al. v Pedro Pierluisi, et. al.

Deni Juste (Legal name: Denise Joan Salas Pitre)

October 13th, 2023

**33**

# UNITED STATES DISTRICT COURT

for the

District of Puerto Rico

| | | |
|---|---|---|
| Ínaru Nadia de la Fuente Díaz, Maru Rosa Hernández, André Rodil, Yeivy Vélez Bartolomei, Gé Castro Cruz, Deni Juste | ) ) ) ) | |
| _Plaintiff(s)_ | ) ) | |
| v. | ) ) | Civil Action No. |
| Pedro Pierluisi, Governor of the Commonwealth of Puerto Rico; Dr. Carlos R. Mellado López, Secretary of the Department of Health; Wanda Llovet, Director the Division of Demographic Registry and Vital Statist | ) ) ) ) ) | |
| _Defendant(s)_ | ) | |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_

> Pedro Pierluisi
> Governor Commonwealth of Puerto Rico
> La Fortaleza
>
> Through: Domingo Emanuelli Hernández
> Secretary of Justice, Calle Teniente César González 677 Esq. Ave. Piñero

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Johanna Emmanuelli Huertas
> 94 Calle Ponce
> San Juan, PR   00917
> 787-342-6499
> jmeh@poalaw.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_Ada I. García Rivera, Esq., CPA_
_CLERK OF COURT_

Date: _____          _____

_Signature of Clerk or Deputy Clerk_

**34**

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

**35**

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Puerto Rico

| | |
|---|---|
| Ínaru Nadia de la Fuente Díaz, Maru Rosa Hernández, André Rodil, Yeivy Vélez Bartolomei, Gé Castro Cruz, Deni Juste<br><br>*Plaintiff(s)*<br><br>v.<br><br>Pedro Pierluisi, Governor of the Commonwealth of Puerto Rico; Dr. Carlos R. Mellado López, Secretary of the Department of Health; Wanda Llovet, Director the Division of Demographic Registry and Vital Statist<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> Pedro Pierluisi
> Governor Commonwealth of Puerto Rico
> La Fortaleza
>
> Through: Domingo Emanuelli Hernández
> Secretary of Justice, Calle Teniente César González 677 Esq. Ave. Piñero

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Johanna Emmanuelli Huertas
> 94 Calle Ponce
> San Juan, PR   00917
> 787-342-6499
> jmeh@poalaw.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*Ada I. García Rivera, Esq., CPA*
*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

**36**

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .


I declare under penalty of perjury that this information is true.


Date: _____                                   _____
                                                              *Server's signature*

                                                         _____
                                                              *Printed name and title*


                                                         _____
                                                              *Server's address*

Additional information regarding attempted service, etc:

**37**

# UNITED STATES DISTRICT COURT

for the

District of Puerto Rico

| | |
|---|---|
| Ínaru Nadia de la Fuente Díaz, Maru Rosa Hernández, André Rodil, Yeivy Vélez Bartolomei, Gé Castro Cruz, Deni Juste <br><br> _Plaintiff(s)_ <br><br> v. <br><br> Pedro Pierluisi, Governor of the Commonwealth of Puerto Rico; Dr. Carlos R. Mellado López, Secretary of the Department of Health; Wanda Llovet, Director the Division of Demographic Registry and Vital Statist <br> _Defendant(s)_ | ) ) ) ) ) ) ) Civil Action No. ) ) ) ) ) ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> Pedro Pierluisi
> Governor Commonwealth of Puerto Rico
> La Fortaleza
>
> Through: Domingo Emanuelli Hernández
> Secretary of Justice, Calle Teniente César González 677 Esq. Ave. Piñero

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Johanna Emmanuelli Huertas
> 94 Calle Ponce
> San Juan, PR   00917
> 787-342-6499
> jmeh@poalaw.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*Ada I. García Rivera, Esq., CPA*
*CLERK OF COURT*

Date: _____          _____
                                                                              *Signature of Clerk or Deputy Clerk*

**38**

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

**39**

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Iñaru Nadia de la Fuente Díaz, Maru Rosa Hernández, André Rodil, Yeivy Vélez Bartolomei, Gé Castro Cruz, Deni Juste | Pedro Pierluisi, Governor of the Commonwealth of Puerto Rico; Dr. Carlos R. Mellado López, Secretary of the Department of Health; Wanda Llovet, Director the Division of Demographic Registry and Vital |

**(b)** County of Residence of First Listed Plaintiff    Puerto Rico
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Puerto Rico
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Johanna Emmanuelli Huertas, 94 Calle Ponce, San Juan, PR 00917
[787-342-6499] jmeh@poalaw.com

Attorneys *(If Known)*
Secretary of Justice, Domingo Emmanuelli

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
*(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| (Excludes Veterans) | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | Exchange |
| | | | ☐ 791 Employee Retirement Income Security Act | | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from Another District *(specify)*    ☐ 6 Multidistrict Litigation - Transfer    ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983

Brief description of cause:
Due process and First Amendment violations

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 0.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE
10/26/2023

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**40**

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

---

## CATEGORY SHEET

---

**You must accompany your complaint with this Category Sheet, and the Civil Cover Sheet (JS-44).**

---

Attorney Name (Last, First, MI):     Emmanuelli Huertas, Johanna M

USDC-PR Bar Number:     210506

Email Address:     jmeh@poalaw.com

---

1.    Title (caption) of the Case (provide only the names of the <u>first</u> party on <u>each</u> side):

    Plaintiff:     Ínaru Nadia de la Fuente Díaz

    Defendant:     Pedro Pierluisi

2.    Indicate the category to which this case belongs:

    ☒ Ordinary Civil Case
    ☐ Social Security
    ☐ Banking
    ☐ Injunction

3.    Indicate the title and number of related cases (if any).

4.    Has a prior action between the same parties and based on the same claim ever been filed before this Court?

    ☐ Yes
    ☒ No

5.    Is this case required to be heard and determined by a district court of three judges pursuant to 28 U.S.C. § 2284?

    ☐ Yes
    ☒ No

6.    Does this case question the constitutionality of a state statute?  (See, Fed.R.Civ. P. 24)

    ☐ Yes
    ☒ No

Date Submitted:     10/27/23

rev. Dec. 2009

[ Print Form ]     [ Reset Form ]

**42**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Ínaru Nadia de la Fuente Díaz, Maru Rosa Hernández, André Rodil, Yeivy Vélez Bartolomei, Gé Castro Cruz, Deni Juste<br>*Plaintiffs*<br><br>vs<br><br>Pedro Pierluisi, in his official capacity as Governor of the Commonwealth of Puerto Rico; Dr. Carlos R. Mellado López, in his official capacity as Secretary of the Department of Health of the Commonwealth; Wanda Llovet Díaz, in her official capacity as the Director of the Division of Demographic Registry and Vital Statistics of the Commonwealth<br>*Defendants* | Civil No.    23-1544<br><br>COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEFS |

## MOTION TO REQUEST THE ENTRY OF A PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT THEREOF

**TO THE HONORABLE COURT:**

**COME NOW** plaintiffs, through the undersigned attorneys and very respectfully **SETS FORTH** and **PRAYS**:

### I.    INTRODUCTION

On this same date plaintiffs have filed a complaint challenging the constitutionality of the Vital Statistics Registry' policy of denying nonbinary individuals a specific marker to identify their identity.

**43**

# II.    DISCUSSION

**A) APPLICABLE LEGAL STANDARD**

The appearing parties seek to redress a Fourteenth and First Amendment violation pursuant to 42 U.S.C. § 1983.   It is hornbook law that "Section 1983 **provides for injunctive relief** and the recovery of damages against individuals and governmental entities that deprive a plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States".   *Santos Serrano v. Laboy Alvarado*, 169 F. Supp.2d 14, 16 (D.P.R. 2001) (emphasis added).   Of course, where -as here- the public officer would otherwise enjoy immunity under the Eleventh Amendment, only prospective injunctive relief may be issued.   *Edelman v. Jordan*, 415 U.S. 651, 677 (1974) ("Though a § 1983 action may be instituted by public aid recipients such as respondent, a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief").

A plaintiff may not obtain a preliminary injunction unless it is established by a preponderance of the evidence that "(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest".   *Corporate Technologies, Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013).   Needless to say, we are cognizant that a preliminary injunction hearing is required by Rule 65 of the Federal Rules of Civil Procedure.   Having said this, **to the extent that we expect defendant to stipulate to the content of their own official documents, it may be that the matter is susceptible to adjudication on the papers**.   This, of course, is the Court's call to make.

**44**

We now discuss each of the aforementioned elements to show how they are met in this case.

**B) LIKELIHOOD OF SUCCESS**

It bears noting that, of all of the preliminary injunction factors "[l]ikelihood of success is the main bearing wall of the four-factor framework". *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996); see also *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity"). We now discuss the reasons why there is a strong likelihood that this Honorable Court will side with the plaintiffs on the merits of their claims.

The United States Constitution as well as the Commonwealth's guarantees all persons equal dignity, the equal protection of the laws, fundamental rights of liberty and privacy, freedom of expression, and freedom from compelled speech. Those constitutional guarantees protect personal decisions central to individual dignity and personal autonomy, including intimate decisions that define personal identity, such as a person's gender identity. When describing the importance of the right to freedom of speech that is secured by the First Amendment, Justice Cardozo observed that said right "is the matrix, the indispensable condition, of nearly every other form of freedom". *Palko v. Connecticut*, 302 U.S. 319, 327 (1937). Regarding the right to privacy, the Supreme Court recognizes that "a constitutional right to privacy is now well established." *Daury v. Smith*, 842 F.2d 9, 13 (1st Cir. 1988). See also *Fournier v. Reardon*, 160 F.3d 754, 758 (1st Cir. 1998) (stating that the constitutional right to privacy is deemed fundamental). protecting

**45**

the integrity of information that is highly personal and intimate, which includes information that could lead to bodily harm and discriminatory actions.

The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law." *U.S. Const. Amend. XIV*, § 1. Puerto Rico is subject to the Due Process Clause. The Due Process Clause of the Fourteenth Amendment places limitations on state action that deprives individuals of life, liberty, or property. The substantive protections of the Due Process Clause also protect the right of every person to the possession and control of their own person, and to define and express their identity. These protections extend to personal decisions central to individual dignity and personal autonomy, including intimate decisions that define personal identity as a person's gender.

The fundamental protections of an individual's autonomy forbid the state from interfering with the right of a transgender person to self-determination with regard to his or her gender identity and to live in accordance with that identity. Such a decision is among the most intimate imaginable, relating to matters that all people are uniquely positioned to understand and define for themselves. The government's refusal to recognize a person's gender identity not only denies a transgender person equal dignity and respect by undermining, indeed denying, their very identity and existence, but it also authorizes and invites other public and private entities to similarly discriminate and deny recognition.

In 2018, transgendered people obtained an Order from this District Court in case 2017-1557 CCC, which directed the Puerto Rico Division of Demographic Registry and Vital Statistics of the Commonwealth (hereinafter the "Demographic Registry") to change

**46**

the gender that appears in their birth certificates from one gender to another (male or

female). *Arroyo González v Rosselló Nevares*, 305 F. Supp.3d 327 (D.P.R. 2018).

> The Demographic Registry of the Commonwealth of Puerto Rico **SHALL ADOPT** the criteria of the Department of Transportation and Public Work's "Request to Change Transgender Persons' Gender Marker," DTOP-DIS-324 Form, as **the** application form to be submitted by transgenders and which shall be accepted as the first step towards the issuance of their new birth certificates, in compliance with the Court's mandate. *See* Attachment A to the Judgment. The transgender individual shall present the application accompanied by one of the following documents: (1) a passport that reflects a person's true gender, whether female or male, (2) a driver's license that reflects the person's true gender, whether female or male, or (3) a certification issued by a healthcare professional or mental health professional with whom the person has a doctor-patient relationship stating, based on his or her professional opinion, the true gender identity of the applicant, whether female or male, and that it is expected that this will continue to be the gender with which the applicant will identify him or herself in the future. If the applicant has not had any of the documents requested previously issued, a health care professional or mental health professional with whom the applicant has a doctor-patient relationship must certify based on his or her professional opinion that the true gender identity of the applicant is ( ) female or ( ) male and that it is expected that this will continue to be the gender with which the applicant will identify him or herself in the future. *See* Part B of DTOP-DIS-32 Form, which is included as Attachment A to the Judgment.

*Arroyo González*, 305 F. Supp.3d at 334 (emphasis in the original). This decision is final

and binds the Demographic Registry officials to register transgender persons as they

identify themselves.

Nonetheless, the Demographic Registry officials have not realized that this

decision also requires them to register nonbinary people. First, because by recognizing

gender and not external physical organs as the fundamental category that will be

considered by the Registry, it now must recognized that sex and gender are a continuum

beyond the male/female binary and, thus, must cease relying on an inaccurate

assumption that sex is binary. Second, because the exclusion of individuals who are

neither male nor female unless they falsely describe themselves as exclusively male or

**47**

female cannot survive the heightened scrutiny required for sex-based classifications. Third, because the government's refusal to recognize a person's sex not only denies a transgender person equal dignity and respect by undermining, indeed denying, their very identity and existence, but it also authorizes and invites other public and private entities to similarly discriminate and deny recognition. Finally, because the Order instructed that "[t]he transgender individual [...] present the application accompanied by [...]: (1) a passport that reflects a person's true gender [...]", thus recognizing that the U.S. passport is a legally binding document for the Commonwealth. Since following the 2018 decision the U.S. State Department has included nonbinary people and the X marker in the passport, that decision now mandates the Registry to include said symbol in their application for sex change.

### B) IRREPARABLE HARM

The concept of "irreparable harm" in the context of equitable injunctive relief refers to an injury that is not subject to compensation by traditional means such as through monetary compensation. *Ross-Simons of Warwick, Inc.*, 102 F.3d at 18. Precisely that is the type of injury that plaintiffs face.

Shall the Registry's policy be allowed to stand, plaintiffs would lose their most fundamental right: the right to identify themselves freely without unreasonable constraints form the government. In its time-honored dissent in *Olmstead v. United States,* 277 U.S. 438, 478 (1928), Justice Brandeis referred to the right to privacy as "the most comprehensive of rights and the right most valued by civilized men." The concept of human dignity should be one of the cornerstones of our legal system . . .

> Generally, for a society to respect human dignity, the special moral relations between people should be left undisturbed. Government should confine itself to

**48**

making sure that this voluntarism is not abridged, no matter how tempting it might be to use its coercive powers to attain some worthy goal. . .”

Machan, *Human Dignity and the Law,* 26 De Paul L. Rev. 807, 819 (1977).

While the Court may not dispense with the irreparable harm requirement, certain constitutional violations are deemed so fundamental that the government's denial, even for minimal periods of time, constitute irreparable injury, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) [“The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury”]. In *Maine Forest Prod. Council v. Cormier*, 586 F. Supp. 3d 22, 62 (D. Me.), aff'd, 51 F.4th 1 (1st Cir. 2022), the Court recognized that

> [a]lthough constitutional violations are    not    per    se irreparable harm, certain constitutional violations are more likely to bring about irreparable harm, namely “infringements of free speech, association, privacy or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief.” *Vaqueria Tres Monjitas, Inc.*, 587 F.3d at 484 (quoting *Pub. Serv. Co. of N.H. v. W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987)).

## C) BALANCE OF THE HARDSHIPS

This part of the analysis requires to compare and contrast how the movant would be affected by the denial of injunctive relief with how the respondent would be affected if the injunction is issued. *Mercado-Salinas v. Bart Enters. Int'l*, 671 F.3d 12, 19 (1st Cir. 2011). Every executive official of the Commonwealth is required to make an oath to preserve the Constitutions that guide our legal system. To the extent that the Demographic Registry's recognition of nonbinary's persons identity will only result in the enforcement of the Commonwealth of Puerto Rico's (“Commonwealth”) public policy that prohibits discrimination by public agencies and instrumentalities based on gender

**49**

identity [OE-2008-57 of November 14, 2008] and comply with the constitutional mandates, there are no hardships to balance.

**D) PUBLIC INTEREST CONSIDERATIONS**

It is settled law that "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences of employing the extraordinary remedy of injunction". *Weinberger v. Romero-Barceló*, 456 U.S. 305, 312 (1982). This is understandable given the fact that many of the cases in which an injunctive relief is sought involve important government or corporate policy matters that affect many more people than those actually named in the caption of the case. In this case, though, the recognition of nonbinary people in Puerto Rico's birth certificate will only be enforced as to petitioners and any other person [non binary or intersex individuals] who voluntarily requests said designation. Moreover, since it would only mean that this Court is enforcing the Commonwealth's public policy against gender discrimination, the public interest falls on the side of granting the injunctive relief.

**WHEREFORE** it is respectfully requested from this Honorable Court that the relief requested in the foregoing action be hereby **GRANTED**.

**CERTIFICATE OF SERVICE**

It is hereby certified that true and exact copy of the foregoing will be served on the defendant along with the service papers.

In San Juan, Puerto Rico this 27th day of October, 2023.

S/ *Johanna M. Emmanuelli Huertas*
JOHANNA M. EMMANUELLI HUERTAS
USDC-PR #210506 Email: jmeh@poalaw.com
94 Calle Ponce, San Juan, PR 00917
Tel.: (787)342-6499

**50**

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| Ínaru Nadia de la Fuente Díaz, Maru Rosa Hernández, André Rodil, Yeivy Vélez Bartolomei, Gé Castro Cruz, Deni Juste<br>*Plaintiffs*<br><br>vs<br><br>Pedro Pierluisi, in his official capacity as Governor of the Commonwealth of Puerto Rico; Dr. Carlos R. Mellado López, in his official capacity as Secretary of the Department of Health of the Commonwealth; Wanda Llovet Díaz, in her official capacity as the Director of the Division of Demographic Registry and Vital Statistics of the Commonwealth<br>*Defendants* | Civil No. 23-1544 MAJ<br><br><br>COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEFS |

**COMPLAINT**

Come now the above-mentioned plaintiffs, through their undersigned counsel, and respectfully set forth and pray:

**Jurisdiction and Venue**

This Honorable Court has subject matter jurisdiction over the instant case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3), as relief is sought under 42 U.S.C. § 1983 for violation of plaintiffs' rights under the Fourteenth Amendment to the Constitution of the United States of America. The District of Puerto Rico is the proper venue as all parties reside in said judicial district, which is also where all relevant facts took place. 28 U.S.C. § 1391(b). Supplemental jurisdiction is hereby invoked, as allowed by 28 U.S.C. § 1367, for claims arising under the Puerto Rico Constitution.

1

**51**

**Introductory Statement**

1. Plaintiffs are nonbinary persons born in Puerto Rico.

2. Defendants are all officers of the Puerto Rico government who are, in the case of the Governor, the ultimate enforcer of the law, as per Article IV of the Commonwealth's Constitution and, in the case of the remaining defendants, they are in charge of running what is commonly the Demographic Registry, and officially known as the "Vital Statistics Registry", a responsibility which should be carried out, not only in compliance with the statutes and regulations pertaining said institution, but also in a manner that does not contravene plaintiffs' constitutional rights.

3. Individual plaintiffs wish to correct their respective Puerto Rico birth certificates to accurately reflect who they are, consistent with their gender identities.

4. In 2018, transgendered people obtained an Order from this Court in case 2017-1557 CCC, directing the Puerto Rico Division of Demographic Registry and Vital Statistics of the Commonwealth (hereinafter the "Demographic Registry") to change the gender that appears in their birth certificates from one gender to another (male or female). *Arroyo González v Rosselló Nevares*, 305 F. Supp.3d 327 (D.P.R. 2018). As a result, now the Registry has a published protocol by which people who so wish may change their gender marker in their birth certificate. [Instructions for Application for Gender Change in Vital Event Certification, Exhibit 1]

5. Notwithstanding, at that time the Registry did not amend their form to include all gender possibilities; instead, it kept the binary system male/female.

6. That decision was based on plaintiffs' constitutional rights to decisional privacy and informational privacy, as well as the Commonwealth of Puerto Rico's ("Commonwealth") public policy that prohibits discrimination by public agencies and instrumentalities based on gender identity [OE-2008-57 of November 14, 2008].

7. Section 1 of the Bill of Rights set forth in Article II of the Commonwealth's Constitution, provides: "The dignity of the human being is inviolable. All men are equal before the law. No discrimination shall be made on account of race, color, sex, birth, social origin or condition, or political or religious ideas. Both the laws and the system of public education shall embody these principles of essential human equality." Section 19 provides that [t]he foregoing enumeration of rights shall not be construed restrictively nor does it contemplate the exclusion of other rights not specifically mentioned which belong to the people in a democracy."

8. On July 5, 2023, plaintiffs, through Amnistía Internacional Puerto Rico, an organization dedicated to promote equity and justice for humankind, requested in writing an amendment to the Application for Gender Change in Vital Event Certification, so as to include an X option. [Letter, Exhibit 2] On September 8, Secretary Llovet answered through an informal email, denying the request indicating that, lacking a court decision or legislative action, they could not amend the form to include the X marker. [Email from Llovet, Exhibit 3]

9. In the letter to Secretary Llovet, plaintiffs informed that, starting April 11, 2022, the US State Department had recently included the X marker for their passports, as a symbol to reflect their identities as non-binary individuals.

10. To request a change of gender in the Registry, the protocol requires that a person present a passport stating the gender they wish to appear in their birth certificates without requiring any additional documentation, as instructed by Judge Cerezo's order[1]. [See Exhibit 1]

---

[1] The specific order issued by the Court is as follows:

The Demographic Registry of the Commonwealth of Puerto Rico **SHALL ADOPT** the criteria of the Department of Transportation and Public Work's "Request to Change Transgender Persons' Gender Marker," DTOP-DIS-324 Form, as **the** application form to be submitted by transgenders and which shall be accepted as the first step towards the issuance of their new birth certificates, in compliance with the Court's mandate. *See* Attachment A to the Judgment. The transgender individual shall present the application accompanied by one of the following documents: (1) a passport that reflects a person's true gender, whether female or male, (2) a driver's license that reflects the person's true gender, whether female or male, or (3) a certification issued by a healthcare professional or mental health professional with whom the person has a doctor-patient relationship stating, based on his or her professional opinion, the true gender identity of the applicant, whether female or male, and that it is expected that this

**53**

11. The United States Constitution guarantees all persons equal dignity, the equal protection of the laws, fundamental rights of liberty and privacy, freedom of expression, and freedom from compelled speech. Those constitutional guarantees protect personal decisions central to individual dignity and personal autonomy, including intimate decisions that define personal identity, such as a person's gender identity. Puerto Rico's refusal to provide accurate birth certificates to transgender people that are consistent with their gender identity violates these federal constitutional guarantees.

12. There is no compelling, important, or even legitimate governmental justification to support Puerto Rico's refusal to provide nonbinary people with accurate birth certificates matching their gender identity nor is there any remotely cognizable injury or substantial burden attributable to having the official document reflect the reality of who these citizens are.

13. Moreover, it is arbitrary to allow the identification of transgender people while denying the identification of nonbinary people.

**PLAINTIFFS**

13. Ínaru Nadia de la Fuente Díaz is a nonbinary person living in San Juan. They is studying Law at the UPR and is an activist through La Sombrilla Cuir. They have a US passport that identifies they with an X marker as their gender. [Exhibit 4]

14. Maru Rosa Hernández is a nonbinary person living in San Juan. They is currently employed. [Exhibit 5]

15. André Rodil is a nonbinary person living in San Juan, who works and study part time. [Exhibit 6]

---

will continue to be the gender with which the applicant will identify him or herself in the future. If the applicant has not had any of the documents requested previously issued, a health care professional or mental health professional with whom the applicant has a doctor-patient relationship must certify based on his or her professional opinion that the true gender identity of the applicant is ( ) female or ( ) male and that it is expected that this will continue to be the gender with which the applicant will identify him or herself in the future. *See* Part B of DTOP-DIS-32 Form, which is included as Attachment A to the Judgment.

*Arroyo González*, 305 F. Supp.3d at 334 (emphasis in the original)

4

**54**

16. Yelvy Vélez Bartolomei is an nonbinary person living in San Juan. They is currently employed. [Exhibit 7]

17. Gé Castro Cruz is a nonbinary person living in San Juan. They is currently employed. [Exhibit 8]

18. Deni Juste is a nonbinary person living in Moca. They is currently employed. [Exhibit 9]

## DEFENDANTS

17. Defendant Gov. Pedro Pierluisi Urrutia (Gov. Pierluisi) is sued in his official capacity as Governor of the Commonwealth of Puerto Rico. In his capacity as governor, Gov. Pierluisi executes the laws of the Commonwealth, including the Vital Statistics Registry Act of Puerto Rico (hereinafter the "Vital Statistics Registry Act"), and supervises the official conduct of all executive and ministerial officers who implement and enforce the Vital Statistics Registry Act. Gov. Pierluisi has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from living consistently with their gender identity, including correcting the gender marker on their birth certificates. Gov. Pierluisi is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state or territorial law at all times relevant to this Complaint.

18. Defendant Dr. Carlos R. Mellado López ("Secretary Mellado") is sued in his official capacity as Secretary of the Department of Health of the Commonwealth of Puerto Rico. Pursuant to 24 P.R. Laws Ann. § 1231, Secretary Mellado's duties include, among others, "prepar[ing], caus[ing] to be printed, and furnish[ing] to the keepers of the Registers, all books, printed matter and forms to be used for the registration of births […] occurring or taking place in the Commonwealth of Puerto Rico." Further, pursuant to 24 P.R. Laws Ann. § 1231, Secretary Mellado "prepare[s] and distribute[s] such detailed instruction . . . as may be necessary for the uniform application [of the Vital Statistics Registry Act]." Secretary Mellado also supervises and manages the Commonwealth's Director of the Division of Demographic Registry and Vital

Statistics, Defendant Wanda Llovet Díaz. Secretary Mellado ensures compliance in all of these functions with the relevant Commonwealth laws, including those that bar transgender persons born in Puerto Rico from correcting the gender markers on their birth certificates. Secretary Mellado is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state or territorial law at all times relevant to this Complaint.

19. Defendant Wanda Llovet Díaz ("Ms. Llovet") is sued in her official capacity as the Director of the Division of Demographic Registry and Vital Statistics the Commonwealth (hereinafter the "Demographic Registry"). In her official capacity, pursuant to 24 P.R. Laws Ann. § 1071, Ms. Llovet is "in charge of all matters connected with the registration of births, marriages and deaths which may occur or take place in Puerto Rico." Ms. Llovet also ensures compliance in all of these functions with the relevant Commonwealth laws, including those that bar transgender persons born in Puerto Rico from correcting the gender markers on their birth certificates. Ms. Llovet is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state or territorial law at all times relevant to this Complaint.

## STATEMENT OF FACTS

20. Moments after a child is born, the general practice in this country is for a physician to assess visually the newborn's genitalia and assign the newborn's sex as "male" or "female" on that basis. Sex, however, is much more complex.

21. "Humans are socially conditioned to view sex and gender as binary attributes. From the moment we are born—or even before—we are definitively labeled 'boy ' or 'girl'"[2].

---

[2] Amanda Montañez, *Beyond XX and XY: The Extraordinary Complexity of Sex Determination*, SCI. AM., Sept. 2017, 50–51, *available at* https://www.scientificamerican.com/article/beyond-xx-and-xy-the-extraordinary-complexity-of-sex-determination/.

**56**

22. Individuals whose gender identity falls within these traditionally recognized confines of "male" and "female" are "binary." Both cisgender people (those whose gender identity matches the sex they were assigned at birth) and transgender people (those whose gender identity does not match the sex assigned at birth) can have a binary gender of male or female.

23. But hundreds of thousands of Americans have a gender identity that is neither male nor female.[3] " [S]cience points to a much more ambiguous reality … The more we learn about sex and gender, the more these attributes appear to exist on a spectrum."[4]

24. The terms "nonbinary" and "gender-neutral" recognize this reality. Indeed:

    Determination of biological sex is staggeringly complex, involving not only anatomy but an intricate choreography of genetic and chemical factors that unfolds over time. Intersex individuals—those for whom sexual development follows an atypical trajectory—are characterized by a diverse range of conditions … [T]he gender with which a person identifies does not always align with the sex they are assigned at birth, and they may not be wholly male or female.[5]

25. Transgender people are people who have a gender identity (the innate knowledge of own's gender that all people have) that is different from the gender they were assigned at birth. Many transgender people are men or women, that is, their gender identity is male or female. Many other transgender people are nonbinary, that is, their gender identity is neither male nor female. For people who are not male or female, the appropriate gender marker is a gender-neural designation, typically an "X".

---

[3] Andrew R. Flores et al., Williams Institute (UCLA), "How Many Adults Identify as Transgender in the United States" (2016), https://williamsinstitute.law.ucla.edu/wp-content/uploads/How-Many-Adults-Identify-as-Transgender-in-the-United-States.pdf, at 3 (1.4 million, or 0.6%, of U.S. adults identify as transgender); Sandy E. James et al., NAT'L CTR FOR TRANSGENDER EQUALITY, THE REPORT OF THE 2015 U.S. TRANSGENDER SURVEY (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf, at 45 & Fig. 4.2 (hereinafter TRANSGENDER SURVEY) (35% of adult transgender population identifies as nonbinary). Currently, the NAT'L CTR FOR TRANSGENDER EQUALITY is gathering data for their 2022 survey.
[4] Montañez, supra n.2.
[5] Id. (footnote omitted).

26. Nonbinary individuals may or may not use the forms "they/them/their" or other gender-neutral pronouns. They may describe themselves using the term "nonbinary"; use more specific gender-neutral terms such as "agender," "genderqueer," "gender fluid," "Two Spirit," "bigender," "pangender," "gender nonconforming," or "gender variant"; or not identify with any gender at all.[6]

27. "Intersex" means having been born with variations in sex characteristics that do not fit typical definitions for male or female bodies. Of the more than 490,000[7] adults in the U.S. with nonbinary gender identities, most were not born intersex.[8]

28. In fact, at this moment the Demographic Registry does not have a marker to properly identify intersex-born babies, denying both the newborn and their families a viable option to register these births and imposing a binary sex arbitrarily.[9]

29. Gender identity—a person's core internal sense of their own gender—is the primary factor in determining a person's sex. Every person has a gender identity. There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to a person's health and well-being.

---

[6] TRANSGENDER SURVEY, supra n.3, at 44 & Fig. 4.1.

[7] See id. at 45 & Fig. 4.2 (35% of adult transgender population identifies as nonbinary); Flores, supra n.3, at 3 (1.4 million transgender adults in U.S.).

[8] TRANSGENDER SURVEY, supra n.3, at 44 & Fig. 4.1. See also Intersex Soc'y of N. Am., "How Common Is Intersex?", http://www.isna.org/faq/frequency (citing studies: "[A]bout 1 in 1500 to 1 in 2000" children are "born [with] noticeably atypical in terms of genitalia," "[b]ut a lot more people than that are born with subtler forms of sex anatomy variations, some of which won't show up until later in life.").

[9] Courts that have addressed requests of relief from intersex plaintiffs have pointed that "Sexual development in cases of intersex persons makes the gender classification at birth inconclusive. It is at maturity that the gender of such persons, like respondent, is fixed. [...] To him belongs the human right to the pursuit of happiness and of health. Thus, to him should belong the primordial choice of what courses of action to take along the path of his sexual development and maturation https://www.icj.org/wp-content/uploads/2012/07/Republic-of-the-Philippines-v.-Jennifer-Cagandahan-Supreme-Court-of-the-Philippines-Second-Division.pdf

30. The incongruence between a transgender person's gender identity and sex assigned at birth can sometimes be associated with gender dysphoria. Gender dysphoria is a serious medical condition recognized in the *American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders*, Fifth Ed. (2013) ("DSM-V"), and by the other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association.

31. Gender dysphoria refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth. If left untreated, gender dysphoria may result in psychological distress, anxiety, depression, and suicidal ideation or even self-harm.

32. The gender change policy maintained by the US State Department for the last decade —first identifying binary transgenders and, as of 2022 nonbinary transgenders—reflects an understanding that the US Government should identify people not according to preconceived notions about gender but according to their actual gender, that is, the gender that individuals know themselves to be, receive appropriate treatment related to, and are generally known as. This understanding mirrors the medical consensus that when a person's sex-related traits do not all align with their gender identity, the person should be treated in accordance with their gender identity. Beyond reflecting a medical consensus and addressing an important community need, policies that acknowledge people's actual gender best serve government interests in accurately identifying individuals.

33. All the reasons for adopting the policy for transgender women and men also apply to nonbinary people. A consensus among leading medical organizations and experts in transgender health acknowledges that people have a range of gender identities, with male and female only two of many possibilities. See e.g. American Psychological Association, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People* 834 (2015) ("Gender identity is defined as a person's deeply felt, inherent sense of being a girl, woman, or female; a boy, a man, or male; a blend of male or female; or an alternative gender"); *DSM-*

**59**

*V* at 451 ("Gender identity...refers to an individual's identification as male, female or, occasionally, some other category other than male or female").

34. Like for anyone else whose sex-related traits do not all align with their gender identity, the medical consensus is that nonbinary people should be treated in accordance with their gender identity. See Brief of Amici Curiae Am. Acad. Of Pediatrics, Am. Psychiatric Assoc., Am. College of Physicians, and 17 Additional Medical and Mental Health Organizations in Support of Respondent, *Gloucester Cty. School Bd. v. G.G.*, 2017 WL 1057281 The international medical consensus regarding treatment for gender dysphoria is to assist the patient to live in accordance with his or her gender identity, thus alleviating the distress. Research has demonstrated that failing to acknowledge transgender people, including nonbinary people, according to their gender identity can cause significant harms; meanwhile, when transgender people are able to live according to their gender identity, their health, safety, and wellbeing is substantially improved. See American Medical Association, LGBTQ Change Efforts Issue Brief (2019), https://www.ama-assn.org/system/files/2019-03/transgender-conversion-issue-brief.pdf. In fact, one study found a drastic reduction in suicide attempts for transgender people, including nonbinary transgender people, who had even just one identity document that accurately reflected their gender identity. Greta R. Bauer, et al. "Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada" 15.1 *BMC Pub. Health* 525 (2015).

35. The government's interest in accurately identifying people also supports recognizing people by the gender they know themselves to be and generally express to others. For many nonbinary people, everyone in their personal and professional lives know them as nonbinary. It is for these reasons that twenty one states and the District of Columbia now acknowledge nonbinary genders on driver's licenses[10].

---

[10]**ARKANSAS** Driver Services Instructions, https://transequality.org/sites/default/files/docs/id/AR%20Drivers%20License%20gender%20change%20guidance.pdf; **CALIFORNIA** Gender Recognition Act, SB 179,

**60**

https://leginfo.legislature.ca.gov/faces/billCompareClient.xhtml?bill_id=201720180SB179; See **COLORADO** Department of Revenue, Change your Sex, https://www.colorado.gov/pacific/dmv/change-your-sex; **INDIANA**, See NBC News, Hoosier ally? Pence's home state quietly begins issuing nonbinary IDs (Mar. 12, 2019), https://www.nbcnews.com/feature/nbc-out/hoosier-ally-pence-s-home-state-quietly-begins-issuing-nonbinary-n982106; See **MAINE** Gender Marker Form, https://www1.maine.gov/sos/bmv/forms/GENDER%20DESIGNATION%20FORM.pdf; See **NEVADA** Department of Motor Vehicles, Name Changes, http://www.dmvnv.com/namechange.htm; **MARYLAND**, See SB 196, 2019 Gen. Assemb., Reg. Sess. (Md. 2019) http://mgaleg.maryland.gov/2019RS/bills/sb/sb0196T.pdf; See MN Driver and Vehicle Services Self-Designated Descriptors, **MINNESOTA**, https://dps.mn.gov/divisions/dvs/Pages/self-designated-descriptors.aspx; **OREGON** Driver & Motor Vehicle Services Instructions, https://www.oregon.gov/ODOT/DMV/Pages/driverid/chg_gender_designation.aspx; **VERMONT** DMV Press Release (Mar. 13, 2019), https://dmv.vermont.gov/press-release/new-license-id-will-allow-third-gender-option-starting-this-summer; **DC** Gender Self-Designation Form, https://dmv.dc.gov/sites/default/files/dc/sites/dmv/publication/attachments/DC%20DMV%20Form%20Gender%20S elf-Designation%20English.pdf; **CONNECTICUT**, See Ned, Lamont (January 27, 2020). "Connecticut Governor Lamont Announces DMV Now Including 'Non-Binary' as Gender Option for Driver's Licenses and ID Cards". *Office of the Governor*. Retrieved 4 January 2020; **HAWAII**, See Herreria, Carla (2019-06-27). "Hawaii Adds Third Gender Option For State-Issued IDs". *HuffPost;* **NEW JERSEY**, See Romine, Taylor (April 20, 2021). "New Jersey Adds 'X' Gender Marker on Driver's Licenses and Other State Identification". *CNN*. Retrieved May 16, 2021; **NEW MEXICO**, See https://static1.squarespace.com/static/61b8c0da4a7ea57834ca0af6/t/61e9da0c6191791b2480af81/1642 715677520/Name&GenderChangeNMEng.pdf.

**61**

36. Seventeen states and New York City now acknowledge nonbinary genders on birth certificates[11]; and several municipalities[12] and at least sixteen countries[13] do the same. See https://thehill.com/changing-america/respect/diversity-inclusion/3507206-here-are-the-states-where-you-can-and-cannot-change-your-gender-designation-on-official-documents/

37. After this Court's decision in 2018, the Demographic Registry's policy allows change of gender only for transgendered binary people, but denies it to transgendered nonbinary people. This arbitrary decision in violation to the rights guaranteed by the US and the Commonwealth's Constitutions has caused and will continue to cause distress to plaintiffs and will further discriminatory treatment against them. This unlawful act can and must be stopped by this Court.

---

[11]California Gender Recognition Act, SB 179; https://leginfo.legislature.ca.gov/faces/billCompareClient.xhtml?bill_id=201720180SB179; CT Dept. of Public Health Testimony on Senate Bill 388, (Feb. 25, 2019), https://www.cga.ct.gov/2019/PHdata/Tmy/2019SB-00388-R000225-Department%20of%20Public%20Health-TMY.PDF; Nev. Admin. Code § 440.030, https://www.leg.state.nv.us/Register/RegsReviewed/$R066-16A.pdf; New Jersey Babs Siperstein Law, https://www.njleg.state.nj.us/2018/Bills/A2000/1718_R2.PDF; See SB 20, 2019 Leg., 54th Sess. (N.M. 2019), signed March 2019, https://legiscan.com/NM/text/SB20/id/1978653; Oregon Health Authority House Bill 2673 Information Sheet, https://www.oregon.gov/oha/PH/BIRTHDEATHCERTIFICATES/CHANGEVITALRECORDS/Documents/OHA-2673.pdf; Washington Wash. Admin. Code § 246-490-075 , http://app.leg.wa.gov/WAC/default.aspx?cite=246-490-075; NBC News, Utah among growing number of states issuing gender-neutral IDs, (Mar. 18, 2019), https://www.nbcnews.com/feature/nbc-out/utah-among-growing-number-states-issuing-gender-neutral-ids-n984326; New York City Health Code Article 207, https://www1.nyc.gov/assets/doh/downloads/pdf/notice/2018/noa-amend-article207-section207-05.pdf.
[12]These municipalities include major cities like **CHICAGO**, Elaine Chen, Who Will Benefit From the Chicago Municipal ID?, (Nov. 28, 2017), https://southsideweekly.com/will-benefit-chicago-municipal-id/, **NEW YORK CITY,** , Matthew Rodriguez, New York City Now Has a Third Gender Option on Its ID Cards, (Jan. 15, 2019), https://www.out.com/news-opinion/2019/1/15/new-york-city-offers-third-gender-option-city-issued-idnyc-cards; and **PHILADELPHIA**, A.D. Amorosi, Gender-free municipal ID cards are close to becoming reality in Philly, (Feb. 28, 2019), http://www.epgn.com/news/14312-gender-free-municipal-id-cards-are-close-to-becoming-reality-in-philly.
[13]Countries include Nepal, India, Malta, Denmark, Bangladesh, Australia, New Zealand, Argentina, Austria, Canada, Colombia, Germany, Iceland, Ireland, the Netherlands, Pakistan and Brazil. See https://www.newsweek.com/which-countries-recognize-third-gender-option-passports-1643167. Aaron Macarow, These Eleven Countries are Way Ahead of the US on Trans Issues, (Feb. 9, 2015), https://archive.attn.com/stories/868/transgender-passport-status; Argentina, Westfall, Sammy (22 July 2021). "Argentina rolls out gender-neutral ID", The Washington Post, Brazil, "Justiça da BA publica provimento permitindo a inclusão de gênero "não binário" no Registro Civil". *Arpen Brasil - Saiba Mais* (in Brazilian Portuguese). 2022-05-11; and

## CAUSES OF ACTION
## COUNT I – DEPRIVATION OF EQUAL PROTECTION
## IN VIOLATION OF THE FOURTEENTH AMENDMENT
## OF THE UNITED STATES CONSTITUTION
## 42 U.S.C. § 1983

38. The Fourteenth Amendment to the United States Constitution, enforceable pursuant 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. Puerto Rico is subject to the equal protection guarantee. Simply put, "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike". *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

39. All individuals born in Puerto Rico are equally situated in the sense that the state mandates that a record be created reflecting the basic facts about their lives. Nonetheless, plaintiffs belong to a protected group whose actual gender identity is not accurately memorialized in the official record.

40. Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex—including gender, gender identity, transgender status and nonconformity with sex-based or gender-based stereotypes—as well as discrimination based on transgender status, is presumptively unconstitutional and subject to heightened scrutiny.

41. Puerto Rico's Birth Certificate Policy facially and intentionally discriminates against the Individual Plaintiffs and other transgender persons based on sex-related considerations. The sex that the government lists on a person's birth certificate is a government classification of a person's sex. In the case of transgender individuals, like the Individuals however, this classification reflects a sex contrary to their true sex, as determined by their gender identity, causing harm as a result.

13

**63**

42. Puerto Rico's Birth Certificate Policy treats nonbinary persons differently than cisgender and other transgender persons who are similarly situated.

43. Under Puerto Rico's Birth Certificate Policy, cisgender persons and transgender binary persons can have birth certificates that accurately reflect their sex and that are consistent with their gender identity, but nonbinary persons are deprived of birth certificates that accurately reflect their sex and that are consistent with their gender identity.

44. Because Puerto Rico's Birth Certificate Policy deprives transgender nonbinary persons born in Puerto Rico of their right to equal dignity, liberty, and autonomy by stigmatizing them and branding them as second-class citizens, it denies nonbinary persons born in Puerto Rico of the equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.

45. Moreover, the officers' actions of denying to include the marker X in the birth certificate runs afoul to the instructions given to citizens, where they state that, by identifying with a US passport, the Registry will change the registered sex. If Plaintiff Ínaru Nadia de la Fuente Díaz, in compliance with the Registry's instructions, presents their US Passport with the form to change their registered sex, the Registry would be unable to comply, thus, creating a gap between the reality presented in the passport and the reality presented in the Registry.

46. Accordingly, Defendants are liable for their violation of the Fourteenth Amendment rights of the Individual Plaintiffs under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Puerto Rico's Birth Certificate Policy unconstitutional and enjoining its enforcement.

47. <u>Discrimination Based On Sex</u>. Defendant's Policy discriminates against Plaintiffs on the basis of sex, both facially and as applied, by barring Plaintiffs from obtaining an accurate birth certificate with a gender marker other than "M" (male) or "F" (female). For example, if Plaintiffs wished to change their sex to either male or female, Defendants would have issued Plaintiff a new birth certificate.

**64**

48. Discrimination against an individual who is neither male nor female as such, just like discrimination against a woman as such, is discrimination based on sex. In denying a change in the Registry, P.R. officials relied upon sex-based considerations. Because of the Demographic Registry's rigid sex-based classification, Plaintiffs,  persons who are neither male nor female, are precluded from obtaining birth certificate with a marker that properly indicates Plaintiffs' sex. The same applies to any intersex petitioner who would request a change of their birth certificate to eliminate the sex category imposed to them at birth. On the other hand, if Plaintiffs were intersex but identified as either male or female, Plaintiffs would qualify for and be issued a a corrected document.

49. Defendants' Policy is also impermissibly premised on assumptions, expectations, stereotypes, or norms about the nature of sex as a binary characteristic, either male or female.

50. The Demographic Registry denies nonbinary people from changing their registered sex because they  fail to conform to the sex-based stereotype that individuals are all clearly male or female. That is, the Registry relies on an inaccurate assumption that sex is binary and that individuals cannot fall along (or outside of) a sex continuum, i.e., the false belief that all people are either exclusively men/male or exclusively women/female. This notion, as seen above, is not sustained by modern scientific and medical studies.

51. All sex-based classifications must be supported by an exceedingly persuasive justification and be substantially related to the achievement of that underlying objective.

52. The exclusion of individuals who are neither male nor female unless they falsely describe themselves as exclusively male or female, cannot survive the heightened scrutiny required for sex-based classifications. Indeed, the Policy is not even tailored to further any legitimate interest at all.

53. Discrimination Based On Status As Neither Male Nor Female. On its face, Defendants' Policy denies an accurate birth certificate to the class of United States citizens whose sex is neither male nor female. Thus, in addition to being

**65**

discrimination based on sex, Defendants' Policy also targets people who do not fit in a male or female sex classification as a group.

54. The United States Supreme Court has not yet determined the level of scrutiny applicable for laws that classify persons for adverse treatment based on their status as people who cannot identify as male or female or their status as intersex. At the very least, such classifications must be rationally related to a legitimate government interest. Here, Defendants' Policy lacks even a rational relationship to a legitimate interest.

55. Discrimination Based on Transgender Status Warrants Heightened Scrutiny. Transgender persons have suffered a long history of extreme discrimination in Puerto Rico and across the country, and continue to suffer such discrimination at present.

56. Transgender persons are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender persons have largely been unable to secure explicit local, state, and federal protections to safeguard them against, and provide remedies for, discrimination.

57. A person's transgender status bears no relation to a person's ability to contribute to society.

58. Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

59. Gender identity generally is fixed at an early age and is highly resistant to change through intervention.

60. For the foregoing reasons, discrimination based on gender identity and transgender status is entitled to heightened scrutiny under the equal protection clause of the Fourteenth Amendment, and Plaintiffs are entitled to relief against Defendants on that basis as well.

COUNT II – DEPRIVATION OF DUE PROCESS

IN VIOLATION OF THE FOURTEENTH AMENDMENT

OF THE UNITED STATES CONSTITUTION

42 U.S.C. § 1983

61. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. Puerto Rico is subject to the Due Process Clause.

62. The Due Process Clause of the Fourteenth Amendment places limitations on state action that deprives individuals of life, liberty, or property.

63. The substantive protections of the Due Process Clause [14], as well as other constitutional provisions, give rise to a right to privacy, protecting the integrity of information that is highly personal and intimate, which includes information that could lead to bodily harm upon disclosure.

64. The substantive protections of the Due Process Clause also protect the right of every person to the possession and control of their own person, and to define and express their identity. These protections extend to personal decisions central to individual dignity and personal autonomy, including intimate decisions that define personal identity as a person's sex.

65. The fundamental protections of an individual's autonomy forbid the state from interfering with the right of a transgender person to self-determination with regard to his or her gender identity and to live in accordance with that identity. Such a decision is among the most intimate imaginable, relating to matters that all people are uniquely positioned to understand and define for themselves.

66. The government's refusal to recognize a person's sex not only denies a transgender person equal dignity and respect by undermining, indeed denying, their very

---

[14] The difference between procedural and substantive due process rights is best explained as follows:

As distinguished from its procedural cousin, then, substantive due process inquiry focuses on "what" the government has done, as opposed to "how and when" the government did it. And although the yardstick against which substantive due process violations are measured has been characterized in various ways, we are satisfied that, before a constitutional infringement occurs, state action must *in and of itself* be egregiously unacceptable, outrageous, or conscience-shocking.

*Amsden v. Moran*, 904 F.2d 748, 754 (1st Cir. 1990) (emphasis added)

**67**

identity and existence, but it also authorizes and invites other public and private entities to similarly discriminate and deny recognition.

67. By enforcing Puerto Rico's Birth Certificate Policy, Defendants unduly burden and unconstitutionally interfere with the fundamental right to autonomy in one's person and identity that all transgender persons born in Puerto Rico have.

68. There is no compelling, or even important or legitimate interest in the government to interfere with the rights of transgender persons to self-definition and autonomy in one's person and identity. This being the case, we are before a deprivation of liberty that clearly meets the "shocks the conscience" threshold that has been applied to substantive due process claims.

69. Accordingly, Defendants are liable for their violation of Plaintiffs' Fourteenth Amendment rights under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Puerto Rico's Birth Certificate Policy unconstitutional and enjoining its enforcement.

COUNT III – ABRIDGEMENT OF FREE SPEECH
IN VIOLATION OF THE FIRST AMENDMENT
OF THE UNITED STATES CONSTITUTION
42 U.S.C. § 1983

70. The First Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983 and applicable to the states through the Fourteenth Amendment, provides that a state "shall make no law . . . abridging the freedom of speech." Puerto Rico is subject to the First Amendment.

71. The freedom of speech protected by the First Amendment is multifaceted. The First Amendment prevents the government from prohibiting speech, as well as from telling individuals what they must say. Compelled statements are equally proscribed by the First Amendment. A claim of compelled speech requires speech to which the speaker objects that is compelled by some governmental action.

72. By forcing transgender persons to permanently identify themselves through their birth certificate with a sex that was assigned to them at birth, Puerto Rico's Birth

**68**

Certificate Policy violates the First Amendment by compelling nonbinary individuals to identify with a sex and identity inconsistent with who they are. The Birth Certificate Policy also prevents nonbinary persons from accurately expressing their identity. There is no clearer example of unconstitutional forced speech than that which forces an individual to self-identify as male or female where their sexuality does not conform to that norm.

73. Similarly, by forcing transgender people to disclose through their birth certificate private, sensitive, and personal information about their transgender status, gender identity, or medical condition, Puerto Rico' Birth Certificate Policy violates the First Amendment by compelling transgender persons to disclose private, sensitive, and personal information that they may not want to be publicly known or that may expose them to an invasion of privacy, prejudice, discrimination, harassment, distress, humiliation, and violence.

74. There is no compelling, important, or even legitimate interest in the government compelling transgender persons to identify with a sex and identity that was incorrectly assigned to them at birth, nor is there a compelling, important, or even legitimate interest in the government forcing transgender persons to involuntarily disclose to third parties a conflict in their official documents whenever they present third parties with their inaccurate birth certificates alongside their passport or other official documents.

75. Accordingly, Defendants are liable for their violation of the First Amendment rights of the Individual Plaintiffs under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Puerto Rico's Birth Certificate Policy unconstitutional and enjoining its enforcement.

COUNT IV:
WRIT OF MANDAMUS

76. Plaintiff's claims—as set forth above— are clear and certain.

77. Pursuant to 22 U.S.C. § 211a, the Defendants Mellado has the power to grant and issue birth certificates, and to cause these documents to be granted by those acting under him.

**69**

78. Defendants' duty to adjudicate Plaintiff's birth certificate and issue Plaintiff a birth certificate is nondiscretionary, ministerial, and free from doubt.

79. Plaintiff has exhausted any administrative remedies that may exist, and no other adequate remedy is available to Plaintiffs.

80. Pursuant to 28 U.S.C. § 1361, Plaintiff is entitled to mandamus relief compelling Defendants to process Plaintiffs' application for a birth certificate that accurately reflects Plaintiffs' nonbinary gender.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter Judgment in their favor and against Defendants on all claims as follows:

a. Enter a declaratory judgment that the actions of Defendants complained of herein, including the enforcement of Puerto Rico's Birth Certificate Policy, are in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and the Free Speech Clause of the First Amendment to the United States Constitution; as well as the Constitution of the Commonwealth of Puerto Rico.

b. Enter a preliminary injunction and permanently enjoin Defendants, their agents, employees, representatives, and successors, and any other person acting directly or indirectly in concert with them, from enforcing Puerto Rico's Birth Certificate Policy, including from refusing to provide birth certificates to transgender nonbinary persons that accurately reflect their sex, consistent with their gender identity;

c. Permanently restrain or enjoin Defendants from relying upon its male-or-female, binary-only gender marker policy;

b. Order Defendants, their agents, employees, representatives, and successors, and any other person acting directly or indirectly in concert with them, to permit transgender nonbinary persons born in Puerto Rico to correct their birth certificates to accurately

**70**

reflect their true sex, consistent with their gender identity, in accordance with the practice delineated in 24 P.R. Laws Ann. § 1136;

c.   Order Defendants to immediately issue corrected birth certificates to Plaintiffs Daniela Arroyo González, Victoria Rodríguez-Roldán, and J.G. accurately reflecting their true sex, consistent with their gender identity, in accordance with the practice delineated in 24 P.R. Laws Ann. § 1136, and without adhering to the practice delineated in 24 P.R. Laws Ann. § 1231 of using a strike-out line to change one's name, or otherwise including any information that would disclose a person's transgender status on the face of the birth certificate;

d.   Issue a writ of mandamus compelling Defendants to process Plaintiff's Application for Gender Change in Vital Event Certification on an individualized, nondiscriminatory basis;

e.   Award Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees; and

f.   Grant such other and further relief in favor of Plaintiffs as this Court deems just, equitable and proper.

Submitted, in the city of San Juan, Puerto Rico, this 30th October, 2023.

## CERTIFICATE OF SERVICE

It is hereby certified that true and exact copy of the foregoing will be served on the defendant along with the service papers.

*S/ Johanna M. Emmanuelli Huertas*
JOHANNA M. EMMANUELLI HUERTAS
USDC-PR #210506 Email: jmeh@poalaw.com
94 Calle Ponce, San Juan, PR 00917
Tel.: (787)342-6499

**71**

GOBIERNO DE PUERTO RICO

Departamento de Salud

**INSTRUCTIONS FOR APPLICANTS RESIDING OUTSIDE PUERTO RICO REQUESTING GENDER CHANGE**

1. Complete the application provided by the Demographic Registry titled APPLICATION FOR GENDER CHANGE IN VITAL EVENT CERTIFICATION.

2. Must submit <u>only one</u> of the following documents:
   - ✓ Driver's license showing change in gender.
   - ✓ Passport showing change in gender.
   - ✓ Certification issued by a health professional or behavior professional who has a Physician-Patient relationship with the applicant. For those professionals practicing in the United States, the Demographic Registry of Puerto will verify they are legally authorized to practice as such.

3. Money order for the amount of $20.00 payable to the Secretary of the Treasury or a $20.00 Internal Revenue Stamp sold by Secretary of Treasury in Puerto Rico.

4. Must submit a copy of a valid ID such as Passport, Driver's License or Non-driver's ID from any state or U.S. territory.

5. In order to obtain a copy of new birth certification the applicant must submit the APPLICATION FOR PUERTO RICO BIRTH CERTIFICATION, which has to be completed in all its parts. All certifications requested by the applicant must include their corresponding payment. For more information please follow the instructions within the application.

**72**

**APPLICATION FOR GENDER CHANGE IN VITAL EVENT CERTIFICATION**

Please complete all the information requested below.

## Part A: Applicant Information

Must submit only one of the following documents:

- Driver's license showing change in gender.
- Passport showing change in gender.
- Certification issued by a health professional or behavior professional who has a Physician-Patient relationship with the applicant. For those professionals practicing in the United States, the Demographic Registry of Puerto will verify they are legally authorized to practice as such. (Part B of this document)

If the applicant can't provide one of the documents listed above, a health professional or behavior professional must complete Part B of this form.

| | | | |
|---|---|---|---|
| Name | Initial | First Last Name | Second Last Name |

Identification number- must be the same presented

Physical Address                                    Mailing Address

By this means, I request the issuance of my birth certification with the gender selection below:

○ Female    ○ Male

Therefore, I, _____, under penalty of perjury, certify; this request obeys exclusively to my interest that my birth certificate issued to me by the Demographic Registry, be in accordance with the gender with which I identify myself. So, I declare this request is not made with the intention of defrauding or committing any illegal act.

_____          _____
Signature of the applicant                              Date (mm/dd/yy)

## Part B: Information of the Clinical Professional who Evaluated the Applicant

| | | |
|---|---|---|
| Name of the Clinical Professional | Initial | Last Names |

**Title of clinical evaluator (Psychologist, Clinical Therapist, Social Worker, Physician or Clinical Counselor)**
Phone Number _____

Physical Address                                    Mailing Address

For all relevant purposes and based on my professional opinion, I certify that the gender identity for the person named above is:

○ Female    ○ Male

And that it can be expected that this will continue to be the gender identification of the applicant in the future. I certify under penalty of perjury that the information provided is true and real.

_____  _____  _____
Signature of the Clinical Professional   Professional License   NO.        Date (mm/dd/yy)

Warning: All information and / or statements provided in this vital event request will be subject to verification. Any false representation, conscious omission or false information may be grounds for disqualification to issue this certification. It may also be criminally prosecuted by Articles 211, 213 to 217, 271, 272, 273 of the Penal Code of Puerto Rico, Act No. 146 of 2012, as amended.
Rev. 02/2019

**73**



GOBIERNO DE PUERTO RICO

Departamento de Salud

PUERTO RICO DEPARTMENT OF HEALTH
DEMOGRAPHIC REGISTRY

APPPLICATION FOR PUERTO RICO BIRTH CERTIFITATION

M RD 225
Revised 02/ 2019

## PART I: REGISTRANT INFORMATION

1.Full Name:

| Last Name | Mother's Last Name | First Name | Middle Name |
|---|---|---|---|

| 2.Date of Birth: (mm/dd/yyyy) | 3.Place of Birth: (Country) |
|---|---|

| 4.Father's Name: | 5.Mother's Name: |
|---|---|

| 6.Purpose: | 7.Number of Copies |
|---|---|

## PART II: APPLICANT INFORMATION

1.Full Name:
(A person ordering his or her own certification should enter "SELF" in this space.)

2. RELATIONSHIP TO PERSON LISTED ABOVE ( PART:1)

| Last Name | First Name | Middle Name |
|---|---|---|

| 3.Mailing Address: (Address where you will receive the document) | 4.Contact Information: |
|---|---|
| Address 1: | Telephone: |
| Address 2: | Email: |
| City State Zip Code | |

| 5.Include ID: | 6.Requester Signature: |
|---|---|
| ☐ Driver's License  ☐ Passport | |
| ☐ State ID  ☐ Others | 7. Date |

### IMPORTANT INFORMATION OBTAINING A BIRTH CERTIFICATION:

**Who can obtain a copy?**
- Registered person with 18 years or older
- Parents of the registered person
- Children of the registered person (must be 18 years or older, if not born in Puerto Rico must submit a copy of their birth certificate to validate kinship)
- Legal guardian appointed by the court house (must submit copy of judicial order)

**Cost of Certificate**
- In order to minimize the unlawful use of a privileged document which has facilitated criminal behavior such as identity theft and fraud each registered person has a limit of 3 copies within a 12 month period which is counted from the first time requested.
- First copy within the 12 month period will have a cost of $7.00. The second and third copy within that same 12 month period will have a cost of $12.00 (both amounts already include the $2.00 service charge per copy)
- **Applicants over 60 years of age residing in Puerto Rico:** first copy within the 12 month period will be of no cost (free). The second and third copy within the same 12 month period will have a cost of $12.00 (service charge is already included per copy)
- **Veterans residing in Puerto Rico:** first copy within the 12 month period will be of no cost (free). The second and third copy within the same 12 month period will have a cost of $12.00 (service charge is already included per copy). **Form DD-214** must be included **(Circular letter number OPVELA-2015-02)**

**Acceptable payment methods**
- Money Order payable to the *SECRETARY OF TREASURE.* Other forms of payment will not be accepted. DO NOT SEND cash nor personal checks.
- The applicant must send the exact amount of money to cover the cost of the certification and service charges. All requests require a search in our data base therefore fees are non-refundable.
- If record is not found a certified *Not Found Statement* will be issued.

**Acceptable forms of identification (include copy on both sides)**
- All identifications must be unexpired and must include the applicant's signature
- If you use your married last name in your ID please provide a copy of your marriage certificate to confirm the maiden name
- Driver's License from any state or U.S. territory
- Passport
- Non-driver's ID from any state or U.S. territory

**SHIPPING INSTRUCTIONS**
- Please include a stamped pre-addressed envelope
- **Postal Address: Registro Demográfico**
  **PO Box 11854**
  **Fernández Juncos Station San Juan, Puerto Rico 00910**

For additional information or questions, please call at: *(787) 765-2929 Ext. 6100* or email: *regdem@salud.pr.gov*



30 de junio de 2023

Lcda. Wanda I. Llovet
Directora Registro Demográfico de Puerto Rico
Departamento de Salud de Puerto Rico
Edificio Metro Center, Urb. Pérez Morris
Calle Mayagüez #5, Esquina Calle Cidra
San Juan, Puerto Rico 00917



**A la mano**

Estimada Lcda. Llovet:

Para cumplir con la decisión emitida en el caso <u>Arroyo González v Rosselló</u>, 305 F. Supp.3d 327 (D.P.R. 2018), en julio del 2018 el Registro Demográfico que usted dirige emitió la Carta Circular Núm. 3-18. A tenor con las instrucciones de la Jueza Cerezo y con el estado legal del momento, el Registro Demográfico enmendó sus políticas y emitió un formulario de solicitud para cambio de género, mediante el que se permite el cambio de sexo/género que aparece en el Registro si la persona presenta los siguientes documentos: 1) un pasaporte, o 2) un certificado de nacimiento con el género con el cual se identifica o, a falta de estos, 3) una certificación emitida por un profesional de la salud. Según la Jueza Cerezo, su determinación se basó en los principios de derecho aplicables, el formulario para cambio de sexo/género del DTOP ya en uso, y las prácticas en otros estados y por el Departamento de Estado de EE.UU.

A pesar de que el Registro Demográfico ha permitido el cambio de sexo/género desde el 2018, la agencia se ha mantenido en el binario de femenino/masculino y no ha sido proactiva en incorporar la alternativa "X" para las personas intersexo o de género no conforme que ya desde el 2021 es parte del formulario para solicitar pasaporte en el Departamento de Estado de EE.UU. Esto significa que, a partir del año pasado, ciudadanes puertorriqueñes tienen un pasaporte que les exime de encasillarse en el binario F/M.

Esta omisión del Registro no solo viola la política pública de Puerto Rico, sino que crea una situación anómala para aquellas personas que completen la solicitud de cambio de género del Registro y presenten sus pasaportes con género X, ya que esa alternativa no aparece en el formulario que tienen que llenar para consignar su cambio. Por

---

Amnistía Internacional Sección Puerto Rico • Calle Humacao #994 - 1A Río Piedras, PR 00925 • (787) 763 – 8318
www.amnistiapr.org

Recibido
HDL 5/julio/2023
2:35 p.m.

**From:** Liza Gallardo   zaga ardo@amn st apr.org
**Subject:** Re: Respuesta de Departamento de Sa ud- Reg stro Demográfico
**Date:** September 11, 2023 at 6:05 PM
**To:** Johanna Emmanue   jmeh2010@gma .com, Johanna Emmanue   jmeh@mac.com, johanna.emmanue huertas@upr.edu,
naru de afuente@gma .com, Ange Gabr e correo.ange.gabr e@gma .com, Margar ta Mora es march.mora es15@gma .com,
D versxs AlPuertoR co d versxs@amn st apr.org

---

**Liza Gallardo** <lizagallardo@amnistiapr.org>                                              5 53 PM (11 minutes ago)

to Wanda, Agnes, Miguel, Ramon

Saludos,
Confiada que se encuentra bien. Agradecemos su respuesta. Estaremos en comunicación para próximos pasos.
Atentamente,
Liza Gallardo Martín

On Fri, Sep 8, 2023 at 9:51 AM Wanda Llovet Díaz <WLlovet@salud.pr gov> wrote:

Saludos y mis escusas por no haberle respondido antes sobre la respuesta a nuestra consulta sobre cambio de género en los certificados de nacimiento para añadirle
la alternativa X por parte de los asesores legales del Departamento de Salud. En la respuesta a nuestra consulta, el pasado 21 de agosto de 2023, se nos respondió
que ni la Asamblea Legislativa ni la reciente jurisprudencia se han expresado sobre esos efectos.

Aunque el Departamento de Salud entiende la importancia de que las personas no binarias tengan métodos para poder sentirse identificados, no obstante, el Registro
Demográfico se ve imposibilitado en este momento, de acceder a incluir como alternativa para el cambio de género la X.

Sin otro particular.

Gracias,

## Wanda del C. Llovet Díaz

Directora Ejecutiva

Registro Demográfico

Departamento de Salud

(787) 765-2929 Exts. 6103,6104,6106 y 6129

Edificio Metro Center Calle Mayaguez #5 Esquina Cidra

San Juan, Puerto Rico 00917



**76**

Greetings,
I trust that you are well. We thank you for your answer. We will be in touch for next steps.
Sincerely,
Liza Gallardo Martín

Greetings and my apologies for not having answered before regarding the response to our consultation about change of gender in the birth certificates to add the X alternative from the legal advisors of the Department of Health. In the response to our consultation, on this past August 21 of 2023, it was stated to us that neither the Legislature nor the recent jurisprudence has addressed it.

Even though the Department of Health understands the importance of nonbinary people having ways to be able to feel identified, nevertheless, the Demographic Registry finds itself unable at this moment, to agree to include the X as an alternative for the change of gender.

With nothing further.

Thanks,

CERTIFICATE OF ACCURACY OF TRANSLATION

I, G. D. Prosper-Sánchez, certify that I have prepared this translation, and that it is a true, accurate and complete translation of the original text in Spanish that was provided to me.

I am a translator who, having approved Phase 1 of the FCICE, is in compliance with Rule 5 (c) (2). I also have a Ph. D. in Hispanic Linguistics.

_____
G. D. Prosper-Sánchez, Ph. D.
gdprospersanchez@gmail.com

October 24, 2023

**78**

STATEMENT UNDER PENALTY OF PERJURY

I, Ínaru Nadia de la Fuente Díaz, of legal age, provide the following certification:

1. My legal name is Ínaru Nadia de la Fuente Díaz.

2. I am a resident of San Juan, Puerto Rico.

3. At present, I work and study.

4. My gender identity is non-binary.

5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.

6. At present I have a US passport.

7. My US passport identifies my gender as X.

8. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Ínaru Nadia de la Fuente Díaz, et. al. v Pedro Pierluisi, et. al.

_____

Ínaru Nadia de la Fuente Díaz

_____October 15th, 2023_____

Date of Signature

**79**

STATEMENT UNDER PENALTY OF PERJURY

I, Maru Rosa, of legal age, provide the following certification:

1. My legal name is Soanely, but I identify as Maru.
2. I am a resident of San Juan.
3. At present, I work.
4. My gender identity is non-binary.
5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.
6. At present I have/do not have a  US passport.
7. When I finally request my US passport, I will identify my gender as X.
8. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Inaru Nadia de la Fuente Díaz, et. al. v  Pedro Pierluisi, et. al.

Maru Rosa

Oct/12/23

**80**

STATEMENT UNDER PENALTY OF PERJURY

I,  André Rodil Rivera          , of legal age, provide the following certification:


1. My legal name is     Paola A. Rodil Rivera         , but I identify as   André Rodil Rivera                    .

2. I am a resident of     San Juan, PR         .

3. At present, I work and study

4. My gender identity is non-binary.

5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.

6. At present I have a  US passport.

7.  My US passport identifies my gender as F.

8. When I finally renew my US passport, I will identify my gender as X.

9. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Ínaru Nadia de la Fuente Díaz, et. al. v  Pedro Pierluisi, et. al.



André Rodil Rivera]


**16 oct 2023**
_____

[Fecha]

**81**

STATEMENT UNDER PENALTY OF PERJURY

I, <u>Yeivy Vélez Bartolomei</u>, of legal age, provide the following certification:

1. My legal name is <u>José Gabriel Vélez Bartolomei</u>, but I identify as <u>Yeivy Vélez Bartolomei</u>.

2. I am a resident of <u>San Juan, Puerto Rico</u>.

3. At present, I work.

4. My gender identity is non-binary.

5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.

6. At present I have a US passport.

7. My US passport identifies my gender as M.

8. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Ínaru Nadia de la Fuente Díaz, et. al. v Pedro Pierluisi, et. al.


<u>Yeivy Vélez Bartolomei</u>

[Nombre]


<u>16/octubre/2023</u>

[Fecha]

**82**

STATEMENT UNDER PENALTY OF PERJURY


I, Gé Areidawani Castro Cruz, of legal age, provide the following certification:


1. My legal name is Génesis Mariangelys Castro Cruz, but I identify as Gé Areidawani Yaha Castro Cruz.
2. I am a resident of San Juan, Puerto Rico_.
3. At present, I work as a bartender.
4. My gender identity is non-binary.
5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.
6. At present I have a  US passport; and the gender marked is F; which I don't identify with.
7. When I finally request my US passport, I will identify my gender as X.
8. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Ínaru Nadia de la Fuente Díaz, et. al. v  Pedro Pierluisi, et. al.


_Gé Areidawani Castro Cruz_


16/octubre/2023


**83**

STATEMENT UNDER PENALTY OF PERJURY

I, Denise Joan Salas Pitre (Chosen name: Deni Juste), of legal age, provide the following certification:

1. My legal name is Denise Joan Salas Pitre, but I identify as Deni Juste.

2. I am a resident of Moca, Puerto Rico.

3. At present, I work as a teacher.

4. My gender identity is non-binary.

5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.

6. At present I do not have a US passport.

7. When I finally request my US passport, I will identify my gender as X.

8. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Ínaru Nadia de la Fuente Díaz, et. al. v Pedro Pierluisi, et. al.

_____

Deni Juste (Legal name: Denise Joan Salas Pitre)

October 13th, 2023

**84**

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| Ínaru Nadia de la Fuente Díaz, Maru Rosa Hernández, André Rodil, Yeivy Vélez Bartolomei, Gé Castro Cruz, Deni Juste<br>*Plaintiffs*<br><br>vs<br><br>Pedro Pierluisi, in his official capacity as Governor of the Commonwealth of Puerto Rico; Dr. Carlos R. Mellado López, in his official capacity as Secretary of the Department of Health of the Commonwealth; Wanda Llovet Díaz, in her official capacity as the Director of the Division of Demographic Registry and Vital Statistics of the Commonwealth<br>*Defendants* | Civil No. 23-1544<br><br><br>COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEFS |

**SECOND AMENDED COMPLAINT**

Come now the above-mentioned plaintiffs, through their undersigned counsel, and respectfully set forth and pray:

**Jurisdiction and Venue**

This Honorable Court has subject matter jurisdiction over the instant case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3), as relief is sought under 42 U.S.C. § 1983 for violation of plaintiffs' rights under the Fourteenth Amendment to the Constitution of the United States of America. The District of Puerto Rico is the proper venue as all parties reside in said judicial district, which is also where all relevant facts took place. 28 U.S.C. § 1391(b). Supplemental jurisdiction is hereby invoked, as allowed by 28 U.S.C. § 1367, for claims arising under the Puerto Rico Constitution.

**85**

**Introductory Statement**

1. Plaintiffs are nonbinary persons born in Puerto Rico.

2. Defendants are all officers of the Puerto Rico government who are, in the case of the Governor, the ultimate enforcer of the law, as per Article IV of the Commonwealth's Constitution and, in the case of the remaining defendants, they are in charge of running what is commonly the Demographic Registry, and officially known as the "Vital Statistics Registry", a responsibility which should be carried out, not only in compliance with the statutes and regulations pertaining said institution, but also in a manner that does not contravene plaintiffs' constitutional rights.

3. Individual plaintiffs wish to correct their respective Puerto Rico birth certificates to accurately reflect who they are, consistent with their gender identities.

4. In 2018, transgendered people obtained an Order from this Court in case 2017-1557 CCC, directing the Puerto Rico Division of Demographic Registry and Vital Statistics of the Commonwealth (hereinafter the "Demographic Registry") to change the gender that appears in their birth certificates from one gender to another (male or female). *Arroyo González v Rosselló Nevares*, 305 F. Supp.3d 327 (D.P.R. 2018). As a result, now the Registry has a published protocol by which people who so wish may change their gender marker in their birth certificate. [Instructions for Application for Gender Change in Vital Event Certification, Exhibit 1]

5. Notwithstanding, at that time the Registry did not amend their form to include all gender possibilities; instead, it kept the binary system male/female.

6. That decision was based on plaintiffs' constitutional rights to decisional privacy and informational privacy, as well as the Commonwealth of Puerto Rico's ("Commonwealth") public policy that prohibits discrimination by public agencies and instrumentalities based on gender identity [OE-2008-57 of November 14, 2008].

**86**

7. Section 1 of the Bill of Rights set forth in Article II of the Commonwealth's Constitution, provides: "The dignity of the human being is inviolable. All men are equal before the law. No discrimination shall be made on account of race, color, sex, birth, social origin or condition, or political or religious ideas. Both the laws and the system of public education shall embody these principles of essential human equality." Section 19 provides that [t]he foregoing enumeration of rights shall not be construed restrictively nor does it contemplate the exclusion of other rights not specifically mentioned which belong to the people in a democracy."

8. On July 5, 2023, plaintiffs, through Amnistía Internacional Puerto Rico, an organization dedicated to promote equity and justice for humankind, requested in writing an amendment to the Application for Gender Change in Vital Event Certification, so as to include an X option. [Letter, Exhibit 2] On September 8, Secretary Llovet answered through an informal email, denying the request indicating that, lacking a court decision or legislative action, they could not amend the form to include the X marker. [Email from Llovet, Exhibit 3]

9. In the letter to Secretary Llovet, plaintiffs informed that, starting April 11, 2022, the US State Department had recently included the X marker for their passports, as a symbol to reflect their identities as non-binary individuals.

10. To request a change of gender in the Registry, the protocol requires that a person present a passport stating the gender they wish to appear in their birth certificates without requiring any additional documentation, as instructed by Judge Cerezo's order[1]. [See Exhibit 1]

---

[1] The specific order issued by the Court is as follows:

The Demographic Registry of the Commonwealth of Puerto Rico **SHALL ADOPT** the criteria of the Department of Transportation and Public Work's "Request to Change Transgender Persons' Gender Marker," DTOP-DIS-324 Form, as **the** application form to be submitted by transgenders and which shall be accepted as the first step towards the issuance of their new birth certificates, in compliance with the Court's mandate. *See* Attachment A to the Judgment. The transgender individual shall present the application accompanied by one of the following documents: (1) a passport that reflects a person's true gender, whether female or male, (2) a driver's license that reflects the person's true gender, whether female or male, or (3) a certification issued by a healthcare professional or mental health professional with whom the person has a doctor-patient relationship stating, based on his or her professional opinion, the true gender identity of the applicant, whether female or male, and that it is expected that this

**87**

11. The United States Constitution guarantees all persons equal dignity, the equal protection of the laws, fundamental rights of liberty and privacy, freedom of expression, and freedom from compelled speech. Those constitutional guarantees protect personal decisions central to individual dignity and personal autonomy, including intimate decisions that define personal identity, such as a person's gender identity. Puerto Rico's refusal to provide accurate birth certificates to transgender people that are consistent with their gender identity violates these federal constitutional guarantees.

12. There is no compelling, important, or even legitimate governmental justification to support Puerto Rico's refusal to provide nonbinary people with accurate birth certificates matching their gender identity nor is there any remotely cognizable injury or substantial burden attributable to having the official document reflect the reality of who these citizens are.

13. Moreover, it is arbitrary to allow the identification of transgender people while denying the identification of nonbinary people.

## PLAINTIFFS

13. Ínaru Nadia de la Fuente Díaz is a nonbinary person living in San Juan. They is studying Law at the UPR and is an activist through La Sombrilla Cuir. They have a US passport that identifies they with an X marker as their gender. [Exhibit 4]

14. Maru Rosa Hernández is a nonbinary person living in San Juan. They is currently employed. [Exhibit 5]

15. André Rodil is a nonbinary person living in San Juan, who works and study part time. [Exhibit 6]

---

will continue to be the gender with which the applicant will identify him or herself in the future. If the applicant has not had any of the documents requested previously issued, a health care professional or mental health professional with whom the applicant has a doctor-patient relationship must certify based on his or her professional opinion that the true gender identity of the applicant is ( ) female or ( ) male and that it is expected that this will continue to be the gender with which the applicant will identify him or herself in the future. *See* Part B of DTOP-DIS-32 Form, which is included as Attachment A to the Judgment.

*Arroyo González*, 305 F. Supp.3d at 334 (emphasis in the original)

**88**

16. Yelvy Vélez Bartolomei is an nonbinary person living in San Juan. They is currently employed. [Exhibit 7]

17. Gé Castro Cruz is a nonbinary person living in San Juan. They is currently employed. [Exhibit 8]

18. Deni Juste is a nonbinary person living in Moca. They is currently employed. [Exhibit 9]

**DEFENDANTS**

17. Defendant Gov. Pedro Pierluisi Urrutia (Gov. Pierluisi) is sued in his official capacity as Governor of the Commonwealth of Puerto Rico. In his capacity as governor, Gov. Pierluisi executes the laws of the Commonwealth, including the Vital Statistics Registry Act of Puerto Rico (hereinafter the "Vital Statistics Registry Act"), and supervises the official conduct of all executive and ministerial officers who implement and enforce the Vital Statistics Registry Act. Gov. Pierluisi has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from living consistently with their gender identity, including correcting the gender marker on their birth certificates. Gov. Pierluisi is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state or territorial law at all times relevant to this Complaint.

18. Defendant Dr. Carlos R. Mellado López ("Secretary Mellado") is sued in his official capacity as Secretary of the Department of Health of the Commonwealth of Puerto Rico. Pursuant to 24 P.R. Laws Ann. § 1231, Secretary Mellado's duties include, among others, "prepar[ing], caus[ing] to be printed, and furnish[ing] to the keepers of the Registers, all books, printed matter and forms to be used for the registration of births [...] occurring or taking place in the Commonwealth of Puerto Rico." Further, pursuant to 24 P.R. Laws Ann. § 1231, Secretary Mellado "prepare[s] and distribute[s] such detailed instruction . . . as may be necessary for the uniform application [of the Vital Statistics Registry Act]." Secretary Mellado also supervises and manages the Commonwealth's Director of the Division of Demographic Registry and Vital

Statistics, Defendant Wanda Llovet Díaz.  Secretary Mellado ensures compliance in all of these functions with the relevant Commonwealth laws, including those that bar transgender persons born in Puerto Rico from correcting the gender markers on their birth certificates.  Secretary Mellado is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state or territorial law at all times relevant to this Complaint.

19. Defendant Wanda Llovet Díaz ("Ms. Llovet") is sued in her official capacity as the Director of the Division of Demographic Registry and Vital Statistics of the Commonwealth (hereinafter the "Demographic Registry").  In her official capacity, pursuant to 24 P.R. Laws Ann. § 1071, Ms. Llovet is "in charge of all matters connected with the registration of births, marriages and deaths which may occur or take place in Puerto Rico."  Ms. Llovet also ensures compliance in all of these functions with the relevant Commonwealth laws, including those that bar transgender persons born in Puerto Rico from correcting the gender markers on their birth certificates.  Ms. Llovet is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state or territorial law at all times relevant to this Complaint.

## STATEMENT OF FACTS

20. Moments after a child is born, the general practice in this country is for a physician to assess visually the newborn's genitalia and assign the newborn's sex as "male" or "female" on that basis. Sex, however, is much more complex.

21. "Humans are socially conditioned to view sex and gender as binary attributes. From the moment we are born—or even before—we are definitively labeled 'boy ' or 'girl'"[2].

---

[2] Amanda Montañez, *Beyond XX and XY: The Extraordinary Complexity of Sex Determination*, SCI. AM., Sept. 2017, 50–51, *available at* https://www.scientificamerican.com/article/beyond-xx-and-xy-the-extraordinary-complexity-of-sex-determination/.

**90**

22. Individuals whose gender identity falls within these traditionally recognized confines of "male" and "female" are "binary." Both cisgender people (those whose gender identity matches the sex they were assigned at birth) and transgender people (those whose gender identity does not match the sex assigned at birth) can have a binary gender of male or female.

23. But hundreds of thousands of Americans have a gender identity that is neither male nor female.[3] " [S]cience points to a much more ambiguous reality ... The more we learn about sex and gender, the more these attributes appear to exist on a spectrum."[4]

24. The terms "nonbinary" and "gender-neutral" recognize this reality. Indeed:

> Determination of biological sex is staggeringly complex, involving not only anatomy but an intricate choreography of genetic and chemical factors that unfolds over time. Intersex individuals—those for whom sexual development follows an atypical trajectory—are characterized by a diverse range of conditions ... [T]he gender with which a person identifies does not always align with the sex they are assigned at birth, and they may not be wholly male or female.[5]

25. Transgender people are people who have a gender identity (the innate knowledge of own's gender that all people have) that is different from the gender they were assigned at birth. Many transgender people are men or women, that is, their gender identity is male or female. Many other transgender people are nonbinary, that is, their gender identity is neither male nor female. For people who are not male or female, the appropriate gender marker is a gender-neural designation, typically an "X".

---

[3] Andrew R. Flores et al., Williams Institute (UCLA), "How Many Adults Identify as Transgender in the United States" (2016), https://williamsinstitute.law.ucla.edu/wp-content/uploads/How-Many-Adults-Identify-as-Transgender-in-the-United-States.pdf, at 3 (1.4 million, or 0.6%, of U.S. adults identify as transgender); Sandy E. James et al., NAT'L CTR FOR TRANSGENDER EQUALITY, THE REPORT OF THE 2015 U.S. TRANSGENDER SURVEY (2016),
https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf, at 45 & Fig. 4.2 (hereinafter TRANSGENDER SURVEY) (35% of adult transgender population identifies as nonbinary). Currently, the NAT'L CTR FOR TRANSGENDER EQUALITY is gathering data for their 2022 survey.
[4] Montañez, supra n.2.
[5] Id. (footnote omitted).

26. Nonbinary individuals may or may not use the forms "they/them/their" or other gender-neutral pronouns. They may describe themselves using the term "nonbinary"; use more specific gender-neutral terms such as "agender," "genderqueer," "gender fluid," "Two Spirit," "bigender," "pangender," "gender nonconforming," or "gender variant"; or not identify with any gender at all.[6]

27. "Intersex" means having been born with variations in sex characteristics that do not fit typical definitions for male or female bodies. Of the more than 490,000[7] adults in the U.S. with nonbinary gender identities, most were not born intersex.[8]

28. In fact, at this moment the Demographic Registry does not have a marker to properly identify intersex-born babies, denying both the newborn and their families a viable option to register these births and imposing a binary sex arbitrarily.[9]

29. Gender identity—a person's core internal sense of their own gender—is the primary factor in determining a person's sex. Every person has a gender identity. There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to a person's health and well-being.

---

[6] TRANSGENDER SURVEY, supra n.3, at 44 & Fig. 4.1.

[7] *See id.* at 45 & Fig. 4.2 (35% of adult transgender population identifies as nonbinary); Flores, *supra* n.3, at 3 (1.4 million transgender adults in U.S.).

[8] TRANSGENDER SURVEY, supra n.3, at 44 & Fig. 4.1. See also Intersex Soc'y of
N. Am., "How Common Is Intersex?", http://www.isna.org/faq/frequency (citing studies: "[A]bout 1 in 1500 to 1 in 2000" children are "born [with] noticeably atypical in terms of genitalia," "[b]ut a lot more people than that are born with subtler forms of sex anatomy variations, some of which won't show up until later in life.").

[9] Courts that have addressed requests of relief from intersex plaintiffs have pointed that "Sexual development in cases of intersex persons makes the gender classification at birth inconclusive. It is at maturity that the gender of such persons, like respondent, is fixed. [...] To him belongs the human right to the pursuit of happiness and of health. Thus, to him should belong the primordial choice of what courses of action to take along the path of his sexual development and maturation https://www.icj.org/wp-content/uploads/2012/07/Republic-of-the-Philippines-v.-Jennifer-Cagandahan-Supreme-Court-of-the-Philippines-Second-Division.pdf

**92**

30. The incongruence between a transgender person's gender identity and sex assigned at birth can sometimes be associated with gender dysphoria. Gender dysphoria is a serious medical condition recognized in the *American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders*, Fifth Ed. (2013) ("DSM-V"), and by the other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association.

31. Gender dysphoria refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth. If left untreated, gender dysphoria may result in psychological distress, anxiety, depression, and suicidal ideation or even self-harm.

32. The gender change policy maintained by the US State Department for the last decade —first identifying binary transgenders and, as of 2022 nonbinary transgenders—reflects an understanding that the US Government should identify people not according to preconceived notions about gender but according to their actual gender, that is, the gender that individuals know themselves to be, receive appropriate treatment related to, and are generally known as. This understanding mirrors the medical consensus that when a person's sex-related traits do not all align with their gender identity, the person should be treated in accordance with their gender identity. Beyond reflecting a medical consensus and addressing an important community need, policies that acknowledge people's actual gender best serve government interests in accurately identifying individuals.

33. All the reasons for adopting the policy for transgender women and men also apply to nonbinary people. A consensus among leading medical organizations and experts in transgender health acknowledges that people have a range of gender identities, with male and female only two of many possibilities. See e.g. American Psychological Association, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People* 834 (2015) ("Gender identity is defined as a person's deeply felt, inherent sense of being a girl, woman, or female; a boy, a man, or male; a blend of male or female; or an alternative gender"); *DSM-*

**93**

*V* at 451 ("Gender identity…refers to an individual's identification as male, female or, occasionally, some other category other than male or female").

34. Like for anyone else whose sex-related traits do not all align with their gender identity, the medical consensus is that nonbinary people should be treated in accordance with their gender identity. See Brief of Amici Curiae Am. Acad. Of Pediatrics, Am. Psychiatric Assoc., Am. College of Physicians, and 17 Additional Medical and Mental Health Organizations in Support of Respondent, *Gloucester Cty. School Bd. v. G.G.*, 2017 WL 1057281 The international medical consensus regarding treatment for gender dysphoria is to assist the patient to live in accordance with his or her gender identity, thus alleviating the distress. Research has demonstrated that failing to acknowledge transgender people, including nonbinary people, according to their gender identity can cause significant harms; meanwhile, when transgender people are able to live according to their gender identity, their health, safety, and wellbeing is substantially improved. See American Medical Association, LGBTQ Change Efforts Issue Brief (2019), https://www.ama-assn.org/system/files/2019-03/transgender-conversion-issue-brief.pdf. In fact, one study found a drastic reduction in suicide attempts for transgender people, including nonbinary transgender people, who had even just one identity document that accurately reflected their gender identity. Greta R. Bauer, et al. "Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada" 15.1 *BMC Pub. Health* 525 (2015).

35. The government's interest in accurately identifying people also supports recognizing people by the gender they know themselves to be and generally express to others. For many nonbinary people, everyone in their personal and professional lives know them as nonbinary. It is for these reasons that twenty one states and the District of Columbia now acknowledge nonbinary genders on driver's licenses[10].

---

[10]**ARKANSAS** Driver Services Instructions, https://transequality.org/sites/default/files/docs/id/AR%20Drivers%20License%20gender%20change%20guidance.pdf; **CALIFORNIA** Gender Recognition Act, SB 179,

https://leginfo.legislature.ca.gov/faces/billCompareClient.xhtml?bill_id=201720180SB179; See **COLORADO** Department of Revenue, Change your Sex, https://www.colorado.gov/pacific/dmv/change-your-sex; **INDIANA**, See NBC News, Hoosier ally? Pence's home state quietly begins issuing nonbinary IDs (Mar. 12, 2019), https://www.nbcnews.com/feature/nbc-out/hoosier-ally-pence-s-home-state-quietly-begins-issuing-nonbinary-n982106; See **MAINE** Gender Marker Form, https://www1.maine.gov/sos/bmv/forms/GENDER%20DESIGNATION%20FORM.pdf; See **NEVADA** Department of Motor Vehicles, Name Changes, http://www.dmvnv.com/namechange.htm; **MARYLAND**, See SB 196, 2019 Gen. Assemb., Reg. Sess. (Md. 2019) http://mgaleg.maryland.gov/2019RS/bills/sb/sb0196T.pdf; See MN Driver and Vehicle Services Self-Designated Descriptors, **MINNESOTA**, https://dps.mn.gov/divisions/dvs/Pages/self-designated-descriptors.aspx; **OREGON** Driver & Motor Vehicle Services Instructions, https://www.oregon.gov/ODOT/DMV/Pages/driverid/chg_gender_designation.aspx; **VERMONT** DMV Press Release (Mar. 13, 2019), https://dmv.vermont.gov/press-release/new-license-id-will-allow-third-gender-option-starting-this-summer; **DC** Gender Self-Designation Form, https://dmv.dc.gov/sites/default/files/dc/sites/dmv/publication/attachments/DC%20DMV%20Form%2 0Gender%20S elf-Designation%20English.pdf; **CONNECTICUT**, See Ned, Lamont (January 27, 2020). "Connecticut Governor Lamont Announces DMV Now Including 'Non-Binary' as Gender Option for Driver's Licenses and ID Cards". *Office of the Governor*. Retrieved 4 January 2020; **HAWAII**, See Herreria, Carla (2019-06-27). "Hawaii Adds Third Gender Option For State-Issued IDs". *HuffPost;* **NEW JERSEY**, See Romine, Taylor (April 20, 2021). "New Jersey Adds 'X' Gender Marker on Driver's Licenses and Other State Identification". *CNN*. Retrieved May 16, 2021; **NEW MEXICO**, See https://static1.squarespace.com/static/61b8c0da4a7ea57834ca0af6/t/61e9da0c6191791b2480af81/1642 715677520/Name&GenderChangeNMEng.pdf.

**95**

36. Seventeen states and New York City now acknowledge nonbinary genders on birth certificates[11]; and several municipalities[12] and at least sixteen countries[13] do the same. See https://thehill.com/changing-america/respect/diversity-inclusion/3507206-here-are-the-states-where-you-can-and-cannot-change-your-gender-designation-on-official-documents/

37. After this Court's decision in 2018, the Demographic Registry's policy allows change of gender only for transgendered binary people, but denies it to transgendered nonbinary people. This arbitrary decision in violation to the rights guaranteed by the US and the Commonwealth's Constitutions has caused and will continue to cause distress to plaintiffs and will further discriminatory treatment against them. This unlawful act can and must be stopped by this Court.

---

[11]California Gender Recognition Act, SB 179; https://leginfo.legislature.ca.gov/faces/billCompareClient.xhtml?bill_id=201720180SB179; CT Dept. of Public Health Testimony on Senate Bill 388, (Feb. 25, 2019), https://www.cga.ct.gov/2019/PHdata/Tmy/2019SB-00388-R000225-Department%20of%20Public%20Health-TMY.PDF; Nev. Admin. Code § 440.030, https://www.leg.state.nv.us/Register/RegsReviewed/$R066-16A.pdf; New Jersey Babs Siperstein Law, https://www.njleg.state.nj.us/2018/Bills/A2000/1718_R2.PDF; See SB 20, 2019 Leg., 54th Sess. (N.M. 2019), signed March 2019, https://legiscan.com/NM/text/SB20/id/1978653; Oregon Health Authority House Bill 2673 Information Sheet, https://www.oregon.gov/oha/PH/BIRTHDEATHCERTIFICATES/CHANGEVITALRECORDS/Documents/OHA-2673.pdf; Washington Wash. Admin. Code § 246-490-075 , http://app.leg.wa.gov/WAC/default.aspx?cite=246-490-075; NBC News, Utah among growing number of states issuing gender-neutral IDs, (Mar. 18, 2019), https://www.nbcnews.com/feature/nbc-out/utah-among-growing-number-states-issuing-gender-neutral-ids-n984326; New York City Health Code Article 207, https://www1.nyc.gov/assets/doh/downloads/pdf/notice/2018/noa-amend-article207-section207-05.pdf.
[12]These municipalities include major cities like **CHICAGO**, Elaine Chen, Who Will Benefit From the Chicago Municipal ID?, (Nov. 28, 2017), https://southsideweekly.com/will-benefit-chicago-municipal-id/, **NEW YORK CITY**, , Matthew Rodriguez, New York City Now Has a Third Gender Option on Its ID Cards, (Jan. 15, 2019), https://www.out.com/news-opinion/2019/1/15/new-york-city-offers-third-gender-option-city-issued-idnyc-cards; and **PHILADELPHIA**, A.D. Amorosi, Gender-free municipal ID cards are close to becoming reality in Philly, (Feb. 28, 2019), http://www.epgn.com/news/14312-gender-free-municipal-id-cards-are-close-to-becoming-reality-in-philly.
[13]Countries include Nepal, India, Malta, Denmark, Bangladesh, Australia, New Zealand, Argentina, Austria, Canada, Colombia, Germany, Iceland, Ireland, the Netherlands, Pakistan and Brazil. See https://www.newsweek.com/which-countries-recognize-third-gender-option-passports-1643167. Aaron Macarow, These Eleven Countries are Way Ahead of the US on Trans Issues, (Feb. 9, 2015), https://archive.attn.com/stories/868/transgender-passport-status; Argentina, Westfall, Sammy (22 July 2021). "Argentina rolls out gender-neutral ID". The Washington Post, Brazil, "Justiça da BA publica provimento permitindo a inclusão de gênero "não binário" no Registro Civil". *Arpen Brasil - Saiba Mais* (in Brazilian Portuguese). 2022-05-11; and

## CAUSES OF ACTION
### COUNT I – DEPRIVATION OF EQUAL PROTECTION
### IN VIOLATION OF THE FOURTEENTH AMENDMENT
### OF THE UNITED STATES CONSTITUTION
### 42 U.S.C. § 1983

38. The Fourteenth Amendment to the United States Constitution, enforceable pursuant 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. Puerto Rico is subject to the equal protection guarantee. Simply put, "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike". *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

39. All individuals born in Puerto Rico are equally situated in the sense that the state mandates that a record be created reflecting the basic facts about their lives. Nonetheless, plaintiffs belong to a protected group whose actual gender identity is not accurately memorialized in the official record.

40. Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex—including gender, gender identity, transgender status and nonconformity with sex-based or gender-based stereotypes—as well as discrimination based on transgender status, is presumptively unconstitutional and subject to heightened scrutiny.

41. Puerto Rico's Birth Certificate Policy facially and intentionally discriminates against the Individual Plaintiffs and other transgender persons based on sex-related considerations. The sex that the government lists on a person's birth certificate is a government classification of a person's sex. In the case of transgender individuals, like the Individuals however, this classification reflects a sex contrary to their true sex, as determined by their gender identity, causing harm as a result.

13

**97**

42. Puerto Rico's Birth Certificate Policy treats nonbinary persons differently than cisgender and other transgender persons who are similarly situated.

43. Under Puerto Rico's Birth Certificate Policy, cisgender persons and transgender binary persons can have birth certificates that accurately reflect their sex and that are consistent with their gender identity, but nonbinary persons are deprived of birth certificates that accurately reflect their sex and that are consistent with their gender identity.

44. Because Puerto Rico's Birth Certificate Policy deprives transgender nonbinary persons born in Puerto Rico of their right to equal dignity, liberty, and autonomy by stigmatizing them and branding them as second-class citizens, it denies nonbinary persons born in Puerto Rico of the equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.

45. Moreover, the officers' actions of denying to include the marker X in the birth certificate runs afoul to the instructions given to citizens, where they state that, by identifying with a US passport, the Registry will change the registered sex. If Plaintiff Ínaru Nadia de la Fuente Díaz, in compliance with the Registry's instructions, presents their US Passport with the form to change their registered sex, the Registry would be unable to comply, thus, creating a gap between the reality presented in the passport and the reality presented in the Registry.

46. Accordingly, Defendants are liable for their violation of the Fourteenth Amendment rights of the Individual Plaintiffs under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Puerto Rico's Birth Certificate Policy unconstitutional and enjoining its enforcement.

47. <u>Discrimination Based On Sex</u>. Defendant's Policy discriminates against Plaintiffs on the basis of sex, both facially and as applied, by barring Plaintiffs from obtaining an accurate birth certificate with a gender marker other than "M" (male) or "F" (female). For example, if Plaintiffs wished to change their sex to either male or female, Defendants would have issued Plaintiff a new birth certificate.

**98**

48. Discrimination against an individual who is neither male nor female as such, just like discrimination against a woman as such, is discrimination based on sex. In denying a change in the Registry, P.R. officials relied upon sex-based considerations. Because of the Demographic Registry's rigid sex-based classification, Plaintiffs, persons who are neither male nor female, are precluded from obtaining birth certificate with a marker that properly indicates Plaintiffs' sex. The same applies to any intersex petitioner who would request a change of their birth certificate to eliminate the sex category imposed to them at birth. On the other hand, if Plaintiffs were intersex but identified as either male or female, Plaintiffs would qualify for and be issued a a corrected document.

49. Defendants' Policy is also impermissibly premised on assumptions, expectations, stereotypes, or norms about the nature of sex as a binary characteristic, either male or female.

50. The Demographic Registry denies nonbinary people from changing their registered sex because they fail to conform to the sex-based stereotype that individuals are all clearly male or female. That is, the Registry relies on an inaccurate assumption that sex is binary and that individuals cannot fall along (or outside of) a sex continuum, i.e., the false belief that all people are either exclusively men/male or exclusively women/female. This notion, as seen above, is not sustained by modern scientific and medical studies.

51. All sex-based classifications must be supported by an exceedingly persuasive justification and be substantially related to the achievement of that underlying objective.

52. The exclusion of individuals who are neither male nor female unless they falsely describe themselves as exclusively male or female, cannot survive the heightened scrutiny required for sex-based classifications. Indeed, the Policy is not even tailored to further any legitimate interest at all.

53. Discrimination Based On Status As Neither Male Nor Female. On its face, Defendants' Policy denies an accurate birth certificate to the class of United States citizens whose sex is neither male nor female. Thus, in addition to being

**99**

discrimination based on sex, Defendants' Policy also targets people who do not fit in a male or female sex classification as a group.

54. The United States Supreme Court has not yet determined the level of scrutiny applicable for laws that classify persons for adverse treatment based on their status as people who cannot identify as male or female or their status as intersex. At the very least, such classifications must be rationally related to a legitimate government interest. Here, Defendants' Policy lacks even a rational relationship to a legitimate interest.

55. <u>Discrimination Based on Transgender Status Warrants Heightened Scrutiny</u>. Transgender persons have suffered a long history of extreme discrimination in Puerto Rico and across the country, and continue to suffer such discrimination at present.

56. Transgender persons are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender persons have largely been unable to secure explicit local, state, and federal protections to safeguard them against, and provide remedies for, discrimination.

57. A person's transgender status bears no relation to a person's ability to contribute to society.

58. Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

59. Gender identity generally is fixed at an early age and is highly resistant to change through intervention.

60. For the foregoing reasons, discrimination based on gender identity and transgender status is entitled to heightened scrutiny under the equal protection clause of the Fourteenth Amendment, and Plaintiffs are entitled to relief against Defendants on that basis as well.

COUNT II – DEPRIVATION OF DUE PROCESS

IN VIOLATION OF THE FOURTEENTH AMENDMENT

**100**

OF THE UNITED STATES CONSTITUTION

42 U.S.C. § 1983

61. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. Puerto Rico is subject to the Due Process Clause.

62. The Due Process Clause of the Fourteenth Amendment places limitations on state action that deprives individuals of life, liberty, or property.

63. The substantive protections of the Due Process Clause [14], as well as other constitutional provisions, give rise to a right to privacy, protecting the integrity of information that is highly personal and intimate, which includes information that could lead to bodily harm upon disclosure.

64. The substantive protections of the Due Process Clause also protect the right of every person to the possession and control of their own person, and to define and express their identity. These protections extend to personal decisions central to individual dignity and personal autonomy, including intimate decisions that define personal identity as a person's sex.

65. The fundamental protections of an individual's autonomy forbid the state from interfering with the right of a transgender person to self-determination with regard to his or her gender identity and to live in accordance with that identity. Such a decision is among the most intimate imaginable, relating to matters that all people are uniquely positioned to understand and define for themselves.

66. The government's refusal to recognize a person's sex not only denies a transgender person equal dignity and respect by undermining, indeed denying, their very

---

[14] The difference between procedural and substantive due process rights is best explained as follows:

> As distinguished from its procedural cousin, then, substantive due process inquiry focuses on "what" the government has done, as opposed to "how and when" the government did it. And although the yardstick against which substantive due process violations are measured has been characterized in various ways, we are satisfied that, before a constitutional infringement occurs, state action must *in and of itself* be egregiously unacceptable, outrageous, or conscience-shocking.

*Amsden v. Moran*, 904 F.2d 748, 754 (1st Cir. 1990) (emphasis added)

**101**

identity and existence, but it also authorizes and invites other public and private entities to similarly discriminate and deny recognition.

67. By enforcing Puerto Rico's Birth Certificate Policy, Defendants unduly burden and unconstitutionally interfere with the fundamental right to autonomy in one's person and identity that all transgender persons born in Puerto Rico have.

68. There is no compelling, or even important or legitimate interest in the government to interfere with the rights of transgender persons to self-definition and autonomy in one's person and identity. This being the case, we are before a deprivation of liberty that clearly meets the "shocks the conscience" threshold that has been applied to substantive due process claims.

69. Accordingly, Defendants are liable for their violation of Plaintiffs' Fourteenth Amendment rights under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Puerto Rico's Birth Certificate Policy unconstitutional and enjoining its enforcement.

COUNT III – ABRIDGEMENT OF FREE SPEECH
IN VIOLATION OF THE FIRST AMENDMENT
OF THE UNITED STATES CONSTITUTION
42 U.S.C. § 1983

70. The First Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983 and applicable to the states through the Fourteenth Amendment, provides that a state "shall make no law . . . abridging the freedom of speech." Puerto Rico is subject to the First Amendment.

71. The freedom of speech protected by the First Amendment is multifaceted. The First Amendment prevents the government from prohibiting speech, as well as from telling individuals what they must say. Compelled statements are equally proscribed by the First Amendment. A claim of compelled speech requires speech to which the speaker objects that is compelled by some governmental action.

72. By forcing transgender persons to permanently identify themselves through their birth certificate with a sex that was assigned to them at birth, Puerto Rico's Birth

**102**

Certificate Policy violates the First Amendment by compelling nonbinary individuals to identify with a sex and identity inconsistent with who they are. The Birth Certificate Policy also prevents nonbinary persons from accurately expressing their identity. There is no clearer example of unconstitutional forced speech than that which forces an individual to self-identify as male or female where their sexuality does not conform to that norm.

73. Similarly, by forcing transgender people to disclose through their birth certificate private, sensitive, and personal information about their transgender status, gender identity, or medical condition, Puerto Rico' Birth Certificate Policy violates the First Amendment by compelling transgender persons to disclose private, sensitive, and personal information that they may not want to be publicly known or that may expose them to an invasion of privacy, prejudice, discrimination, harassment, distress, humiliation, and violence.

74. There is no compelling, important, or even legitimate interest in the government compelling transgender persons to identify with a sex and identity that was incorrectly assigned to them at birth, nor is there a compelling, important, or even legitimate interest in the government forcing transgender persons to involuntarily disclose to third parties a conflict in their official documents whenever they present third parties with their inaccurate birth certificates alongside their passport or other official documents.

75. Accordingly, Defendants are liable for their violation of the First Amendment rights of the Individual Plaintiffs under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Puerto Rico's Birth Certificate Policy unconstitutional and enjoining its enforcement.

COUNT IV:
WRIT OF MANDAMUS

76. Plaintiff's claims—as set forth above— are clear and certain.

77. Pursuant to 22 U.S.C. § 211a, the Defendants Mellado has the power to grant and issue birth certificates, and to cause these documents to be granted by those acting under him.

**103**

78. Defendants' duty to adjudicate Plaintiff's birth certificate and issue Plaintiff a birth certificate is nondiscretionary, ministerial, and free from doubt.

79. Plaintiff has exhausted any administrative remedies that may exist, and no other adequate remedy is available to Plaintiffs.

80. Pursuant to 28 U.S.C. § 1361, Plaintiff is entitled to mandamus relief compelling Defendants to process Plaintiffs' application for a birth certificate that accurately reflects Plaintiffs' nonbinary gender.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter Judgment in their favor and against Defendants on all claims as follows:

a.  Enter a declaratory judgment that the actions of Defendants complained of herein, including the enforcement of Puerto Rico's Birth Certificate Policy, are in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and the Free Speech Clause of the First Amendment to the United States Constitution; as well as the Constitution of the Commonwealth of Puerto Rico.

b.  Enter a preliminary injunction and permanently enjoin Defendants, their agents, employees, representatives, and successors, and any other person acting directly or indirectly in concert with them, from enforcing Puerto Rico's Birth Certificate Policy, including from refusing to provide birth certificates to transgender nonbinary persons that accurately reflect their sex, consistent with their gender identity;

c.  Permanently restrain or enjoin Defendants from relying upon its male-or-female, binary-only gender marker policy;

d.  Order Defendants, their agents, employees, representatives, and successors, and any other person acting directly or indirectly in concert with them, to permit transgender nonbinary persons born in Puerto Rico to correct their birth certificates to accurately

**104**

reflect their true sex, consistent with their gender identity, in accordance with the practice delineated in 24 P.R. Laws Ann. § 1136;

e. Order Defendants to immediately issue corrected birth certificates to Plaintiffs consistent with their gender identity, in accordance with the practice delineated in 24 P.R. Laws Ann. § 1136, and without adhering to the practice delineated in 24 P.R. Laws Ann. § 1231 of using a strike-out line to change one's name, or otherwise including any information that would disclose a person's transgender status on the face of the birth certificate;

f. Issue a writ of mandamus compelling Defendants to process Plaintiff's Application for Gender Change in Vital Event Certification on an individualized, nondiscriminatory basis;

g. Award Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees; and

h. Grant such other and further relief in favor of Plaintiffs as this Court deems just, equitable and proper.

Submitted, in the city of San Juan, Puerto Rico, this 9th November, 2023.

## CERTIFICATE OF SERVICE

I hereby certify that on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and will serve a copy by mail upon defendants.

S/ *Johanna M. Emmanuelli Huertas*
JOHANNA M. EMMANUELLI HUERTAS
USDC-PR #210506 Email: jmeh@poalaw.com
94 Calle Ponce, San Juan, PR 00917
Tel.: (787)342-6499

21

**105**

GOBIERNO DE PUERTO RICO

Departamento de Salud

**INSTRUCTIONS FOR APPLICANTS RESIDING OUTSIDE PUERTO RICO REQUESTING GENDER CHANGE**

1. Complete the application provided by the Demographic Registry titled APPLICATION FOR GENDER CHANGE IN VITAL EVENT CERTIFICATION.

2. Must submit <u>only one</u> of the following documents:
   - ✓ Driver's license showing change in gender.
   - ✓ Passport showing change in gender.
   - ✓ Certification issued by a health professional or behavior professional who has a Physician-Patient relationship with the applicant. For those professionals practicing in the United States, the Demographic Registry of Puerto will verify they are legally authorized to practice as such.

3. Money order for the amount of $20.00 payable to the Secretary of the Treasury or a $20.00 Internal Revenue Stamp sold by Secretary of Treasury in Puerto Rico.

4. Must submit a copy of a valid ID such as Passport, Driver's License or Non-driver's ID from any state or U.S. territory.

5. In order to obtain a copy of new birth certification the applicant must submit the APPLICATION FOR PUERTO RICO BIRTH CERTIFICATION, which has to be completed in all its parts. All certifications requested by the applicant must include their corresponding payment. For more information please follow the instructions within the application.

**106**

**APPLICATION FOR GENDER CHANGE IN VITAL EVENT CERTIFICATION**

Please complete all the information requested below.

## Part A: Applicant Information

Must submit only one of the following documents:

- ● Driver's license showing change in gender.
- ● Passport showing change in gender.
- ● Certification issued by a health professional or behavior professional who has a Physician-Patient relationship with the applicant. For those professionals practicing in the United States, the Demographic Registry of Puerto will verify they are legally authorized to practice as such. (Part B of this document)

If the applicant can't provide one of the documents listed above, a health professional or behavior professional must complete Part B of this form.

| | | | |
|---|---|---|---|
| Name | Initial | First Last Name | Second Last Name |

Identification number- must be the same presented

Physical Address                                   Mailing Address

By this means, I request the issuance of my birth certification with the gender selection below:

◯ Female     ◯ Male

Therefore, I, _____, under penalty of perjury, certify; this request obeys exclusively to my interest that my birth certificate issued to me by the Demographic Registry, be in accordance with the gender with which I identify myself. So, I declare this request is not made with the intention of defrauding or committing any illegal act.

_____                          _____
Signature of the applicant                          Date (mm/dd/yy)

## Part B: Information of the Clinical Professional who Evaluated the Applicant

| | | |
|---|---|---|
| Name of the Clinical Professional | Initial | Last Names |

**Title of clinical evaluator (Psychologist, Clinical Therapist, Social Worker, Physician or Clinical Counselor)**

Phone Number _____

Physical Address                                   Mailing Address

For all relevant purposes and based on my professional opinion, I certify that the gender identity for the person named above is:

◯ Female     ◯ Male

And that it can be expected that this will continue to be the gender identification of the applicant in the future. I certify under penalty of perjury that the information provided is true and real.

_____   _____   _____
Signature of the Clinical Professional   Professional License   NO.      Date (mm/dd/yy)

Warning: All information and / or statements provided in this vital event request will be subject to verification. Any false representation, conscious omission or false information may be grounds for disqualification to issue this certification. It may also be criminally prosecuted by Articles 211, 213 to 217, 271, 272, 273 of the Penal Code of Puerto Rico, Act No. 146 of 2012, as amended.
Rev. 02/2019

**107**



GOBIERNO DE PUERTO RICO

Departamento de Salud

PUERTO RICO DEPARTMENT OF HEALTH
DEMOGRAPHIC REGISTRY

APPPLICATION FOR PUERTO RICO BIRTH CERTIFITICATION

M RD 225
Revised 02/ 2019

## PART I: REGISTRANT INFORMATION

1.Full Name:

| Last Name | Mother's Last Name | First Name | Middle Name |

| 2.Date of Birth: (mm/dd/yyyy) | 3.Place of Birth: (Country) |

| 4.Father's Name: | 5.Mother's Name: |

| 6.Purpose: | 7.Number of Copies |

## PART II: APPLICANT INFORMATION

| 1.Full Name: (A person ordering his or her own certification should enter "SELF" in this space.) | 2. RELATIONSHIP TO PERSON LISTED ABOVE ( PART:1) |

| Last Name | First Name | Middle Name |

| 3.Mailing Address: (Address where you will receive the document) | 4.Contact Information: |

Address 1:          Telephone:

Address 2:          Email:
City    State    Zip Code

| 5.Include ID: | 6.Requester Signature: |

☐ Driver's License     ☐ Passport

☐ State ID     ☐ Others

7. Date

**IMPORTANT INFORMATION OBTAINING A BIRTH CERTIFICATION:**

**Who can obtain a copy?**
- Registered person with 18 years or older
- Parents of the registered person
- Children of the registered person (must be 18 years or older, if not born in Puerto Rico must submit a copy of their birth certificate to validate kinship)
- Legal guardian appointed by the court house (must submit copy of judicial order)

**Cost of Certificate**
- In order to minimize the unlawful use of a privileged document which has facilitated criminal behavior such as identity theft and fraud each registered person has a limit of 3 copies within a 12 month period which is counted from the first time requested.
- First copy within the 12 month period will have a cost of $7.00. The second and third copy within that same 12 month period will have a cost of $12.00 (both amounts already include the $2.00 service charge per copy)
- **Applicants over 60 years of age residing in Puerto Rico:** first copy within the 12 month period will be of no cost (free). The second and third copy within the same 12 month period will have a cost of $12.00 (service charge is already included per copy)
- **Veterans residing in Puerto Rico:** first copy within the 12 month period will be of no cost (free). The second and third copy within the same 12 month period will have a cost of $12.00 (service charge is already included per copy). **Form DD-214 must be included (Circular letter number OPVELA-2015-02)**

**Acceptable payment methods**
- Money Order payable to the *SECRETARY OF TREASURE.* Other forms of payment will not be accepted. DO NOT SEND cash nor personal checks.
- The applicant must send the exact amount of money to cover the cost of the certification and service charges. All requests require a search in our data base therefore fees are non-refundable.
- If record is not found a certified *Not Found Statement* will be issued.

**Acceptable forms of identification (include copy on both sides)**
- All identifications must be unexpired and must include the applicant's signature
- If you use your married last name in your ID please provide a copy of your marriage certificate to confirm the maiden name
- Driver's License from any state or U.S. territory
- Passport
- Non-driver's ID from any state or U.S. territory

**SHIPPING INSTRUCTIONS**
- Please include a stamped pre-addressed envelope
- **Postal Address: Registro Demográfico**
  **PO Box 11854**
  **Fernández Juncos Station San Juan, Puerto Rico 00910**

For additional information or questions, please call at: *(787) 765-2929 Ext. 6100* or email: *regdem@salud.pr.gov*

 

30 de junio de 2023

Lcda. Wanda I. Llovet
Directora Registro Demográfico de Puerto Rico
Departamento de Salud de Puerto Rico
Edificio Metro Center, Urb. Pérez Morris
Calle Mayagüez #5, Esquina Calle Cidra
San Juan, Puerto Rico 00917



**A la mano**

Estimada Lcda. Llovet:

Para cumplir con la decisión emitida en el caso <u>Arroyo González v Rosselló</u>, 305 F. Supp.3d 327 (D.P.R. 2018), en julio del 2018 el Registro Demográfico que usted dirige emitió la Carta Circular Núm. 3-18. A tenor con las instrucciones de la Jueza Cerezo y con el estado legal del momento, el Registro Demográfico enmendó sus políticas y emitió un formulario de solicitud para cambio de género, mediante el que se permite el cambio de sexo/género que aparece en el Registro si la persona presenta los siguientes documentos: 1) un pasaporte, o 2) un certificado de nacimiento con el género con el cual se identifica o, a falta de estos, 3) una certificación emitida por un profesional de la salud. Según la Jueza Cerezo, su determinación se basó en los principios de derecho aplicables, el formulario para cambio de sexo/género del DTOP ya en uso, y las prácticas en otros estados y por el Departamento de Estado de EE.UU.

A pesar de que el Registro Demográfico ha permitido el cambio de sexo/género desde el 2018, la agencia se ha mantenido en el binario de femenino/masculino y no ha sido proactiva en incorporar la alternativa "X" para las personas intersexo o de género no conforme que ya desde el 2021 es parte del formulario para solicitar pasaporte en el Departamento de Estado de EE.UU. Esto significa que, a partir del año pasado, ciudadanes puertorriqueñes tienen un pasaporte que les exime de encasillarse en el binario F/M.

Esta omisión del Registro no solo viola la política pública de Puerto Rico, sino que crea una situación anómala para aquellas personas que completen la solicitud de cambio de género del Registro y presenten sus pasaportes con género X, ya que esa alternativa no aparece en el formulario que tienen que llenar para consignar su cambio. Por

Recibido
HHL 5/julio/2023
2:35 p.m.

**109**

**From:** Liza Gallardo  zaga ardo@amn st apr.org
**Subject:** Re: Respuesta de Departamento de Sa ud- Reg stro Demográfico
**Date:** September 11, 2023 at 6:05 PM
**To:** Johanna Emmanue  jmeh2010@gma .com, Johanna Emmanue  jmeh@mac.com, johanna.emmanue huertas@upr.edu, naru.de afuente@gma .com, Ange Gabr e  correo.ange .gabr e @gma .com, Margar ta Mora es march.mora es15@gma .com, D versxs AIPuertoR co  d versxs@amn st apr.org

LG

Liza Gallardo <lizagallardo@amnistiapr.org>                                                                    5 53 PM (11 minutes ago)

to Wanda, Agnes, Miguel, Ramon  ▾

Saludos,
Confiada que se encuentra bien. Agradecemos su respuesta. Estaremos en comunicación para próximos pasos.
Atentamente,
Liza Gallardo Martín

On Fri, Sep 8, 2023 at 9:51 AM Wanda Llovet Diaz <WLlovet@salud.pr.gov> wrote:

Saludos y mis escusas por no haberle respondido antes sobre la respuesta a nuestra consulta sobre cambio de género en los certificados de nacimiento para añadirle la alternativa X por parte de los asesores legales del Departamento de Salud. En la respuesta a nuestra consulta, el pasado 21 de agosto de 2023, se nos respondió que ni la Asamblea Legislativa ni la reciente jurisprudencia se han expresado sobre esos efectos.

Aunque el Departamento de Salud entiende la importancia de que las personas no binarias tengan métodos para poder sentirse identificados, no obstante, el Registro Demográfico se ve imposibilitado en este momento, de acceder a incluir como alternativa para el cambio de género la X.

Sin otro particular.

Gracias,

# Wanda del C. Llovet Díaz

Directora Ejecutiva

Registro Demográfico

Departamento de Salud

(787) 765-2929 Exts. 6103,6104,6106 y 6129

Edificio Metro Center Calle Mayaguez #5 Esquina Cidra

San Juan, Puerto Rico 00917



**110**

Greetings,
I trust that you are well. We thank you for your answer. We will be in touch for next steps.
Sincerely,
Liza Gallardo Martín

Greetings and my apologies for not having answered before regarding the response to our consultation about change of gender in the birth certificates to add the X alternative from the legal advisors of the Department of Health. In the response to our consultation, on this past August 21 of 2023, it was stated to us that neither the Legislature nor the recent jurisprudence has addressed it.

Even though the Department of Health understands the importance of nonbinary people having ways to be able to feel identified, nevertheless, the Demographic Registry finds itself unable at this moment, to agree to include the X as an alternative for the change of gender.

With nothing further.

Thanks,

**111**

CERTIFICATE OF ACCURACY OF TRANSLATION

I, G. D. Prosper-Sánchez, certify that I have prepared this translation, and that it is a true, accurate and complete translation of the original text in Spanish that was provided to me.

I am a translator who, having approved Phase 1 of the FCICE, is in compliance with Rule 5 (c) (2). I also have a Ph. D. in Hispanic Linguistics.

_____

G. D. Prosper-Sánchez, Ph. D.
gdprospersanchez@gmail.com

October 24, 2023

**112**

STATEMENT UNDER PENALTY OF PERJURY

I, Ínaru Nadia de la Fuente Díaz, of legal age, provide the following certification:

1. My legal name is Ínaru Nadia de la Fuente Díaz.

2. I am a resident of San Juan, Puerto Rico.

3. At present, I work and study.

4. My gender identity is non-binary.

5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.

6. At present I have a  US passport.

7. My US passport identifies my gender as X.

8. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Ínaru Nadia de la Fuente Díaz, et. al. v  Pedro Pierluisi, et. al.

_____

Ínaru Nadia de la Fuente Díaz


____October 15th, 2023_____

Date of Signature

**113**

STATEMENT UNDER PENALTY OF PERJURY

I, Maru Rosa, of legal age, provide the following certification:

1. My legal name is Soanely, but I identify as Maru.
2. I am a resident of San Juan.
3. At present, I work.
4. My gender identity is non-binary.
5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.
6. At present I have/do not have a US passport.
7. When I finally request my US passport, I will identify my gender as X.
8. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Inaru Nadia de la Fuente Díaz, et. al. v Pedro Pierluisi, et. al.

Maru Rosa

Oct/12/23

**114**

STATEMENT UNDER PENALTY OF PERJURY

I,   André Rodil Rivera          , of legal age, provide the following certification:

1. My legal name is     Paola A. Rodil Rivera        , but I identify as   André Rodil Rivera                    .

2. I am a resident of    San Juan, PR         .

3. At present, I work and study

4. My gender identity is non-binary.

5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.

6. At present I have a  US passport.

7.  My US passport identifies my gender as F.

8. When I finally renew my US passport, I will identify my gender as X.

9. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Ínaru Nadia de la Fuente Díaz, et. al. v  Pedro Pierluisi, et. al.

André Rodil Rivera]

16 oct 2023
_____

[Fecha]

**115**

STATEMENT UNDER PENALTY OF PERJURY

I, <u>Yeivy Vélez Bartolomei</u>, of legal age, provide the following certification:

1. My legal name is <u>José Gabriel Vélez Bartolomei</u>, but I identify as <u>Yeivy Vélez Bartolomei</u>.

2. I am a resident of <u>San Juan, Puerto Rico</u>.

3. At present, I work.

4. My gender identity is non-binary.

5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.

6. At present I have a US passport.

7. My US passport identifies my gender as M.

8. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Ínaru Nadia de la Fuente Díaz, et. al. v Pedro Pierluisi, et. al.

<u>Yeivy Vélez Bartolomei</u>

[Nombre]

<u>16/octubre/2023</u>

[Fecha]

**116**

STATEMENT UNDER PENALTY OF PERJURY

I, Gé Areidawani Castro Cruz, of legal age, provide the following certification:

1. My legal name is Génesis Mariangelys Castro Cruz, but I identify as Gé Areidawani Yaha Castro Cruz.
2. I am a resident of San Juan, Puerto Rico_.
3. At present, I work as a bartender.
4. My gender identity is non-binary.
5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.
6. At present I have a  US passport; and the gender marked is F; which I don't identify with.
7. When I finally request my US passport, I will identify my gender as X.
8. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Ínaru Nadia de la Fuente Díaz, et. al. v  Pedro Pierluisi, et. al.


Gé Areidawani Castro Cruz


16/octubre/2023


**117**

STATEMENT UNDER PENALTY OF PERJURY

I, Denise Joan Salas Pitre (Chosen name: Deni Juste), of legal age, provide the following certification:

1. My legal name is Denise Joan Salas Pitre, but I identify as Deni Juste.

2. I am a resident of Moca, Puerto Rico.

3. At present, I work as a teacher.

4. My gender identity is non-binary.

5. I cannot change my gender identity in the Demographic Registry because the form created to request a change of gender does not include an X marker, which is the marker used by the Department of State to identify non-binary people.

6. At present I do not have a US passport.

7. When I finally request my US passport, I will identify my gender as X.

8. I present this statement to supplement the complaint filed in the Federal District Court of Puerto Rico, in the case Ínaru Nadia de la Fuente Díaz, et. al. v Pedro Pierluisi, et. al.

_____

Deni Juste (Legal name: Denise Joan Salas Pitre)

October 13th, 2023

**118**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ÍNARU NADIA DE LA FUENTE DÍAZ, MARU ROSA HERNÁNDEZ, ANDRÉ RODRIL, YEIVY VÉLEZ BARTOLOMEI, GÉ CASTRO CRUZ, DENI JUSTE <br><br> Plaintiffs <br><br> v. <br><br> PEDRO PIERLUISI URRUTIA, in his official capacity as Governor of the Commonwealth of Puerto Rico; DR. CARLOS R. MELLADO LÓPEZ, in his official capacity as the Secretary of the Department of Health of the Commonwealth of Puerto Rico; WANDA LLOVET DÍAZ, in her official capacity as the Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico. <br><br> Defendants | Civil No. 23-1544 (MAJ) |

## MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

**TO THE HONORABLE COURT:**

**COME NOW** Defendants, Hon. Pedro Pierluisi Urrutia, in his official capacity as Governor of the Commonwealth of Puerto Rico; Dr. Carlos R. Mellado López in his official capacity as Secretary of the Department of Health of the Commonwealth of Puerto Rico; and Wanda Llovet Diaz, in her official capacity as the Director of the Demographic Registry and Vital

1

**119**

Statistics of the Commonwealth of Puerto Rico (hereinafter "Defendants"), and very respectfully
STATE, ALLEGE, and PRAY as follows:

## I.     INTRODUCTION

On November 15, 2023, Plaintiffs filed the Second Amended Complaint challenging
Puerto Rico's Birth Certificate policy and practice to recognize only the binary male/female
system. (Docket No. 12, pp. 13-19). They claim that the policy and practice to disallow transgender
nonbinary people born in Puerto Rico from correcting their gender marker on their birth certificate
to "X" violates their Fourteenth Amendment's right to privacy and Equal Protection and their First
Amendment Right to freedom of speech. Id. Plaintiffs argue that Article 694 of the Puerto Rico
Civil Code, P.R. Laws ann. tit. 31 §7655, and the Vital Statistics Registry of Puerto Rico, P.R.
Laws ann. tit. 24 § 1041 et seq., are unconstitutional as applied by the Demographic Registry
because they cannot change a nonbinary person's gender to "X." (Docket No. 12, ¶37).

Plaintiffs request this Honorable Court to: (i) rule that the Government's actions and their
enforcement of the Puerto Rico Birth Certificate policy violate the Equal Protection Clause and
Due Process Clause of the Fourteenth Amendment of the United States Constitution, as well as the
Free Speech Clause of the First Amendment of the United States Constitution; (ii) permanently
enjoin Defendants from enforcing the Puerto Rico Birth Certificate policy, which includes refusing
to provide birth certificates to transgender nonbinary persons that accurately reflect their gender
identity; (iii) permanently enjoin Defendants from relying upon its male-or-female, binary-only
gender marker policy and issue corrected birth certificates consistent with Plaintiffs' nonbinary
gender identity; (iv) order Defendants to permit transgender nonbinary persons born in Puerto Rico
to correct their birth certificates to reflect their sex, consistent with their gender identity; (v) issue
a writ of *mandamus* compelling Defendants to process Plaintiffs' application for gender change;

**120**

and (vi) award Plaintiffs costs and attorney fees and other relief that the Court deems proper. (Docket No. 12, pp. 20-21).

As this court will surmise, Plaintiffs failed to state a claim upon which relief may be granted on all counts. First, the Puerto Rico Civil Code and the Vital Statistics Registry Act do not recognize a nonbinary gender. Therefore, Defendants are not authorized by law to issue a birth certificate with a sex marker other than male or female. Second, Plaintiffs failed to allege sufficient facts to conclude that there is a long history and tradition of protecting a right to amend their sex designation on a birth certificate to reflect a nonbinary gender identity or that such right is fundamental to the scheme of ordered liberty that would classify Defendants' actions as a due process clause violations under the Fourteenth Amendment. Third, Plaintiffs failed to plead how the Department of Health's policy violates the Equal Protection Clause. Finally, the Department of Health's policy does not violate Plaintiffs' First Amendment rights because the Government does not restrict their ability to express and present themselves in alignment with their gender identity. As a result, this Court must dismiss Plaintiffs' Second Amended Complaint with prejudice.

## II. STANDARD OF REVIEW FOR MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Rule 12 (b)(6) of the Federal Rules of Civil Procedure allows dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). To survive dismissal under Rule 12 (b)(6), a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In doing so, the court must accept as true all "well-pleaded facts [and indulge] all reasonable inferences in plaintiffs' favor." Id.

3

**121**

In judging the sufficiency of a complaint, courts must "differentiate between well-pleaded facts, on the one hand, and bald assertions, unsupportable conclusions, periphrastic circumlocution, and the like, on the other hand; the former must be credited but the latter can be safely ignored." LaChapelle v. Berkshire Life Ins., 142 F.3d 507, 508 (quoting Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996)); Buck v. American Airlines, Inc. 476 F. 3d 29, 33 (1st Cir. 2007); see also Rogan v. Menino, 175 F. 3d 75, 77 (1st Cir. 1999).

Moreover, "even under the liberal pleading standards of Fed. R. Civ. P. 8, the Supreme Court has held that to survive a motion to dismiss, a complaint must allege a plausible entitlement to relief." Twombly, 550 U.S. at 559. Although complaints do not need detailed factual allegations, the plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Id. at 556.

In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court reaffirmed Twombly and clarified that two underlying principles must guide a court's assessment of the adequacy of pleadings when evaluating whether a complaint can survive a Rule 12 (b)(6) motion. Id. at 678. The Court explained that they are not compelled to accept legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Second, a complaint survives only if it states a plausible claim for relief. Twombly, 550 U.S. at 556. Thus, any non-conclusory factual allegations in the complaint, accepted as true, must be sufficient to give the claim facial plausibility. Id. A claim has facial plausibility when the pleaded facts allow the court to reasonably infer that the defendant is liable for the specific misconduct alleged. Iqbal, 556 U.S. at 678. This pleading standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." Id. Such inferences must amount to more than a sheer possibility and be as plausible as any obvious

**122**

alternative explanation. Id. Plausibility is a context-specific determination that requires the court to draw on its judicial experience and common sense. Id. at 679.

The Court of Appeals for the First Circuit has stated that when facts alleged in the complaint do not "possess enough heft to sho[w] that [plaintiff is] entitled to relief," the complaint must be dismissed. Ruiz Rivera v. Pfizer Pharm, LLC. 521 F3d 76, 84 (1st Cir. 2008). Plaintiff "is not entitled to proceed perforce by virtue of allegations that merely parrot the elements of the cause of action." Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (citing Iqbal, 665 U.S. at 680).

### III.   DISCUSSION

#### A. Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983.

Section 1983 in itself does not create substantive rights, but merely provides a venue for vindicating federal rights elsewhere conferred. Graham v. M.S. Connor, 490 U.S. 386 (1989). It creates a private right of action for redressing abridgments or deprivations of federally assured rights. Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004); Mcintosh v. Antonino, 71 F.3d 29, 33 (1st Cir. 1995); Evans v. Avery, 100 F.3d 1033, 1036 (1st Cir. 1996).

To establish liability pursuant to section 1983, a plaintiff must first establish that "the conduct complained of was committed by a person acting under color of state law." Parrat v. Taylor, 451 U.S. 527, 535 (1981). Secondly, a plaintiff must allege facts sufficient to conclude that the alleged conduct worked a denial of rights secured by the Constitution or laws of the United States. See Cepero-Rivera v. Fagundo, 474 F3d 124 (1st Cir. 2005); Johnson v. Mahoney, 424 F.3d 83, 89 (1st Cir. 2005) cited in Vélez-Rivera v. Agosto-Alicea, 437 F.3d 145 (1st Cir. 2006). A section 1983 violation occurs when an official acting under color of state law acts to deprive an individual of a federally protected right. Maymí v. Puerto Rico Ports Authority, 515 F.3d 20, 205

**123**

(1st Cir. 2008). Moreover, plaintiffs must show that defendant's actions were the cause in fact of the alleged constitutional deprivation. <u>Gagliardi</u> v. <u>Sullivan</u>, 513 F. 3d 301, 306 (1st Cir. 2008).

Under section 1983, a plaintiff is required to allege personal action or inaction by each defendant within the scope of their responsibility that would make each of them personally answerable in damages. <u>Pinto</u> v. <u>Nettleship</u>, 737 F.2d 130, 133 (1st Cir. 1984). Plaintiff must show that the defendants were involved in the alleged deprivation of their rights. To impose liability upon a defendant, it is necessary that "the conduct complained of must have been casually connected to the deprivation." <u>Gutiérrez-Rodriguez</u> v. <u>Cartagena</u>, 882 F.2d 553 (1st Cir. 1989).

The element of causal connection requires that plaintiffs establish that the defendants: (i) were personally involved in the violation, <u>see</u> <u>Monell</u> v. <u>Department of Social Services</u>, 436 U.S. 658, 694 n. 58 (1978); and (ii) their conduct was intentional, grossly negligent, or amounted to a reckless or callous indifference to the plaintiff's constitutional rights. As will be shown, the Department of Health's policy and practice does not constitute a violation of Plaintiffs constitutional rights as it is in strict compliance with the Puerto Rico Civil Code and Vital Registry's Act.

**B. The Puerto Rico Department of Health's practice and policy is in strict compliance with the Puerto Rico Civil Code and the Vital Statistics Registry Act of Puerto Rico.**

Plaintiffs are challenging the Government's policy and practice of allowing change of gender only between male or female that does not contemplate a nonbinary gender marker. (Docket No. 12, ¶ 37). However, the Department of Health's policy and practice when issuing Birth Certificates is done in strict compliance with the Puerto Rico Civil Code and the Vital Registry's Act. The Department of Health and its Demographic and Vital Statistics of Puerto Rico are part of the executive branch of the government and cannot issue a birth certificate with a nonbinary gender marker that has not been recognized by the Legislature.

6

**124**

A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it, whether or not the basis has foundation in the record. <u>Heller</u> v. <u>Doe</u>, 509 U.S. 312, 320-321 (1993) (internal quotations and citations omitted). On June 1, 2020, the Government of Puerto Rico approved Act No. 55 of June 1st, 2020, as amended, also known as the Puerto Rico Civil Code, P.R. Laws ann. tit. 31 §5311, <u>et seq.</u> The Civil Code is a general law which rules multiple issues related to human life and daily human interactions. <u>See</u> Statement of Motives of Puerto Rico Civil Code, Act No. 55 of June 1st, 2020, as amended. It states that all facts and judicial acts concerning a person's civil status will be registered in the Demographic Registry of Puerto Rico. Its organization and administration will be ruled by special legislation. P.R. Law ann. tit. 31 §7631. The Demographic Registry will have registration of the circumstances of birth, the registered person's name, and the person's sex at birth, among other demographic facts. <u>Id.</u> at §7632.

As to the modification of a person's sex in the register, article 694 of the Puerto Rico Civil Code states:

> No amendments will be authorized in the original birth record. A court may issue a judgment authorizing the register to make a note on the original register's margin of the person's sex, when applicable, due to a posterior change or modification to the sex at birth. However, in these cases, the substitution of the historical and vital act of sex at birth will not be authorized. Only in the case where a medical expert determines the ambiguity of the sex at birth, at the time of birth, and this fact is registered in the records of the Demographic Registry will the judicial authority order the substitution of the original sex at birth in the demographic registry records.

> Nothing here construed will undermine the process established in cases of a request for change of gender in a birth certificate. These requests will be accompanied with the Passport, driver's license or a certification submitted by a health professional who has a physician-patient relationship and certifies the applicant's gender. In these cases, the registry shall issue the certificate, safeguarding the right to privacy. (Translation ours) 31 P.R. Laws ann. tit. 31 §7655.

As to the interpretation and application of the Law, the Puerto Rico Civil Code incorporates the rules of hermeneutics. When analyzing the wording used in the Code, Article 25 states: "The words used in this Code in present tense, includes future tense; those used in male voice will also include the female voice, unless due to the nature of the disposition, it is limited only to one; a singular number will include the plural number, and the plural will include the singular number." P.R. Laws Ann. tit. 31 §5347 (our translation).[1] As a result, the Civil Code recognizes the right of transgender individuals to change the gender marker in their birth certificates to reflect the applicants' true gender, whether its male or female.[2] However, the Puerto Rico Legislative Assembly did not legislate nor recognize in its rule of hermeneutics a nonbinary gender other than male or female.

The Civil Code further establishes that the organization and administration of all vital facts and judicial acts concerning a person's civil status are ruled by the Vital Statistics Registry Act of Puerto Rico. P.R. Laws ann. tit. 24 §1041 et seq. The Vital Statistics Registry Act creates a General Demographic Registry within the Department of Health. Its purpose is to register, collect, guard, preserve and certify vital facts of people born in Puerto Rico. Id. at § 1042 (1). After the year 1931,

---

[1] Article 25, in its original Spanish language, states: "Las palabras usadas en este Código en el tiempo presente, incluyen también el futuro; las usadas en masculino incluyen el femenino, a menos que por la naturaleza de la disposición se limiten manifiestamente a solo uno; el número singular incluye el plural, y el plural incluye el singular." P.R. Laws Ann. tit. 31 §5347.

[2] This newly approved Civil Code incorporated the ruling issued by a sister court in this district. In Arroyo González v. Rosselló Nevares, 305 F. Supp. 3d 327 (D.P.R. 2018) the court recognized the process for a person to request a change of gender in their birth certificate. In the cited case, the district court issued an Order recognizing the right of transgender individuals to change the gender marker in their birth certificates with the applicants' true gender. Additionally, the court ordered the Demographic Registry of the Government of Puerto Rico to adopt the criteria of the Department of Transportation and Public Works "Request to Change Transgender Person's Gender Marker" as the application form to be submitted and accepted as the first step toward the issuance of their new birth certificates. In their application, individuals shall also present an official document, whether a passport, driver's license or a certification issued by a healthcare professional, that reflects that persons' true gender, whether male or female. Arroyo, supra., at 333-334. However, neither the District Court nor the Legislative Assembly recognized a nonbinary gender marker.

**126**

the Demographic Registry became a formal and credible statistical registry that allows the study

of vital statistics of our population. <u>See</u> Statement of Motives of Act No. 220 of August 9, 1998,

also known as the Vital Statistics Registry Act of Puerto Rico, P.R. Laws ann. tit. 24 §1041 <u>et seq</u>.

It is the instrument that contains the official version of the existence, civil status and vital facts of

the people born in Puerto Rico. The information that is contained in the Registry constitutes *prima*

*facie* evidence of the fact to be proven. <u>Ex Parte Delgado-Hernández</u>, 165 D.P.R. 170, 187 (2005);

<u>Medina</u> v. <u>Pons</u>, 81 D.P.R. 1, 8 n. 11 (1959); <u>Bigas Surs.</u> v. <u>Comisión Industrial</u>, 71 D.P.R. 336

(1950); <u>Pueblo</u> v. <u>Ramírez</u>, 65 D.P.R. 680 (1946); <u>Mercado</u> v. <u>American Railroad Co</u>, 61 D.P.R.

228 (1943).

In <u>Ex Parte Delgado-Hernández</u>, the Puerto Rico Supreme Court expressed:

The Demographic Registry Act provides the procedure to amend the birth certificate, also as a manner of exception. The Act provides: the omissions or inaccuracies that appear on any certificate prior to being registered at the Department of Health can be corrected inserting the necessary corrections or additions in red ink on the certificate, but after being filed at the Department of Health, no rectification, addition or amendment can be made that substantially alters the same, but only by virtue of a Court Order, which shall be filed at the Department of Health making reference to the corresponding certificate.

165 DPR at p. 188.

As noted by the Puerto Rico Supreme Court, the Demographic Registry Act is

complemented by section 1071-19 of the Demographic Registry Regulations, which provides:

Corrections or alterations after the inscription is made- after the certificate has been accepted by the Registrar, it cannot be the object of any change, erasure or alteration, nor can the transcription made in the record book be changed without due process of law.

<u>Id</u>.

Pursuant to the Puerto Rico Civil Code, the Vital Statistics Registry Act of Puerto Rico and

as ruled by the Puerto Rico Supreme Court, there are only two (2) ways for the correction of

**127**

mistakes in a birth certificate: (i) before the certificate is registered and (ii) after the certificate has been registered at the Department of Health. The Puerto Rico Supreme Court has interpreted the Vital Statistics Registry Act of Puerto Rico restrictively, concluding that any change requested must have been previously authorized by law. Ex Parte Delgado-Hernández, 165 D.P.R. at 189; Ex Parte León Rosario, 109 D.P.R. 804 (1980).

Article 694 of the Puerto Rico Civil Code, 31 P.R. Law ann. 31 §7655, and the United States District Court for the District of Puerto Rico's opinion in Arroyo González v. Rosselló Nevarez, 305 F. Supp. 327 (D.P.R. 2018) allows for change in the birth certificate when the applicant is a male or female transgender person. Yet, the Puerto Rico Civil Code and the Vital Statistics Registry Act do not authorize a change in a person's birth certificate to reflect a gender other than male or female.

The Puerto Rico Department of Health and its division of Demographic Registry and Vital Statistics are part of the executive power. The executive power contemplates the authority to execute, carry out, and enforce the laws. The executive power does not make the laws in first instance. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952) ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker"). As a result, the Department of Health and the Division of Demographic Registry and Vital Statistics cannot authorize Plaintiffs' request for change in the birth certificate without legislation to that effect or a court order.

**C. The Department of Health's policy and practice does not infringe upon a fundamental right protected by the Fourteenth Amendment's Substantive Due Process Clause.**

Plaintiffs bring a Fourteenth Amendment substantive due process claim arguing that the Department of Health's policy, as applied, interferes with their fundamental right to individual autonomy and consists of a deprivation of liberty that "shocks the conscience." (Docket No. 12,

¶¶ 61-69).  The Department of Health's policy and practice, however, is not conscience shocking under the Due Process Clause. And even assuming Plaintiffs adequately alleged a conscience shocking conduct, they failed to plead a cognizable liberty or property interest and therefore, their claims must be dismissed.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without the due process of law. U.S. Const. amend. XIV §1. The Supreme Court of the United States has recognized that the Due Process Clause protects two categories of substantive rights: (i) the rights guaranteed by the first eight amendments, and (ii) a select list of fundamental rights that are not mentioned in the Constitution. Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 237-238 (2022).  In deciding whether a right falls into either of these categories, the Court has long asked whether the right is "deeply rooted in history or tradition" and whether it is essential to our Nation's "scheme of ordered liberty." Id.  "Historical inquiries of this nature are essential whenever we are asked to recognize a new component of the liberty protected by the Due Process Clause because the term liberty alone provides little guidance." Dobbs, 597 U.S. at p. 239.

A Plaintiff's substantive due process claim challenges the specific acts of a sate officer. Plaintiff must show that both the acts were so egregious as to shock the conscience that they deprived them of a protected interest in life, liberty, or property. See Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005) (stating that "[i]t is not enough to claim the governmental action shocked the conscience" but plaintiff must also show a deprivation of a protected interest). A conscience shocking conduct is an indispensable element of a substantive due process challenge to executive action. DePoutot v. Raffaelly, 424 F.3d 112, 118 n. 4 (1st Cir. 2005).

There is no scientifically precise formula for determining whether executive action is sufficiently shocking to trigger the protections of the substantive due process branch of the

11

**129**

Fourteenth Amendment. See Nestor Colón Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992) (referring to the inquiry as "virtually standardless"). Therefore, the analysis will vary with the subject matter and circumstances.

The First Circuit has stated that the requisite inquiry involves "a comprehensive analysis of the attendant circumstances before any abuse of official power is condemned as conscience-shocking." Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006) (quoting Depoutot, 424 F.3d at 119). For example, for a conduct to be deemed as conscience shocking, it must be "at the very least, extreme and egregious" or "truly outrageous, uncivilized, and intolerable." Id. A mere violation of state law, even violations resulting from bad faith, do not invariably amount to conscience shocking behavior. Id. The allege conscience shocking behavior "must be stunning." Amsden v. Moran, 904 F.2d 748 (1st Cir. 1990).

The First Circuit has consistently ruled that the substantive due process may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determination of a state or local decisionmakers, whether those decisions are right or wrong. Any permit or license denial, no matter how unattractive, falls short of being "truly horrendous" and is unlikely to qualify as conscience shocking for a substantive due process claim. Pagán, 448 F.3d at p. 33. This standard is rigorous but necessary since a lesser standard would run the risk of "insinuate[ing] the oversight and discretion of federal judges into areas traditionally reserved for the states and local tribunals and would dash any hope of maintaining a meaningful separation between federal and state jurisdiction," Id. (quoting Creative Environments, Inc. v. Estabrook, 680 F.2d 822 (1st Cir. 1982)).

Plaintiffs failed to identify a fundamental right that is protected by the Fourteenth Amendment. "Constitutional analysis must begin with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding documents mean." Dobbs, supra, at

**130**

235. When Amnesty International Puerto Rico Chapter requested an amendment to the application for gender change in Vital Events Certification to include "X" as an alternative for nonbinary, intersex or gender nonconforming persons, the Department of Health ultimately responded that since the Legislative Assembly nor the courts had addressed this particular request, they were impeded from making the change. (Docket No. 12, ¶ 8; Docket Nos. 12-2, 12-3). Defendants' application of its policy is not conscience shocking, extreme, egregious, or horrifying. Therefore, Plaintiffs' substantive due process claim must be dismissed with prejudice.

Even assuming for argument's sake only that Plaintiffs adequately alleged a conscience shocking conduct by the Department of Health, they failed to plead a cognizable claim of liberty or property interest. The Constitution makes no express reference to a right to privacy concerning one's gender, nor does it reference a right to be treated consistent with one's gender identity. Therefore, Plaintiffs must show that the right is somehow implicit in the constitutional text and that the Due Process clause provides substantive protection for Plaintiff's right to privacy and autonomy under the "liberty" interest. Dobbs, supra. at 215.

Here, Plaintiffs do not allege sufficient facts for this court to conclude that the right to amend the sex designation on their birth certificate has historically been protected. They claim that since the District Court's decision in Arroyo González v. Rosselló Nevares, 305 F.Supp. 3d 327 (D.P.R. 2018), transgender people have the right to change the gender that appears in their birth certificates from one gender to another (male or female), but point to no authority suggesting that a non-binary classification has existed prior to the year 1931, when the Demographic Registry became a formal and credible statistical registry. See Statement of Motives, Act No. 220 of August 9, 1998. Plaintiffs allege that seventeen (17) states, New York City, and several municipalities acknowledge nonbinary genders on birth certificates. (Docket No. 12, ¶ 35-36). These states and

**131**

municipalities, however, authorized nonbinary genders on birth certificates throughout the legislative process and not via the courts. It follows that the right to include nonbinary genders on birth certificates was not reasonably considered, or even existed, when the Fourteenth Amendment was adopted. See Dobbs, 597 U.S. at 251 ("Not only are respondents and their *amici* unable to show that a constitutional right to abortion was established when the Fourteenth Amendment was adopted, but they have found no support for the existence of an abortion right that predates the latter part of the 20th century—no state constitutional provision, no statute, no judicial decision, no learned treatise").

Plaintiffs also failed to plead how the right of a transgender person to self-determination and autonomy is an essential component of ordered liberty. An individual's freedom to act does not confer the right to compel the government to act. Brown v. Cooke, 362 F. App'x 897, 900 (10th Cir. 2010) ("[T]here is [no] fundamental right of citizens to compel the Government to accept a common-law name change and reform its records accordingly"). Plaintiffs' freedom to define and express their identity may correspond to one of the many understandings of liberty, but it is not an integral component of "ordered liberty" as defined by the Supreme Court. See Dobbs, 597 U.S. at 256 ("License to act on the basis of such beliefs may correspond to one of the many understandings of 'liberty,' but it is certainly not 'ordered liberty'"). As a result, Plaintiffs have failed to allege sufficient facts to conclude that there is a long history and tradition of protecting the right to amend the sex designation on a birth certificate to reflect a nonbinary gender identity, or that such right is fundamental to the scheme of ordered liberty. In this way, the Second Amended Complaint must be dismissed.

14

**132**

**D. The Department of Health's policy and practice does not discriminate on the basis of sex and is valid under the Equal Protection Clause.**

Plaintiffs claim that because Puerto Rico's Birth Certificate policy violates the Fourteenth Amendment under the Equal Protection clause by allowing for cisgender and transgender persons to have a birth certificate that reflects their gender identity, it discriminates against a nonbinary person on the basis of sex. (Docket No. 12, pp. 13-16). They contend that Defendants' policy engages in sex-based discrimination, which is subject to heightened scrutiny. (Docket No. 12, ¶¶ 38-66). However, gender identity and transgender status are not a suspect classification under the Equal Protection Clause and therefore should be analyzed under the rational basis framework.

The Equal Protection Clause provides that "[n]o state shall…deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV §1. It is "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr. 473 U.S. 432 (1985). However, the guarantee of equal protection coexists with the reality that most legislation must be classified for some purpose or another. See Romer v. Evans, 517 U.S. 620 (1996). Thus, Equal Protection Clause "does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992). When considering an equal protection claim, the court must first determine what level of scrutiny applies and then determine whether the law or policy at issue survives such scrutiny.

In determining what level of scrutiny applies to a plaintiff's equal protection claim, the court looks for the basis of the distinction between the classes of persons. See O.S. v. Carolene Products Co., 304 U.S. 144, 152 n.4 (1938). "If the challenged government action implicates a fundamental right, or classifies individuals using a suspect classification, such as race or national

origin, a court will review that challenged action applying a strict scrutiny." Price-Cornelison v. Brooks, 524 F.3d 1103, 1109 (10th Cir. 2008).

On the other hand, if the challenged government action does not implicate a fundamental right or a protected class, the court will apply a rational basis review. Carney v. Okla. Dep't of Public Safety, 875 F.3d 1347 (10th Cir. 2017). Under the rational standard, Plaintiffs' claim will fail "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307 (1993).

Since "[e]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," the starting point for evaluating the constitutionality of a law, policy or practice under the Equal Protection Clause is the rational basis test. F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993). Therefore, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Id. This standard of review is a paradigm of judicial restraint. Id.

The SCOTUS also developed a third category, referred to as "quasi-suspect" classification, which is subject to intermediate scrutiny. However, the Court has only placed two (2) classifications in this category: sex and illegitimacy. See Reed v. Reed, 404 US. 71 (1971) (holding classifications based on sex calls for heightened standard of review); Trimble v. Gordon, 430 U.S. 762 (1977) (holding that classifications based on legitimacy were not inherently suspect but that "[i]n a case like this, the Equal Protection Clause requires more than the mere incantation of a proper state purpose"). These cases, however, do not provide guidance on whether intermediate scrutiny should apply to classifications based on characteristics beyond sex or illegitimacy. The

16

**134**

Supreme Court has not expanded the scope of quasi-suspect classification and, since adding illegitimacy in 1977, has declined every opportunity to recognize a new quasi-suspect class. See City of Cleburne, 473 U.S. at 445-446 (refusing to recognize mental disabilities as a quasi-suspect classification, as "it would be difficult to find a principled way to distinguish" that classification from "a variety of other groups"); Mass. Bd. of Ret. v. Murgia, 427 U.S 307 (1976) (holding that age classifications are subject to rational basis review); Romer v. Evans, 517 U.S. 620, 633 (1996) (avoiding the question of whether a classification based on sexual orientation merits heightened scrutiny). Therefore, the heightened scrutiny has not been extended to other classifications such as classifications based on gender identity.

In the case at bar, there is a rational basis for the Department of Health to prohibit an amendment of sex designation on a birth certificate to include a gender which is neither male nor female. The Department of Health has a legitimate interest in protecting the integrity and accuracy of vital records. See, e.g., Pavan v. Smith, 582 U.S. 563 (2017) (Gorsuch J., dissenting) (rational reasons exist for a biology-based birth registration regime, like ensuring government officials can identify public health trends and helping individuals determine their biological lineage, citizenship, or susceptibility to genetic disorders"). Additionally, the Department of Health has a legitimate interest in maintaining a binary system for the purpose of collecting information.

Plaintiffs allege that because transgender nonbinary persons cannot obtain a birth certificate with that reflects their gender, they are deprived of the equal protection of the laws. They also allege that by having "X" in a U.S. Passport gender marker and not being able to make that change in their birth certificate, it creates a gap between the reality presented in the U.S. Passport and the one presented in the Demographic Registry. (Docket No. 12, ¶¶ 43-45). Nevertheless, neither the Due Process Clause nor the Equal Protection Clause demand logical

**135**

tidiness. The fact that a law is imperfect does not make it irrational. See Vance v. Bradley, 440 U.S. 93, 108 (1979) ("Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this perfection is by no means required").

Finally, it is not the role of the court to decide whether Defendants have chosen the best path, or the least restrictive means. Equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. Beach Commc'ns, 508 U.S. at 313; see also New Orleans v. Dukes, 427 U.S. 297, 303 (1976) ("The judiciary may not sit as a super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines…"). As a result, Plaintiffs cannot state a cognizable claim under the Due Process or Equal Protection clauses and must be dismissed with prejudice.

**E. The Department of Health's policy and practice does not violate Plaintiffs' First Amendment Rights.**

Plaintiffs' claim that Defendant's refusal to amend their birth certificates violates their first amendment right to freedom of speech by: (i) "compelling a non-nonbinary individual to identify with a sex and identity inconsistent with who they are"; and (ii) compels them to "disclose to third parties a conflict in their official documents." (Docket No. 12, ¶¶ 72-74). However, as this court will conclude, the contents of a birth certificate are government speech and therefore, do not implicate the First Amendment.

The First Amendment provides that "Congress shall make no law…abridging the freedom of speech." U.S. Const. amend. I. The First Amendment protects against prohibitions of speech, and against laws or regulations that compel speech. "Since all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech

18

**136**

is that one who chooses to speak may also decide what not to say." <u>Hurley</u> v. <u>Irish-Am. Gay, Lesbian and Bisexual Grp. Of Boston</u>, 515 U.S. 557 (1995). However, the Free Speech Clause protection "extend[s]...only to conduct that is inherently expressive." <u>Rumsfeld</u> v. <u>Forum for Academic & Institutional Rights, Inc.</u>, 547 U.S. 47, 66 (2006); <u>see also Cressman</u> v. <u>Thompson</u>, 798 F.3d 938, 952-953 (10th Cir. 2015) (stating that the "animating principle" behind pure-speech protection is "safeguarding self-expression").

The Department of Health's policy is only implicated when Plaintiffs present their birth certificates to a third party. However, "[t]he act of presenting identification" or "handing government documents to someone else, has never been considered a form of expressive conduct. <u>United States</u> v. <u>Cline</u>, 286 F. App'x 817, 820 (4th Cir. 2008) (holding that production of identification documents does not implicate any right protected by the First Amendment). When Plaintiffs present themselves to society in conformance with their gender identities, their conduct is expressive. The expressive component of their transgender nonbinary identity is not created by the sex designation listed on their birth certificates, but by the various actions they take to present themselves as transgender nonbinary persons, that being in the way they dress or changing their legal name. The Department of Health's policy and practice does not restrict Plaintiffs' ability to express and present themselves as nonbinary persons nor does it prevent them from bringing their gender expression into alignment with their gender identities. Therefore, a change on a person's sex designation on their birth certificate does not restrict Plaintiffs' right to freedom of speech or expression.

Plaintiffs allege that Defendants' birth certificate policy and practice compels transgender nonbinary people to identify with a sex and identity inconsistent with who they are. (Docket No. 12, ¶ 72). However, the content in a birth certificate is government speech and therefore does not

imply the First Amendment. Government compelled speech is antithetical to the First Amendment. Forcing an individual "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable… "invades the sphere of intellect and spirit which is the purpose of the First Amendment to our Constitution to reserve from all official control." Wooley v. Maynard, 430 U.S. 705 (1977) (quoting W.Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943)). The government cannot coerce affirmations of belief, compel unwanted expression, or force one speaker to host the message of another as a public accommodation. See Hurley, 515 U.S. at 572.

The "First Amendment Free Speech Clause does not prevent the government from declining to express a view." Shurtleff v. City of Boston, 142 U.S. 243 (2022). The government-speech doctrine provides that" [w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." Walker v. Tex. Div. Sons of Confederate Veterans, Inc., 576 U.S. 200 (2015) ("[G]overnment statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas").

The content of a birth certificate constitutes government speech which does not imply the First Amendment. Birth certificates are a communication of data chosen by the Commonwealth of Puerto Rico, on behalf of the government. A birth certificate is spoken by the government, who is certifying the information therein to be accurate, as opposed to the birth certificate holder. The State determines what information is required on a birth certificate, and what information can and cannot be subsequently amended. Walker, 576 U.S. at 121 ("[L]icense plates are, essentially, government ID's. And issuers of ID typically do not permit the placement on their ID's of message[s] with which they do not wish to be associated"). If state law permitted individuals to communicate their own messages in birth certificates without restriction, birth certificates would

cease to function as reliable government-issued identification. Id. As a result, Plaintiff's failed to state a claim under the First Amendment and must therefore be dismissed.

## IV.  CONCLUSION

Taking as true the allegations in the Second Amended Complaint, it is evident that Plaintiffs' federal claims under the First and Fourteenth Amendments fail as a matter of law. The Puerto Rico Civil Code and the Vital Statistics Registry Act do not recognize a nonbinary gender or an "X" as a gender marker as requested by Plaintiffs. Therefore, the Department of Health is not authorized by law to issue a birth certificate with a gender marker other than male or female. Additionally, Plaintiffs have failed to plead sufficient facts to show that the Department of Health's policy and practice shocks the conscience nor that there is a long history and tradition of protecting a right to amend a birth certificate to reflect a nonbinary gender identity or that such right is fundamental to the scheme of ordered liberty. Finally, the Department of Health's policy does not violate Plaintiffs First Amendment rights since the Government does not restrict their ability to express and present themselves in alignment with their gender identity. As a result, this Court must dismiss Plaintiff's Second Amended Complaint with prejudice.

**WHEREFORE**, appearing Defendants respectfully request the court to grant the present Motion to Dismiss for Failure to State a Claim and as a result, dismiss with prejudice all claims against them.

**I HEREBY CERTIFY** that I electronically filed the foregoing with the Clerk of the Court, who will send notification of such filing to the parties subscribing to the CM/ECF System.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico this 22nd day of January 2024.

**139**

**DOMINGO EMANUELLI-HERNÁNDEZ**
Secretary of Justice

**SUSANA I. PEÑAGARÍCANO-BROWN**
Deputy Secretary in Charge of Civil Litigation

**MARCIA I. PÉREZ-LLAVONA**
Director of Legal Affairs
Federal Litigation and Bankruptcy Division

*S/ Diana I. Pérez-Carlo*
**DIANA I. PÉREZ-CARLO**
USDC No. 307313
Email: diana.perez@justicia.pr.gov
Tel. (787) 721-2900, ext. 1419

**DEPARTMENT OF JUSTICE
OF PUERTO RICO**
Federal Litigation Division
PO Box 9020192
San Juan Puerto Rico, 00902-0192

**140**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ÍNARU NADIA DE LA FUENTE DÍAZ, MARU ROSA HERNÁNDEZ, ANDRÉ RODRIL, YEIVY VÉLEZ BARTOLOMEI, GÉ CASTRO CRUZ, DENI JUSTE<br><br>Plaintiffs<br><br>v.<br><br>PEDRO PIERLUISI URRUTIA, in his official capacity as Governor of the Commonwealth of Puerto Rico; DR. CARLOS R. MELLADO LÓPEZ, in his official capacity as the Secretary of the Department of Health of the Commonwealth of Puerto Rico; WANDA LLOVET DÍAZ, in her official capacity as the Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico.<br><br>Defendants | Civil No. 23-1544 (MAJ) |

**OPPOSITION TO PLAINTIFFS' MOTION TO REQUEST THE ENTRY OF A PRELIMINARY INJUNCTION**

**TO THE HONORABLE COURT:**

 **COME NOW** Defendants, Hon. Pedro Pierluisi Urrutia, in his official capacity as Governor of the Commonwealth of Puerto Rico; Dr. Carlos R. Mellado López, in his official capacity as Secretary of the Department of Health of the Commonwealth of Puerto Rico; and Wanda Llovet Díaz, in her official capacity as the Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico (hereinafter "Defendants"), and very respectfully STATE, ALLEGE, and PRAY as follows:

**141**

## I.    INTRODUCTION

On October 27, 2023, Plaintiffs filed a Complaint against appearing Defendants (Docket No. 1). On November 15, 2023, Plaintiffs filed a Second Amended Complaint challenging Puerto Rico's Birth Certificate policy and practice to recognize only the binary male/female system. (Docket No. 12, pp. 13-19). They claim that the policy and practice to disallow transgender nonbinary people born in Puerto Rico from correcting their gender marker on their birth certificate to "X" violates their Fourteenth Amendment's right to privacy and Equal Protection and their First Amendment Right to freedom of speech. Id. Plaintiffs further argue that Article 694 of the Puerto Rico Civil Code, P.R. Laws ann. tit. 31 §7655, and the Vital Statistics Registry of Puerto Rico, P.R. Laws ann. tit. 24 § 1041 et seq., are unconstitutional as applied by the Demographic Registry because they cannot change a nonbinary person's gender to "X." (Docket No. 12, ¶37).[1]

On January 22, 2024, Defendants filed a Motion to Dismiss for Failure to State a Claim arguing that the Puerto Rico Civil Code and the Vital Statistics Registry Act do not recognize a nonbinary gender and therefore, Defendants are not authorized by law to issue a birth certificate with a sex marker other than male or female. (Docket No. 17). Defendants also argued that Plaintiffs failed to allege sufficient facts to conclude that there is a long history and tradition of protecting a right to amend their sex designation on a birth certificate to reflect a nonbinary gender

---

[1] Plaintiffs request this Honorable Court to: (i) rule that the Government's actions and their enforcement of the Puerto Rico Birth Certificate policy violate the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the United States Constitution, as well as the Free Speech Clause of the First Amendment of the United States Constitution; (ii) permanently enjoin Defendants from enforcing the Puerto Rico Birth Certificate policy, which includes refusing to provide birth certificates to transgender nonbinary persons that accurately reflect their gender identity; (iii) permanently enjoin Defendants from relying upon its male-or-female, binary-only gender marker policy and issue corrected birth certificates consistent with Plaintiffs' nonbinary gender identity; (iv) order Defendants to permit transgender nonbinary persons born in Puerto Rico to correct their birth certificates to reflect their sex, consistent with their gender identity; (v) issue a writ of *mandamus* compelling Defendants to process Plaintiffs' application for gender change; and (vi) award Plaintiffs costs and attorney fees and other relief that the Court deems proper. (Docket No. 12, pp. 20-21).

**142**

identity or that such right is fundamental to the scheme of ordered liberty that would classify Defendants' actions as a due process clause violations under the Fourteenth Amendment. Id. Moreover, Defendants argued that Plaintiffs failed to plead how the Department of Health's policy violates the Equal Protection Clause. Id. And finally, Defendants sustained that the Department of Health's policy does not violate Plaintiffs' First Amendment rights because the Government does not restrict their ability to express and present themselves in alignment with their gender identity. Id.

With their initial Complaint, Plaintiffs filed a Motion for Preliminary Injunction under section 1983 (Docket No. 3). On February 8, 2024, this Court Ordered appearing Defendants to file their response to Plaintiffs' request for a preliminary injunction (Docket No. 18). Plaintiffs' arguments on their motion for preliminary injunction miss the mark and fail to establish the required four (4) elements for such an extraordinary remedy. Importantly, it is unlikely that Plaintiffs will succeed on the merits of their Fourteenth and First Amendment claims and will not suffer any irreparable harm if the preliminary injunction is denied. On the other hand, the Department of Health and the Demographic Registry have a public interest in keeping the current system to maintain uniformity between the state agencies, facilitate the search of identities, and limit unnecessary mismatches. As a result, Plaintiffs' request to enjoin the Government's birth certificate policy and practice must be denied with prejudice.

## II.  A PRELIMINARY INJUNCTION IS UNWARRANTED IN THE PRESENT CASE.

The Court of Appeals for the First Circuit has established four (4) factors in determining whether to issue a preliminary injunction, to wit: (i) the movant's probability of success on the merits; (ii) the likelihood of irreparable harm absent preliminary injunctive relief; (iii) a comparison between the harm to the movant if no injunction issues and the harm to the objectors

**143**

if one does issue; and (iv) how the granting or denial of an injunction will interact with the public interest. See New Comm Wireless Services v. SprintCom, Inc., 287 F.3d 1, 8-9 (1st Cir. 2002). A preliminary injunction is an "extraordinary and drastic remedy," never awarded as of right. Munaf v. Green, 553 U.S. 674, 690 (2008). Whether to issue a preliminary injunction depends on balancing equities where the requisite showing for each of the four factors turns, in part, on the strength of the others. Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 611-13 (1st Cir. 1988). Although a hearing is often held prior to entry of a preliminary injunction, a hearing is not an indispensable requirement. Aoude v. Mobil Oil Corp., 862 F.2d 890, 893 (1st Cir. 1988).[2] Plaintiffs have failed to meet all four prongs that are required to satisfy the issuing of a preliminary injunction. As a result, their request must be denied.

### A. Plaintiffs are unlikely to succeed on the merits.[3]

The first prong, the movant's likelihood of success on the merits, "weighs most heavily in the preliminary injunction calculus." Shurtleff v. City of Bos., 986 F.3d 78, 85-86 (1st Cir. 2021) (citing Ryan v. U.S. Immig. & Customs Enf't, 974 F.3d 9, 18 (1st Cir. 2020)) "[I]f the movant cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." Id.

Plaintiffs allege that they have a likelihood of success on the merits because of their rights to freedom of speech, right to privacy, their right to individual autonomy and self determination to

---

[2] In their Preliminary Injunction, Plaintiffs stated that "to the extent that we expect defendant to stipulate to the content of their own official documents, it may be that the matter is susceptible to adjudication on the papers." Defendants stipulate the content in the "Application for Gender Change in Vital Event Certification" included in the Second Amended Complaint. (Docket No. 12-1).

[3] Being that the matters to be discussed in the instant Response were the subject of Defendants' Motion to Dismiss for Failure to State a Claim filed on January 22, 2024, Defendants hereby incorporate by reference the arguments raised in said Motion as if fully set forth herein. (Docket No. 17).

**144**

live in accordance with their gender identity and the District Court's ruling in <u>Arroyo González</u> v.

<u>Rosselló Nevares</u>, 305 F. Supp. 3d 327 (D.P.R. 2018). However, the Department of Health's policy

and practice does not constitute a violation of Plaintiffs' constitutional rights and therefore, they

are unlikely to succeed on the merits of the Second Amended Complaint.

1. **The Puerto Rico Department of Health's policy and practice is in strict compliance with the Puerto Rico Civil Code and the Vital Statistics Registry Act of Puerto Rico.**

Plaintiffs challenge the Government's policy and practice of allowing change of gender

only between male or female that does not contemplate a nonbinary gender marker (Docket No.

12, ¶37).  However, the Department of Health's policy and practice when issuing birth certificates

is done in strict compliance with the Puerto Rico Civil Code and the Vital Registry's Act. Since

the Department of Health and its Demographic and Vital Statistics of Puerto Rico are part of the

executive branch of government, they cannot issue a birth certificate with a nonbinary gender

marker that has not been recognized by the Legislature.

The Puerto Rico Civil Code recognizes the right to modify a person's gender. Article 694

states:

> No amendments will be authorized in the original birth record. A court may issue a judgment authorizing the register to make a note on the original register's margin of the person's sex, when applicable, due to a posterior change or modification to the sex at birth. However, in these cases, the substitution of the historical and vital act of sex at birth will not be authorized. Only in the case where a medical expert determines the ambiguity of the sex at birth, at the time of birth, and this fact is registered in the records of the Demographic Registry will the judicial authority order the substitution of the original sex at birth in the demographic registry records.

> Nothing here construed will undermine the process established in cases of a request for change of gender in a birth certificate. These requests will be accompanied with the Passport, driver's license or a certification submitted by a health professional who has a physician-patient relationship and certifies the applicant's gender. In these cases, the registry shall issue the certificate, safeguarding the right to privacy. (Translation ours) P.R. Laws ann. tit. 31 §7655.

**145**

As to the interpretation and application of the Law, the Puerto Rico Civil Code incorporates the rules of hermeneutics. When analyzing the wording used in the Code, Article 25 states: "The words used in this Code in present tense, includes future tense; those used in male voice will also include the female voice, unless due to the nature of the disposition, it is limited only to one; a singular number will include the plural number, and the plural will include the singular number." P.R. Laws Ann. tit. 31 §5347 (our translation).[4] As a result, the Civil Code recognizes the right of transgender individuals to change the gender marker in their birth certificates to reflect the applicants' true gender, whether its male or female.[5] The Puerto Rico Legislative Assembly did not legislate nor recognize in its rule of hermeneutics a nonbinary gender other than male or female.

The Civil Code further establishes that the organization and administration of all vital facts and judicial acts concerning a person's civil status are ruled by the Vital Statistics Registry Act of Puerto Rico. P.R. Laws ann. tit. 24 §1041 et seq. The Vital Statistics Registry Act creates a General Demographic Registry within the Department of Health. Its purpose is to register, collect, guard, preserve and certify vital facts of people born in Puerto Rico. Id. at § 1042 (1). After the year 1931,

---

[4] Article 25, in its original Spanish language, states: "Las palabras usadas en este Código en el tiempo presente, incluyen también el futuro; las usadas en masculino incluyen el femenino, a menos que por la naturaleza de la disposición se limiten manifiestamente a solo uno; el número singular incluye el plural, y el plural incluye el singular." P.R. Laws Ann. tit. 31 §5347.

[5] This newly approved Civil Code incorporated the ruling issued by a sister court in this district. In Arroyo González v. Rosselló Nevares, 305 F. Supp. 3d 327 (D.P.R. 2018) the court recognized the process for a person to request a change of gender in their birth certificate. In the cited case, the district court issued an Order recognizing the right of transgender individuals to change the gender marker in their birth certificates with the applicants' true gender. Additionally, the court ordered the Demographic Registry of the Government of Puerto Rico to adopt the criteria of the Department of Transportation and Public Works "Request to Change Transgender Person's Gender Marker" as the application form to be submitted and accepted as the first step toward the issuance of their new birth certificates. In their application, individuals shall also present an official document, whether a passport, driver's license or a certification issued by a healthcare professional, that reflects that persons' true gender, whether male or female. Arroyo, supra., at 333-334. However, neither the District Court nor the Legislative Assembly recognized a nonbinary gender marker.

the Demographic Registry became a formal and credible statistical registry that allows the study of vital statistics of our population. See Statement of Motives of Act No. 220 of August 9, 1998, also known as the Vital Statistics Registry Act of Puerto Rico, P.R. Laws ann. tit. 24 §1041 et seq.

Pursuant to the Puerto Rico Civil Code, the Vital Statistics Registry Act of Puerto Rico and as ruled by the Puerto Rico Supreme Court, there are only two (2) ways for the correction of mistakes in a birth certificate: (i) before the certificate is registered; and (ii) after the certificate has been registered at the Department of Health. The Puerto Rico Supreme Court has interpreted the Vital Statistics Registry Act of Puerto Rico restrictively, concluding that any change requested must have been previously authorized by law. Ex Parte Delgado-Hernández, 165 D.P.R. 170, 189 (2005); Ex Parte León Rosario, 109 D.P.R. 804 (1980).

Article 694 of the Puerto Rico Civil Code, 31 P.R. Law ann. 31 §7655, and the United States District Court for the District of Puerto Rico's opinion in Arroyo González v. Rosselló Nevarez, 305 F. Supp. 327 (D.P.R. 2018) allows for change in the birth certificate when the applicant is a male or female transgender person. Yet, the Puerto Rico Civil Code and the Vital Statistics Registry Act do not authorize a change in a person's birth certificate to reflect a gender other than male or female.

### 2. The Department of Health's policy and practice does not infringe upon a fundamental right protected by the Fourteenth Amendment's Substantive Due Process Clause.

In their preliminary injunction, Plaintiffs allege that the substantive protections of the Due Process Clause forbid the state from interfering with the right of a transgender person to self-determination and to live in accordance with their gender identity. (Docket No. 3, p. 5). But the Department of Health's policy and practice is not conscience shocking under the Due Process

Clause and even assuming Plaintiffs adequately alleged a conscience shocking conduct, they failed to plead a cognizable liberty or property interest.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without the due process of law." U.S. Const. amend. XIV §1. The Supreme Court of the United States has recognized that the Due Process Clause protects two categories of substantive rights: (i) the rights guaranteed by the first eight amendments; and (ii) a select list of fundamental rights that are not mentioned in the Constitution. <u>Dobbs</u> v. <u>Jackson Women's Health Org.</u>, 597 U.S. 215, 237-238 (2022). In deciding whether a right falls into either of these categories, the Court has long asked whether the right is "deeply rooted in history or tradition" and whether it is essential to our Nation's "scheme of ordered liberty." <u>Id</u>. "Historical inquiries of this nature are essential whenever we are asked to recognize a new component of the liberty protected by the Due Process Clause because the term liberty alone provides little guidance." <u>Dobbs</u>, 597 U.S. at p. 239.

A Plaintiff's substantive due process claim challenges the specific acts of a state officer. Plaintiff must show that the acts were so egregious as to shock the conscience that they deprived them of a protected interest in life, liberty, or property. See <u>Rivera</u> v. <u>Rhode Island</u>, 402 F.3d 27, 34 (1st Cir. 2005) (stating that "[i]t is not enough to claim the governmental action shocked the conscience" but plaintiff must also show a deprivation of a protected interest). A conscience shocking conduct is an indispensable element of a substantive due process challenge to executive action. <u>DePoutot</u> v. <u>Raffaelly</u>, 424 F.3d 112, 118 n. 4 (1st Cir. 2005).

The First Circuit has stated that the requisite inquiry involves "a comprehensive analysis of the attendant circumstances before any abuse of official power is condemned as conscience-shocking." <u>Pagán</u> v. <u>Calderón</u>, 448 F.3d 16, 32 (1st Cir. 2006) (quoting <u>Depoutot</u>, 424 F.3d at 119). For example, for a conduct to be deemed as conscience shocking, it must be "at the very least,

**148**

extreme and egregious" or "truly outrageous, uncivilized, and intolerable." Id.  A mere violation of state law, even violations resulting from bad faith, do not invariably amount to conscience shocking behavior. Id. The allege conscience shocking behavior "must be stunning." Amsden v. Moran, 904 F.2d 748 (1st Cir. 1990).

Plaintiffs have failed to identify a fundamental right that is protected by the Fourteenth Amendment and therefore, are unlikely to prevail on the merits. When Amnesty International Puerto Rico Chapter requested an amendment to the application for gender change in Vital Events Certification to include "X" as an alternative for nonbinary, intersex or gender nonconforming persons, the Department of Health ultimately responded that since the Legislative Assembly nor the courts had addressed this particular request, they were impeded from making the change. (Docket No. 12, ¶ 8; Docket Nos. 12-2, 12-3). Defendants' application of its policy is not conscience shocking, extreme, egregious, or horrifying. Therefore, Plaintiffs' preliminary injunction must be denied.

Even assuming *in arguendo* that Plaintiffs adequately alleged a conscience shocking conduct by the Department of Health, they nevertheless failed to plead a cognizable claim of liberty or property interest. The Constitution makes no express reference to a right to privacy concerning one's gender, nor does it reference a right to be treated consistent with one's gender identity. Therefore, Plaintiffs must show that the right is somehow implicit in the constitutional text and that the Due Process clause provides substantive protection for Plaintiff's right to privacy and autonomy under the "liberty" interest. Dobbs, supra. at 215.

Here, Plaintiffs do not allege sufficient facts for this court to conclude that the right to amend the sex designation on their birth certificate has historically been protected.  They claim that since the District Court's decision in Arroyo González v. Rosselló Nevares, 305 F.Supp. 3d

9

**149**

327 (D.P.R. 2018), transgender people have the right to change the gender that appears in their birth certificates from one gender to another (male or female), but point to no authority suggesting that a non-binary classification has existed prior to the year 1931, when the Demographic Registry became a formal and credible statistical registry. See Statement of Motives, Act No. 220 of August 9, 1998. Plaintiffs allege that seventeen (17) states, New York City, and several municipalities acknowledge nonbinary genders on birth certificates. (Docket No. 12, ¶¶35-36). These states and municipalities, however, authorized nonbinary genders on birth certificates throughout the legislative process and not via the courts.  It follows that the right to include nonbinary genders on birth certificates was not reasonably considered, or even existed, when the Fourteenth Amendment was adopted. See Dobbs, 597 U.S. at 251 ("Not only are respondents and their *amici* unable to show that a constitutional right to abortion was established when the Fourteenth Amendment was adopted, but they have found no support for the existence of an abortion right that predates the latter part of the 20th century—no state constitutional provision, no statute, no judicial decision, no learned treatise").

### 3. The Department of Health's policy and practice does not discriminate on the basis of sex and is valid under the Equal Protection Clause.

In their Preliminary Injunction, Plaintiffs claim that the Department of Health's policy and practice discriminates on the basis of sex by not providing a gender marker to those persons who do not identify as female or male. However, gender identity and transgender status are not a suspect classification under the Equal Protection Clause and therefore should be analyzed under the rational basis framework and not under a heightened scrutiny.

The Equal Protection Clause provides that "[n]o state shall…deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV §1. It is "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne

10

**150**

Living Ctr. 473 U.S. 432 (1985). However, the guarantee of equal protection coexists with the reality that most legislation must be classified for some purpose or another. See Romer v. Evans, 517 U.S. 620 (1996). Thus, Equal Protection Clause "does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992). When considering an equal protection claim, the court must first determine what level of scrutiny applies and then determine whether the law or policy at issue survives such scrutiny.

In determining what level of scrutiny applies to a plaintiff's equal protection claim, the court looks for the basis of the distinction between the classes of persons. See O.S. v. Carolene Products Co., 304 U.S. 144, 152 n.4 (1938). "If the challenged government action implicates a fundamental right, or classifies individuals using a suspect classification, such as race or national origin, a court will review that challenged action applying a strict scrutiny." Price-Cornelison v. Brooks, 524 F.3d 1103, 1109 (10th Cir. 2008). On the other hand, if the challenged government action does not implicate a fundamental right or a protected class, the court will apply a rational basis review. Carney v. Okla. Dep't of Public Safety, 875 F.3d 1347 (10th Cir. 2017). Under the rational standard, Plaintiffs' claim will fail "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307 (1993).

Since "[e]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," the starting point for evaluating the constitutionality of a law, policy or practice under the Equal Protection Clause is the rational basis test. F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993). Therefore, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional

rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Id. This standard of review is a paradigm of judicial restraint. Id.

In the case at bar, there is a rational basis for the Department of Health to prohibit an amendment of sex designation on a birth certificate to include a gender which is neither male nor female. The Department of Health has a legitimate interest in protecting the integrity and accuracy of vital records. See, e.g., Pavan v. Smith, 582 U.S. 563 (2017) (Gorsuch J., dissenting) (rational reasons exist for a biology-based birth registration regime, like ensuring government officials can identify public health trends and helping individuals determine their biological lineage, citizenship, or susceptibility to genetic disorders"). Additionally, the Department of Health has a legitimate interest in maintaining a binary system for the purpose of collecting information.

Finally, it is not the role of the court to decide whether Defendants have chosen the best path, or the least restrictive means. Equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. Beach Commc'ns, 508 U.S. at 313; see also New Orleans v. Dukes, 427 U.S. 297, 303 (1976) ("The judiciary may not sit as a super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines…"). As a result, Plaintiffs cannot state a cognizable claim under the Due Process or Equal Protection clauses and are unlikely to succeed on the merits. Thus, their request for a preliminary injunction must be dismissed with prejudice.

### 4. The Department of Health's policy and practice does not violate Plaintiffs' First Amendment Rights.

In their preliminary injunction, Plaintiffs argue that the Department of Health's refusal to amend their birth certificate violates their First Amendment right to freedom of speech. However,

as this court will conclude, the contents of a birth certificate are government speech and therefore, do not implicate the First Amendment.

The First Amendment provides that "Congress shall make no law…abridging the freedom of speech." U.S. Const. amend. I. The First Amendment protects against prohibitions of speech, and against laws or regulations that compel speech. "Since all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. Of Boston, 515 U.S. 557 (1995). However, the Free Speech Clause protection "extend[s]…only to conduct that is inherently expressive." Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 66 (2006); see also Cressman v. Thompson, 798 F.3d 938, 952-953 (10th Cir. 2015) (stating that the "animating principle" behind pure-speech protection is "safeguarding self-expression").

The Department of Health's policy is only implicated when Plaintiffs present their birth certificates to a third party. However, "[t]he act of presenting identification" or "handing government documents to someone else, has never been considered a form of expressive conduct." United States v. Cline, 286 F. App'x 817, 820 (4th Cir. 2008) (holding that production of identification documents does not implicate any right protected by the First Amendment). When Plaintiffs present themselves to society in conformance with their gender identities, their conduct is expressive. The expressive component of their transgender nonbinary identity is not created by the sex designation listed on their birth certificates, but by the various actions they take to present themselves as transgender nonbinary persons, that being in the way they dress or changing their legal name. The Department of Health's policy and practice does not restrict Plaintiffs' ability to express and present themselves as nonbinary persons nor does it prevent them from bringing their

**153**

gender expression into alignment with their gender identities. Therefore, a change on a person's sex designation on their birth certificate does not restrict Plaintiffs' right to freedom of speech or expression.

The content in a birth certificate is government speech and therefore does not imply the First Amendment. Government compelled speech is antithetical to the First Amendment. Forcing an individual "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable… "invades the sphere of intellect and spirit which is the purpose of the First Amendment to our Constitution to reserve from all official control." Wooley v. Maynard, 430 U.S. 705 (1977) (quoting W.Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943)).   The government cannot coerce affirmations of belief, compel unwanted expression, or force one speaker to host the message of another as a public accommodation. See Hurley, 515 U.S. at 572.

Birth certificates are a communication of data chosen by the Commonwealth of Puerto Rico, on behalf of the government. A birth certificate is spoken by the government, who is certifying the information therein to be accurate, as opposed to the birth certificate holder. The State determines what information is required on a birth certificate, and what information can and cannot be subsequently amended. Walker, 576 U.S. at 212 ("[L]icense plates are, essentially, government ID's. And issuers of ID typically do not permit the placement on their ID's of message[s] with which they do not wish to be associated"). If state law permitted individuals to communicate their own messages in birth certificates without restriction, birth certificates would cease to function as reliable government-issued identification. Id. As a result, Plaintiff's fail to prove their likelihood of success on the merits and therefore their preliminary injunction must be denied.

**B. Plaintiffs have not suffered irreparable harm that warrants the issuance of a preliminary injunction.**

Irreparable harm is a necessary threshold for awarding preliminary injunctive relief. Preliminary injunctions are a strong medicine, and they should not be issued merely to calm the imaginings of the movant. Matos ex rel. Matos v. Clinton Sch. Dist., 367 F.3d 68, 73 (1st Cir. 2004). A preliminary injunction should not be issued except to prevent a real threat of harm. Ross-Simons, 102 F.3d at 19; 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 2948.1, at 153-54 (2d ed. 1995). A threat that is either unlikely to materialize or purely theoretical will not do. Ross-Simons, 102 F.3d at 19; Pub. Serv. Co. v. Town of W. Newbury, 835 F.2d 380. 382 (1st Cir. 1987). If a case can be adjudicated on the merits before the harm complained will occur, there is no sufficient justification for preliminary injunctive relief. 11A Wright, Miller & Kane, §2948.1 at 149. The irreparable harm must be "neither remote nor speculative, but actual and imminent". In re Bora Bora, Inc., 424 B.R. 17, 26 (Bankr. D.P.R. 2010).

The Supreme Court has frequently reiterated that the standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction. Los Angeles v. Lyons, 461 U.S. 95, 103 (1983). Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with the characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. Mazurek v. Armstrong, 520 U.S. 968 (1997) (*per curiam*). In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Production Co. v. Village of Gambell, Ak, 480 U.S. 531, 542 (1987).

In most cases, irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief. Irreparable harm is "an essential prerequisite" for receiving such

redress. The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant. Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004) (Internal citation omitted). A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store. Regan v. Vinick & Young (In re Rare Coin Galleries of Am., Inc.), 862 F.2d 896, 902 (1st Cir. 1988). An injunction should issue only where the intervention of a court of equity "is essential in orders effectually to protect property rights against injuries otherwise irremediable." Cavanaugh v. Looney, 248 U.S. 453, 456 (1919).

In the case at bar, Plaintiffs utterly failed to specify the factual allegations of irreparable harm needed to clear the threshold of an award of preliminary injunctive relief. In their request for preliminary injunction, Plaintiffs plead that should the Demographic Registry's policy and practice be sustained, they would lose their right to identify themselves freely. (Docket No. 3, p. 6). However, as discussed in Defendants Motion to Dismiss, the Department of Health's policy and practice does not bar Plaintiffs' expressive conduct. The expressive component of their transgender nonbinary identity is not created by the sex designation listed on their birth certificates, but by the various actions they take to present themselves as nonbinary persons and aligning it with their gender identity. Plaintiffs are currently free to identify themselves freely and therefore, no irreparable harm stemming from their alleged right to identify themselves will happen if the preliminary injunction is denied. Moreover, "X" gender markers have been available for U.S. Passports since April 11, 2022, but only one of the six plaintiffs has obtained it. (Docket Nos. 12-4 to 12-9). Therefore, no irreparable harm stemming from their alleged right to identify themselves will happen if the preliminary injunction is denied.

16

**156**

Should the court issue a preliminary injunction while it proceeds on the merits of the case, it would create a displacement in the Department of Health's database. The Department's policy and practice helps make the Demographic Registry's data useful for other agencies. Adding a third gender marker may burden other state agencies since all the agencies in Puerto Rico accommodate only two sexes, and including a third may complicate searches, burdening other agencies that use the Demographic Registry's data and therefore causing irreparable harm.

### C.  The balance of equities and the effect of the Court's ruling on the public interest undisputedly tip the balance in favor of denying preliminary injunctive relief.

The Supreme Court of the United States has stated that the final two factors, "assessing the harm to the opposing party and weighing the public interest" typically "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009). Accordingly, the Court should analyze these factors together. A preliminary injunction is a potent weapon that should be used only when necessary to safeguard a litigant's legitimate interests. Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151, 163 (1st Cir. 2004). Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as well as the substance of the legal issues it presents. See Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20, 24 (2008). The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward. University of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).

In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Production Co., 480 U.S. at 542. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Weinberger v. Romero-Barceló, 456 U.S. 305, 312 (1982). Thus, "[a]n injunction should issue only where the

17

**157**

intervention of a court of equity is essential to effectually protect property rights against injuries otherwise irremediable." Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011). This involves weighing "the balance of relevant hardships as between the parties." Vaquería Tres Monjitas, Inc., v. Irizarry, 587 F.3d 464, 482 (1st Cir. 2009). The Courts must balance "the hardships that will befall the nonmovant if the injunction does not issue." Mercado-Salinas v. Bart Enterprises Int'l, Ltd., 671 F.3d 12, 19 (1st Cir. 2011). A preliminary injunction is not appropriate unless there is "a fit (or lack of friction) between the injunction and the public interest." Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003).

It is in the public interest to have an understandable demographic registry that can provide useful data for other agencies. To minimize confusion, the Department of Health has a public interest in making this data useful for other agencies. The Department's policy and practice of keeping the system in the female and male binary enhances the ability to verify identities and limit unnecessary mismatches. Moreover, including a third sex designation may burden other agencies who use the Demographic Registry's data since the current state of law in Puerto Rico is limited to two sexes, male and female. Additionally, should the court issue a preliminary injunction, it would require that the Department of Health incur in programming costs, design and modification of its systems which would require time and monetary resources. Therefore, it is in the public's best interest that the preliminary injunction be denied.

### III.    CONCLUSION

The Puerto Rico Department of Health and its division of Demographic Registry and Vital Statistics are part of the executive branch of the government. The executive branch contemplates the authority to execute, carry out, and enforce the laws. The executive branch does not make the laws in the first instance. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952)

18

**158**

("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker"). As a result, the Department of Health and the Division of Demographic Registry and Vital Statistics cannot authorize Plaintiffs' request for change in the birth certificate without legislation to that effect or a court order.

Notwithstanding, Plaintiffs' allegations do not meet any of the necessary requirements that must be established for the issuance of such an extraordinary relief, the preliminary injunction. First, Plaintiffs are unlikely to succeed on the merits because of the arguments espoused in the Motion to Dismiss, adopted by reference as if fully set forth herein and discussed in this Opposition. Second, Plaintiffs have failed to set forth an irreparable harm. Plaintiffs are currently free to identify themselves freely and therefore, no irreparable harm stemming from their alleged right to identify themselves will happen if the preliminary injunction is denied. Lastly, it is in the public interest that the Demographic Registry maintains an integrated system where other state agencies may collect data, verify identities, and limit unnecessary mismatches. Given the extraordinary nature relief requested by Plaintiffs, it is respectfully pleaded that this court maintains the status quo and deny the request for preliminary injunction.

**WHEREFORE**, appearing Defendants respectfully request that the court deny Plaintiffs' Request for a Preliminary Injunction and dismiss with prejudice all claims against them.

**I HEREBY CERTIFY** that I electronically filed the foregoing with the Clerk of the Court, who will send notification of such filing to the parties subscribing to the CM/ECF System.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico this 18th day of March 2024.

**159**

**DOMINGO EMANUELLI-HERNÁNDEZ**
Secretary of Justice

**SUSANA I. PEÑAGARÍCANO-BROWN**
Deputy Secretary in Charge of Civil Litigation

**MARCIA I. PÉREZ-LLAVONA**
Director of Legal Affairs
Federal Litigation and Bankruptcy Division

*S/ Diana I. Pérez-Carlo*
**DIANA I. PÉREZ-CARLO**
USDC No. 307313
Email: diana.perez@justicia.pr.gov
Tel. (787) 721-2900, ext. 1419

**DEPARTMENT OF JUSTICE
OF PUERTO RICO**
Federal Litigation Division
PO Box 9020192
San Juan Puerto Rico, 00902-0192

**160**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ÍNARU NADIA DE LA FUENTE DÍAZ, MARU ROSA HERNÁNDEZ, ANDRÉ RODRIL, YEIVY VÉLEZ BARTOLOMEI, GÉ CASTRO CRUZ, DENI JUSTE<br><br>Plaintiffs<br><br>v.<br><br>PEDRO PIERLUISI URRUTIA, in his official capacity as Governor of the Commonwealth of Puerto Rico; DR. CARLOS R. MELLADO LÓPEZ, in his official capacity as the Secretary of the Department of Health of the Commonwealth of Puerto Rico; WANDA LLOVET DÍAZ, in her official capacity as the Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico.<br><br>Defendants | Civil No. 23-1544 (MAJ) |

## ANSWER TO SECOND AMENDED COMPLAINT
### (Docket No. 12)

**TO THE HONORABLE COURT:**

**COME NOW** Defendants, Hon. Pedro Pierluisi Urrutia, in his official capacity as Governor of the Commonwealth of Puerto Rico; Dr. Carlos R. Mellado López in his official capacity as Secretary of the Department of Health of the Commonwealth of Puerto Rico; and Wanda Llovet Díaz, in her official capacity as the Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico (hereinafter "Defendants"), and very respectfully STATE, ALLEGE, and PRAY as follows:

1

**161**

## GENERAL ALLEGATIONS

1.      All conclusions the law alleged in the Second Amended Complaint are disputed, insofar as applicable to the allegations herein.

2.      All factual allegations contained in the Second Amended Complaint, except those specifically admitted below, and only as qualified herein, are hereby denied.

3.      Defendants reserve the right to amend the answers and affirmative defenses set forth below as deemed necessary.

## JURISDICTION AND VENUE

The unnumbered paragraph of the Second Amended Complaint contains the statutory basis on which federal jurisdiction is invoked and therefore does not require a responsive pleading. To the extent that a responsive pleading is required, the same is hereby denied.

## INTRODUCTORY STATEMENT

1.      As to Paragraph 1 of the Second Amended Complaint, it is admitted that according to the unsworn statements submitted, Plaintiffs identify with a nonbinary gender identity and are residents of Puerto Rico.

2.      Paragraph 2 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.  It is affirmatively alleged that Plaintiffs are not entitled to any relief. Defendants have acted at all times in compliance with the Vital Statistics Registry Act of Puerto Rico, P.R. Laws Ann. tit. 24 §1041 et seq. and the Puerto Rico Civil Code P.R. Law Ann. tit. 31 §5311, et seq.

3.      Paragraph 3 of the Second Amended Complaint contains a recitation of the relief sought by Plaintiffs and therefore, does not require a responsive pleading. To the extent that a

**162**

responsive pleading is required, the same is hereby denied. Defendants deny that Plaintiffs are entitled to any relief under the constitutional and statutory provisions.

4.      Paragraph 4 of the Second Amended Complaint does not require a responsive pleading insofar as it is a legal conclusion regarding the ruling in Arroyo González v. Rosselló Nevares, 305 F. Supp. 3d 327 (D.P.R. 2018). In the alternative, if a responsive pleading is required, the applicability of the ruling in the present case is denied since it is not precedential nor authoritative.

5.      Paragraph 5 of the Second Amended Complaint is admitted. It is affirmatively alleged that the Registry amended their form in strict compliance with the Court's ruling in Arroyo González v. Rosselló Nevares, 305 F. Supp. 3d 327, 334 (D.P.R. 2018).

6.      Paragraph 6 of the Second Amended Complaint does not require a responsive pleading insofar as it is a legal conclusion regarding the ruling in Arroyo González v. Rosselló Nevares, 305 F. Supp. 3d 327 (D.P.R. 2018). In the alternative, if a responsive pleading is required, the applicability of the ruling in the present case is denied since it is neither precedential nor authoritative.

7.      Paragraph 7 of the Second Amended Complaint does not require a responsive pleading insofar as it includes legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied. It is affirmatively alleged that Plaintiffs' citation of Article II and Section 19 of the Commonwealth's Constitution should be read and interpreted in context.

8.      As to Paragraph 8 of the Second Amended Complaint, it is admitted that Amnesty International, Puerto Rico Chapter, sent a letter to Wanda Llovet, Executive Director of the Demographic Registry Division. It is also admitted that on September 8, 2023, Director Wanda

**163**

Llovet emailed a response stating that the Vital Statistics Registry could not include X as a gender marker.

9. Paragraph 9 of the Second Amended Complaint is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading since the exhibit filed with the Complaint is incomplete. (Docket No. 12-2). It is affirmatively alleged that the U.S. State Department's decision to include the X marker in its passports does not bind the Government of Puerto Rico. The Puerto Rico's legislative system allows no room for liberal interpretation regarding facts of life recorded in the Vital Statistic Registry of Puerto Rico, P.R. Law Ann. tit. 24 §1041 et seq., and its exceptions shall be construed restrictively. See, León Rosario v. Torres, 109 D.P.R. 804 (1980).

10. As to Paragraph 10 of the Second Amended Complaint, it is admitted that the Application for Gender Change in Vital Event Certification requires that applicant submit one of the following documents: (i) Driver's license showing change in gender; (ii) Passport showing change in gender; (iii) Certification issued by a health professional or behavior professional who has a Physician-Patient relationship with the applicant. It is affirmatively alleged that pursuant to the Court Order in Arroyo González v. Rosselló Nevares, 305 F. Supp. 3d 327 (D.P.R. 2018), the documents to be filed with the application recognizes two (2) genders, male or female and does not recognize a nonbinary gender or X gender marker.

11. Paragraph 11 of the Second Amended Complaint does not require a responsive pleading insofar as it includes legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

**164**

12. Paragraph 12 of the Second Amended Complaint does not require a responsive pleading insofar as it includes legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

13. Paragraph 13 of the Second Amended Complaint is denied.

## PLAINTIFFS

13. As to the second Paragraph 13 of the Second Amended Complaint, it is admitted in good faith that Plaintiff Ínaru Nadia de la Fuente Díaz identifies as a nonbinary person who lives in San Juan, whose passport identifies them with an X marker as their gender, as submitted in their Statement under Penalty of Perjury (Docket No. 12-4). The rest of the averment is denied for lack of sufficient knowledge and/or information at this moment.[1]

14. Paragraph 14 of the Second Amended Complaint is admitted in good faith, as submitted with their Statement Under the Penalty of Perjury. (Docket No. 12-5).

15. As to Paragraph 15 of the Second Amended Complaint is admitted in good faith that André Rodil identifies as a nonbinary person and lives in San Juan, as submitted with their Statement Under the Penalty of Perjury (Docket No. 12-6). The rest of the averment is denied for lack of sufficient knowledge and/or information at this moment.

16. Paragraph 16 of the Second Amended Complaint is admitted in good faith, as submitted with their Statement Under Penalty of Perjury (Docket No. 12-7).

17. Paragraph 17 of the Second Amended Complaint is admitted in good faith, as submitted with their Statement Under Penalty of Perjury (Docket No. 12-8).

---

[1] There appears to be a mistake in the numeration of the paragraphs in the Second Amended Complaint. To facilitate the Court's reading, Defendants have adopted the numeration assigned to each paragraph, even though they are repeated.

18.      Paragraph 18 of the Second Amended Complaint is admitted in good faith, as submitted with their Statement Under Penalty of Perjury (Docket No. 12-9).

### DEFENDANTS

17.      As to the second Paragraph 17 of the Second Amended Complaint, it is admitted that Gov. Pedro Pierluisi Urrutia, in his official capacity as governor, executes the laws of the Commonwealth and supervises all executive officers. The rest of the allegation is denied. It is affirmatively alleged that Defendant Pierluisi Urutia has acted at all times in strict compliance with the U.S. Constitution, the Puerto Rico Civil Code and the Vital Statistics and Registry Act.[2]

18.      As to the second Paragraph 18 of the Second Amended Complaint, it is admitted that Dr. Carlos R. Mellado López is Secretary of the Department of Health of Puerto Rico. Among his duties are those established in P.R. Law. Ann. tit. 24 § 1231. The rest of the allegation is denied. It is affirmatively alleged that Defendant Mellado López has acted at all times in strict compliance with the U.S. Constitution, the Puerto Rico Civil Code and the Vital Statistics and Registry Act.

19.      As to Paragraph 19 of the Second Amended Complaint, it is admitted that Defendant Wanda Llovet Díaz is the Director of the Division of Demographic Registry and Vital Statistics. It is admitted that the Department of Demographic Registry and Vital Statistics is in charge of all matters connected with the registration of births, marriages, and deaths. The rest of the allegation is denied. It is affirmatively alleged that Defendant Llovet Díaz has acted at all times in strict compliance with the U.S. Constitution, the Puerto Rico Civil Code and the Vital Statistics and Registry Act.

---

[2] There appears to be a mistake in the numeration of the paragraphs in the Second Amended Complaint. To facilitate the Court's reading, Defendants have adopted the numeration assigned to each paragraph, even though they are repeated.

6

**166**

## STATEMENT OF FACTS

20.     As to Paragraph 20 of the Second Amended Complaint, it is admitted that the general practice is for a physician to assess the newborn's genitalia and assign a sex at birth pursuant to Article 682 of the Puerto Rico Civil Code. P.R. Law Ann. tit. 31, §7632. The rest of the averment is denied for lack of sufficient knowledge and/or information. To the extent that a responsive pleading is required, the same is hereby denied.

21.     Paragraph 21 of the Second Amended Complaint is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading. To the extent that a responsive pleading is required, the same is hereby denied. It is affirmatively alleged that the cited article does not establish legal precedent.

22.     Paragraph 22 of the Second Amended Complaint is admitted.

23.     Paragraph 23 of the Second Amended Complaint is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading. To the extent that a responsive pleading is required, the same is hereby denied. It is affirmatively alleged that the cited articles do not establish legal precedent.

24.     Paragraph 24 of the Second Amended Complaint is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading. To the extent that a responsive pleading is required, the same is hereby denied. It is affirmatively alleged that the cited article does not establish legal precedent.

25.     As to Paragraph 25 of the Second Amended Complaint, it is admitted that transgender people are people who have a gender identity that is different from the gender they were assigned at birth. The rest of the averment is denied for lack of sufficient knowledge and/or

7

**167**

information to formulate a responsive pleading. To the extent that a responsive pleading is required, the same is hereby denied.

26.     Paragraph 26 of the Second Amended Complaint is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading. To the extent that a responsive pleading is required, the same is hereby denied. It is affirmatively alleged that the cited article does not establish legal precedent.

27.     As to Paragraph 27 of the Second Amended Complaint, it is admitted that an intersex individual as someone born with the reproductive or sexual anatomy and/or chromosomal pattern that does not fit typical definitions of male or female. The rest of the allegation is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading. To the extent that a responsive pleading is required, the same is hereby denied. It is affirmatively alleged that the cited article does not establish legal precedent. It is also affirmatively alleged that the Intersex Society of North America webpage cited by Plaintiffs closed its doors and stopped updating the cited website in 2008.

28.     Paragraph 28 of the Second Amended Complaint is denied. Article 694 of the Puerto Rico Civil Code allows the substitution to the sex assigned at birth when medical experts recognize the ambiguity of sex at birth. P.R. Law Ann. tit. 31 § 7655. In the alternative, it is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading. As to footnote 9, it is affirmatively alleged that the cited article does not establish legal precedent.

29.     As to Paragraph 29 of the Second Amended Complaint, it is admitted that gender identity is a person's internal sense of their own gender. The rest of the allegation is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading.

**168**

30.     As to Paragraph 30 of the Second Amended Complaint, it is admitted that gender dysphoria is recognized by the American Psychiatric Association. The rest of the allegation is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading.

31.     Paragraph 31 of the Second Amended Complaint is admitted.

32.     Paragraph 32 of the Second Amended Complaint is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading. It is affirmatively alleged that the U.S. State Department's decision to include the X marker in its passports does not bind the Government of Puerto Rico.

33.     Paragraph 33 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. In the alternative, it is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading. It is affirmatively alleged that Plaintiffs are not entitled to relief.

34.     Paragraph 34 of the Second Amended Complaint is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading. To the extent that a responsive pleading is required, the same is hereby denied. It is affirmatively alleged that the cited article does not establish legal precedent. It is affirmatively alleged that Defendants have acted at all times in strict compliance with the U.S. Constitution, the Puerto Rico Civil Code and the Vital Statistics and Registry Act.

35.     Paragraph 35 of the Second Amended Complaint is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading.  It is affirmatively alleged that Defendants have acted at all times in strict compliance with the U.S. Constitution, the Puerto Rico Civil Code and the Vital Statistics and Registry Act.

**169**

36. Paragraph 36 of the Second Amended Complaint is admitted. It is affirmatively alleged that the states that have acknowledged nonbinary genders on birth certificates have passed legislation to that effect. It is affirmatively alleged that the Department of Health and its division of Demographic Registry and Vital Statistics cannot issue a birth certificate with an "X" gender marker without legislation.

37. Paragraph 37 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied. It is admitted that in Arroyo González v. Rosselló Nevares, 305 F.Supp.3d 327 (2018), the District Court ordered that the application form to be submitted by transgender individuals for the issuance of their new birth certificates must include one of three documents, a passport, a driver's license or a certification issued by a healthcare professional that reflects the person's true gender, whether female or male. Id. at p. 334.

## CAUSES OF ACTION

### Count I
Deprivation of the Equal Protection in Violation of the Fourteenth Amendment of the United States Constitution
42 U.S.C. § 1983

38. Paragraph 38 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

39. Paragraph 39 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

10

**170**

40.     Paragraph 40 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

41.     Paragraph 41 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied. Defendants deny that Plaintiffs are entitled to any relief under the constitutional and statutory provisions.

42.     Paragraph 42 of the Second Amended Complaint is denied. Defendants deny that plaintiffs are entitled to any relief under the constitutional and statutory provisions.

43.     Paragraph 43 of the Second Amended Complaint is denied. Defendants deny that plaintiffs are entitled to any relief under the constitutional and statutory provisions.

44.     Paragraph 44 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied. Defendants deny that Plaintiffs are entitled to any relief under the constitutional and statutory provisions.

45.     Paragraph 45 of the Second Amended Complaint is denied. It is affirmatively alleged that pursuant to Arroyo, the Puerto Rico Civil Code and the Vital Statistics Registry Act, the registered sex can only be changed from Male to Female or Female to Male. It is affirmatively alleged that the U.S. State Department's decision to include the X marker in its passports does not bind the Government of Puerto Rico.

46.     Paragraph 46 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive

**171**

pleading is required, the same is hereby denied. Defendants deny that Plaintiffs are entitled to any relief under the constitutional and statutory provisions.

47.     Paragraph 47 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

48.     Paragraph 48 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

49.     Paragraph 49 of the Second Amended Complaint is denied. Defendants' policy and practice is established in strict compliance with the Puerto Rico Civil Code and the Vital Statistics Registry Act.

50.     Paragraph 50 of the Second Amended Complaint is denied. Defendants' policy and practice is established in strict compliance with the Puerto Rico Civil Code and the Vital Statistics Registry Act.

51.     Paragraph 51 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

52.     Paragraph 52 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

53.     Paragraph 53 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

54.     Paragraph 54 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

55.     Paragraph 55 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

56.     Paragraph 56 of the Second Amended Complaint is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading. To the extent that a responsive pleading is required, the same is hereby denied.

57.     Paragraph 57 of the Second Amended Complaint is admitted.

58.     Paragraph 58 of the Second Amended Complaint is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading. To the extent that a responsive pleading is required, the same is hereby denied.

59.     Paragraph 59 of the Second Amended Complaint is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading. To the extent that a responsive pleading is required, the same is hereby denied.

60.     Paragraph 60 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied. It is denied that Plaintiffs are entitled to any relief under the constitutional and statutory provisions.

**173**

**COUNT II**
Deprivation of Due Process in Violation of the Fourteenth Amendment of the
United States Constitution
42 U.S.C. §1983

61.     Paragraph 61 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

62.     Paragraph 62 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

63.     Paragraph 63 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

64.     Paragraph 64 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

65.     Paragraph 65 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

66.     Paragraph 66 of the Second Amended Complaint is denied.

67.     Paragraph 67 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

**174**

68.     Paragraph 68 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

69.     Paragraph 69 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied. It is denied that Plaintiffs are entitled to any relief under the constitutional and statutory provisions.

**COUNT III**
Abridgement of Free Speech in Violation of the First Amendment of the
United States Constitution
42 U.S.C. § 1983

70.     Paragraph 70 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

71.     Paragraph 71 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

72.     Paragraph 72 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

73.     Paragraph 73 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

74.     Paragraph 74 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions. To the extent that a responsive pleading is required, the same is hereby denied.

75.     Paragraph 75 of the Second Amended Complaint does not require a responsive pleading insofar as they are legal statements and/or conclusions that do not require a responsive allegation. To the extent that a responsive pleading is required, the same is hereby denied. It is denied that Plaintiffs are entitled to any relief under the constitutional and statutory provisions.

**COUNT IV**
Writ of Mandamus

76.     Paragraph 76 of the Second Amended Complaint is denied.

77.     Paragraph 77 of the Second Amended Complaint is denied. Defendant Carlos Mellado is the Secretary of Health and does not have the power to grant and issue passports as stated in 22 U.S.C.A. § 211a.

78.     Paragraph 78 of the Second Amended Complaint is denied. It is affirmatively alleged that the Department of Health and the Demographic Registry issues birth certificates in strict compliance with the Vital Statistics Registry Act and the Civil Code of Puerto Rico.

79.     Paragraph 79 of the Second Amended Complaint is denied for lack of sufficient knowledge and/or information to formulate a responsive pleading.

80.     Paragraph 80 of the Second Amended Complaint is denied. It is affirmatively alleged that Plaintiffs are not entitled to any relief.

**PRAYER FOR RELIEF**

Paragraphs (a) to (h) contain various legal statements, theories and conclusions and therefore do not require a responsive pleading. However, in the alternative that they do, each one

16

**176**

of those paragraphs (a-h) are hereby opposed and denied. It is affirmatively alleged that Plaintiffs are not entitled to any relief.

## AFFIRMATIVE DEFENSES

1.      All the Defendants' answers to Plaintiffs' Second Amended Complaint are hereby incorporated by reference as affirmative defenses.

2.      The Second Amended Complaint fails to state a claim upon which relief may be granted against the Defendants.

3.      The Second Amended Complaint fails to state a claim cognizable under any applicable federal or state statute.

4.      The Second Amended Complaint fails to state specific acts of the Defendants which amount to a deprivation of any of Plaintiffs' constitutional, federal or state protected rights.

5.      Defendants have acted at all times in strict compliance with the law and in good faith in the performance of their duties.

6.      Defendants, at all times, have acted within the established framework of their authority and duties and neither negligently nor intentionally violated any of Plaintiffs' constitutional rights.

7.      The instant action is barred by the Eleventh Amendment.

8.      The instant case is time barred.

9.      In the hypothesis that Plaintiffs are entitled to any relief, which Defendants vehemently deny, they are not entitled to recover under the Constitution of the United States.

10.      The Second Amended Complaint fails to state specific facts adequate to show that Plaintiffs suffered any damages as a result of the alleged official acts of Defendants. Therefore, Plaintiffs are not entitled to any damages or any other relief.

**177**

11.     Defendants' actions, if any, were objectively reasonable viewed in the lights of the facts and circumstances confronting them.

12.     There is no causal link between the alleged conduct and the alleged deprivation of Plaintiff's federal and/or state protected rights.

13.     Plaintiffs have failed to join indispensable parties.

14.     In the hypothesis that Plaintiffs are entitled to any relief, which Defendants vehemently deny, they are not entitled to recover under the Constitution of the United States.

15.     The complaint fails to state specific facts adequate to show that Plaintiffs suffered any damages as a result of the alleged official acts of the Defendants. Therefore, Plaintiffs are not entitled to any damages or any other relief.

16.     Defendants' actions, if any, were objectively reasonable viewed in the lights of the facts and circumstances confronting them.

17.     The Department of Health's policy and practice does not constitute a violation of Plaintiff's constitutional rights as it is in strict compliance with the Puerto Rico Civil Code and the Vital Statistics Registry Act.

18.     The Puerto Rico Supreme Court has interpreted the Vital Statistics Registry Act restrictively, concluding that any change requested must have been previously authorized by law. Ex Parte Delgado-Hernández, 165 D.P.R. at 170, 189 (2005); Ex Parte León Rosario, 109 D.P.R. 804 (1980).

19.     The Puerto Rico Civil Code and the Vital Statistics Registry Act do not recognize a nonbinary gender. Defendants are not authorized by law to use a birth certificate with a sex marker other than male or female.

20.     The Department of Health and the Demographic Registry and Vital Statistics division cannot authorize Plaintiff's request for change in the birth certificate without legislation to that effect.

21.     Plaintiffs have failed to allege sufficient facts to conclude that there is a long history and tradition protecting a right to amend their sex designation on a birth certificate to reflect a nonbinary gender identity or that such right is fundamental to the scheme of ordered liberty.

22.     Defendants' application of its policy and practice is not conscience shocking, extreme, egregious, or horrifying.

23.     Plaintiffs have failed to allege sufficient facts to conclude that there is a long history and tradition of protecting the right to amend the sex designation on a birth certificate to reflect a nonbinary gender identity.

24.     A nonbinary gender identity is not a suspect classification under the Equal Protection Clause.

25.     Plaintiffs cannot state a cognizable claim under the Equal Protection Clause.

26.     The contents of a birth certificate are government speech and do not implicate the First Amendment.

27.     The Department of Health's Policy and Practice does not violate Plaintiffs' First Amendment rights because the Government does not restrict their ability to express and present themselves in alignment with their gender identity.

28.     Plaintiffs are not entitled to recover attorney fees, costs and other litigation expenses.

29. Defendants hereby reserve the right to amend the pleading, to bring any other party, and/or to raise any other affirmative defense, according to the established procedure, that may arise as a result of the discovery.

30. Appearing Defendants do not waive any other affirmative defense that may arise during discovery proceedings.

**WHEREFORE**, it is respectfully requested from this Honorable Court that the Second Amended Complaint be dismissed, that Plaintiffs be charged with costs and attorney's fees and that Defendants are granted any other relief as the Court may deem fit and proper.

**I HEREBY CERTIFY** that the instant motion was electronically filed with the Clerk of the Court through the CM/ECF System, which will send notification of such filing to the subscribing parties.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico on the 18th day of March 2024.

**DOMINGO EMANUELLI-HERNÁNDEZ**
Secretary of Justice

**SUSANA I. PEÑAGARÍCANO-BROWN**
Deputy Secretary in Charge of Civil Litigation

**MARCIA I. PÉREZ-LLAVONA**
Director of Legal Affairs
Federal Litigation and Bankruptcy Division

*S/ Diana I. Pérez-Carlo*
**DIANA I. PÉREZ-CARLO**
USDC No. 307313
Email: diana.perez@justicia.pr.gov
Tel. (787) 721-2900, ext. 1419

**DEPARTMENT OF JUSTICE OF PUERTO RICO**
Federal Litigation Division
PO Box 9020192
San Juan Puerto Rico, 00902-0192

**180**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| Ínaru Nadia de la Fuente Díaz, et als.<br>*Plaintiffs*<br><br>vs<br><br>Pedro Pierluisi, et als.<br>*Defendants* | Civil No. 23-cv-1544 (MAJ)<br><br><br>COMPLAINT FOR DECLARATORY,<br>INJUNCTIVE AND OTHER RELIEFS |
| --- | --- |

OPPOSITION TO MOTION TO DISMISS

To the Honorable Court:

In their Motion to Dismiss for Failure to State a Claim [Dkt. 17], Defendants rightly explain the judicial doctrine advanced in *Twombly*: courts must not dismiss a complaint if there is a "plausible entitlement to relief". However, their contention is that defendants, by following the "Department of Health policy and practice" did not act against plaintiffs' constitutional rights. They argue that they are bound to follow the legislature mandate that the only generic recordings be male or female, for which reason transgender persons who identify as male or female can receive a change of sex/gender in their birth certificate[1]. They advance a distinction regarding the Demographic Registry: "[it] contains the official version of

---

[1] Let's remember that this action has been the result of case *Arroyo González v Rosselló*, 305 F.Supp.3d 327 (D.P.R. 2018), which ordered these same officials to record the change, an action that had been previously denied to them, forcing the petition to this Court in 2017. As the Court certainly remembers, at the time *Arroyo González* was filed, the Department of Transportation and Public Works had already allowed the change of gender in their identifications, following the issuance of the Commonwealth's public policy against trans discrimination. [Executive Order OE 2015-29].

1

**181**

the existence, civil status and vital facts of the people born in Puerto Rico". Although the Complaint clearly alleges infringement of the Fourteenth Amendment's Substantive Due Process, Equal Protection and the First Amendment, they argue that plaintiffs' did not "plead a cognizable claim of liberty or property interest", that under the Equal Protection sex-based discrimination test they have a reasonable reason in "protecting the integrity and accuracy of vital records" by "maintaining a binary system for the purpose of collecting information" and that birth certificates — being governmental speech— do not trigger the First Amendment guarantees. Most of these arguments are a rehash of arguments already dismissed in *Arroyo González v Roselló*, 305 F. Supp. 3rd, 327 (D.P.R. 2018). Nonetheless, we again present to the Court the appropriate legal standard in this case.

The facts in the Second Amendment Complaint are straightforward:

1. All plaintiffs are non-binary transgender individuals.

2. One of them, Inaru Nadia de la Fuente, has already obtained a U.S. passport that identifies their gender as X. All other plaintiffs will identify their gender as X in the U.S. passport.

3. After the decision in *Arroyo González v Roselló,* the Commonwealth's Registry issued the procedure that guides the change of gender: Submit <u>one</u> of the following documents: 1) driver license showing change in gender; 2) passport showing change in gender; 3) certification issued by a health or behavior professional attesting to the patient's gender. See Dkt. 12-1.

**182**

4.  On April 2022, the Department of State began to issue U.S. passports with an X marker.

5.  The Commonwealth's Registry does not include an X marker.

6.  On 2023 the Registry denied plaintiffs' request to amend the forms to include the X marker so that they can obtain a birth certificate that adequately represents their gender, in compliance with the Registry's published instructions.

7.  The Complaint alleges that the denial to include an X marker for nonbinary gender violates the Fourteenth Amendment, the Equal Protection Clause and the First Amendment.

DISCUSSION

> The right to identify our own existence lies at the heart of one's humanity.
> Judge Carmen Cerezo, 2018

A. GENDER IDENTITY

The issue before this Court, although new to this District, has been addressed by other courts: what is the correlation between the terms *sex* and *gender*. See *Matter of Hollister*, 305 Or. App. 368 (2020) [granting a change in the birth certificate from female to nonbinary]. First, since historically the word *gender* had been used as a close synonym of the word *sex*, it is no surprise that the Supreme Court found that discrimination based on *gender* is discrimination based on *sex*. See *Bostock v Clayton, Georgia*, 590 U.S. 644 (2020) [Title VII case] . Consequently, in *Bostock* the Court recognized that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex". Id at 660. The reasoning is that "[a]n employer who fires an individual for being homosexual or

**183**

transgender fires that person for traits or actions it would not have questioned in members of a different sex. Id at 651-652. Here the court is obviously referring to the behavioral, cultural, or psychological traits typically associated with one sex, or "gender roles." See *Miriam Webster Dictionary*, https://www.merriam-webster.com/dictionary/gender; retrieved March 2024.

By the middle of the XX[th] century, the concept of *gender* began to transcend the dichotomy male/female. See *Mirriam Webster*, at "Are *gender* and *sex* the same? Usage Guide". The new usage is now recorded in the *Cambridge Dictionary's* definition of *gender* as "a group of people in a society who share particular qualities or ways of behaving which that society associates with being male, female, or another identity". https://dictionary.cambridge.org/dictionary/english/gender; retrieved March 2024 [emphasis provided]. The Courts that have recently faced controversies regarding "gender identity" have recognized that this term not only refers to the binary male/female, but to other identity constructions beyond the binary. For example, in *Hecox v. Little*, 79 F.4th 1009, 1016 (9th Cir. 2023) the Court defined *gender identity* as "the term used to describe a person's sense of being male, female, neither, or some combination of both" [emphasis provided], following the up-to-date medical and professional conception of the term *gender*:

> the socially constructed roles, behaviors, activities, and attributes that a given society considers appropriate for different genders. In a human context, the distinction between gender and sex reflects the usage of these terms: Sex refers to the biological status of being male, female, or intersex, whereas gender implies the psychological, behavioral, social, and cultural aspects of gender (i.e., masculinity, femininity,

4

**184**

nonbinary, nonconforming, or other gender)." *APA Dictionary of Psychology*, https:// dictionary.apa.org/gender, retrieved March 2024.

B. APPLICABLE LAW

"'No right,' in this Court's time-honored view, 'is held more sacred, or is more carefully guarded,' than 'the right of every individual to the possession and control of his own person'." *Dobbs v Jackson Women's Health Organization*, 597 U.S. 215, 379 (2022), citing *Union Pacific R. Co. v Botsford*, 141 U.S. 250, 251 (1891) [dissenting opinion of Breyer, Sotomayor and Kagan]. Matters involving the most intimate and personal choices a citizen may make in a lifetime, choices central to personal dignity and autonomy, [*e.g.* marriage, contraceptives, child rearing, procreation, denial of medical treatment, decisions about education, decisions involving where to reside or with whom to have sex], "are inherent to the liberty protected by the Fourteenth Amendment. See *Cook v Gates*, 528 F. 3d 42 (1st Cir. 2008) for a discussion of cases. "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Arroyo González*, supra, at 333, quoting *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 851 (1992) [*rev.* on other grounds[2]]. All of the Supreme Court's decisions regarding the right to liberty of the Fourteenth Amendment were recognized "as —'the most intimate and personal' a person can make, —reflect fundamental aspects of personal identity; they define the very "attributes of personhood". *Dobbs*, supra, dissenting

---

[2] *Dobbs'* majority was adamant that their decision only affected women's right to abortion and not other rights based on the same rationale. They based the distinction in the fact that abortion deals with an unborn life, whereas all other cases dealt with personal or individual interests.

**185**

opinion at 380.  We believe that none of those aspects are more personal than the decision of self identification, the construction of our own self as persons.   As recognized by Justice Kennedy,   "[t]he Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons, within a lawful realm, to define and express their identity." *Obergefell v Hodges*, 576 U.S. 644, 652 (2015).

In *Obergefell*, the Court engaged in a discussion of the liberty aspect of the Fourteenth Amendment and its treatment by the Supreme Court: "these liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs. Id at 653, quoting *Eisenstadt v. Baird*, 405 U.S. 438, 453, (1972); *Griswold v. Connecticut*, 381 U.S. 479, 484-486 (1965).  The decision advises that, as part of the judicial duty to interpret the Constitution,  the courts must "exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect." Id at 664.

> The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning. When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed. *Id.*

Here and now, as happened in *Obergefell v Hodges, supra,* and *Lawrence v Texas*, 539 U.S. 558 (2003) this Court is confronted with new terms and ideas that have been just recently developed, not

**186**

only because of changes in the theoretical conception of society and its constituents, but because of medical and scientific developments. "The Court, like many institutions, has made assumptions defined by the world and time of which it is a part." *Obergefell* at 665.

One such assumption is that there are only two sexes and, thus, two genres corresponding to them. But, as recent literature and even court cases attest, studies have proven that *gender* is a separate category from *sex* and it does not correspond to the binary system of male/female. See *Matter of Hollister*, *supra*. "[I]n interpreting the Equal Protection Clause, the Court has recognized that new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed and unchallenged." *Obergefell* at  673. Contrary to Defendants contention,

> [t]he dynamic of our constitutional system is that individuals need not  await legislative action before asserting a fundamental right. The Nation's courts are open to injured individuals who come to them to vindicate their own direct, personal stake in our basic charter. An individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public disagrees and even if the legislature refuses to act. *Obergefell* at 677.

As *Obergefell* did when examining lesbian and gays' claim that denying them the right to marriage was unconstitutional, this Court must examine if Plaintiffs have a liberty interest in their self identification as nonbinary, in light of all new developments in science and the recognition of an identity beyond the binary male/female.   The answer, following the jurisprudence discussed previously, should be YES.

**187**

The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated should be treated alike". *Cleburne v Cleburne Living Center, Inc.* 472 U.S. 432, 439 (1985).  After *Arroyo González*, all trans binary people may change their birth certificate to show their appropriate gender identity, male or female. The Registry keeps the birth information in their archives and issues a new birth certificate to the citizen, therefore, no original information is deleted or lost. The Registry's only offered reason for not including an X in the birth certificate is that they must maintain the "integrity of the records"; "collect information"; the "study of vital statistics of our population"; "the official version of the existence, civil status and vital facts of the people born in Puerto Rico". None of these are disrupted by the addition of an X and, in fact, were discarded by Judge Cerezo. On the contrary, the Commonwealth's records would be more truthful if they were to maintain records of nonbinary people too, as well as intersex people[3]. Moreover, after *Arroyo González*, the Registry has in place a procedure to maintain the birth information of trans people intact while giving a new birth certificate with the changed gender, that is, the gender that is real at the moment of the issuance of the certificate.

---

[3] In fact, the record of intersex individuals is vital for medical and sociological research, but the Registry has refused to keep those records, probably because of an outdated idea of intersex as a malformation or disease. For example, if a person born with physical intersex characteristics wanted to keep their body unchanged in the manner it was when born, the Commonwealth's Registry would deny such person a right to their own bodily integrity. In fact, they would force the person to chose one sex over the other, regardless of their physical traits.

It is telling that the Legislature added a second paragraph to Art. 694 of the 2020 Civil Code after *Arroyo González,* instead of rewriting the statute. While the first paragraph exclusively uses the term *sex*, the second paragraph exclusively uses the word *gender*[4]. In a very similar case, *Matter of Hollister*, supra, the Oregon Court declined to engage the constitutional challenges —the same raised in this case— because the Judge deemed that a simple statutory interpretation would suffice to decide that plaintiff had a right to change their birth certificate to nonbinary. The Judge concluded his analysis of the terms *sex* and *gender identity* in the Oregon statute affirming:

> Given, then, that an applicant's gender identity is the basis for the applicant's legal change of sex, it logically follows that, under ORS 33, 460, legal sex designations cannot be limited to "male" or "female". The statute's requirement that the legal sex designation correspond to the applicant's affirmed gender identity strongly suggests that the option of "nonbinary" be available as a choice. Id at 377.

The Commonwealth's hermeneutic rule, as the Defendants have already pointed out in their Motion, is that statutes are understood by reading the letter of the law, giving words the

---

[4] "No amendments will be authorized in the original birth record. A court may issue a judgment authorizing the register to make a note on the original register's margin of the person's sex, when applicable, due to a posterior change or modification to the sex at birth. However, in these cases, the substitution of the historical and vital act of sex at birth will not be authorized. Only in the case where a medical expert determines the ambiguity of the sex at birth, at the time of birth, and this fact is registered in the records of the Demographic Registry will the judicial authority order the substitution of the original sex at birth in the demographic registry records.

Nothing here construed will undermine the process established in cases of a request for change of gender in a birth certificate. These requests will be accompanied with the Passport, driver's license or a certification submitted by a health professional who has a physician-patient relationship and certifies the applicant's gender. In these cases, the registry shall issue the certificate, safeguarding the right to privacy." 31 P.R. Laws ann. tit. 31 §7655.

**189**

meaning they commonly have in the appropriate context. When the Legislature used the term *gender* in the second paragraph instead of *sex*, it acknowledge and adopted the difference between those two terms, following *Arroyo González*[5].  All proffered reasons for not adding an X marker have vanished under *Arroyo González* and the 2020 *Civil Code*. The only reason to make a distinction between binary and nonbinary trans people is an improper animus: the disapproval of the second class. "The Constitution's guarantee of equality 'must at the very least mean that a bare [...] desire to harm a politically unpopular group cannot' justify disparate treatment of that group."  *U.S. v Windsor*, 570 U.S. 744, 770 (2013).

The clear mandate of the 2020 Civil Code is that, notwithstanding all previous prohibitions contained in the Registry's Act, any person can change their gender by presenting a Passport or a driver's license that designate their gender differently to the sex recorded in the Registry. Once plaintiff De la Fuente presented his passport with an X gender-marker, the Registry was bound, under Puerto Rico's law, to include that designation in their records. Nothing in Art. 684 defeats that literal interpretation. Once De la Fuente follows all published procedures and presents their U.S. Passport, the Registry has a legal duty to add an X marker to include their gender.

---

[5] We acknowledge that *Arroyo González* was a case whose plaintiffs were all binary trans and, therefore, they assumed a gender within the boundaries of that dichotomy. Nonetheless, by recognizing the difference between sex and "assumed gender" it fundamentally changed the nature of the Demographic Registry, which now may contain two separate informations: the sex at birth and the gender.  The Legislature accepted this new form of keeping records and approved that a person change its gender marker in the Registry.

**190**

This is the reason why Defendants are mistaken when they discuss the requirements to raise a constitutional challenge of a statute. Plaintiffs contention is that, after *Arroyo González* and the amendment to Cc art. 694 , both the courts and the Legislature have recognized *gender* as a separate construction of *sex* and have allowed for the change of *gender* in the birth certificate according to the person's gender identity. After 2020, there is no statutory reason for denying Plaintiffs' petition.

C. Scrutiny

The substantive component of the due process of the Fourteenth Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v Glucksberg*, 521 U.S. 702, 720 (1997).    "[A]ll gender-based classifications… warrant heightened scrutiny." *U.S. v Virginia*, 518 U.S. 515, 555 (1996). As discussed in *Cook*, supra, all cases that conceived people's personal decisions regarding sexual conduct as a liberty interest have been decided under the heightened judicial scrutiny. Id at 52.

Similarly, "[u]nder equal protection jurisprudence, a governmental classification aimed at a "suspect class" is also subject to heightened judicial scrutiny. *Cook* at 61. Following *Bostock*, a classification denying nonbinary persons a change of gender in the birth certificate is a determination "based on sex", because it's based on the assumption that all people must conform to the binary male/female and nonbinary people do not identify with neither. "[A]s gender classifications "generally provide[ ] no sensible ground for differential treatment," *id.*, "

11

**191**

'all gender-based classifications today' warrant 'heightened scrutiny.' " *Hecox v. Little*, 79 F.4th 1009, 1021 (9th Cir. 2023), quoting *United States v. Virginia* , 518 U.S. 515, 555 (1996) and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994).

However, the heightened scrutiny that applies to gender is the intermediate scrutiny. "Intermediate scrutiny (applicable to quasi-suspect classes like gender and illegitimacy) requires that a classification "be substantially related to an important governmental objective."" *Hassan v. City of New York*, 804 F.3d 277, 298–99 (3d Cir. 2015), <u>as amended</u> (Feb. 2, 2016), quoting *Clark v. Jeter,* 486 U.S. 456 (1988). See *Cook*, supra, at 56 [stating that Lawrence, supra, identified a liberty interest in consensual adult same-sex sex but applie[d] a standard of review that lies between strict scrutiny and rational basis: if the State had a legitimate interest adequate to justify the intrusion on liberty.]

Defendants refusal to include an X marker would certainly fail both strict and intermediate scrutiny. But it also would fail a rational review. As we have discussed *ante*, there is not even a rational basis for not including an X marker.  Under the rational review, "the focus is entirely on the rationality of the states's reason for enacting the law", that is, the reason cannot be invalid or wholly irrelevant to the achievement of the State's goal. *Cook*, supra at 55. "Moral disapproval of this group [homosexuals], like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Fourteenth Amendment." *Lawrence v Texas*, 538 U.S. 558, 582 (2003).  Once plaintiffs have proven that the

**192**

purported basis for not including an X for gender is a mere excuse —since keeping records of the birth sex is readily achieved by the Registry's internal protocols already in place after *Arroyo González*—, this Court must vindicate plaintiffs' right to self expression in the Registry even under a rational review.

Finally, the Registry's denial in allowing plaintiffs to use a certification that is truthful in terms of their gender identity constitutes "compel speech" because it forces plaintiffs to lie in their gender identification and because they will eventually have diverse official documents recording disparate genders. This matter of law was already discussed and settled in *Arroyo González*, so that no further discussion is required.

WHEREFORE it is respectfully requested from this Honorable Court to deny dismissal.

CERTIFICATE OF SERVICE

It is hereby certified that this motion was filed electronically and a true and exact copy of the foregoing will be served on the defendants by the Pacer system.

In San Juan, Puerto Rico this 20th day of March, 2024.

S/ Johanna M. Emmanuelli Huertas
JOHANNA M. EMMANUELLI HUERTAS
USDC-PR #210506 Email: jmeh@mac.com
94 Calle Ponce, San Juan, PR 00917
Tel.: (787)342-6499

**193**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| Ínaru Nadia de la Fuente Díaz, et als.<br>*Plaintiffs*<br><br>vs<br><br>Pedro Pierluisi, et als.<br>*Defendants* | Civil No. 23-cv-1544 (MAJ)<br><br>COMPLAINT FOR<br>DECLARATORY, INJUNCTIVE<br>AND OTHER RELIEFS |
|---|---|

MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE COURT:

Come now plaintiffs, to move the Court to issue a Summary Judgment, and argue as

follows:

**194**

# LIST OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)............................................5

*Arroyo González v Rosselló*, 305 F.Supp.3d 327 (D.P.R. 2018) ...............................3,7

*Bostock v Clayton, Georgia*, 590 U.S. 644 (2020)...................................................6,14

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).....................................................4

*Clark v. Jeter,* 486 U.S. 456 (1988) ..........................................................................14

*Cleburne v Cleburne Living Center, Inc.* 472 U.S. 432, 439 (1985) ............................10

*Cook v Gates*, 528 F. 3d 42  (1st Cir. 2008) ........................................................7,14

*Dobbs v Jackson Women's Health Organization*, 597 U.S. 215, 379 (2022)...................7

*Doe v. Town of Plymouth* , 825 F.Supp. 1102, 1107 (D. Mass. 1993) ...................1514

*Eisenstadt v. Baird*, 405 U.S. 438, 453, (1972) ........................................................8

*Fowler v State* 104 F. 4th 770 (2024) ......................................................................12

*Griswold v. Connecticut*, 381 U.S. 479, 484-486 (1965)...............................................8

*Hassan v. City of New York*, 804 F.3d 277, 298–99 (3d Cir. 2015) ...........................14

*Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023)..................................................6,12,14

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994) .........................................14

*Lawrence v Texas*, 539 U.S. 558 (2003).............................................................9,15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ................4

*Matter of Hollister*, 305 Or. App. 368 (2020).....................................................5,9,10

*Matter of N.K.*, 174 N.Y.S. 3d 541, 543 (2022) ....................................................10

*Obergefell v Hodges*, 576 U.S. 644, 652 (2015).....................................................8,9

*Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 851 (1992)...................7

*Romer v. Evans*, 517 U.S. 620, 634 (1996) ...........................................................12

**195**

*Union Pacific R. Co. v Botsford*, 141 U.S. 250, 251 (1891) ........................................... 7

*U.S. v Virginia*, 518 U.S. 515, 555 (1996) ........................................ 13,14

*U.S. v Windsor*, 570 U.S. 744, 770 (2013) ............................................. 12

*Washington v Glucksberg*, 521 U.S. 702, 720 (1997) ................................. 13

*Matter of N.K.*, 174 N.Y.S. 3d 541, 543 (2022) ...................................... 11

FRCP 56 ............................................................................ 4

2020 Civil Code, Art. 694, 31 P.R. Laws ann. tit. 31 §7655 ............................ 10,13

Executive Order OE 2015-29 .......................................................... 2,3

*Miriam Webster Dictionary*,

https://www.merriam-webster.com/dictionary/gender;

retrieved March 2024 ............................................................... 6

Cambridge Dictionary

https://dictionary.cambridge.org/dictionary/english/gender ............................ 6

*APA Dictionary of Psychology*,

https://dictionary.apa.org/gender, retrieved March 2024 ............................... 7

**196**

UNCONTROVERTED FACTS

1. Application for Gender Change in Vital Event Certification requires that applicant submit <u>one</u> of the following documents: (i) Driver's license showing change in gender; (ii) Passport showing change in gender; (iii) Certification issued by a health professional or behavior professional who has a Physician-Patient relationship with the applicant. [Admitted in Answer]

2. The Application for Gender Change only includes two gender markers: male and female. [See form, Appendix 12-1]

3. The Commonwealth's Registry does not include an X marker or any other such marker beyond male and female. [Id]

4. The *APA Dictionary of Psychology* recognizes nonbinary as a category of gender. [*APA Dictionary of Psychology*, https://dictionary.apa.org/gender, retrieved March 2024]

5. Although the Vital Registry's Act prohibits the changes to the birth certificate in custody of the Division of Demographic Registry and Vital Statistics of the Commonwealth, an amendment following *Arroyo González v Rosselló*, 305 F.Supp.3d 327 (D.P.R. 2018) specifically states that "[N]othing here construed will undermine the process established in cases of a request for change of gender in a birth certificate. These requests will be accompanied with the Passport, driver's license or a certification submitted by a health professional who has a physician-patient relationship and certifies the applicant's gender. In these cases, the registry shall issue the certificate, safeguarding the right to privacy." 31 P.R. Laws ann. tit. 31 §7655.

6. The Department of State of the Unites States of America issues U.S. passports with an X marker. [See https://travel.state.gov/content/travel/en/passports/need-passport/selecting-your-gender-marker.html]

7. In 2023 the Registry denied plaintiffs' request to amend the forms to include the X marker so that they can obtain a birth certificate that adequately represents their gender, in compliance with the Registry's published instructions. [See Dkt. 12-3]

8. Plaintiff Ínaru Nadia de la Fuente Díaz identifies as a nonbinary person who lives in San Juan, whose passport identifies them with an X marker as their gender. [Statement under Penalty of Perjury, Dkt.12-4]

9. Maru Rosa Hernández is a nonbinary person living in San Juan. They is currently employed. [Statement under Penalty of Perjury, Dkt. 12-5]

10. André Rodil identifies as a nonbinary person and lives in San Juan, as submitted with their Statement Under the Penalty of Perjury [Statement under Penalty of Perjury, Dkt. 12-6].

**197**

11. Yelvy Vélez Bartolomei is a nonbinary person living in San Juan. They is currently employed. [Statement under Penalty of Perjury, Dkt. 12-7]

12. Gé Castro Cruz is a nonbinary person living in San Juan. They is currently employed. [Statement under Penalty of Perjury, Dkt. 12-8]

13. Deni Juste is a nonbinary person living in Moca. They is currently employed. [Statement under Penalty of Perjury, Dkt. 12-9]

14. An individual's birth certificate is a primary identification document. In Puerto Rico, it is needed to obtain a driver's license, a marriage license, a U.S. passport, a Social Security card, a voting card, and generally as proof of identification to conduct banking transactions and other business. [See Finding of Fact 13 in *Arroyo González*]

15. Birth certificates in Puerto Rico indicate a person's birth-assigned sex based on the appearance of genitalia rather than their actual sex, as determined by their gender identity and lived experience. [See Finding of Fact 15 in *Arroyo González*]

16. Individuals whose gender identity falls within these traditionally recognized confines of " male" and "female" are "binary." Both cisgender people (those whose gender identity matches the sex they were assigned at birth) and transgender people (those whose gender identity does not match the sex assigned at birth) can have a binary gender of male or female. [Admitted in Answer # 22]

17. Transgender people are people who have a gender identity that is different from the gender they were assigned at birth. [Admitted in Answer # 25]

18. Gender identity is a person's internal sense of their own gender. [Admitted in Answer, #29]

19. The incongruence between a transgender person's gender identity and sex assigned at birth is associated with gender dysphoria. Gender dysphoria is a serious medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Ed. (2013)("DSM–V"). [See Finding of Fact 20 in *Arroyo González*]

20. Gender dysphoria refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth. If left untreated, gender dysphoria may result in psychological distress, anxiety, depression, and suicidal ideation or even self-harm. [See Finding of Fact 21 in *Arroyo González*]

21. On November 14, 2008, the Commonwealth of Puerto Rico (the "Commonwealth") issued Executive Order OE–2008–57 that established as a matter of public policy the prohibition of discrimination in the provision of public services. It applies to all public agencies and instrumentalities, including the Demographic Registry of Puerto Rico. Such

**198**

sweeping outlawed discrimination in all forms, including gender identity. [See Finding of Fact 33 in *Arroyo González*]

## INTRODUCTION

This action is the result of case *Arroyo González v Rosselló*, 305 F.Supp.3d 327 (D.P.R. 2018), which ordered these same defendants officials to record a change in gender, an action that had been previously denied to them, forcing the petition to this Court in 2017. At the time *Arroyo González* was filed, the Department of Transportation and Public Works had already allowed the change of gender in their identifications, following the issuance of the Commonwealth's public policy against trans discrimination. [Executive Order OE 2015-29]. This case is based on the same grounds: gender is a social construct that, upon imposition by the Government upon individuals, violates their right to be free of the State's imposition of gender *in lieu* of their self identification as non-binary.

In their filings before the Court, Defendants advance a distinction between *Arroyo González* and this petition regarding the Demographic Registry: "[it] contains the official version of the existence, civil status and vital facts of the people born in Puerto Rico" and that the Registry protects "the integrity and accuracy of vital records" by "maintaining a binary system for the purpose of collecting information".   Therefore,  this Court must address a novel issue in this District: if maintaining a binary system to identify individuals violates the Fourteenth Amendment, the Equal Protection Clause and the First Amendment.

## DISCUSSION

> The right to identify our own existence lies at the heart of one's humanity.
>
> Judge Carmen Cerezo, 2018

A. Legal Standards for Summary Judgment under Rule 56

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record...." Fed. R. Civ. P. 56(c)(1)(A).

Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of their pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists or shows that the materials cited by the movant do not establish the absence of a genuine dispute. *See* Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at

4

**200**

586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.

To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita*, 475 U.S. at 587.

## B. GENDER IDENTITY

The issue before this Court, although new to this District, has been addressed by other courts: what is the correlation between the terms *sex, gender and the binary system based on sex*. See *Matter of Hollister*, 305 Or. App. 368 (2020) [granting a change in the birth certificate from female to nonbinary]. First, since historically the word *gender* had been used as a close synonym of the word *sex*, it is no surprise that the Supreme Court found that discrimination based on *gender* is discrimination based on *sex*. See *Bostock v Clayton, Georgia*, 590 U.S. 644

**201**

(2020) [Title VII case] . Consequently, in *Bostock* the Court recognized that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex". Id at 660. The reasoning is that "[a]n employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Id at 651-652. Here the court is obviously referring to the behavioral, cultural, or psychological traits typically associated with one sex, or "gender roles." See *Miriam Webster Dictionary*, https://www.merriam-webster.com/dictionary/gender; retrieved March 2024.

By the middle of the XX[th] century, the concept of *gender* began to transcend the dichotomy male/female. See *Mirriam Webster*, at "Are *gender* and *sex* the same? Usage Guide". The new usage is now recorded in the *Cambridge Dictionary's* definition of *gender* as "a group of people in a society who share particular qualities or ways of behaving which that society associates with being male, female, <u>or another identity</u>". https://dictionary.cambridge.org/dictionary/english/gender; retrieved March 2024 [emphasis provided]. The Courts that have recently faced controversies regarding "gender identity" have recognized that this term not only refers to the binary male/female, but to other identity constructions beyond the binary. For example, in *Hecox v. Little*, 79 F.4th 1009, 1016 (9th Cir. 2023) the Court defined *gender identity* as "the term used to describe a person's sense of being male, female, neither, <u>or some combination of both</u>" [emphasis provided], following the up-to-date medical and professional conception of the term *gender*:

> the socially constructed roles, behaviors, activities, and attributes that a given society considers appropriate for different genders. In a human context, the distinction between gender and sex reflects the usage of these terms: Sex refers to the biological status of being male, female, or intersex, whereas gender implies the psychological, behavioral, social, and cultural aspects of gender (i.e., masculinity, femininity,

**202**

nonbinary, nonconforming, or other gender)." *APA Dictionary of Psychology*, https://dictionary.apa.org/gender, retrieved March 2024.

## C. APPLICABLE LAW

"'No right,' in this Court's time-honored view, 'is held more sacred, or is more carefully guarded,' than 'the right of every individual to the possession and control of his own person'." *Dobbs v Jackson Women's Health Organization*, 597 U.S. 215, 379 (2022), citing *Union Pacific R. Co. v Botsford*, 141 U.S. 250, 251 (1891) [dissenting opinion of Breyer, Sotomayor and Kagan].  Matters involving the most intimate and personal choices a citizen may make in a lifetime, choices central to personal dignity and autonomy, [*e.g.* marriage, contraceptives, child rearing, procreation, denial of medical treatment, decisions about education, decisions involving where to reside or with whom to have sex], "are inherent to the liberty protected by the Fourteenth Amendment.  See *Cook v Gates*, 528 F. 3d 42  (1st Cir. 2008) for a discussion of cases. "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Arroyo González*, supra, at 333, quoting *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 851 (1992) [*rev.* on other grounds]. All of the Supreme Court's decisions regarding the right to liberty of the Fourteenth Amendment were recognized "as —'the most intimate and personal' a person can make, — reflect fundamental aspects of personal identity; they define the very "attributes of personhood".  *Dobbs*, supra, dissenting opinion at 380.  We believe that none of those aspects are more personal than the decision of self identification, the construction of our own self as persons.  As recognized by Justice Kennedy,  "[t]he Constitution promises liberty to all within

**203**

its reach, a liberty that includes certain specific rights that allow persons, within a lawful realm, to define and express their identity." *Obergefell v Hodges*, 576 U.S. 644, 652 (2015).

In *Obergefell*, the Court engaged in a discussion of the liberty aspect of the Fourteenth Amendment and its treatment by the Supreme Court: "these liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs. Id at 653, quoting *Eisenstadt v. Baird*, 405 U.S. 438, 453, (1972); *Griswold v. Connecticut*, 381 U.S. 479, 484-486 (1965). The decision advises that, as part of the judicial duty to interpret the Constitution, the courts must "exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect." Id at 664.

> The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning. When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed. *Id.*

Here and now, as happened in *Obergefell v Hodges, supra,* and *Lawrence v Texas*, 539 U.S. 558 (2003) this Court is confronted with new terms and ideas that have been just recently developed, not only because of changes in the theoretical conception of society and its constituents, but because of medical and scientific developments. "The Court, like many institutions, has made assumptions defined by the world and time of which it is a part." *Obergefell* at 665.

One such assumption is that there are only two sexes and, thus, two genres corresponding to them. But, as recent literature and even court cases attest, studies have proven that *gender* is a separate category from *sex* and it does not correspond to the binary

**204**

system of male/female. See *Matter of Hollister*, *supra*. "[I]n interpreting the Equal Protection Clause, the Court has recognized that new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed and unchallenged." *Obergefell* at 673. Contrary to Defendants contention,

> [t]he dynamic of our constitutional system is that individuals need not await legislative action before asserting a fundamental right. The Nation's courts are open to injured individuals who come to them to vindicate their own direct, personal stake in our basic charter. An individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public disagrees and even if the legislature refuses to act. *Obergefell* at 677.

As *Obergefell* did when examining lesbian and gays' claim that denying them the right to marriage was unconstitutional, this Court must examine if Plaintiffs have a liberty interest in their self identification as nonbinary, in light of all new developments in science and the recognition of an identity beyond the binary male/female. The answer, following the jurisprudence discussed previously, should be YES.

The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated should be treated alike". *Cleburne v Cleburne Living Center, Inc.* 472 U.S. 432, 439 (1985). After *Arroyo González*, all trans binary people may change their birth certificate to show their appropriate gender identity, male or female. The Registry keeps the birth information in their archives and issues a new birth certificate to the citizen, therefore, no original information is deleted or lost. The Registry's only offered reason for not including an X in the birth certificate is that they must maintain the "integrity of the records"; "collect information"; the "study of vital statistics of our population"; "the official version of the existence, civil status and vital facts of the people born in Puerto Rico". None of these are disrupted by the addition of an X and, in fact, were already discarded by Judge Cerezo. On the contrary, if the purported reason were so important for government, the Commonwealth's

**205**

records would be more truthful if they were to maintain records of nonbinary people too, as well as intersex people. Moreover, after *Arroyo González*, the Registry has in place a procedure to maintain the birth information of trans people intact while giving a new birth certificate with the changed gender, that is, the gender that is real at the moment of the issuance of the certificate.

It is telling that the Legislature added a second paragraph to Art. 694 of the 2020 Civil Code after *Arroyo González,* instead of rewriting the statute. While the first paragraph exclusively uses the term *sex* and grants specific exceptions in which the birth certificate may be amended, the second paragraph exclusively uses the word *gender*. In a very similar case, *Matter of Hollister*, supra, the Oregon Court declined to engage the constitutional challenges —the same raised in this case— because the Judge deemed that a simple statutory interpretation would suffice to decide that plaintiff had a right to change their birth certificate to nonbinary. The Judge concluded his analysis of the terms *sex* and *gender identity* in the Oregon statute affirming:

> Given, then, that an applicant's gender identity is the basis for the applicant's legal change of sex, it logically follows that, under ORS 33, 460, legal sex designations cannot be limited to "male" or "female". The statute's requirement that the legal sex designation correspond to the applicant's affirmed gender identity strongly suggests that the option of "nonbinary" be available as a choice.  Id at 377.

Similarly, in *Matter of N.K.*, 174 N.Y.S. 3d 541, 543 (2022) the New York court ordered a change of the plaintiff's Georgia's birth certificate to non-binary, indicating that "the Court is unaware of any law or regulation in Georgia expressly addressing, providing for, or prohibiting such option".  Following these reasonings, we submit to this Court that, by amending the law, Puerto Rico's legislature specifically granted the previously prohibited changes and, by including, for the first and only occurrence in that statute, the word "gender",

**206**

the Puerto Rico legislature acknowledge the possibility of having to amend the birth certificate in accordance with the <u>gender identity</u> of the individual, as expressed in a U.S. passport, a driver's license issued by Puerto Rico or any other jurisdiction, or a medical certification of the person's true gender identity. Since non-binary is, indeed, a "gender identity" recognized by the medical profession, the Registry cannot proffer that they are following Puerto Rico's law while denying plaintiffs a change of gender to nonbinary, since the statute now expressly grants the option to change one's gender identification.

The Commonwealth's hermeneutic rule, as the Defendants have already pointed out in their Motion, is that statutes are understood by reading the letter of the law, giving words the meaning they commonly have in the appropriate context. When the Legislature used the term *gender* in the second paragraph instead of *sex*, it acknowledged and adopted the difference between those two terms, following *Arroyo González*.  All proffered reasons for not adding an X marker have vanished under *Arroyo González* and the 2020 *Civil Code*.

The Commonwealth's actions are more invidious, as they have now, in practice, created a classification within the trans gender identity that is nowhere found in the medical and psychological literature regarding gender identity. At present, trans people who conform to the binary distinction are recognized by the government as people whose gender identity is a fundamental right of personhood, while trans people whose identity is non binary are excluded from the rights recognized for those who are binary trans.

The only reason to make a distinction between binary and nonbinary trans people is an improper animus: the disapproval of the second class. "The Constitution's guarantee of equality 'must at the very least mean that a bare […] desire to harm a politically unpopular group cannot' justify disparate treatment of that group."  *U.S. v Windsor*, 570 U.S. 744, 770

**207**

(2013).  When state action cannot be explained by a legitimate state interest, it "raise[s] the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Romer v. Evans*, 517 U.S. 620, 634 (1996).  Here, the proffered rational basis of "maintaining the integrity of vital records" is, evidently, a thinly disguised excuse to exclude an X marker because the Registry already makes changes based on gender and because strict protocols already exist to maintain the integrity of the records in cases of change of gender.  Defendants have offered no other basis for their exclusionary conduct. Regarding the test to evaluate purposeful discrimination met here, see *Fowler v Stitt*, pp. 787 et. seq.

The clear mandate of the 2020 Civil Code is that, notwithstanding all previous prohibitions contained in the Registry's Act, any person can change their gender by presenting a Passport or a driver's license that designate their gender differently to the sex recorded in the Registry. Once plaintiff De la Fuente presented their passport with an X gender-marker, the Registry was bound, under Puerto Rico's law, to include that designation in their records. Nothing in Art. 684 defeats that literal interpretation; on the contrary, the statue clearly lays out the procedure for a citizen to follow. Once De la Fuente follows all published procedures and presents their U.S. Passport, the Registry has a legal duty to add an X marker to include their gender.

This is the reason why Defendants are mistaken when they discuss the requirements to raise a constitutional challenge of a statute. Plaintiffs contention is that, after *Arroyo González* and the amendment to Cc art. 694 , both the courts and the Legislature have recognized *gender* as a separate construction of *sex* and have allowed for the change of *gender* in the birth certificate according to the person's gender identity. After 2020, there is no statutory basis for denying Plaintiffs' petition.

**208**

D. Scrutiny

The substantive component of the due process of the Fourteenth Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v Glucksberg*, 521 U.S. 702, 720 (1997). "[A]ll gender-based classifications… warrant heightened scrutiny." *U.S. v Virginia*, 518 U.S. 515, 555 (1996). As discussed in *Cook*, supra, all cases that conceived people's personal decisions regarding sexual conduct as a liberty interest have been decided under the heightened judicial scrutiny. Id at 52.

Similarly, "[u]nder equal protection jurisprudence, a governmental classification aimed at a "suspect class" is also subject to heightened judicial scrutiny. *Cook* at 61. Following *Bostock*, a classification denying nonbinary persons a change of gender in the birth certificate is a determination "based on sex", because it's based on the assumption that all people must conform to the binary male/female and nonbinary people do not identify with either. "[A]s gender classifications "generally provide[ ] no sensible ground for differential treatment," *id.*, " 'all gender-based classifications today' warrant 'heightened scrutiny.' " *Hecox v. Little*, 79 F.4th 1009, 1021 (9th Cir. 2023), quoting *United States v. Virginia* , 518 U.S. 515, 555 (1996) and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994).

However, the heightened scrutiny that applies to gender is the intermediate scrutiny. "Intermediate scrutiny (applicable to quasi-suspect classes like gender and illegitimacy) requires that a classification "be substantially related to an important governmental objective."" *Hassan v. City of New York*, 804 F.3d 277, 298–99 (3d Cir. 2015), as amended (Feb. 2, 2016), quoting *Clark v. Jeter,* 486 U.S. 456 (1988). See *Cook*, supra, at 56 [stating that

**209**

Lawrence, supra, identified a liberty interest in consensual adult same-sex sex but applie[d] a standard of review that lies between strict scrutiny and rational basis: if the State had a legitimate interest adequate to justify the intrusion on liberty.]

Defendants' refusal to include an X marker would certainly fail both strict and intermediate scrutiny. But it also would fail a rational review. As we have discussed *ante*, there is not even a rational basis for not including an X marker.  Under the rational review, "the focus is entirely on the rationality of the State's reason for enacting the law", that is, the reason cannot be invalid or wholly irrelevant to the achievement of the State's goal. *Cook*, supra at 55. "Moral disapproval of this group [homosexuals], like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Fourteenth Amendment." *Lawrence v Texas*, 538 U.S. 558, 582 (2003).  Once plaintiffs have proven that the purported basis for not including an X for gender is a mere excuse  —since keeping records of the birth sex is readily achieved by the Registry's internal protocols already in place after *Arroyo González*—, this Court must vindicate plaintiffs' right to self expression in the Registry even under a rational review.  "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Arroyo González* at 333. This right to self expression is intertwined with the most fundamental right of human beings: their right to exist. As Judge Cerezo advises, "'there are few areas which are closely intimate facts of a personal nature' than one's transgendered status." Id, quoting *Doe v Town of Plymouth*, 825 F. Supp. 1102, 1107 (D. Mass. 1993).   Finally, the Registry's denial in allowing plaintiffs to use a certification that is truthful in terms of their gender identity constitutes "compelled speech" because it forces plaintiffs to lie in their gender identification and because they will eventually have diverse official documents recording disparate gender

14

**210**

markers. As Judge Cerezo stated, "Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." Id. At 333. This matter of law was already discussed and settled in *Arroyo González*, so we invoke *stare decisis* doctrine.

WHEREFORE it is respectfully requested from this Honorable Court to grant Judgment for plaintiffs.

CERTIFICATE OF SERVICE

It is hereby certified that this motion was filed electronically and a true and exact copy of the foregoing will be served on the defendants by the Pacer system.

In San Juan, Puerto Rico this 6th day of September, 2024.

S/ Johanna M. Emmanuelli Huertas
JOHANNA M. EMMANUELLI HUERTAS
USDC-PR #210506 Email: jmeh@mac.com
94 Calle Ponce, San Juan, PR 00917
Tel.: (787)342-6499

**211**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| ÍNARU NADIA DE LA FUENTE DÍAZ, *et al.*, <br><br>     *Plaintiffs*, <br><br> v. <br><br> PEDRO PIERLUISI, *et al.*, <br><br>     *Defendants*. | Civ. No. 23-01544 (MAJ) |

## OPINION AND ORDER

### I.    Introduction

On October 30, 2023, Ínaru Nadia de la Fuente Díaz, Maru Rosa Hernández, André Rodil, Yeivy Vélez Bartolomei, Gé Castro Cruz, and Deni Juste (collectively "Plaintiffs") filed their Amended Complaint against the Governor of the Commonwealth of Puerto Rico, the Secretary of the Department of Health of the Commonwealth of Puerto Rico, and the Director of the Division of Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico (collectively "Defendants") in their official capacities. (**ECF No. 12**). They maintain that the Commonwealth of Puerto Rico's practice to recognize only the binary male and female designation on birth certificates (hereinafter the "Birth Certificate Policy") violates their Fourteenth Amendment right to privacy and equal protection, and their First Amendment right to freedom of speech.[1] (**ECF No. 12**).

---

[1]     Plaintiffs also allege the Birth Certificate Policy violates their rights under the Commonwealth of Puerto Rico's Constitution. (**ECF No. 12 at 3 ¶ 7**).

**212**

They request this Court compel Defendants to allow nonbinary transgender persons born in Puerto Rico to correct their birth certificates to accurately "reflect their true sex, consistent with their gender identity," in accordance with the practice delineated in 24 P.R. Laws Ann. § 1136. *Id.* at 20.

Pending before the Court are Plaintiffs' Motion for Preliminary Injunction and Defendants' Motion to Dismiss the Complaint. (**ECF Nos. 3, 17**). Both parties have opposed the other's motions. (**ECF Nos. 28, 30**). Because Defendants' Motion is potentially dispositive, the Court addresses it first. For the reasons stated hereafter, the Court **DENIES** both motions. (**ECF No. 3, 17**).

## II.   Analysis

### a.  Defendants' Motion to Dismiss (ECF No. 17)

Beginning with Plaintiffs' allegation that the Birth Certificate Policy violates their Fourteenth Amendment right to equal protection, the Equal Protection Clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "Courts apply different levels of review, or scrutiny, to Equal Protection Clause claims based off the type of impermissible classification the plaintiff alleges the defendant made." *Jones as next friend of Jimmy v. Massachusetts Interscholastic Athletic Ass'n*, 22-cv-11426, 2022 WL 6819608, at *4 (D. Mass. Oct. 11, 2022), *appeal dismissed*, 22-cv-1784, 2022 WL 19520186 (1st Cir. Dec. 6, 2022).

While it is well settled that sex-based discrimination requires a heightened level of scrutiny under the Equal Protection Clause, it is less clear where discrimination based on

*gender identity* fits into the equation. *United States v. Virginia (VMI)*, 518 U.S. 515, 532-33, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996); *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 9 n. 5 (1st Cir. 2012). The Court is unable to find—and the parties have not pointed to—any analogous cases to the instant matter in this circuit. Accordingly, the Court is faced with an issue of first impression.

In light of this, the Court will not dismiss Plaintiffs' Complaint at this juncture, as their equal protection claim—at the very least—survives. *See Greiman v. Hodges*, 79 F. Supp. 3d 933, 946 (S.D. Iowa 2015) ("[G]iven that Plaintiff has asserted important constitutional claims which present issues of first impression, the Court finds that discovery and full consideration of the case on the merits is warranted."); *McGary v. City of Portland,* 386 F.3d 1259, 1270 (9th Cir. 2004) (Courts "should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions."); *Woolford v. City of Ashland, Missouri*, 20-cv-04105, 2020 WL 5118049, at *4 (W.D. Mo. Aug. 31, 2020) (declining to dismiss case as a matter of law when issue of first impression was presented) (collecting cases). Defendants' Motion to Dismiss is thus **DENIED**.

### b. Plaintiffs' Motion for Preliminary Injunction (ECF No. 3)

Moving to Plaintiff's motion, Plaintiffs seek a preliminary injunction enjoining Defendants from employing Puerto Rico's Birth Certificate Policy because it violates their right to equal protection and due process under the Fourteenth Amendment and free speech under the First Amendment. (**ECF No. 3**). The parties have consented to this motion being decided on the briefs. (**ECF No. 3 at 2**); (**ECF No. 28 at 4 n. 2**).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 42 (1st Cir. 2024). Notably, "[a] preliminary injunction is an extraordinary remedy never awarded as of right."[2] *La Simple Co, Ltd. v. SLP Enterprises, LLC*, 21-cv-10058, 2021 WL 1648762, at *4 (D. Mass. Apr. 27, 2021) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

Moving to the four-factor test, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). Given this is an issue of first impression, the Court is unable to determine at this juncture what Plaintiffs' likelihood of success is. Accordingly, the Court finds this issue is better suited to be dealt with on a more developed factual record. *See 22 Franklin LLC v. Bos. Water & Sewer Comm'n*, 549 F. Supp. 3d 194, 197 (D. Mass. 2021) ("Courts are generally disinclined to issue mandatory preliminary injunctions unless the facts and the law clearly favor the

---

[2]     The Court also notes that "[t]he purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication on the merits, more effectively to remedy discerned wrongs." *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995). Where, as here, a party requests an order that would compel action by the other party and disturb rather than preserve the status quo, the motion is one for a mandatory preliminary injunction and is appropriately granted only in those circumstances when the exigencies of the situation demand such relief. *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010); *see also Stinnie v. Holcomb*, 77 F.4th 200, 212 (4th Cir. 2023), *cert. granted sub nom. Lackey v. Stinnie*, 144 S. Ct. 1390 (2024) ("The traditional office of a preliminary injunction, we have observed, is to protect the status quo and to prevent irreparable harm during the pendency of the lawsuit, thus preserving the court's ability to render a meaningful judgment on the merits.") (internal citations and quotations omitted). "Nevertheless, those exigencies should still be measured according to the same four-factor test, as the focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo." *Braintree Lab'ys, Inc.*, 622 F.3d at 40–41.

moving party.") (internal citations and quotations omitted); *see also L.L. Bean, Inc. v. Bank of Am.*, 630 F. Supp. 2d 83, 89 (D. Me. 2009) (finding same) (collecting cases). In light of this, the Court need not discuss the remaining three factors.[3] *See Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). Plaintiffs' Motion for Preliminary Injunction is thus **DENIED**.

## III.    Conclusion

Accordingly, for the reasons stated above, Defendants' Motion to Dismiss is **DENIED**. (**ECF No. 17**). Moreover, because the Court is unable to ascertain Plaintiffs' likelihood of success at this juncture, their Motion for Preliminary Injunction is also **DENIED**. (**ECF No. 3**).

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 23rd day of September, 2024.

*/s/* **María Antongiorgi-Jordán**
**MARIA ANTONGIORGI-JORDAN**
**UNITED STATES DISTRICT JUDGE**

---

[3]      In so holding, the Court also notes Defendants' assertion that if the Court were to grant Plaintiffs' request for a preliminary injunction, it would require Defendants to incur "programming costs [and] design and modification of its systems which would require time and monetary resources." (**ECF No. 28 at 18**). Given the fact Defendants will need to make various administrative changes to comply with the mandatory preliminary injunction Plaintiffs seek, the Court again, feels that this matter is more appropriately resolved at a later stage in the proceedings.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ÍNARU NADIA DE LA FUENTE DÍAZ, MARU ROSA HERNÁNDEZ, ANDRÉ RODRIL, YEIVY VÉLEZ BARTOLOMEI, GÉ CASTRO CRUZ, DENI JUSTE<br><br>Plaintiffs<br><br>v.<br><br>JENNIFFER GONZÁLEZ COLÓN, in her official capacity as Governor of the Commonwealth of Puerto Rico; DR. VICTOR RAMOS OTERO, in his official capacity as the Appointed Secretary of the Department of Health of the Commonwealth of Puerto Rico; WANDA LLOVET DÍAZ, in her official capacity as the Interim Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico.<br><br>Defendants | Civil No. 23-1544 (MAJ) |

## OPPOSITION TO PLAINTIFFS MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT

**TO THE HONORABLE COURT:**

**COME NOW** Defendants Hon. Jenniffer González Colón, in her official capacity as Governor of the Commonwealth of Puerto Rico; Dr. Victor Ramos Otero López in his official capacity as Appointed Secretary of the Department of Health of the Commonwealth of Puerto Rico; and Wanda Llovet Díaz, in her official capacity as the Interim Director of the Demographic

1

**217**

Registry and Vital Statistics of the Commonwealth of Puerto Rico (hereinafter "Defendants")[1],

and very respectfully STATE, ALLEGE, and PRAY as follows:

## I.      INTRODUCTION

The Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico

("Demographic Registry") records one set of information in its birth certificates, that is, biological

sex based on genitalia at birth. However, after the Puerto Rico District Court's decision in Arroyo

González v. Rosselló Nevares, 305 F.Supp.3d 327 (2018), the Demographic Registry was ordered

to issue birth certificates to transgender individuals which reflected their gender identity, whether

male or female, and not their sex assigned at birth. Id. at p. 334. While the current policy and

practice allows for changes in the birth certificate copy, Plaintiffs would prefer to add an "X" as a

nonbinary gender identity. Rather than seek to change that through the political process, Plaintiffs

ask the federal judiciary to constitutionalize the contents of state birth certificates and create a third

nonbinary option. But nothing in the Fourteenth Amendment provides a constitutional right to

force States to record a third nonbinary gender identity option in their own records.

This Court should determine that no case or controversy exists as, considering Plaintiffs'

*Statement of Uncontested Material Facts* ("SUMF"), which have been accepted by Defendants in

the *Response to Plaintiffs' Statement of Uncontested Material Facts* ("RSUMF"), as well as the

*Additional Statement of Uncontested Material Facts* ("ASUMF"), it is evident that the Department

of Health's policy and practice of not contemplating a nonbinary gender marker, does not violate

Plaintiffs' civil rights. As this court will surmise, the Equal Protection Clause provides Plaintiffs

---

[1] When the Complaint was filed, Pedro Pierluisi Urrutia was the Governor of the Commonwealth of Puerto Rico. He was automatically substituted by Governor Jenniffer González Colón on January 2nd, 2025. Likewise, at the time of the filing of the Complaint, Dr. Carlos Mellado López was the Secretary of the Department of Health. He was automatically substituted by the appointed Secretary of Health, Victor Ramos Otero. See Fed. Civ. Proc. R. 25(d). Both are sued in their official capacities.

with no such right because the Department of Health's policy and practice does not treat nonbinary persons differently than others. All Puerto Rico birth certificate records, as well as other identification documents issued by the Government, are issued under the "male" or "female" designation. Since the Legislature has not recognized a third nonbinary option identified as "X", birth certificates may be amended only in those instances recognized in the Puerto Rico Civil Code, P.R. Law ann. tit. 31 §7655 and the Vital Statistics Registry Act of Puerto Rico. P.R. Law ann. tit. 24 §1041 et seq. An "X" gender marker has not been legislated nor is recognized by any other agency or office in the Government of Puerto Rico. "In interpreting an essentially unmendable constitution, the federal courts must be careful about freezing in time just one new approach to a difficult policy issue, particularly one that is steadily evolving and one that turns on each State's plenary power to decide how to speak for itself about the matter." Gore v. Lee, 107 F. 4th 548 (6th Cir. 2024).

Moreover, even if arguendo there was a different treatment for persons who identify as nonbinary, such a challenge would still satisfy constitutional review since transgender discrimination claims are evaluated under a rational basis review. L.W. v. Skrmetti, 83 F. 4th 460, 486-487 (6th Cir. 2023). If special accommodations for nonbinary persons are to be required on birth certificates, they have to come from positive law and not through the Equal Protection Clause. Bd. of Trustees v. Garrett, 531 U.S. 356, 368 (2001). And here, it is uncontested that the Department of Health's policy and practice satisfies the rational basis standard.

Further, Plaintiffs have not shown a long history and tradition of protecting a right to amend their sex designation on a birth certificate to reflect a nonbinary gender identity or that that such right is fundamental to the scheme of ordered liberty that would classify Defendants' actions as a due process clause violation under the Fourteenth Amendment. Finally, the Department of

3

**219**

Health's policy does not violate Plaintiffs' First Amendment rights because the Government does not restrict their ability to express and present themselves in alignment with their gender identity. Since there is no factual controversy in the instant case, in light of Plaintiffs' SUMF accepted in Defendants' RSUMF and Defendants' ASUMF, the Court must deny Plaintiffs' *Motion for Summary Judgment* and, as a result, grant the instant *Cross Motion for Summary Judgment,* dismissing the *Second Amended Complaint* with prejudice.

## II.    PROCEDURAL BACKGROUND

On November 15, 2023, Plaintiffs filed a *Second Amended Complaint* challenging Puerto Rico's birth certificate policy and practice which recognizes only male and female identifications. (Docket No. 12, pp. 13-19).[2] With their initial *Complaint*, Plaintiffs filed a *Motion for Preliminary Injunction* under § 1983 (Docket No. 3). They claim that the Government's historical policy and practice, which does not include an "X" gender marker, disallows individuals who identify as transgender nonbinary from correcting their gender marker on their birth certificate to "X" and violates their Fourteenth Amendment's right to privacy and Equal Protection and their First Amendment Right to freedom of speech. Id.

On January 22, 2024, Defendants filed a *Motion to Dismiss for Failure to State a Claim*. (Docket No. 17). Essentially, they argued that, taking as true the allegations in the *Second Amended*

---

[2] Plaintiffs request this Honorable Court to: (i) rule that the Government's actions and their enforcement of the Puerto Rico Birth Certificate policy violate the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the United States Constitution, as well as the Free Speech Clause of the First Amendment of the United States Constitution; (ii) permanently enjoin Defendants from enforcing the Puerto Rico Birth Certificate policy, which includes refusing to provide birth certificates to transgender nonbinary persons that accurately reflect their gender identity; (iii) permanently enjoin Defendants from relying upon its male-or-female, binary-only gender marker policy and issue corrected birth certificates consistent with Plaintiffs' nonbinary gender identity; (iv) order Defendants to permit transgender nonbinary persons born in Puerto Rico to correct their birth certificates to reflect their sex, consistent with their gender identity; (v) issue a writ of *mandamus* compelling Defendants to process Plaintiffs' application for gender change; and (vi) award Plaintiffs costs and attorney fees and other relief that the Court deems proper. (Docket No. 12, pp. 20-21). The Second Amended Complaint did not alter the substance of the original allegations.

**220**

*Complaint*, Plaintiffs' federal claims under the First and Fourteenth Amendments fail as a matter of law. Defendants also filed an opposition to their request for preliminary injunction and argued that Plaintiffs failed to establish the required four (4) elements for such an extraordinary remedy. (Docket No. 28). On September 23, 2024, the Court entered an *Opinion and Order* denying Plaintiffs' *Motion for Preliminary Injunction* as well as Defendants' *Motion to Dismiss for Failure to State a Claim* by stating that this is an issue of first impression. (Docket No. 39, pp. 2-3).

On September 6, 2024, Plaintiffs filed a *Motion for Summary Judgment* arguing that the Department of Health's policy and practice of issuing birth certificates with a sex or gender classification of male or female exclusively violates the Fourteenth Amendment, the Equal Protection Clause, and the First Amendment. (Docket No. 36).

Defendants will argue in this opposition to summary judgment that the Department of Health and the Demographic Registry are not authorized by law to issue a birth certificate with a sex marker other than male or female. Any change to the Department of Health's policy and practice as well as its historical use and customs has to be implemented by legislation. The Court cannot usurp the legislature's powers and duties by granting such requests.

Moreover, Plaintiffs failed to show that there is a long history and tradition of protecting a right to amend sex designations on a birth certificate to reflect a nonbinary gender identity or that such right is fundamental to the scheme of ordered liberty that would classify Defendants actions as a due process clause violation under the Fourteenth Amendment. Also, Plaintiffs fail to show how the Department of Health's policy and practice violates the Equal Protection Clause on the basis of sex. Finally, the Department of Health's policy and practice does not violate Plaintiffs' First Amendment Rights because the Government does not restrict their ability to express and present themselves in alignment with their gender identity. As a result, the Court must consider

**221**

Plaintiffs' well pleaded SUMF as well as Defendants' ASUMF and deny Plaintiffs' *Motion for Summary Judgment,* grant Defendants' *Cross Motion for Summary Judgment* and dismiss the *Second Amended Complaint* with prejudice.

### III.   STANDARD OF REVIEW

A motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which entitles a party to judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). Fed. R. Civ. P. 56(b) provides that a party against whom a claim is asserted "may, at any time, move with or without supporting affidavits for summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(c) further states that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." The First Circuit has stated that "[O]ne of the principal purposes of the Summary Judgment rule is to isolate and dispose of factually unsupported claims or defenses." Wynne v. Tufts University School of Med., 976 F. 2d 791, 794 (1st Cir. 1992). Summary Judgment exists to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required. Id.

The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party properly supports a motion for summary judgment, "the burden shifts to the nonmoving party, with respect to each issue on which [it] has the burden of proof, to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v.

6

**222**

Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (citing Novellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)).

Local Rule 56 governs the factual assertions made by both parties in the context of summary judgment. Loc. Rule 56; Hernández v. Phillip Morris USA., Inc., 486 F.3d 1, 7 (1st Cir. 2007). The Rule "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." CMI Capital Market Inv. v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008). Pursuant to Rule 56, the movant must submit factual assertions in "a separate, short and concise statement of material facts, set forth in numbered paragraphs," and "[e]ach fact asserted in the statement shall be supported by a record citation as required by subsection (e) of this rule." Loc. Rule 56(b). The Court "disregard[s] any statement of fact not supported by a specific citation to record material properly considered on summary judgment." Loc. Rule 56(e). While the facts that are properly supported shall be deemed admitted unless properly controverted, the First Circuit has repeatedly "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]" which are designed to function as a means of focusing the district court's attention on what is and what is not genuinely controverted. Mercado-Reyes v. City of Angels, Inc., 295 F. Supp. 3d 74 (D.P.R. 2018). The Court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts. Loc. Rule 56 (e).

In opposing summary judgment, the nonmoving party may not rest upon the mere allegations or denials of its pleadings but must set forth specific facts showing that there is a genuine issue of material facts. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." See Johnson v. Univ. of P.R., 714 F.3d 48, 52 (1st Cir.

**223**

2013). Although "the district judge must eye all reasonable inferences in the light most congenial to the nonmoving party," the latter's evidence "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a fact finder must resolve at an ensuing trial." Mack v. Great Atlantic and Pacific, 871 F.2d 179, 181 (1st Cir. 1989).

Even though there are no material factual controversies in dispute, Plaintiffs' Motion for Summary Judgment fails to meet the standard established by the Federal Rules of Civil Procedure as well as Local Rule 56. Plaintiffs' SUMF fail to include specific citation of record material. (*See SUMF ¶¶ 1, 4, 21; RSUMF ¶¶ 1, 4, 21*). Additionally, Plaintiffs' SUMF are not statements of facts based on the instant case, but a finding of facts and legal conclusions based on the specific facts in Arroyo Gonzalez v. Rosselló Nevares, 305 F. Supp. 3d 327 (D.P.R. 2018) (*See, SUMF ¶¶ 5, 14, 15, 19-21; RSUMF ¶¶ 5, 14, 15, 19-21*). As a result, Plaintiffs' objected SUMF must be stricken from the record as immaterial.

Notwithstanding the above, Plaintiffs' SUMF which have been admitted by Defendants' RSUMF as well as the *Additional Statements of Uncontested Material Facts* ("ASUMF"), are firmly supported by evidence and demonstrate that there are no genuine issues for trial. (*See SUMF ¶¶ 2, 3, 6-13, 16-18; RSUMF ¶¶ 2, 3, 6-13, 16-18; ASUMF ¶¶ 1-16*). The Department of Health is entitled to summary judgment in its favor, as the evidence overwhelmingly supports that the Department of Health's policy and practice does not violate Plaintiffs' constitutional rights. This court should therefore deny Plaintiffs *Motion for Summary Judgment* and grant the Department of Health's *Cross Motion for Summary Judgment*.

**224**

## IV.    DISCUSSION

### A.  Section 1983 of the Civil Rights Act, 42 U.S.C. §1983.

Section 1983 in itself does not create substantive rights, but merely provides a venue for vindicating federal rights elsewhere conferred. Graham v. M.S. Connor, 490 U.S. 386 (1989). It creates a private right of action for redressing abridgments or deprivations of federally assured rights. Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004); Mcintosh v. Antonino, 71 F.3d 29, 33 (1st Cir. 1995); Evans v. Avery, 100 F.3d 1033, 1036 (1st Cir. 1996).

To establish liability pursuant to section 1983, a plaintiff must first establish that "the conduct complained of was committed by a person acting under color of state law." Parrat v. Taylor, 451 U.S. 527, 535 (1981). Secondly, a plaintiff must allege facts sufficient to conclude that the alleged conduct worked a denial of rights secured by the Constitution or laws of the United States. See Cepero-Rivera v. Fagundo, 474 F3d 124 (1st Cir. 2005); Johnson v. Mahoney, 424 F.3d 83, 89 (1st Cir. 2005) cited in Vélez-Rivera v. Agosto-Alicea, 437 F.3d 145 (1st Cir. 2006). A section 1983 violation occurs when an official acting under color of state law acts to deprive an individual of a federally protected right. Maymí v. Puerto Rico Ports Authority, 515 F.3d 20, 205 (1st Cir. 2008). Moreover, plaintiffs must show that defendants' actions were the cause in fact of the alleged constitutional deprivation. Gagliardi v. Sullivan, 513 F. 3d 301, 306 (1st Cir. 2008).

Under section 1983, a plaintiff must show that the defendants were involved in the alleged deprivation of their rights. To impose liability upon a defendant, it is necessary that "the conduct complained of must have been casually connected to the deprivation." Gutiérrez-Rodriguez v. Cartagena, 882 F.2d 553 (1st Cir. 1989). The element of causal connection requires that plaintiffs establish that the defendants: (i) were personally involved in the violation, see Monell v. Department of Social Services, 436 U.S. 658, 694 n. 58 (1978); and (ii) their conduct was

9

**225**

intentional, grossly negligent, or amounted to a reckless or callous indifference to the plaintiff's constitutional rights. <u>Simmons</u> v. <u>Dickhaut</u>, 804 F. 2d 182, 185 (1st Cir. 1986). Causation is an essential element of a section 1983 cause of action. A plaintiff cannot succeed in a civil rights action if they fail to demonstrate a causal connection between the state's official's alleged wrongful action and the alleged deprivation. <u>See</u> <u>Reimer</u> v. <u>Smith</u>, 663 F.2d 1316, 1322 (5th Cir. 1981).

To succeed in an action pursuant to section 1983, the plaintiff, who has the burden of proof, first must show official conduct. That is, an act or omission undertaken under color of state law. <u>Roche</u> v. <u>John Hancock Mut. Life Ins. Co.</u>, 81 F.3d 249, 253 (1st Cir. 1996). Second, the plaintiff must satisfy the "constitutional injury" requirement by making a showing of a deprivation of a federally secured right. <u>Baker</u> v. <u>McCollan</u>, 443 U.S. 137, 142 (1979); <u>Nieves</u> v. <u>McSweeny</u>, 241 F.3d 46, 53 (1st Cir. 2001). As will be shown, the Department of Health's policy and practice does not constitute a violation of Plaintiffs constitutional rights as it is in strict compliance with the Puerto Rico Civil Code and Vital Statistics Registry's Act.

**B. The Department of Health's Policy and Practice is Constitutional.**

At the outset, it must be underscored that Plaintiffs are not challenging the constitutionality of Puerto Rico law. They are challenging the Government's policy and practice of not contemplating a nonbinary gender marker. (Docket No. 12, ¶ 37). The Department of Health's policy and practice when issuing Birth Certificates is done in strict compliance with the Puerto Rico Civil Code and the Vital Registry's Act. The Department of Health and its Demographic and Vital Statistics of Puerto Rico are part of the executive branch of the government and cannot issue a birth certificate with a nonbinary gender marker identified as "X" that has not been recognized by the Legislature. *See ASUMF* ¶ 14.

**226**

Birth certificates offer vital information for the use of public officials. Recording the circumstances of these births provide insights about population changes, demographics, fertility rates, infant mortality, and other medical issues. To capture this data, the States record the facts of each person's birth and compile them in a birth certificate. Moreover, the Federal Government has great interest in the information compiled by the states and asks them to record information about every birth and compiles the nationwide data in an annual report. 4 U.S.C. 242k(g)(h). This information allows the support of statistical and epidemiological activities that improve the effectiveness, efficiency, and quality of health services. Id. at 242k(a).

In Puerto Rico, the process to collect vital statistics data as well as the process to issue certifications is regulated by the Puerto Rico Civil Code, P.R. Law ann. tit. 31 §5311, et seq.[3] ("the Civil Code") and the Vital Statistics Registry Act of Puerto Rico. P.R. Law ann. tit. 24 §1041 et seq. The Puerto Rico Civil Code is a general law which rules on multiple issues related to human life and daily human interactions. See Statement of Motives of Puerto Rico Civil Code, Act No. 55 of June 1st, 2020, as amended. As to all facts and judicial acts concerning a person's civil status, the Civil Code dictates that it will be registered in the Demographic Registry of Puerto Rico. Its organization and administration is ruled by special legislation. P.R. Law ann. tit. 31 §7631. The Demographic Registry will have registration of the circumstances of birth, the registered person's name, and the person's sex at birth, among other demographic facts. Id. at §7632.

As to the modification of a person's sex in the register, article 694 of the Puerto Rico Civil Code states:

> No amendments will be authorized in the original birth record. A court may issue a
> judgment authorizing the register to make a note on the original register's margin

---

[3] On June 1, 2020, the Government of Puerto Rico approved Act No. 55 of June 1st, 2020, as amended, also known as the Puerto Rico Civil Code, P.R. Law ann. tit. 31 §5311, et seq. Since its approval, Article 694, P.R. Law ann. tit. 31 §7655, has not been subject to state court interpretation.

11

**227**

of the person's sex, when applicable, due to a posterior change or modification to the sex at birth. However, in these cases, the substitution of the historical and vital act of sex at birth will not be authorized. Only in the case where a medical expert determines the ambiguity of the sex at birth, at the time of birth, and this fact is registered in the records of the Demographic Registry will the judicial authority order the substitution of the original sex at birth in the demographic registry records.

Nothing here construed will undermine the process established in cases of a request for change of gender in a birth certificate. These requests will be accompanied with the Passport, driver's license or a certification submitted by a health professional who has a physician-patient relationship and certifies the applicant's gender. In these cases, the registry shall issue the certificate, safeguarding the right to privacy. 31 P.R. Law ann. tit. 31 §7655. (Translation ours).

Article 2 of the Civil Code establishes that the basis for Puerto Rico Law are the Constitution, the law, customs, as well as the general principles of law. P.R. Law ann. tit. 31 §5312. Additionally, Article 4 states that policy and customs will only govern in the absence of applicable law if it's not contrary to the moral or the public order and if its spontaneity, generality and constancy is proven. 31 P.R. Law ann. tit. § 5314. As to the interpretation and application of the Law, the Civil Code incorporates the rules of hermeneutics. When analyzing the wording used in the Civil Code, Article 25 states: "The words used in this Code in present tense, includes future tense; those used in male voice will also include the female voice, unless due to the nature of the disposition, it is limited only to one; a singular number will include the plural number, and the plural will include the singular number." P.R. Law ann. tit. 31 § 5347 (our translation).[4] As a result, the Civil Code recognizes the current practice of allowing transgender individuals to change the sex marker in their birth certificates to reflect the applicants' gender, whether its male or female.[5]

---

[4] Article 25, in its original Spanish language, states: "Las palabras usadas en este Código en el tiempo presente, incluyen también el futuro; las usadas en masculino incluyen el femenino, a menos que por la naturaleza de la disposición se limiten manifiestamente a solo uno; el número singular incluye el plural, y el plural incluye el singular." P.R. Law ann. tit. 31 § 5347.

[5] Article 694 of the Puerto Rico Civil Code was enacted after the ruling of Arroyo González v. Rosselló Nevares, 305 F. Supp. 3d 327 (D.P.R. 2018). In Arroyo González, the court recognized the process for a person to request a change

12

**228**

However, the Puerto Rico Legislative Assembly did not legislate nor recognize in its rule of hermeneutics a third nonbinary gender other than male or female. *See, ASUMF,* ¶¶ 4, 8-10. A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it, whether or not the basis has foundation in the record. <u>Heller</u> v. <u>Doe</u>, 509 U.S. 312, 320-321 (1993) (internal quotations and citations omitted).

The Civil Code further establishes that the organization and administration of all vital facts and judicial acts concerning a person's civil status are ruled by the Vital Statistics Registry Act of Puerto Rico. P.R. Law ann. tit. 24 §1041 <u>et seq</u>. The Vital Statistics Registry Act creates a General Demographic Registry within the Department of Health. Its purpose is to register, collect, guard, preserve and certify vital facts of people born in Puerto Rico. <u>Id</u>. at § 1042 (1). *See, ASUMF,* ¶¶ 1-3. After the year 1931, the Demographic Registry became a formal and credible statistical registry that allows the study of vital statistics of our population. <u>See</u> Statement of Motives of Act No. 220 of August 9, 1998, also known as the Vital Statistics Registry Act of Puerto Rico, P.R. Law ann. tit. 24 §1041 <u>et seq</u>. It is the instrument that contains the official version of the existence, civil status and vital facts of the people born in Puerto Rico. *See, ASUMF,* ¶ 4. The information that is contained in the Registry constitutes *prima facie* evidence of the fact to be proven. <u>Ex Parte Delgado-Hernández</u>, 165 D.P.R. 170, 187 (2005); <u>Medina</u> v. <u>Pons</u>, 81 D.P.R. 1, 8 n. 11 (1959);

---

of gender in their birth certificate. In the cited case, the district court issued an Order recognizing the right of transgender individuals to change the sex marker in their birth certificates with the applicants' gender identity under the principle of a constitutional right to privacy. Additionally, the court ordered the Demographic Registry of the Government of Puerto Rico to adopt the criteria of the Department of Transportation and Public Works "Request to Change Transgender Person's Gender Marker" as the application form to be submitted and accepted as the first step toward the issuance of their new birth certificates. In their application, individuals shall also present an official document, whether a passport, driver's license or a certification issued by a healthcare professional, that reflects that persons' true gender, **whether male or female**. <u>Arroyo</u>, <u>supra.</u>, at 333-334. Neither the District Court nor the Legislative Assembly recognized a nonbinary gender marker.

<u>Bigas Surs.</u> v. <u>Comisión Industrial</u>, 71 D.P.R. 336 (1950); <u>Pueblo</u> v. <u>Ramírez</u>, 65 D.P.R. 680 (1946); <u>Mercado</u> v. <u>American Railroad Co</u>, 61 D.P.R. 228 (1943).

In <u>Ex Parte Delgado-Hernández</u>, the Puerto Rico Supreme Court expressed:

> The Demographic Registry Act provides the procedure to amend the birth certificate, also as a manner of exception. The Act provides: the omissions or inaccuracies that appear on any certificate prior to being registered at the Department of Health can be corrected inserting the necessary corrections or additions in red ink on the certificate, but after being filed at the Department of Health, no rectification, addition or amendment can be made that substantially alters the same, but only by virtue of a Court Order, which shall be filed at the Department of Health making reference to the corresponding certificate.

165 D.P.R. at p. 188.

As noted by the Puerto Rico Supreme Court, the Demographic Registry Act is complemented by section 1071-19 of the Demographic Registry Regulations, which provides:

> Corrections or alterations after the inscription is made- after the certificate has been accepted by the Registrar, it cannot be the object of any change, erasure or alteration, nor can the transcription made in the record book be changed without due process of law. <u>Id</u>.

Pursuant to the Civil Code, the Vital Statistics Registry Act of Puerto Rico, and as ruled by the Puerto Rico Supreme Court, there are only two (2) ways for the correction of mistakes in a birth certificate: (i) before the certificate is registered; and (ii) after the certificate has been registered at the Department of Health. The Puerto Rico Supreme Court has interpreted the Vital Statistics Registry Act of Puerto Rico restrictively, concluding that any change requested must have been previously authorized by law. <u>Ex Parte Delgado-Hernández</u>, 165 D.P.R. at 189; <u>Ex Parte León Rosario</u>, 109 D.P.R. 804 (1980).

Article 694 of the Puerto Rico Civil Code, 31 P.R. Law ann. tit. 31 §7655, and the United States District Court for the District of Puerto Rico's opinion in <u>Arroyo, supra</u>, allow for change in the birth certificate when the applicant is a male or female transgender person. Yet, the Puerto

**230**

Rico Civil Code and the Vital Statistics Registry Act do not authorize a change in a person's birth certificate to reflect a gender other than male or female. *See ASUMF,* ¶¶ 4, 6, 8-10.

The Puerto Rico Department of Health and its division of Demographic Registry and Vital Statistics are part of the executive power. The executive power contemplates the authority to execute, carry out, and enforce the laws. It does not make the laws in first instance. *See* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952) ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker"). In order to alter the established policy and practice of the Demographic Registry to issue birth certificates with male or female markers, which has been the use and custom since the inception of the Demographic Registry, it must be done through legislation. *See ASUMF,* ¶¶ 14, 16. To alter use and customs, legislation is needed. By definition, the courts must not entertain the instant controversy from the bench, without considering the country's preferences, reflected through its elected officials. Cintrón-Román v. Jiménez Echevarría, 210 D.P.R. 1, 9 (2023) (Translation ours). The Department of Health and the Division of Demographic Registry and Vital Statistics collects and custodies the instruments which contain the official version of the existence and vital facts of the people of Puerto Rico, which constitutes *prima facie* evidence. *See ASUMF,* ¶¶ 1-3. As a result, the Department of Health and the Division of Demographic Registry and Vital Statistics cannot authorize Plaintiffs' request for change in the birth certificate without clear legislation to that effect.

**Summary Judgment is warranted as to the Department of Health**

As amply discussed, and considering Plaintiffs' SUMF and Defendants' RSUMF and ASUMF, summary judgment is warranted as to the Department of Health. To this date, neither the Vital Statistics and Registry Act nor the Puerto Rico Civil Code have recognized an "X" gender

**231**

marker in birth certificate or other government issued documents. *See, SUMF, ¶ 3; RSUMF, ¶ 3; ASUMF, ¶¶* 4, 8-10. Moreover, even though in <u>Arroyo</u>, <u>supra</u>, a district sister court ordered the Demographic Registry issue an amended birth certificate to persons who identified as transgender, it only considered two (2) gender markers, female or male. As such, the Puerto Ricos's current legal framework does not consider "X" a gender marker for birth certificate or other governmental documents. *See, SUMF*, ¶¶ 2-3; *RSUM*F, ¶¶ 2-3; *ASUMF*, ¶¶ 4-6, 8-10; 14. Since the Government of Puerto Rico nor the state courts have recognized an "X", the Department of Health and the Demographic Registry do not have the authority to create a new gender category without legislative approval. *See, ASUMF* ¶ 14, 16.

### C. The Department of Health's policy and practice does not discriminate on the basis of sex and does not violate the Equal Protection Clause.

Plaintiffs claim that because Puerto Rico's Birth Certificate policy violates the Fourteenth Amendment under the Equal Protection clause by not allowing for cisgender and transgender persons to have a birth certificate that reflects their gender identity, it discriminates against a nonbinary person on the basis of sex. (Docket No. 12, ¶¶ 3-16). They contend that Defendants' policy engages in sex-based discrimination, subject to heightened scrutiny. (Docket No. 36, pg. 16-17).[6] However, gender identity and transgender status are not a suspect classification under the Equal Protection Clause and therefore should be analyzed under the rational basis framework.

The Equal Protection Clause provides that "[n]o state shall…deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV §1. It is "essentially a direction that all persons similarly situated should be treated alike." <u>City of Cleburne</u> v. <u>Cleburne</u>

---

[6] When making reference to any page number in *Plaintiffs' Motion for Summary Judgment*, it will be to the Docket Entry page number at the top of the page.

16

Living Ctr. 473 U.S. 432 (1985). It is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993).

The guarantee of equal protection coexists with the reality that most legislation must be classified for some purpose or another. See Romer v. Evans, 517 U.S. 620 (1996). Thus, Equal Protection Clause "does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992). The language in the Equal Protection clause "was not designed to compel uniformity in the face of difference," Whitney v. State Tax Comm'n, 309 U.S. 530, 542 (1940); rather it bars only "intentional and arbitrary discrimination." Glicher v. Mich Liquor Control Comm'n, 160 F.2d 96, 99 (6th Cir. 1947) (quotations omitted).

When considering an equal protection claim, the court must first determine what level of scrutiny applies and then determine whether the law or policy at issue survives such scrutiny. Laws that discriminate based on suspect classifications, such as race or sex, receive heightened review. City of Cleburne v. Cleburne Living Ctr., 473 U.S. at 440-441. Otherwise, laws are "presumed to be valid" and will be upheld if they bear a rational relationship to a legitimate state interest. Id. at 440.

In determining what level of scrutiny applies to a plaintiff's equal protection claim, the court looks for the basis of the distinction between the classes of persons. See O.S. v. Carolene Products Co., 304 U.S. 144, 152 n.4 (1938). "If the challenged government action implicates a fundamental right, or classifies individuals using a suspect classification, such as race or national origin, a court will review that challenged action applying a strict scrutiny." Price-Cornelison v. Brooks, 524 F.3d 1103, 1109 (10th Cir. 2008). On the other hand, if the challenged government action does not implicate a fundamental right or a protected class, the court will apply a rational

17

**233**

basis review. <u>Carney</u> v. <u>Okla. Dep't of Public Safety</u>, 875 F.3d 1347 (10th Cir. 2017). Under the rational standard, Plaintiffs' claim will fail "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." <u>F.C.C. v. Beach Commc'ns, Inc.</u>, 508 U.S. 307 (1993).

Since "[e]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," the starting point for evaluating the constitutionality of a law, policy or practice under the Equal Protection Clause is the rational basis test. <u>F.C.C. v. Beach Commc'ns, Inc.</u>, 508 U.S. 307, 313 (1993). Therefore, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." <u>Id</u>. This standard of review is a paradigm of judicial restraint. <u>Id</u>.

Plaintiffs argue that the Department of Health's policy and practice discriminates on the basis of gender, which is also discrimination on the basis of sex. They invoke the Supreme Court's generic statement that "all gender-based classifications today warrant heightened scrutiny." <u>United States</u> v. <u>Virginia</u>, 518 U.S. 515 (1996) (Docket No. 36, p. 16). Moreover, they claim that following <u>Bostock</u> v. <u>Clayton County</u>, 590 U.S. 644 (2020), a classification denying a person who identifies as nonbinary a birth certificate with an "X" gender marker is a determination on the basis of sex. Such interpretation of <u>Bostock</u> is incorrect because this contention is premised on a Title VII case which does not apply to an equal protection claim. As the Supreme Court stated, its text driven reasoning in <u>Bostock</u> applies only to cases brought under Title VII and declined to prejudge other discrimination laws. <u>Id</u>. at 680-681; <u>Pelcha</u> v. <u>MW Bancorp, Inc.</u>, 988 F.3d 318, 324 (6th Cir. 2021) (refusing to apply <u>Bostock</u> to the Age Discrimination in Employment Act); <u>Meriwether</u> v.

18

**234**

Hartop, 992 F.3d 492, 510 n. 4 (6th Cir. 2021) (reasoning that Title VII analysis does not apply to Title IX).

The differences between the language of the statute and the Constitution supply an initial reason why Bostock does not apply to an Equal Protection Clause.[7] L.W. v. Skrmetti, 83 F.4th 460, 484 (6th Cir. 2023). Were the Court to import the Title VII test into the Fourteenth Amendment, as Plaintiffs suggest, it would also require adding Title VII's defenses to the Constitution. Id. As such, The Supreme Court's reasoning in Bostock is inapplicable in the instant case since its decision is limited to employment under Title VII and does not extend to the broader issue of recognizing nonbinary gender markers on vital records.

The Department of Health and the Demographic Registry implement its policy and practice fairly, treating all citizens alike by issuing a birth certificate with a male or female sex designation. As such, it does not deny benefits stemming from a basic right protected by equal protection or substantive due process. Pavan v. Smith, 582 U.S. 563, 566-67 (2017). But absent an existing fundamental right, the Constitution does not require the States to embrace Plaintiffs' view of what information a birth certificate must record. Gore v. Lee, 107 F. 4th at 557. In this way, the Department of Health's policy and practice in recording sex, whether male or female, instead of a non-binary gender identity, does not withhold a constitutionally prescribed benefit. The Department of Health's policy and practice treats all sexes equally by issuing a birth certificate that states whether that citizen is male or female. *See, ASUMF,* ¶¶ 4, 6, 9-10, 14.

---

[7] Title VII focuses on but-for discrimination: It is "unlawful…for an employer…to discriminate against any individual…because of…sex." 42 U.S.C. § 2000e-2(a)(1). Meanwhile, the Equal Protection Clause focuses on the denial of equal protection: "No State shall…deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

Plaintiffs claim that the Department of Health's policy and practice discriminates on the basis of gender and must be classified as a suspect or quasi suspect class is incorrect. (Docket No. 36, p. 16). For a class to be classified as a suspect or quasi-suspect class, it must have been subjected to discrimination; exhibit obvious, immutable, or distinguishing characteristics that define them as a discreet group; and considered a minority or politically powerless. <u>See</u>, e.g. <u>Massachusetts Board of Retirement</u> v. <u>Murgia</u>, 427 U.S. 307, 313-314 (1976). The Supreme Court "has never defined a suspect or quasi-suspect class on anything other than a trait that is definitively ascertainable at the moment of birth." <u>Ondo</u> v. <u>City of Cleveland</u>, 795 F.3d 597, 609 (6th Cir. 2015). It follows that Courts have not recognized a person's transgender status as a suspect class. This is because transgender individuals "do not exhibit obvious, immutable, or distinguished characteristics that define them as a discrete group." <u>Bowen</u> v. <u>Gilliard</u>, 483 U.S. 587 (1987) (quotation omitted). The Sixth Circuit has stated that transgender identity refers to "a huge variety of gender identities and expressions." <u>Gore</u> v. <u>Lee</u>, 107 F. 4th at 558. Due to this, gender identity is not ascertainable at the moment of birth and can change over time. <u>Id</u>. Gender identity is a person's internal sense of their own gender and, since it is not an obvious, immutable or distinguishing characteristic, cannot be defined as a discrete group. As a result, it fails to meet the criteria to qualify as a suspect class. <u>L.W. by and through Williams</u> v. <u>Skrmetti</u>, 83 F.th 460, 486-88 (6th Cir. 2023).

Moreover, Plaintiffs fail to show that the Department of Health's policy and practice stems from animus against nonbinary individuals or that it was created with such a goal. The Department's policy and practice long predates the medical diagnosis of gender dysphoria or the consideration of a third nonbinary gender. Also, Plaintiffs have not established a cognizable claim of political powerlessness. <u>See</u>, <u>Cleburne</u>, 473 U.S. at 445. The political record shows that multiple

20

**236**

states and cities have implemented new laws benefitting nonbinary transgender individuals. As the *Second Amended Complaint* states, transgender individuals have had political success in convincing state governments throughout the United States to permit identification documents to match their gender identity. *See, ASUMF*, ¶ 16. "These and other legislative measures in favor of transgender rights make it difficult to maintain that their cause is one destined for political failure." <u>Gore</u> v. <u>Lee</u>, 107 F. 4th at 558-560. Consequently, it is necessary to conclude that transgender individuals do not occupy "a position of political powerlessness" that requires extraordinary protection from the majoritarian political process." <u>San Antonio Indep. Sch. Dist.</u> v. <u>Rodríguez</u>, 411 U.S. 1, 28 (1973). The Department of Health's policy and practice does not exceed its discretion in issuing birth certificate records with a male or female gender marker since States have considerable discretion in defining the terms used in their own laws and in deciding what records to keep. <u>Shurtleff</u> v. <u>City of Boston</u>, 596 U.S. 243, 251 (2022).

In the absence of any foundation for a heightened review, the Court must conclude that the Department of Health's policy and practice is supported by a rational basis. <u>FCC</u> v. <u>Beach Commc'ns, Inc.</u>, 508 U.S. 307, 313 (1993). Equal Protection does not give a free hand for courts to judge the fairness or logic of legislative choices. <u>Id</u>. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is a reasonably conceivable state of facts that could provide a rational basis for the classification. <u>Id</u>.

Ample legitimate explanations support the Department of Health's policy and practice. First, it is the Department of Health's policy and practice to maintain legislative integrity and authority. "Only the written word is the law, and all persons are entitled to its benefit." <u>Bostock</u> v. <u>Clayton County</u>, 590 U.S. at 653. This principle supports the State's position that creating a new

**237**

gender category, such as "X," without legislative approval undermines the separation of powers. Only the state legislature has the authority to enact such changes and ensure democratic accountability and avoid administrative overreach. *See, ASUMF,* ¶¶ 14-16.

Second, The Department of Health has an interest in maintaining the integrity of public records. *See,* ASUMF, ¶¶ 15. Birth certificates serve vital functions as foundational legal documents and maintaining biologically based classifications ensure their reliability and historical accuracy. See, Tuan Anh Nguyen v. INS, 533 U.S. 53, 73 (2001) (respecting this "most basic biological difference []" avoids the risk of "making the guarantee of equal protection superficial"); Pavan v. Smith, 582 U.S. at 568 (Gorsuch, J. dissenting) (noting that "rational reasons exist for a biology birth registration scheme…line ensuring government officials can identify public health trends and helping individuals determine their biological lineage, citizenship, or susceptibility to genetic disorders"); Kasper v. School Board of St. Johns County, 57 F. 4th 791, 803 n. 6 (2022) (noting that "biological sex…is the driving force behind the Supreme Court's sex-discrimination jurisprudence"). Insisting that birth certificates include some metrics, such as sex, time and date of birth remain unchanged absent evidence of error correlates with the Department of Health's stated interests and its viewpoints about the best way to keep records of birth in the State. *See, ASUMF,* ¶¶ 1-4;14-16.

The rational standard of review does not require States to show that a classification is the only way, the best way, or even the most defensible way to achieve their interests. FCC v. Beach Commc'ns, Inc., 508 U.S. at 313; Mas. Bd. of Ret. v. Murgia, 427 U.S. 307, 316 (1976). It requires only that "some plausible reason" supports the classification, no matter how imprudent or ineffective. Tiwari v. Friedlander, 26 F. 4th 355, 361-62 (6th Cir. 2022). A state "does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect."

Murgia, 427 U.S. at 316. The Department of Health's policy and practice treats both sexes equally by issuing a birth certificate that states whether that citizen is male or female. *See ASUMF,* ¶¶ 4, 6, 10. This being the case, the Department of Health's policy and practice of not including an "X" marker in its records rationally correlates with the State's interest in consistency and historical accuracy of its vital statistic records. *See, ASUMF,* ¶¶ 14-16.

**Summary judgment is warranted as to the Department of Health**

When considering Plaintiffs' SUMF, Defendants' ASUMF, and the legal arguments previously discussed, it is necessary to conclude that the Department of Health's policy and practice does not discriminate on the basis of sex and therefore, does not violate the Equal Protection Clause. It is uncontested that the Department of Health treats all sexes equally and issues birth certificates to all its citizens with a female or male marker. *See, SUMF* ¶¶ 2-3; *RSUMF* ¶¶ 2-3; *ASUMF*, ¶¶ 4, 6, 8-10, 14.

First, Plaintiffs assertion that the Department of Health's policy and practice discriminates on the basis of gender and must therefore be classified as a suspect or quasi suspect class is incorrect. As discussed, for a class to be classified as a suspect or quasi suspect class, it must have been subject to discrimination; exhibit obvious, immutable, or distinguishing characteristics that define them as a discreet group; and considered a minority or politically powerless. See, e.g. Massachusetts Board of Retirement, 427 U.S. at 313-314. However, transgender individuals do not exhibit obvious, immutable or distinguished characteristics that define them as a discreet group. Gender identity is a person's internal sense of their own gender and, since it is not ascertainable at the moment of birth, it can change over time. Gore v. Lee, 107 F 4th at 558. *See, SUMF*, ¶¶16-18; *RSUMF*, ¶¶ 16-18. Since gender identity is not an obvious or immutable characteristic, it fails to meet the criteria to qualify as a suspect class. Additionally, Plaintiffs have

**239**

not shown that that individuals who identify as nonbinary are politically powerless since it is uncontested that the Department of State of the United States of America as well as multiple states have recognized a third gender option as "X". *See SUMF*, ¶ 6; *RSUMF* ¶ 6; *ASUMF*, ¶ 16. As a result, it is evident that a classification based on gender identity is not a classification on the basis of sex and is not subject to heightened review.

The Department of Health's policy and practice is supported by its intent to maintain legislative integrity and authority. Moreover, creating a new gender category such as "X, without legislative approval undermines the separation of powers. As such, it is up to the state legislature to enact such a change and ensure democratic accountability and avoid administrative overreach. *See, ASUMF*, ¶¶ 14-16. Additionally, the Department of Health has a legitimate interest in preserving, certifying, analyzing and maintaining the integrity of public records. *See, ASUMF*, ¶¶ 1-4; 15. As such, it is uncontested that the Department of Health's policy and practice of not including an "X" marker in its records rationally correlates with the states interest in consistency and historical accuracy of its vital statistic records. *See ASUMF* ¶¶ 1-4, 14-16.  Therefore, this Court should deny Plaintiffs' request for summary judgment and grant Defendants' request for the same.

**D.  The Department of Health's policy and practice does not infringe upon a fundamental right protected by the Fourteenth Amendment's Substantive Due Process Clause.**

Plaintiffs bring a Fourteenth Amendment substantive due process claim arguing that the Department of Health's policy, as applied, interferes with their fundamental right to individual autonomy and consists of a deprivation of liberty that "shocks the conscience." (Docket No. 12, ¶¶ 61-69).  The Department of Health's policy and practice, however, is not conscience shocking under the Due Process Clause. And even assuming Plaintiffs adequately alleged conscience shocking conduct, they failed to plead a cognizable liberty or property interest.

24

**240**

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without the due process of law. U.S. Const. amend. XIV §1. The Supreme Court of the United States has recognized that the Due Process Clause protects two categories of substantive rights: (i) the rights guaranteed by the first eight amendments; and (ii) a select list of fundamental rights that are not mentioned in the Constitution. Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 237-238 (2022). In deciding whether a right falls into either of these categories, the Court has long asked whether the right is "deeply rooted in history or tradition" and whether it is essential to our Nation's "scheme of ordered liberty." Id. "Historical inquiries of this nature are essential whenever we are asked to recognize a new component of the liberty protected by the Due Process Clause because the term liberty alone provides little guidance." Dobbs, 597 U.S. at p. 239.

A Plaintiff's substantive due process claim challenges the specific acts of a state officer and must show that both the acts were so egregious as to shock the conscience that they deprived them of a protected interest in life, liberty, or property. See Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005) (stating that "[i]t is not enough to claim the governmental action shocked the conscience" but plaintiff must also show a deprivation of a protected interest). A conscience shocking conduct is an indispensable element of a substantive due process challenge to executive action. DePoutot v. Raffaelly, 424 F.3d 112, 118 n. 4 (1st Cir. 2005).

There is no scientifically precise formula for determining whether executive action is sufficiently shocking to trigger the protections of the substantive due process branch of the Fourteenth Amendment. See Nestor Colón Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992) (referring to the inquiry as "virtually standardless"). Therefore, the analysis will vary with the subject matter and circumstances.

25

**241**

The First Circuit has stated that the requisite inquiry involves "a comprehensive analysis of the attendant circumstances before any abuse of official power is condemned as conscience-shocking." Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006) (quoting Depoutot, 424 F.3d at 119). For example, for a conduct to be deemed as conscience shocking, it must be "at the very least, extreme and egregious" or "truly outrageous, uncivilized, and intolerable." Id. A mere violation of state law, even violations resulting from bad faith, do not invariably amount to conscience shocking behavior. Id. The allege conscience shocking behavior "must be stunning." Amsden v. Moran, 904 F.2d 748 (1st Cir. 1990).

The appellate court has consistently ruled that the substantive due process may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determination of a state or local decisionmakers, whether those decisions are right or wrong. Any permit or license denial, no matter how unattractive, falls short of being "truly horrendous" and is unlikely to qualify as conscience shocking for a substantive due process claim. Pagán, 448 F.3d at p. 33. This standard is rigorous but necessary since a lesser standard would run the risk of "insinuate[ing] the oversight and discretion of federal judges into areas traditionally reserved for the states and local tribunals and would dash any hope of maintaining a meaningful separation between federal and state jurisdiction." Id. (quoting Creative Environments, Inc. v. Estabrook, 680 F.2d 822 (1st Cir. 1982)).

Plaintiffs failed to identify a fundamental right that is protected by the Fourteenth Amendment. "Constitutional analysis must begin with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding documents mean." Dobbs, supra, at 235. When Amnesty International Puerto Rico Chapter requested an amendment to the application for gender change in Vital Events Certification to include "X" as an alternative for nonbinary, intersex or gender nonconforming persons, the Department of Health ultimately responded that

26

**242**

since the Legislative Assembly nor the courts had addressed this particular request, they were impeded from making the change. *See, ASUMF,* ¶¶ 12-14. Defendants' application of its policy is not conscience shocking, extreme, egregious, or horrifying. Therefore, Plaintiffs' substantive due process claim must be dismissed with prejudice.

Even assuming *in arguendo* that Plaintiffs adequately alleged a conscience shocking conduct by the Department of Health, they failed to plead a cognizable claim of liberty or property interest. The Constitution makes no express reference to a right to privacy concerning one's gender, nor does it reference a right to be treated consistent with one's gender identity. Therefore, Plaintiffs must show that the right is somehow implicit in the constitutional text and that the Due Process clause provides substantive protection for Plaintiff's right to privacy and autonomy under the "liberty" interest. Dobbs, supra. at 215.

Here, Plaintiffs do not allege sufficient facts for this court to conclude that the right to amend the sex designation on their birth certificate has historically been protected. They claim that since the District Court's decision in Arroyo González, transgender people have the right to change the gender that appears in their birth certificates from one gender to another (male or female) but point to no authority suggesting that a non-binary classification has existed prior to the year 1931, when the Demographic Registry became a formal and credible statistical registry. See Statement of Motives, Act No. 220 of August 9, 1998.

Plaintiffs allege that seventeen (17) states, New York City, and several municipalities acknowledge nonbinary genders on birth certificates. (Docket No. 12, p. 10-12, ¶¶ 35-36; Docket No. 29, p. 10, ¶ 36). These states and municipalities, however, authorized nonbinary genders on birth certificates throughout the legislative process and not via the courts. *See, ASUMF*, ¶ 16. It follows that the right to include nonbinary genders on birth certificates was not reasonably

27

**243**

considered, or even existed, when the Fourteenth Amendment was adopted. See Dobbs, 597 U.S. at 251 ("Not only are respondents and their *amici* unable to show that a constitutional right to abortion was established when the Fourteenth Amendment was adopted, but they have found no support for the existence of an abortion right that predates the latter part of the 20th century—no state constitutional provision, no statute, no judicial decision, no learned treatise").

Plaintiffs also failed to plead how the right of a transgender person to self-determination and autonomy is an essential component of ordered liberty. An individual's freedom to act does not confer the right to compel the government to act. Brown v. Cooke, 362 F. App'x 897, 900 (10th Cir. 2010) ("[T]here is [no] fundamental right of citizens to compel the Government to accept a common-law name change and reform its records accordingly"). Plaintiffs' freedom to define and express their identity may correspond to one of the many understandings of liberty, but it is not an integral component of "ordered liberty" as defined by the Supreme Court. See Dobbs, 597 U.S. at 256 ("License to act on the basis of such beliefs may correspond to one of the many understandings of "liberty," but it is certainly not "ordered liberty"").

Moreover, Plaintiffs invoked the *stare decisis* doctrine stating that the instant matter was already discussed by another sister court in this district in Arroyo González. But as previously discussed, the substantive due process right to "informational privacy" applied in Arroyo González is not deeply rooted in history and tradition. The Supreme Court has stated without elaboration that there exists a due process interest in avoiding disclosure of personal matters. Whalen v. Roe, 429 U.S. 589, 599 (1977). The Court has said little else on the subject ever since. Nat'l Aeronautics & Space Admin. v. Nelson, 562 U.S. 134, 146 (2011); Id. at 162 (Scalia, J., concurring in judgment) (noting that "there is no constitutional right to informational privacy"). "[H]istory shows that, however important individuals may perceive the designation of their sex on a birth

28

**244**

certificate, it is only recently that States have modified their laws to permit sex designations to conform to gender identity." Gore v. Lee, 107 F. 4th at 562.

As a result, Plaintiffs fail to show sufficient facts to conclude that there is a long history and tradition of protecting the right to amend the sex designation on a birth certificate to reflect a nonbinary gender identity, or that such right is fundamental to the scheme of ordered liberty.

**Summary Judgment is warranted as to the Department of Health**

When considering Plaintiffs' SUMF, as well as Defendants' ASUMF, it is necessary to conclude that the Department of Health has not violated a fundamental right under the Fourteenth Amendment. When Plaintiffs requested an amendment to include an "X" in the application for gender change in vital events certification, the Department responded that since neither the Legislative assembly nor the courts had addressed this, they were unable to make such a change. *See SUMF* ¶¶ 3, 7; *RSUMF* ¶¶ 3, 7; *ASUMF*, ¶¶ 11-14. As such, it is uncontested that such an action is not conscience shocking, extreme egregious or horrifying.

Similarly, the Department of Health's policy and practice does not violate Plaintiffs' liberty given that the right to amend a sex designation on a birth certificate is not historically protected. Since 1931 the Demographic Registry has studied and collected the vital statistics of people of Puerto Rico and it has not recognized the authority to include an "X" gender marker. *See ASUMF* ¶¶ 1-4. Moreover, on June 1, 2020, the Government of Puerto Rico approved the most recent Civil Code and did not include an "X". *See ASUMF*, ¶¶ 7-10. Th record is devoid of a long history and tradition of amending sex designations on a birth certificate to include a nonbinary gender identity. In this way, this Court must grant Defendants' *Cross Motion for Summary Judgment* and dismiss the *Second Amended Complaint* with prejudice.

**245**

**E. The Department of Health's policy and practice is not "compelled speech" and does not violate Plaintiffs' First Amendment Rights.**

Plaintiffs claim that Defendants' refusal to amend their birth certificates violates their First Amendment right to freedom by forcing them to lie in their gender identification. (Docket No. 36, p. 17). However, as this court will conclude, the contents of a birth certificate are government speech and therefore, do not implicate the First Amendment.

The First Amendment provides that "Congress shall make no law…abridging the freedom of speech." U.S. Const. amend. I. The First Amendment protects against prohibitions of speech, and against laws or regulations that compel speech. "Since all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. Of Boston, 515 U.S. 557 (1995). However, the Free Speech Clause protection "extend[s]…only to conduct that is inherently expressive." Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 66 (2006); see also Cressman v. Thompson, 798 F.3d 938, 952-953 (10th Cir. 2015) (stating that the "animating principle" behind pure-speech protection is "safeguarding self-expression").

The Department of Health's policy is only implicated when Plaintiffs present their birth certificates to a third party. However, "[t]he act of presenting identification" or "handing government documents" to someone else, has never been considered a form of expressive conduct. Interest of C.G., 976 N.W. 2d 318, 341 (2022); United States v. Cline, 286 F. App'x 817, 820 (4th Cir. 2008) (holding that production of identification documents does not implicate any right protected by the First Amendment). When Plaintiffs present themselves to society in conformance with their gender identities, their conduct is expressive. The expressive component of their transgender nonbinary identity is not created by the sex designation listed on their birth certificates,

30

**246**

but by the various actions they take to present themselves as transgender nonbinary persons, that being in the way they dress or changing their legal name. The Department of Health's policy and practice does not restrict Plaintiffs' ability to express and present themselves as nonbinary persons nor does it prevent them from bringing their gender expression into alignment with their gender identities. Therefore, a change on a person's sex designation on their birth certificate does not restrict Plaintiffs' right to freedom of speech or expression.

Moreover, the content in a birth certificate is government speech and therefore does not imply the First Amendment. Government compelled speech is antithetical to the First Amendment. Forcing an individual "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable… "invades the sphere of intellect and spirit which is the purpose of the First Amendment to our Constitution to reserve from all official control." Wooley v. Maynard, 430 U.S. 705 (1977) (quoting W.Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943)). The government cannot coerce affirmations of belief, compel unwanted expression, or force one speaker to host the message of another as a public accommodation. See Hurley, 515 U.S. at 572. The "First Amendment Free Speech Clause does not prevent the government from declining to express a view." Shurtleff v. City of Boston, 142 U.S. 243 (2022). The government-speech doctrine provides that" [w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." Walker v. Tex. Div. Sons of Confederate Veterans, Inc., 576 U.S. 200 (2015) ("[G]overnment statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas").  In short, Plaintiffs have failed to show, as a matter of law, a First Amendment freedom of expression violation. This, because the Legislative Assembly has not recognized or included an "X" gender marker within the Demographic Registry.

**Summary Judgment is warranted as to the Department of Health**

Birth certificates are a communication of data chosen by the Commonwealth of Puerto Rico, on behalf of the government. A birth certificate is spoken by the government, who is certifying the information therein to be accurate, as opposed to the birth certificate holder. The State determines what information is required on a birth certificate, and what information can and cannot be subsequently amended. Walker, 576 U.S. at 121 ("[L]icense plates are, essentially, government ID's. And issuers of ID typically do not permit the placement on their ID's of message[s] with which they do not wish to be associated"). If state law permitted individuals to communicate their own messages in birth certificates without restriction, birth certificates would cease to function as reliable government-issued identification. Id. As a result, Plaintiff's failed to prove a claim under the First Amendment and must therefore be dismissed with prejudice.

As amply discussed in Section B, the Vital Statistics and Registry Act, which created the Demographic Registry within the Department of Health, serves the purpose of registering, collecting, guarding and preserving the vital facts of people born in Puerto Rico. *See ASUMF ¶¶ 1-3.* Since its inception, neither the Government of Puerto Rico nor its Legislative Assembly have recognized or included an "X" gender marker within the Demographic Registry. The use and customs have always been limited to the female and male sex designations. *See ASUMF ¶¶ 4.* Therefore, this Court must enter summary judgment in favor of the Department of Health and dismiss the instant Complaint.

## V.    CONCLUSION

As this Court will surmise, no case or controversy exists in that the Department of Health's policy and practice is constitutional and, therefore, Summary Judgment is warranted in favor of the Defendants. The State's refusal to administratively allow an "X" gender marker designation

32

**248**

on birth certificates without legislative authorization is constitutionally justifiable. No controversy exists that the Department of Health has several important governmental objectives that support its policy, including maintaining consistency and reliability in vital records, ensuring public trust in the integrity of these documents and adhering to statutory framework. These objectives align with the government's interest in preserving accurate and historically consistent recordkeeping practices. Nothing in the Constitution deputizes Plaintiffs contention to override the legislature's judgment and demand policy they believe to be more favorable. Concluding otherwise would violate the most deeply rooted tradition of looking to democracy to answer public policy questions. As such, it is necessary to conclude that the Department of Health's policy and practice does not discriminate on the basis of sex. Therefore, summary judgment must be issued in favor of Defendants and the *Second Amended Complaint* dismissed with prejudice.

Moreover, Plaintiffs have failed to prove how the Department of Health's policy and practice shocks the conscience nor that there is a long history and tradition of protecting a right to amend a birth certificate to reflect a nonbinary gender or identity. Finally, the Department of Health's policy and practice does not violate Plaintiffs First Amendment Rights since the Government has not restricted their ability to express and present themselves in alignment with their gender identity. The Department of Health is entitled to summary judgment in its favor, as the evidence overwhelmingly supports that its policy and practice does not violate Plaintiffs' constitutional rights. This court should therefore deny Plaintiffs *Motion for Summary Judgment* and grant the Department of Health's *Cross Motion for Summary Judgment*.

**WHEREFORE,** appearing Defendants respectfully request the court to deny Plaintiffs' *Motion for Summary Judgment* and grant Defendants' *Cross Motion for Summary Judgment* and as a result, dismiss with prejudice all claims against them.

**I HEREBY CERTIFY** that I electronically filed the foregoing with the Clerk of the Court, who will send notification of such filing to the parties subscribing to the CM/ECF System.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico on this 10th day of January 2025.

**JANET PARRA-MERCADO**
Appointed Secretary of Justice

**SUSANA I. PEÑAGARÍCANO-BROWN**
Interim Deputy Secretary in Charge of Litigation

*S/ Diana I. Pérez-Carlo*
**DIANA I. PÉREZ-CARLO**
USDC No. 307313
Email: diana.perez@justicia.pr.gov
Tel. (787) 721-2900, ext. 1419

**DEPARTMENT OF JUSTICE OF PUERTO RICO**
Federal Litigation Division
PO Box 9020192
San Juan Puerto Rico, 00902-0192

34

**250**

Case: 25-1638    Document: 00118338811    Page: 258    Date Filed: 09/10/2025    Entry ID: 6750029

Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ÍNARU NADIA DE LA FUENTE DÍAZ, MARU ROSA HERNÁNDEZ, ANDRÉ RODRIL, YEIVY VÉLEZ BARTOLOMEI, GÉ CASTRO CRUZ, DENI JUSTE<br><br>Plaintiffs<br><br>v.<br><br>PEDRO PIERLUISI URRUTIA, in his official capacity as Governor of the Commonwealth of Puerto Rico; DR. CARLOS R. MELLADO LÓPEZ, in his official capacity as the Secretary of the Department of Health of the Commonwealth of Puerto Rico; WANDA LLOVET DÍAZ, in her official capacity as the Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico.<br><br>Defendants | Civil No. 23-1544 (MAJ) |

## SWORN STATEMENT

I, Wanda del C. Llovet Díaz, of legal age, married, in my official capacity as Director of the Demographic Registry and Vital Statistics of the Government of Puerto Rico, and resident of Trujillo Alto, Puerto Rico, upon information and belief of the facts asserted herein, do solemnly declare under penalty of perjury:

1.      I was appointed Director of the Demographic Registry and Vital Statistics of the Government of Puerto Rico by former Secretary of Health, Dr. Jaime Rivera Dueño, to serve from February 2, 2009, to May 13, 2013, and was reappointed for a second term by the former Secretary of Health, Dr. Rafael Rodríguez Mercado, on January 3, 2017, serving in the same capacity to the present.

1

251

Case: 25-1638    Document: 00118338811    Page: 259    Date Filed: 09/10/2025    Entry ID: 6750029

2.     The Vital Statistics and Registry Act created the General Demographic Registry within the Department of Health of Puerto Rico. Its purpose is to register, collect, guard, preserve and certify vital facts of people born in Puerto Rico. It also collects, analyzes and publishes vital statistics. P.R. Law. Ann. Tit. 24 §1042.

3.     Since 1931 the Demographic Registry has been the formal and credible statistical registry which allows the study of vital statistics of the population of Puerto Rico. It is the instrument that contains the official version of the existence, civil status and vital facts of the people born in Puerto Rico.

4.     Since the enactment of the Vital Statistics and Registry Act and the creation of the Demographic Registry, the Government of Puerto Rico nor its Legislative Assembly has not recognized an "X" gender marker.

5.     On June 1, 2020, the Government of Puerto Rico approved Act No. 55 of June 1st, 2020, as amended, also known as the Puerto Rico Civil Code, P.R. Laws ann. tit. 31 §5311, et seq.

6.     Article 694 of the Puerto Rico Civil Code, P.R. Laws ann. tit. 31 §7655, has not been interpreted by the state courts since its approval.

7.     When enacting the Puerto Rico Civil Code, the Legislative Assembly did not create a third nonbinary gender classification such as "X".

8.     As such, the use and customs in Puerto Rico has always recognized and used female and male sex classifications.

9.     The District Court in Arroyo-González v. Rosselló-Nevarez, 305 F. Supp. 3d 327 (D.P.R. 2018) did not create additional sex markers such as "X" for birth certificates.

10.     On June 30, 2023, Amnesty International of Puerto Rico sent a letter to Wanda Llovet, Director of the Demographic Registry of Puerto Rico requesting that the Demographic

**252**

Registry amend its form to include an "X" gender marker for those individuals who do not identify as male or female.

11.    On September 8, 2023, I responded to Amnesty International of Puerto Rico stating that the Demographic and Vital Statistics Registry could not include "X" as a gender marker unless there was legislation to that effect. Prior to issuing this response, I sought specific legal advice from the Legal Affairs Division of the Department of Health. Based on their counsel, I subsequently drafted and signed the communication informing Amnesty International of this decision.

12.    The Demographic Registry and Vital Statistics of Puerto Rico does not have the authority to create a new gender category, such as "X" without legislative approval. The Department of Health and the Demographic Registry cannot unilaterally expand its authority to create a new legal category in sex and gender classifications.

13.    Birth certificates are foundational legal documents, and a biologically based classification ensures its reliability and historical accuracy. As such, the Department of Health has a legitimate interest in restricting amendments to gender markers in birth certificates and ensure they are based on biological sex.

14.    In introducing an "X" designation would impact numerous legal frameworks including those governing gender-specific facilities, benefits and programs. Without legislative guidance, such changes risk creating inconsistencies and ambiguities.

*[Space left intentionally blank]*

3

**253**

Case: 25-1638    Document: 00118338811    Page: 261    Date Filed: 09/10/2025    Entry ID: 6750029

**STATEMENT UNDER PENALTY OF PERJURY AS PER 18 U.S.C.A. §1746(2)**

I, Wanda del C. Llovet Díaz, as Director of the Demographic Registry and Vital Statistics of the Government of Puerto Rico, solemnly declare pursuant to 28 U.S.C. §1746, under penalty of perjury, that the foregoing is true and correct.

In San Juan, Puerto Rico on the 30th day of December 2024.

Wanda del C. Llovet Díaz
Director of the Demographic Registry and Vital Statistics of the Government of Puerto Rico

254

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| ÍNARU NADIA DE LA FUENTE DÍAZ, MARU ROSA HERNÁNDEZ, ANDRÉ RODRIL, YEIVY VÉLEZ BARTOLOMEI, GÉ CASTRO CRUZ, DENI JUSTE<br><br>Plaintiffs<br><br>v.<br><br>JENNIFFER GONZÁLEZ COLÓN, in her official capacity as Governor of the Commonwealth of Puerto Rico; DR. VICTOR RAMOS OTERO, in his official capacity as the Appointed Secretary of the Department of Health of the Commonwealth of Puerto Rico; WANDA LLOVET DÍAZ, in her official capacity as the Interim Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico.<br><br>Defendants | Civil No. 23-1544 (MAJ) |

## RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTESTED MATERIAL FACTS

## TO THE HONORABLE COURT:

**COME NOW** Defendants, Hon. Jenniffer González Colón, in her official capacity as Governor of the Commonwealth of Puerto Rico; Dr. Victor Ramos Otero López in his official capacity as Appointed Secretary of the Department of Health of the Commonwealth of Puerto Rico; and Wanda Llovet Díaz, in her official capacity as the Interim Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico (hereinafter "Defendants")[1], and very respectfully STATE, ALLEGE, and PRAY as follows:

---

[1] When the Complaint was filed, Pedro Pierluisi Urrutia was the Governor of the Commonwealth of Puerto Rico. He was automatically substituted by Governor Jenniffer González Colón on January 2nd, 2025. Likewise, at the time of

1

**255**

Pending before this Court is Plaintiffs' Motion for Summary Judgment, together with a Statement of Undisputed Material Facts ("SUMF") (Docket No. 36, pp. 1-3). Defendants object to Plaintiffs' SUMF since they have not been filed in a separate document as required by Rule 56 (b) of the Local Rules. Without waiving this general objection, appearing Defendants respond to the uncontested facts proposed by Plaintiffs, with reference to the same paragraph numbers used in their submission.

1. Paragraph 1 is objected for failing to include citation to the specific page or paragraph of the identified record material, as required by Local Rule 56 (e). Said rule, aptly referred to as an "anti-ferret rule," is intended to protect the district court from ferreting through the summary judgment record in search of disputed material facts and prevent litigants from shifting that burden onto to the court. CMI Capital Mkt. Inv., LLC v. González-Toro, 520 F.3d 58, 62(1st Cir. 2008) ("The purpose of this rule is to relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute."). As such, this statement must be stricken from the record for failure to comply with Fed. R. Civ. P. 56 (c) and Local Rules of Civil Procedure 56(e).

2. Paragraph 2 is admitted.

3. Paragraph 3 is admitted.

4. Paragraph 4 is objected for failing to include specific citation of record material, as required by Local Rule 56 (e). Said rule, aptly referred to as an "anti-ferret rule," is intended to protect the district court from ferreting through the summary judgment record in search of disputed material facts and prevent litigants from shifting that burden onto to the court. CMI Capital Mkt.

---

the filing of the Complaint, Dr. Carlos Mellado López was the Secretary of the Department of Health. He was automatically substituted by the appointed Secretary of Health, Victor Ramos Otero. See Fed. Civ. Proc. R. 25(d). Both are sued in their official capacities.

Inv., LLC, 520 F.3d at 62 ("The purpose of this rule is to relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute."). As such, this statement must be stricken from the record for failure to comply with Fed. R. Civ. P. 56 (c) and Local Rules of Civil Procedure 56(e).

5.      Paragraph 5 is objected for not being a statement of uncontested material fact, but a conclusion of law.

6.      Paragraph 6 is admitted.

7.      Paragraph 7 is admitted with the qualification that on September 8, 2023, the Demographic Registry denied Plaintiffs' request to amend to amend its gender change forms since neither the legislative assembly nor the courts have recognized an "X" gender marker. *See, Docket No. 12-3, pp. 1-2.*

8.      As to Paragraph 8, it is admitted that Plaintiff Ínaru Nadia de la Fuente Díaz identifies as a nonbinary person living in San Juan, as stated in their sworn statement. As to the statement regarding the content of their passport, it is objected since the passport has not been made part of the summary judgment record. Documentary evidence used to support or oppose a motion for summary judgment must be admissible in nature. Estate of Usaamah Abdullah Rahim v. Doe, 51 F. 4th 402, 412 (1st Cir. 2022). In interpreting the interactions between Rules 1001-108 of the Federal Rules of Evidence and traditional common law evidentiary principles, courts have developed what is known as the "best evidence rule," which constitutes an important evidentiary consideration. See e.g. Sylvania Electric Products, Inc. v. Flanagan, 352 F.2d 1005, 1008 (1st Cir. 1965) ("The best evidence rule should not be applied as a mere technicality"). The best evidence rule requires a party trying to prove the content of a written document must introduce the document

**257**

itself. <u>Rodríguez</u> v. <u>Señor Frogs de la Isla, Inc.</u>, 642 F.3d 28, 34 (1st Cir. 2011). A witness's sworn statement regarding the content of a written document is inadmissible.

9.      Paragraph 9 is admitted that this is their testimony in their sworn statement under penalty of perjury.

10.      Paragraph 10 is admitted that this is their testimony in their sworn statement under the penalty of perjury.

11.      Paragraph 11 is admitted that this is their testimony in their sworn statement under penalty of perjury

12.      Paragraph 12 is admitted that this is their testimony in their sworn statement under penalty of perjury**.**

13.      Paragraph 13 is admitted that this is their testimony in their sworn statement under penalty of perjury.

14.      Paragraph 14 is objected for not being a statement of uncontested fact based on the facts in the instant case, but a finding of fact and legal conclusion based on the specific facts in <u>Arroyo González</u> v. <u>Rosselló Nevares</u>, 305 F. Supp 3d 327 (D.P.R. 2018). Paragraph 14 is also objected for failing to include specific citation of record material, as required by Local Rule 56 (e). Said rule, aptly referred to as an "anti-ferret rule," is intended to protect the district court from ferreting through the summary judgment record in search of disputed material facts and prevent litigants from shifting that burden onto to the court. <u>CMI Capital Mkt. Inv</u>., LLC, 520 F.3d at 62 ("The purpose of this rule is to relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute."). As such, this statement must be stricken from the record for failure to comply with Fed. R. Civ. P. 56 (c) and Local Rules of Civil Procedure 56(e).

**258**

15.     Paragraph 15 is objected for not being a statement of uncontested fact based on the facts in the instant case, but a finding of fact and legal conclusion based on the specific facts in Arroyo González v. Rosselló Nevares, 305 F. Supp 3d 327 (D.P.R. 2018). It is also objected for failing to include specific citation of record material as required by Local Rule 56(e). Said rule, aptly referred to as an "anti-ferret rule," is intended to protect the district court from ferreting through the summary judgment record in search of disputed material facts and prevent litigants from shifting that burden onto to the court. CMI Capital Mkt. Inv., LLC, 520 F.3d at 62 ("The purpose of this rule is to relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute."). As such, this statement must be stricken from the record for failure to comply with Fed. R. Civ. P. 56 (c) and Local Rules of Civil Procedure 56(e).

16.     Paragraph 16 is admitted.

17.     Paragraph 17 is admitted.

18.     Paragraph 18 is admitted.

19.      Paragraph 19 is objected for not being a statement of uncontested fact based on the facts in the instant case, but a finding of fact and legal conclusion based on the specific facts in Arroyo González v. Rosselló Nevares, 305 F. Supp 3d 327 (D.P.R. 2018). It is also objected for failing to include specific citation of record material as required by Local Rule 56(e). Said rule, aptly referred to as an "anti-ferret rule," is intended to protect the district court from ferreting through the summary judgment record in search of disputed material facts and prevent litigants from shifting that burden onto to the court. CMI Capital Mkt. Inv., LLC, 520 F.3d at 62 ("The purpose of this rule is to relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute."). As such, this statement must be

**259**

stricken from the record for failure to comply with Fed. R. Civ. P. 56 (c) and Local Rules of Civil Procedure 56(e).

20.     Paragraph 20 is objected for not being a statement of uncontested fact based on the facts in the instant case, but a finding of fact and legal conclusion based on the specific facts in Arroyo González v. Rosselló Nevares, 305 F. Supp 3d 327 (D.P.R. 2018). It is also objected for failing to include specific citation of record material as required by Local Rule 56(e). Said rule, aptly referred to as an "anti-ferret rule," is intended to protect the district court from ferreting through the summary judgment record in search of disputed material facts and prevent litigants from shifting that burden onto to the court. CMI Capital Mkt. Inv., LLC, 520 F.3d at 62 ("The purpose of this rule is to relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute."). As such, this statement must be stricken from the record for failure to comply with Fed. R. Civ. P. 56 (c) and Local Rules of Civil Procedure 56(e).

21.     Paragraph 21 is objected for not being a statement of uncontested fact based on the facts in the instant case, but a finding of fact and legal conclusion based on the specific facts in Arroyo González v. Rosselló Nevares, 305 F. Supp 3d 327 (D.P.R. 2018). It is also objected for failing to include specific citation of record material as required by Local Rule 56(e). Said rule, aptly referred to as an "anti-ferret rule," is intended to protect the district court from ferreting through the summary judgment record in search of disputed material facts and prevent litigants from shifting that burden onto to the court. CMI Capital Mkt. Inv., LLC, 520 F.3d at 62 ("The purpose of this rule is to relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute."). As such, the Court must disregard the instant SUMF for not being supported by a specific citation to record material.

**260**

In the alternative, documentary evidence used to support or oppose a motion for summary judgment must be admissible in nature. Estate of Usaamah Abdullah Rahim v. Doe, 51 F. 4th 402, 412 (1st Cir. 2022). In interpreting the interactions between Rules 1001-108 of the Federal Rules of Evidence and traditional common law evidentiary principles, courts have developed what is known as the "best evidence rule", which constitutes an important evidentiary consideration. See e.g. Sylvania Electric Products, Inc. v. Flanagan, 352 F.2d 1005, 1008 (1st Cir. 1965) ("The best evidence rule should not be applied as a mere technicality"). The best evidence rule requires a party trying to prove the content of a written document must introduce the document itself. Rodríguez v. Señor Frogs de la Isla, Inc., 642 F.3d 28, 34 (1st Cir. 2011). A witness's statement regarding the content of an Executive Order is inadmissible, unless any of the exceptions to the best evidence rule applies. As such, this statement must be stricken from the record for failure to comply with Fed. R. Civ. P. 56 (c) and Local Rules of Civil Procedure 56(e).

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico on the 10th day of January 2025.

**I HEREBY CERTIFY** that on this same date I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys on record.

*[Space left intentionally blank]*

**261**

**JANET PARRA-MERCADO**
Appointed Secretary of Justice

**SUSANA I. PEÑAGARÍCANO-BROWN**
Interim Deputy Secretary in Charge of Litigation

*S/ Diana I. Pérez-Carlo*
**DIANA I. PÉREZ-CARLO**
USDC No. 307313
Email: diana.perez@justicia.pr.gov
Tel. (787) 721-2900, ext. 1419

**DEPARTMENT OF JUSTICE**
**OF PUERTO RICO**
Federal Litigation Division
PO Box 9020192
San Juan Puerto Rico, 00902-0192

**262**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ÍNARU NADIA DE LA FUENTE DÍAZ, MARU ROSA HERNÁNDEZ, ANDRÉ RODRIL, YEIVY VÉLEZ BARTOLOMEI, GÉ CASTRO CRUZ, DENI JUSTE <br><br> Plaintiffs <br><br> v. <br><br> JENNIFFER GONZÁLEZ COLÓN, in her official capacity as Governor of the Commonwealth of Puerto Rico; DR. VICTOR RAMOS OTERO, in his official capacity as the Appointed Secretary of the Department of Health of the Commonwealth of Puerto Rico; WANDA LLOVET DÍAZ, in her official capacity as the Interim Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico. <br><br> Defendants | Civil No. 23-1544 (MAJ) |

## ADDITIONAL STATEMENT OF UNCONTESTED MATERIAL FACTS

**TO THE HONORABLE COURT:**

**COME NOW** Defendants, Hon. Jenniffer González Colón, in her official capacity as Governor of the Commonwealth of Puerto Rico; Dr. Victor Ramos Otero López in his official capacity as Appointed Secretary of the Department of Health of the Commonwealth of Puerto Rico; and Wanda Llovet Díaz, in her official capacity as the Interim Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico (hereinafter "Defendants")[1],

---

[1] When the Complaint was filed, Pedro Pierluisi Urrutia was the Governor of the Commonwealth of Puerto Rico. He was automatically substituted by Governor Jenniffer González Colón on January 2nd, 2025. Likewise, at the time of the filing of the Complaint, Dr. Carlos Mellado López was the Secretary of the Department of Health. He was automatically substituted by the appointed Secretary of Health, Victor Ramos Otero. See Fed. Civ. Proc. R. 25(d). Both are sued in their official capacities.

**263**

through the undersigned legal representatives, who very respectfully submit the following *Additional Statement of Uncontested Material Facts* ("ASUMF") in support of Cross Motion for Summary Judgment, pursuant to the provisions of Local Rules 56 (b) and (c).

1.  The Vital Statistics and Registry Act created the General Demographic Registry within the Department of Health of Puerto Rico. Its purpose is to register, collect, guard, preserve and certify vital facts of people born in Puerto Rico *See Exhibit 1, p. 2, ¶ 2.*

2.  The Vital Statistics and Demographic Registry also collects, analyzes and publishes vital statistics. *See Exhibit 1, p. 2, ¶ 2.*

3.  Since 1931, the Demographic Registry has been the formal and credible statistical registry which allows the study of vital statistics of the population of Puerto Rico. It is the instrument that contains the official version of the existence, civil status and vital facts of the people born in Puerto Rico. *See Exhibit 1, p. 2, ¶ 3.*

4.  Since the creation of the Demographic Registry, neither the Government of Puerto Rico nor its Legislative Assembly has recognized an "X" gender marker. As such, the use and customs in Puerto Rico has always been the use of female and male sex designations. *See Exhibit 1, p. 2, ¶ 4.*

5.  On April 20, 2018, the District Court issued a Judgment in <u>Arroyo-González</u> v. <u>Rosselló-Nevares</u>, 305 F. Supp. 3d 327 (D.P.R. 2018). The Court ordered that the Demographic Registry of the Commonwealth of Puerto Rico adopt the criteria of the Department of Transportation and Public Work's "Request to Change Transgender Persons' Gender Marker," DTOP-DIS-324 and issue a new birth certificate to transgender persons according to their gender identity, whether female or male. *See <u>Arroyo-González</u> v. <u>Rosselló-Nevares</u>, 305 F. Supp. 3d 327, 334 (D.P.R. 2018); Docket No. 12, p. 3, ¶10; Docket No. 29, p. 4, ¶ 10.*

2

**264**

6.      The District Court in <u>Arroyo-González</u> did not create additional markers other than female or male in birth certificates.  *Exhibit 1, Sworn Statement, p. 2, ¶ 8; Docket No. 12, p. 3, ¶10; Docket No. 29, p. 4, ¶ 10; <u>See</u> <u>Arroyo-González</u> v. <u>Rosselló-Nevares</u>, 305 F. Supp. 3d 327, 334 (D.P.R. 2018)*

7.      On June 1, 2020, the Government of Puerto Rico approved Act No. 55 of June 1st, 2020, as amended, also known as the Puerto Rico Civil Code, P.R. Law ann. tit. 31 §5311, <u>et seq.</u> *Exhibit 1, p. 2, ¶ 5.*

8.      Since its approval, Article 694 of the Puerto Rico Civil Code, P.R. Law ann. tit. 31 §7655, has not been subject to state court interpretation.  *Exhibit 1, p. 2, ¶ 6.*

9.      When enacting the Puerto Rico Civil Code, the Legislative Assembly did not create a third nonbinary gender classification such as "X". *Exhibit 1, p. 2, ¶ 7.*

10.     As such, the use and customs in Puerto Rico has always used female and male sex and gender classifications. *Exhibit 1, p. 2, ¶ 8.*

11.     On June 30, 2023, Amnesty International of Puerto Rico sent a letter to Wanda Llovet, Director of the Demographic Registry of Puerto Rico requesting that the Demographic Registry amend its form to include an "X" gender marker for those individuals who do not identify as male or female. *See Exhibit No. 1, p. 2-3, ¶ 9; Docket No. 12, p. 3, ¶¶ 8, 10; Docket No. 29, p. 3-4, ¶¶ 8, 10.*

12.      On September 8, 2023, Wanda Llovet responded to Amnesty International of Puerto Rico stating that the Vital Statistics Registry could not include "X" as a gender marker unless there was legislation to that effect. *See Exhibit 1, p. 3, ¶ 10; Docket No. 12-3, p. 1-2.*

13.     Prior to issuing this response, Wanda Llovet, Director of the Demographic Registry, sought specific legal advice from the Legal Affairs Division of the Department of Health. Based

3

**265**

on their counsel, she drafted and signed the communication informing Amnesty International of this decision. *See Exhibit 1, p. 3, ¶ 10; Docket No. 12-3, p. 1-2.*

14.     Neither the Department of Health nor the Demographic Registry and Vital Statistics of Puerto Rico have the authority to create a new gender category, such as "X", without legislative approval.  The Department of Health cannot unilaterally expand its authority to create a new legal category in sex and gender classifications. *See Exhibit 1, p. 3, ¶ 11.*

15.     Birth certificates are foundational legal documents, and a biologically based classification ensures its reliability and historical accuracy. *See Exhibit 1, p. 3, ¶ 12.*

16.     Multiple states and cities in the United States have acknowledged nonbinary genders on driver's licenses and birth certificates by passing legislation to that effect. *See Docket No. 12, p. 10-12, ¶¶ 35-36, n. 10-11; Docket No. 29, p. 10, ¶ 36.*

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico on the 10th day of January 2025.

**I HEREBY CERTIFY** that on this same date I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys on record.

*[Space left intentionally blank]*

**266**

**JANET PARRA-MERCADO**
Appointed Secretary of Justice

**SUSANA I. PEÑAGARÍCANO-BROWN**
Interim Deputy Secretary in Charge of Litigation

*S/ Diana I. Pérez-Carlo*
**DIANA I. PÉREZ-CARLO**
USDC No. 307313
Email: diana.perez@justicia.pr.gov
Tel. (787) 721-2900, ext. 1419

**DEPARTMENT OF JUSTICE
OF PUERTO RICO**
Federal Litigation Division
PO Box 9020192
San Juan Puerto Rico, 00902-0192

**267**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| ÍNARU NADIA DE LA FUENTE DÍAZ, *et al*.<br><br>Plaintiffs<br><br>v.<br><br>JENNIFFER GONZÁLEZ COLÓN, *et al*.<br><br>Defendants | Civil No. 23-1544 (MAJ) |

## MOTION FOR RECONSIDERATION PURSUANT TO RULE 59(E) OF THE FEDERAL RULES OF CIVIL PROCEDURE

**TO THE HONORABLE COURT:**

**COME NOW** Defendants Hon. Jenniffer González Colón, in her official capacity as Governor of the Commonwealth of Puerto Rico; Dr. Victor Ramos Otero López, in his official capacity as Secretary of the Department of Health of the Commonwealth of Puerto Rico; and Wanda Llovet Díaz, in her official capacity as the Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico ("Defendants"), and very respectfully STATE and PRAY as follows:

### I.      INTRODUCTION

As a threshold matter, Defendants respectfully assert that the Court's *Opinion and Order* misapplies the standard of rational review and incorrectly places the burden of defending the birth certificate format on the Defendants instead of the Plaintiffs. Moreover, in so doing, the Court misconstrues the record and attributes concessions to the Defendants that are unsupported by the record. Had the Court correctly applied the rational review standard; it would have immediately

1

**268**

ascertained that the Plaintiffs unquestionably failed to carry their burden of negating every conceivable basis that might support the rationality of the birth certificate format. In any event, if —for the sake of argument only— the Court understands that Plaintiffs did in fact carry their burden of demonstrating that the birth certificate format is unsupported by any rational explanation, the undisputed record before the Court clearly demonstrates that the Government of Puerto Rico ("Government") has easily met the rational review standard under the Equal Protection Clause. Under this standard, a statutory classification will be upheld so long as there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993). Where a plausible reason exists for government action, the Court's inquiry ends. Id. Here, issuing birth certificates with "Male" or "Female" markers is supported by plausible and legitimate state interests and thus must be sustained under rational basis review. This is so because the Department of Health's birth certificate format is protecting legitimate governmental interests that include preserving legislative authority and ensuring the consistency, accuracy and transferability of public records.

Further, as a corollary to the above, it bears mentioning that the rational basis inquiry "employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." U.S. v. Skrmetti, 605 U.S. __ (2025) (quoting Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 314 (1976)). However, Defendants respectfully sustain that the Court's *Opinion and Order*, in exercising its unquestioned prerogative of judicial review, ignores a growing judicial trend —led by the Supreme Court of the United States itself— of leaving sensitive matters of policy up to the states and their respective legislative processes. See, Dobbs v. Jackson Women's Health Organization, 597 U.S. 215, 274 (2022) (highlighting that courts must explain when they depart

**269**

from the "normal rule that courts defer to the judgments of legislatures in areas fraught with medical and scientific uncertainties") (internal citations and quotations omitted). Thus, for the reasons further explained below, Defendants respectfully request this Court to reconsider its ruling and ultimately dismiss the *Second Amended Complaint*.

## II.     PROCEDURAL BACKGROUND

On November 15, 2023, Plaintiffs filed a *Second Amended Complaint* challenging the Government's issuance of birth certificates (Docket No. 12, pp. 13-19). To wit, Plaintiffs claim that the Government's failure to add a third gender marker for nonbinary individuals prevents persons who do not identify as either male or female from displaying their true gender identity be it through a designation of "X", or any other nonbinary signifier on their birth certificates. In so doing, Plaintiffs posit, Defendants violate their rights under the Fourteenth Amendment's Equal Protection and Due Process Clauses, as well as their First Amendment's right to free speech. Id.

On September 6, 2024, Plaintiffs moved for *Summary Judgment*, arguing that the Puerto Rico Department of Health's ("Department of Health") binary-only birth certificates violate the Fourteenth and First Amendments. (Docket No. 36). With respect to the Equal Protection Clause, Plaintiffs argued that the said birth certificate format constitutes sex-based discrimination and therefore warrants a heightened scrutiny. Id. at 16. In the alternative, they contend that even under a rational basis review, the Department of Health's asserted interests—such as maintaining the integrity of vital records—fail to meet constitutional standards and are grounded in impermissible animus. Id. at 13-17. They further argue that the Department of Health's justifications had already been rejected in Arroyo González v. Rosselló Nevares, 305 F. Supp. 3d 327 (D.P.R. 2018). Id. at 9-10.

**270**

On January 10, 2025, Defendants filed their *Opposition to Plaintiffs' Motion for Summary Judgment and Cross Motion for Summary Judgment*. (Docket No. 52).  Defendants argued that the Government does not discriminate against nonbinary individuals because all government-issued identification documents in Puerto Rico, including birth certificates, adhere to binary gender classifications under male or female designations. Nevertheless, even assuming *arguendo* that the birth certificate format treats nonbinary individuals differently, Defendants maintained that it survives rational basis review. Defendants posited that the Department of Health's birth certificates format is supported by legitimate state interests, including preserving the legislative integrity and authority granted to the Commonwealth, maintaining consistency and integrity in vital records, and ensuring the reliability of historical data. Id. at 16-24. As such, they argued that issuing birth certificates with binary sex markers exclusively is rationally related to these governmental interests. Plaintiffs did not file an Opposition to Defendants' *Cross Motion for Summary Judgment*.

On May 30, 2025, this Court issued an *Opinion and Order* granting Plaintiffs' *Motion for Summary Judgment* and denying Defendants' *Cross Motion for Summary Judgment.* (Docket No. 59).  In finding that summary judgment was appropriate under the Equal Protection Clause of the Fourteenth Amendment, the Court declined to address the remaining constitutional claims. (Docket No. 59 at 6, n.7). The Court held that the Government could not discern a rational basis for distinguishing between binary and nonbinary individuals in the context of gender markers. Consequently, it ordered the Department of Health to amend its Application for Gender Change form to include an "X" gender marker option on their birth certificate. (Docket No. 59). On June 2, 2025, the Court entered *Judgment* "dismissing" the case with prejudice in its entirety without the imposition of costs or attorneys' fees. (Docket No. 60).

**271**

### III. RECONSIDERATION UNDER FEDERAL RULE OF CIVIL PROCEDURE 59(e)

A motion for reconsideration is considered under Fed. R. Civ. P. 59 or Rule 60, depending on the time such motion is served. Generally, pursuant to motions for reconsideration under Fed. R. Civ. P. 59(e), "the moving party must "either establish a manifest error of law or must present newly discovered evidence."" Marie v. Allied Home Mortgage Corp., 402 F.3d 1, 7 n.2 (1st Cir. 2005) (quoting Pomerleau v. W. Springfield Pub. Sch., 362 F.3d 143, 146 n.2 (1st Cir. 2004)).

A motion for reconsideration "does not provide a vehicle for a party to undo its own procedural failures and it certainly does not allow a party to introduce new evidence or advance arguments that could or should have been presented to the district court prior to the judgment." Marks 3-Zet-Ernst Marks GmBh & Co. KG v. Presstek, Inc., 455 F.3d 7, 15-16 (1st Cir. 2006). Notwithstanding, any motion seeking the reconsideration of judgment or order is considered a motion to alter or amend judgment under Fed. R. Civ. P. 59 (e) if it seeks to change the order or judgment issued. Hatfield v. Board of Country Comm'rs for Converse County, 52 F.3d 858, 861 (10th Cir. 1995). A motion under Rule 59(e) is not a mechanism to rehash old arguments that have already been rejected by the court or raise new legal theories that should have been raised earlier. Nat'l Metal Finishing Co. v. Barclays American/Commercial, Inc., 899 F.2d 119, 122 (1st Cir. 1990).

On this basis, Defendants respectfully request this Honorable Court to reconsider its *Opinion and Order* at Docket No. 59 holding that the Department of Health's Birth Certificate Policy did not meet the rational basis standard under the Equal Protection Clause due to a manifest error of law, as will be argued herein.

# IV.    ANALYSIS[1]

### A.  Plaintiffs have not met their burden under the Equal Protection Clause's Rational Standard.

The Equal Protection Clause provides that "[n]o state shall…deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV §1. The provision does not by itself create substantive rights and does not forbid States from drawing distinctions in their laws. <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 10 (1992). It is "essentially a direction that all persons similarly situated should be treated alike." <u>City of Cleburne v. Cleburne Living Ctr</u>. 473 U.S. 432 (1985).

If a statute treats similarly situated persons equally (e.g., no classifications between classes of individuals is made) then generally Equal Protection Clause principles are not implicated. Accordingly, analysis of whether a law violates the Equal Protection Clause begins in identifying "the classification that it draws." <u>Coalition for Economic Equity v. Wilson</u>, 122 F.3d 692, 702 (9th Cir. 1997). But, even when a statute indeed creates distinct classes, such an action is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. <u>FCC v. Beach Commc'ns, Inc.</u>, 508 U.S. at 313.

To that point, as a general rule, legislation is presumed to be valid and will be sustained if a classification drawn by the challenged statute is rationally related to a legitimate state interest. <u>City of Cleburne</u>, 473 U.S. at 440. A rational basis review under the Equal Protection Clause is guided by the principle that the courts do not have "a license…to judge the wisdom, fairness, or

---

[1] For the sake of brevity, this motion will focus on the Court's ruling that Defendants' Equal Protection Clause rights in light of the fact that the Court declined to rule on the issue of whether the Department of Health's birth certificate policy: (a) was sex-based discrimination, and (b) the policy infringes on Plaintiffs First Amendment and substantive due process rights. (Docket No. 59). However, nothing in this motion should be construed as a waiver or concession of the argument that Defendants have not discriminated against Plaintiffs on the basis of sex nor infringed on their First Amendment or substantive due process rights.

logic of legislative choices." Heller v. Doe, 509 U.S. 312, 319 (1993) (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. at 313. Where "social or economic legislation is at issue, the Equal Protection Clause allows the statewide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." City of Cleburne, 473 U.S. at 440. In this context, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is a reasonably conceivable state of facts that could provide a rational basis for the classification. FCC v. Beach Communications, Inc, 508 U.S. at 313.

In light of this deferential standard, the government "has no obligation to produce evidence to sustain the rationality of a statutory classification." Heller, 509 U.S. at 320. Instead, the "burden is on the one attacking the legislative arrangement to [negate] every conceivable basis which might support it…" Id. Unless the plaintiff makes such a showing, courts need not examine what "such reasonably conceivable state of facts may be" because a government's duty to defend it is legislative action is only activated when a plaintiff carries said burden in cases that implicate social and economic policies that do not infringe on fundamental constitutional rights. Mulero-Carrillo v. Román Hernández, 790 F.3d 99, 108 (1st Cir. 2015). It follows then that "[a] statutory discrimination will not be set aside if any state of facts reasonably made may be conceived to justify it." McGowan v. Maryland, 366 U.S. 420 (1961). Further, courts must accept as constitutional those legislative classifications that bear a rational relationship to a legitimate government interest. As such, a strong presumption of validity exists and therefore, any reasonably conceivable state of facts will do. Heller, at 509 U.S. at 319-20.

Amongst this backdrop, from the outset, Defendants respectfully note that the Court's *Opinion and Order* commences its analysis from a flawed premise. Specifically, the Court stated

**274**

that a classification was "apparent" from the face of the Application for Gender Change Form and goes as far as to incorrectly stating that "Defendants concede that the Birth Certificate Policy creates a classification. . . ." (Docket No. 59, p. 10). However, as Defendants extensively put forth in their unopposed *Cross Motion for Summary Judgment,* the format treats all individuals equally because it allows all transgender individuals to switch the gender on their birth certificate to that which better comports with their gender be it "Male" to "Female." Solely because the legislative assembly of Puerto Rico only envisioned gender changes rooted in the biological sexes of male and female does not lead to the conclusion that it creates a distinction between nonbinary transgender individuals and binary transgender individuals. As such, the Court erred in so hastily finding that a classification was in fact created by the Department of Health biologically based birth certificate format.

This is particularly the case given that Defendants never conceded that said format in fact creates a classification between similarly situated individuals. On the contrary, as Defendants repeatedly asserted in their cross motion: "[the Department of Health] treat[s] all citizens alike by issuing a birth certificate with a male or female sex designation. As such, it does not deny benefits stemming from a basic right protected by equal protection or substantive due process." (Docket No. 52, p. 19). Thus, as can be gleamed from this and many other similar excerpts from the *Cross Motion for Summary Judgment¸* Defendants never conceded that the birth certificate policy creates a classification. Moreover, Defendants reiterate that the Government's action is neutral and does not confer or deny benefits or compel any individual to act.  Based on this, it does not implicate fundamental rights under Equal Protection or Substantive Due Process. Pavan v. Smith, 582 U.S. 563, 566-67 (2017).

**275**

Still, even assuming *arguendo* that Puerto Rico's birth certificate policy did create such a classification, in properly applying the standard for rational review, it was the Plaintiffs who had the obligation to refute "every conceivable basis" that might support it. Heller, 509 U.S. at 320. However, the Court's *Opinion and Order* makes no finding that Plaintiffs did in fact carry that burden. On the contrary, once the Court concluded that the birth certificate format created a classification against nonbinary individuals, it immediately proceeded to discuss Defendants' purported failure to put forth a legitimate interest that would rationally explain the Government's failure to create a separate category for nonbinary individuals on their birth certificates. (Docket No. 59, p. 12-19). But, Defendants respectfully contend that such reasoning could only be entertained if the Court expressly found that Plaintiffs had made a showing that no conceivable basis supported the birth certificate format. Yet, other than the conclusory proposition that the "only reason to make a distinction between binary and nonbinary trans people is an improper animus" Plaintiffs put forth no reasoning that would put the Court in position to scrutinize the Government's rationale behind the current birth certificate format.[2] (Docket No. 36, p. 14-15). As a result of Plaintiffs' unquestionable failure to carry the heavy burden of mustering a challenge that would survive rational scrutiny, their *Motion for Summary Judgment* must be denied and the complaint dismissed without the need to delve into what the Government's explanation behind its policy would be.

---

[2] As the record shows, Plaintiffs did not oppose Defendants' *Cross Motion for Summary Judgment* and its *Additional Statement of Uncontested Material Facts*. (Docket No. 52-3). Since Plaintiffs did not controvert Defendants' *Additional Statement of Uncontested Material Facts*, they shall be deemed admitted pursuant to Local Rule 56 (e).

**276**

**B.** **The Department of Health's Birth Certificate Policy and Practice of issuing birth certificates with "Male" or "Female" sex markers and not including a third nonbinary gender is related to legitimate state interests.**

In any event, as extensively argued in the Defendants' unopposed *Cross Motion for Summary Judgment*, the Department of Health meets and exceeds the rationality standard under the Equal Protection Clause and, therefore, the Government's birth certificate policy must be sustained. In that sense, the crux of the District Court's equal protection analysis was its finding that the Department of Health must include an "X" gender marker on birth certificates because that decision fails rational basis review. The Court reached this conclusion primarily because the Department of Health retains the original birth certificate after issuing an amended one, suggesting that preserving historical records is not undermined by the inclusions of an "X" designation. (Docket No. 59 at p. 17-18). Defendants respectfully assert, however, that the Commonwealth and its Department of Health presented ample legitimate justifications for issuing birth certificates solely with "Male" or "Female" gender markers, thereby satisfying the rational basis standard. Further, Defendants posit the Court overstepped the rational basis standard of review because when a court understands that a policy is rationally related to a legitimate interest, it is a question for the legislatures not the courts to determinate how to better serve that interest.

In its *Opinion and Order*, the Court concluded that the birth certificate format creates an impermissible classification between binary and nonbinary individuals and therefore violates the Equal Protection Clause (Docket No 59, p. 6). The Court found that the Gender Change Application Form provides options only for individuals identifying within the binary framework, excluding nonbinary applicants. Id. at 10. While the Court acknowledged that the Commonwealth has a legitimate interest in the integrity of public records, it ruled that this interest failed rational

**277**

basis review due to existing procedures allowing for the amendment and retention of original certificates. Id. at p. 16-17.

Defendants respectfully submit that the Court erred in concluding that the Government did not show a rational basis for its birth certificate policy. Under well-established precedent, the rational basis test requires the Court to uphold a classification if any reasonably conceivable set of facts could provide a rational basis for the classification. FCC v. Beach Commc'ns, Inc., 508 U.S. at 313. Legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. City of Cleburne, 473 U.S. at 440; Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78 (1911) ("A classification having some reasonable basis does not offend against the [Equal Protection Clause] merely because it is not made with mathematical nicety or because in practice it results in some inequality").

Along that line, although the Court cited authority from other jurisdictions recognizing gender identity-based discrimination as sex discrimination, it ultimately declined to determine the applicable level of scrutiny and instead found that the policy failed even under rational basis review. (Docket No. 59, p. 11-12). However, rational basis review is "very deferential", Newark Cab Ass'n v. City of Newark, 901 F.3d 146, 156 (3rd Cir. 2018), and "a paradigm of judicial restraint." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. at 313. Defendants assert that under the narrow rational review, the Commonwealth's interest is rationally related to its action. Jones v. Governor of Fl., 975 F.3d 1016, 1035 (11th Cir. 2020) (explaining that a state is not required "to draw the perfect line [or] even to draw a line superior to some other line it might have drawn" because the Constitution requires "only a 'rational line'").

Here, there is a rational basis for a policy that prevents the Government from adding markers in a birth certificate other than those matching the biological sex. Moreover, ample

**278**

legitimate explanations support the Department of Health's birth certificate format. And, under a rational basis, a state policy should stand even if it "is significantly over-inclusive or under-inclusive." Williams v. Pryor, 240 F.3d 944, 948 (11th Cir. 2001).

*First, preservation of historical accuracy*. In its *Opinion and Order*, the Court agreed that the Commonwealth has a legitimate state interest in maintaining the integrity of public records but dismissed such reason as a rational basis because an existing scheme exists in cases where a birth certificate has been amended. (Docket No. 59 at p. 16-17). The Sixth Circuit, however, has recognized that the Department of Health has a legitimate interest in maintaining a consistent, historical record, the discretion of defining the terms used in their own laws as well as deciding what records to keep. Gore v. Lee, 107 F.4th 548, 561 (2024). Therefore, the Department of Health abides by the Puerto Rico Civil Code, in limiting itself to "Male" and "Female" gender markers exclusively on the birth certificates it issues. Whether the court finds a policy imprudent, ineffective or imperfect does not mean it is irrational for constitutional purposes. Id.

*Second, reliability of legal documents*. The Government has a legitimate interest in maintaining a consistent and historical definition of sex in its birth certificates and has considerable discretion in defining the terms used in their own laws as well as deciding what records to keep. Gore at 560. Birth certificates serve vital functions as foundational legal documents and maintaining biologically based classifications ensure their reliability and historical accuracy. See, Tuan Anh Nguyen v. INS, 533 U.S. 53, 73 (2001) (respecting this "most basic biological difference []" avoids the risk of "making the guarantee of equal protection superficial"); Pavan, 582 U.S. at 568 (Gorsuch, J. dissenting) (noting that "rational reasons exist for a biology based birth registration scheme…line ensuring government officials can identify public health trends and helping individuals determine their biological lineage, citizenship, or susceptibility to genetic

**279**

disorders"); Kasper v. School Board of St. Johns County, 57 F.4th 791, 803 n. 6 (2022) (noting that "biological sex…is the driving force behind the Supreme Court's sex-discrimination jurisprudence").

    *Third*, *Government Speech Doctrine*. The content of a birth certificate constitutes government speech. The Commonwealth has discretion to determine the messages conveyed in official records. Therefore, an amended birth certificate, even if it is for an individual's own use, is still government speech, regardless of whether the State has system in place that preserves the original birth certificate. The government's interest in the accuracy of its speech meets the rational standard. Deciding what information goes on a birth certificate, and whether to include an "X" gender marker, "is a matter of public policy to be decided by" the Government of Puerto Rico, not by Plaintiffs or a court. K. v. Health Div., Dep't of Hum. Res. 560 P.2d 1070, 1072 (Ore. 1977).

    *Fourth*, *fraud prevention and administrative uniformity*. Defendants also have a legitimate state interest in safeguarding the accuracy of documents used to determine benefit eligibility and prevent fraud. Hartin v. Dir. Of Bureau of Recs. & Stat., 347 N.Y.S. 2d 515, 518 (N.Y. Sup. Ct. 1973) (holding that the "public interest for protection against fraud" outweighs the "desire of concealment of a change of sex"). The Commonwealth of Puerto Rico models its policy and practice after the Puerto Rico Civil Code and the Vital Registry's Act which, as amply discussed in *Defendant's Cross Motion for Summary Judgment* only recognizes "Male" and "Female" designations. (Docket No. 52 at p. 10-16). Corbitt v. Secretary of the Alabama Law Enforcement Agency, 115 F. 4th 1335, 1349 (11th Cir. 2024) ("Modeling a policy after a preexisting statute is rationally related to accomplishing Alabama's goal of developing and maintaining a uniform legal scheme and consistent policies and procedures.).

**280**

*Fifth, transferability and marketability of public records*. As the Court itself discussed in its *Opinion and Order*, around seventeen states allow their citizens to include a gender-neutral sex or gender marker on their birth certificates. However, the inclusion of a nonbinary identity in vital records has been the product of legislative action as it still a hotly debated item in the policy realm. As such, were the Government to amend its procedures to include a third gender category that is only accepted by a minority of states in the union as of this writing, such an action could burden the transferability and undermine the trustworthiness of the Government's official documents and records when its citizens seek to move to or do business in jurisdictions that do not recognize gender expressions other than male or female.

As stated previously, Defendants assert that Plaintiffs failed to meet their burden of rebutting all conceivable justifications for the challenged policy. Plaintiffs' argument is limited to stating that Defendants arguments were already discarded by Judge Cerezo in <u>Arroyo González</u> (Docket No. 36 at 12-13);[3] and that the Demographic Registry already retains the original birth certificate when issuing an amended one, rendering the historical record intact. <u>Id</u>. This does not negate the broad array of legitimate interests supporting the policy, nor does it undermine the presumption of constitutionality that applies under rational basis review. Defendants' interest in maintaining the accuracy of its vital records complies and broadly surpasses the rational standard under the Equal Protection Clause.

Moreover still, the Government and its Department of Health have shown its legitimate state interest in maintaining accurate vital records pursuant to its birth certificate policy. As amply

---

[3] It bears mentioning that to the extent Plaintiffs —and the Court for that matter— look towards <u>Arroyo-González</u> for guidance they tread on uncertain judicial grounds. On the one hand, it is problematic to extrapolate the Arroyo-Gonzalez ruling here because that was not an Equal Protection case. Rather, it was a case premised on the right to privacy. More importantly, recent Supreme Court precedent has greatly curtailed the traditional federal right to privacy. See, <u>Dobbs</u>, 597 U.S. at 300 (Abortion laws to be reviewed under rational scrutiny for courts must respect a legislatures judgment "even when laws at issue concern matters of great social significance and moral substance.")

**281**

discussed in Defendants unopposed *Opposition to Summary Judgment and Cross Motion for Summary Judgment*, the Department of Health has reasonably supported its policy. The rational basis inquiry "employs relatively relaxed standard of deflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." U.S. v. Skrmetti, 605 U.S. ___ (2025) (quoting Massachusetts Bd, of Retirement v. Murgia, 427 U.S. 307, 314 (1976)). Under this standard, the Court must uphold a statutory classification so long as there is "any reasonably conceivable state of facts that would provide a rational basis for the classification." FCC v. Beach Communications, Inc., 508 U.S. at 313. Where there exist "plausible reasons" for the relevant government action, the Court's inquiry is at an end. Id. at 313-314. Rational basis review is critical to safeguarding the state's legitimate interests. Under this level of review, courts ask only whether a law is "rationally related to a legitimate governmental interest." Department of Agriculture v. Moreno, 413 U.S. 528 (1973).

Finally, even when Plaintiffs failed to meet their burden of negating every conceivable basis in favor of the birth certificate format, the Court did not afford the strong presumption of validity owed to the Government's policy. Whether the court finds a policy imprudent, ineffective or imperfect does not mean it is irrational. Gore 107 F. 4th at 561. The Department of Health's consistent issuance of birth certificates stating "Male" or "Female" applies equally to all applicants and rationally advances the Government's interest in consistency, administrative coherence, transferability and historical integrity of public records.

**C. The Department of Health's Birth Certificate Policy meets a rational standard, and any changes should be left to the Commonwealth's elected representatives.**

The rational basis inquiry "employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." Massachussets Bd. of Retirement, U.S. at 314. Under this standard, the court

15

**282**

must hold a statutory classification so long as there is "any reasonably conceivable state of facts that could provide a rational basis for the classification. FCC v. Beach Communication, Inc., 508 U.S. at 313. Where there exist "plausible reasons" for the relevant government action, the Court's inquiry is at an end. U.S. v. Skrmetti, 605 U.S. __ (2025).

In its *Opinion and Order*, the Court dismissed Defendants' argument that the Department of Health cannot legislate out of whole cloth the official governmental recognition of a gender category such as "X" without legislative approval since it undermines the separation of powers, stating that such a position was misplaced. (Docket No. 59 at p. 13). However, Defendants respectfully submit that this position is both constitutionally and administratively grounded. As previously explained, expanding gender classifications on official records is appropriately reserved for legislative action—not unilateral administrative change.

The Supreme Court has consistently held that states are afforded "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." Id. In areas of economics social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. Dandridge v. Williams, 397 U.S. 471, 485 (1970).

Birth certificates are not merely personal identifiers; they serve as foundational public documents providing essential data for government officials, including information on population trends, fertility rates, and public health metrics. The Vital Statistics Registry Act creates a General Demographic Registry within the Department of Health to register, collect, guard, preserve and certify vital facts of the people born in Puerto Rico P.R. Law. Ann. tit. 24 § 1042 (1). It is the formal and credible statistical registry that allows the study of vital statistics of our population. This registry is the official source for vital demographic data and serves as *prima facie* evidence of the facts recorded therein. Ex Parte Delgado-Hernández, 165 D.P.R. 170, 187 (2005).

**283**

This case implicates a broader debate about the extent to which individuals may compel state agencies to alter foundational documents based on subjective self-identification. As the Court noted, at least seventeen other states allow the gender marker on birth certificates to be amended to include a nonbinary gender identity. (Docket No. 59 at p. 15). However, such changes have followed the democratic process and implemented their changes through policymaking—not by judicial mandate. The Equal Protection Clause does not resolve these public policy disagreements, nor does it empower courts to substitute their judgment for that of elected officials. The Court's role is not to judge the wisdom, fairness, or logic" of the Government's birth certificate format, FCC v. Beach Communications, Inc, 508 U.S. at 313. In so recognizing, the Supreme Court in Dobbs clarified that rights that have no basis in the "Constitution's text or in our Nation's history" are not fundamental rights that would trigger heightened scrutiny. Dobbs, 597 U.S. at 300. This is so because courts, faced with health and welfare policy, should not substitute their social and economic beliefs for those of the legislative process even "when the laws at issue concern matters of great social significance and moral substance." Id.

In sum, while Defendants do not contest the Court's faculty to exercise judicial review of the Government's laws and policies, such is a power that it must brandish with caution and a great degree of deference to the democratic process in cases that do not implicate fundamental rights. From the Supreme Court's recent pronouncements, Plaintiffs would be hard pressed to put forth a contention that forcing the government to include a third gender category —unrecognized by a majority of states and countries' official documents— on the Government's birth certificates is a fundamental right protected by the Constitution. See, Dobbs, 597 U.S. at 300 (abortion not a fundamental constitutional right, thus the courts must defer to the democratic process); U.S. v. Skrmetti, 605 U.S. ___ (2025) (banning of gender dysphoria treatment for minors survives rational

**284**

review). As it follows, the questions regarding the Government's birth certificate policy must be left to the people, their elected representatives and the democratic process. The Court is not here to second guess the State's line-drawing, evaluate the efficacy of the State's policy or rewrite the policy based on its own sense of fairness. <u>Corbitt v. Secretary of the Alabama Law Enforcement Agency</u>, 115 F 4th 1335 (11th Cir. 2024).

Accordingly, while Defendants stress that Plaintiffs have not—and cannot—negate every conceivable justification supporting the Department's line-drawing. <u>Id</u> ("We must uphold the classification unless [the plaintiffs] negat[e] every conceivable basis which might support it."). Yet, contrary to the correct application of this standard, the Court never required Plaintiffs to meet such a standard and immediately turned its inquiry towards the Government's explanation. Regardless, even if the Court where to find that they have met their burden under the deferential standard of rational review under the Equal Protection Clause, the Government's has exceeded the threshold.

## V.    CONCLUSION

Defendants assert that no case or controversy exists as to the constitutionality of the Department of Health's birth certificate format and, therefore, Summary Judgment should be granted in their favor of Defendants. The Government's decision to require legislative authorization before recognizing an "X" gender marker designation on birth certificates is constitutionally sound and firmly grounded in principles of administrative law and separation of powers.

Because the Plaintiffs have not met their required burden and the Department of Health's Policy is presumed to be valid and bears a rational relationship to a legitimate governmental interest, it must be upheld under the Equal Protection Clause. To conclude otherwise would

18

**285**

contravene deeply rooted constitutional traditions that entrust the resolution of complex social and policy questions to the democratic process—not the courts. See Skrmetti, 605 U.S. ___ (2025).

**WHEREFORE**, defendants respectfully request the court to reconsider its *Opinion and Order* (Docket No. 59) and, pursuant to the arguments stated herein, conclude that the Department of Health's birth certificate format does not violate the Equal Protection Clause since it is amply supported by legitimate state interests and, consequently, dismiss the *Second Amended Complaint* with prejudice.

**WE HEREBY CERTIFY** that on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of this filing to all attorneys on record.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico on the 27th day of June 2025.

**LOURDES L. GÓMEZ TORRES**
Secretary of Justice

**ANTONIO M. CINTRÓN ALMODÓVAR**
Deputy Secretary of Civil Litigation

**SUSANA I. PEÑAGARÍCANO BROWN**
Director of Federal Litigation and
Bankruptcy Division

*S/ Diana I. Pérez-Carlo*
**DIANA I. PÉREZ-CARLO**
USDC No. 307313
Email: diana.perez@justicia.pr.gov
Tel. (787) 721-2900, ext. 1419

**DEPARTMENT OF JUSTICE
OF PUERTO RICO**
Federal Litigation and Bankruptcy Division
PO Box 9020192
San Juan Puerto Rico, 00902-0192

**286**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Ínaru Nadia de la Fuente Díaz, et als.<br>*Plaintiffs*<br><br>vs<br><br>Jennifer González, et als.<br>*Defendants* | Civil No. 23-cv-1544 (MAJ)<br><br>COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEFS |

## Motion for Order to Enforce Judgment

**TO THE HONORABLE COURT:**

**COME NOW** plaintiffs, through the undersigned attorney, and very respectfully

**SET FORTH** and **PRAY**:

On May 30, 2025, the Court entered Judgment supported by an Opinion and Order whereby it grants Plantiffs' request to obtain a marker for their gender identification, and orders Defendants to "promptly amend the Application for Gender Change form to include an option to select an 'X' as one's gender marker on one's birth certificate". It also directed Plaintiffs to "wait for the new application form to become available". O&O at 19, Dkt. 59. On June 13, Plaintiffs, through Amnesty International, sent an email to defendant Wanda Llovet Díaz, the Registry's Director, to inquire about the process to follow in order to obtain the new certificates. On June 16, Director Llovet sent a brief and unresponsive answer indicating that, upon consultation with the Legal Division of the Health Department, she was told that the time for appeal is still running. From this vague text, Plaintiffs can only infer that Defendants have not even begun to

1

**287**

prepare the new forms under the incorrect interpretation that the Judgment is not still enforceable.

FRCP 62 provides that a federal judgment is enforceable after 14 days from its entry, with noted exceptions. The exception that would apply to this case is solely under the Court's discretion and only after Defendants request a stay, and the Court considers all positions on the issue. Therefore, at this time the Judgment is enforceable.

As the Court's Opinion eloquently points, the government has infringed upon plaintiffs' constitutional rights, even defying its own laws and policies, as provided in Executive Order 2008-57. Sustaining the *status quo* would only further such illegal action and the animosity towards non-binary people in Puerto Rico.

THEREFORE, Plaintiffs request an order to Defendants to complete all necessary administrative work within an established time-frame, that should not exceed another month. If not, Defendants will not comply with the Court's order in, at least, two more years.

It is hereby certified that true and exact copy of the foregoing will be served by the court's system.

In San Juan, Puerto Rico this 1st day of July, 2025.

S/ *Johanna M. Emmanuelli Huertas*
JOHANNA M. EMMANUELLI HUERTAS
USDC-PR #210506
Email:   jmeh@mac.com
P.O. Box 136 Villalba, PR. 00766
Tel.:   (787)342-6499

2

**288**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

---

ÍNARU NADIA DE LA FUENTE DÍAZ, *et al*.

Plaintiffs

v.

JENNIFFER GONZÁLEZ COLÓN, *et al*.

Defendants

Civil No. 23-1544 (MAJ)

---

**NOTICE OF APPEAL**

**TO THE HONORABLE COURT:**

**COME NOW**, Hon. Jenniffer González Colón, in her official capacity as Governor of the Commonwealth of Puerto Rico; Dr. Víctor Ramos Otero López, in his official capacity as Secretary of the Department of Health of the Commonwealth of Puerto Rico; and Wanda Llovet Díaz, in her official capacity as the Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico, and very respectfully STATE and PRAY as follows:

Defendants hereby notify their appeal to the United States Court of Appeals for the First Circuit from the *Opinion and Order* (**Docket No. 59**) entered on May 30, 2025, granting Plaintiffs' Motion for *Summary Judgment* and the corresponding *Judgment* (**Docket No. 60**) entered on June 2, 2025. The 30-day-time period to file this Notice of Appeal began to accrue on July 1st, 2025, after this Court entered an *Order* (**Docket No. 62**), on June 30, 2025, denying Defendants *Motion for Reconsideration* (Docket No. 61).

**WHEREFORE** it is respectfully requested that the Court take notice of the above Notice of Appeal.

**289**

**WE HEREBY CERTIFY** that on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of this filing to all attorneys on record.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico on the 1st day of July 2025.

**LOURDES L. GÓMEZ TORRES**
Secretary of Justice

**ANTONIO M. CINTRÓN ALMODÓVAR**
Deputy Secretary of Civil Litigation

**SUSANA I. PEÑAGARÍCANO BROWN**
Director of Federal Litigation and
Bankruptcy Division

*S/ Diana I. Pérez-Carlo*
**DIANA I. PÉREZ-CARLO**
USDC No. 307313
Email: diana.perez@justicia.pr.gov
Tel. (787) 721-2900, ext. 1419

**DEPARTMENT OF JUSTICE
OF PUERTO RICO**
Federal Litigation and Bankruptcy Division
PO Box 9020192
San Juan Puerto Rico, 00902-0192

**290**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **ÍNARU NADIA DE LA FUENTE DÍAZ**, *et al.* | CIVIL No. 23-1544 (MAJ) |
| Plaintiffs | RE: DECLARATORY AND INJUNCTIVE RELIEF |
| v. | |
| **JENNIFFER GONZÁLEZ COLÓN**, *et al.* | |
| Defendants | |

## MOTION TO STAY PROCEEDINGS PENDING APPEAL

**TO THE HONORABLE COURT:**

**COME NOW** Defendants Hon. Jenniffer González Colón, in her official capacity as Governor of the Commonwealth of Puerto Rico; Dr. Victor Ramos Otero López, in his official capacity as Secretary of the Department of Health of the Commonwealth of Puerto Rico; and Wanda Llovet Díaz, in her official capacity as the Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico (collectively "Defendants"), and respectfully move for a stay pending appeal pursuant to Fed. R. App. P. 8(a)(1)(A), and **STATE** and **PRAY** as follows:

### I.     INTRODUCTION

On May 30, 2025, the Court entered an *Opinion and Order* granting Plaintiffs' *Motion for Summary Judgment* (Docket No. 59) and issued a corresponding *Judgment* (Docket No. 60) on June 2, 2025. In sum, the Court ordered Defendants to amend Puerto Rico's Application for Gender Change form to include an "X" gender marker on their birth certificate, finding that the Puerto Rico's current binary birth certificate format failed rational basis review under the Equal Protection Clause. (Docket 59 at 19).  After several procedural events, including the Court's

**291**

denial of a post-judgment motion for reconsideration filed by Defendants, on July 1, 2025, Plaintiffs filed a *Motion for Enforcement of Judgment* requesting the Court order Defendants to amend Puerto Rico's birth certificate format and procedures in accordance with the Court's *Opinion and Order* within a period "not [to] exceed another month." (Docket No. 63). That same day, Defendants filed a *Notice of Appeal* (Docket No. 64) from both the Court's *Opinion and Order* and Judgment (Docket Nos. 59, 60).

On July 8, 2025, despite the pending appeal, and without affording Defendants an opportunity to respond, the Court granted Plaintiffs' motion to enforce judgment and required Defendants to file proof of compliance by July 31, 2025. (Docket No. 66).

As a result, Defendants now respectfully request a stay of the Court's May 30, 2025, *Opinion and Order* and June 2, 2025, *Judgment* pending resolution of the appeal before the First Circuit. In essence, Defendants stress that the Court's ruling implicates serious legal questions concerning rational basis review, judicial deference to the political branches, and the limits of judicial authority to compel executive action absent legislative mandate. Thus, since Defendants are appealing the Court's Order granting Plaintiffs' *Motion for Summary Judgment* and denying Defendants' *Cross Motion for Summary Judgment*, the enforcement of the *Opinion and Order* and corresponding *Judgment* must be stayed pending resolution of the appeal.

## II.    STANDARD OF REVIEW

Under Fed. R. App. P. 8(a) and applicable First Circuit precedent, courts consider four factors applicable to preliminary injunctions when determining whether to grant a stay pending appeal: (1) whether the applicant has made a strong showing of success on the merits; (2) whether the applicant will be irreparably harmed absent injunctive relief; (3) whether issuance of the stay will injure other parties; and (4) where the public interest lies. <u>Nken v. Holder</u>, 556 U.S. 418, 434 (2009) (quoting <u>Hilton v. Braunskill,</u> 481 U.S. 770, 776-77 (1987)); <u>Acevedo-García v. Vera-</u>

**292**

Monroig, 296 F.3d 13, 16 n. 3 (1st Cir. 2002); Joubert-Vázquez v. Alvarez-Rubio, 841 F.Supp.2d 570, 573 (D.P.R. 2012).

The first two factors, the Supreme Court made clear, "are the most critical." Nken, 556 U.S. at 434. Because both of these factors "require a showing of more than mere possibility," the movants "must show a strong likelihood of success, and they must demonstrate that irreparable injury will be likely absent . . . [a stay]." Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010). "The sine qua non [of the stay pending appeal standard] is whether the [movants] are likely to succeed on the merits." Acevedo-García v. Vera-Monroig, 296 F.3d at16 (per curiam) (*quoting* Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir.1993)); Rivera-Torres v. Ortíz Vélez, 341 F.3d 86, 95 (1st Cir. 2003). Accordingly, "[w]hat matters . . . is not the raw amount of irreparable harm [a] party might conceivably suffer, but rather the risk of such harm in light of the party's chance of success on the merits . . . ." In re Elias, 182 F.App'x 3, 4 (1st Cir. 2006) (citation and internal quotation marks omitted); United Steelworkers of America v. Textron, Inc., 836 F.2d 6, 7 (1st Cir.1987).

### III.    DISCUSSION

On May 30, 2025, this Court entered an *Opinion and Order* (Docket No. 59), granting, in our view incorrectly, Plaintiffs' *Motion for Summary Judgment* and denying Defendants' *Cross Motion for Summary Judgment*. The Court's order required Defendants to "promptly amend their Application for Gender Change form to include an option to select an "X" as one's gender marker on their birth certificate." (Docket No. 59 at 19). The Court found that the "Puerto Rico's current Birth Certificate Policy is not supported by a rational basis and therefore violates the Equal Protection Clause of the Fourteenth Amendment." Id. This, notwithstanding that Petitioner failed to meet their burden of negating every conceivable basis supporting the policy under a rational

basis review and the Government's policy being rationally related to multiple legitimate state interests as further detailed in Defendants' *Cross Motion for Summary Judgment* (Docket No. 52) and *Motion for Reconsideration Pursuant to Rule 59(E) of the Federal Rules of Civil Procedure* (Docket No. 61).

Based on this, Defendants respectfully proffer the present case should be stayed to allow the First Circuit to address complex and novel constitutional issues surrounding Equal Protection, the proper scope of rational basis review, and the deference owed to legislative and administrative discretion in matters of public policy and vital statistics.

**A. The Court's Reasoning Relied on Now Vacated Precedent.**

As a threshold matter, it bears mentioning that in its *Opinion and Order,* the Court relied heavily on the Tenth Circuit's decision in Fowler v. Stitt, 104 F. 4th 770 (10th Cir. 2024), concluding that the Government's binary-only birth certificates failed rational basis review and therefore violate the Equal Protection Clause under the Fourteenth Amendment. Specifically, the Court stated that while the Government may have a legitimate interest in maintaining accurate birth records, it failed to sufficiently articulate that interest. (Docket No. 59 at p. 11, 14, 17-19). At the time the *Opinion and Order* was issued, a petition for certiorari in Stitt v. Fowler, Docket No. 24-801, ___ S. Ct.___ (2025),[1] was pending before the Supreme Court of the United States.

However, on June 30, 2025, the Supreme Court granted certiorari in Stitt v. Fowler, vacated the Tenth Circuit's decision in Fowler v. Stitt, supra, and remanded the case to that Circuit for further consideration in light of its decision in United States v. Skrmetti, 605 U.S. ___ (2025).[2]

---

[1] The issue presented: Whether the equal protection clause of the Fourteenth Amendment requires a state to alter its official certificate documenting a person's sex at birth to represent that person's current gender identity.

[2] Holding: Tennessee's law prohibiting certain medical treatments for transgender minors is not subject to heightened scrutiny under the equal protection clause of the Fourteenth Amendment and satisfies rational basis review.

**294**

See Stitt v. Fowler, Docket No. 24-801, ___ S. Ct.___ (2025); 2025 WL 1787695. In Defendants'
view, the sole fact that the Court's *Opinion and Order* is undergirded by precedent that has since
been directly overturned by the Supreme Court supports staying the case to allow further
exploration by the First Circuit of this issue.

**B. Defendants have a strong likelihood of success on the merits.**

That said, here, Defendant's on appeal challenge the Court's conclusion that Puerto Rico's
binary birth certificate format is not supported by a rational basis. In short, Defendants contend
that the Court's ruling departs from well-established Equal Protection precedent by misapplying
rational basis review. As the Supreme Court has repeatedly emphasized, rational basis review is
highly deferential to legislative judgments. See FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313
(1993) ("Where there are plausible reasons for [government] action, our inquiry is at an end.").
Under this standard, legislation is presumed valid and upheld if any reasonably conceivable state
of facts could justify the classification.

In this case, no state classification exists because the challenged policy treats all individuals
equally by issuing birth certificates with either "Male" or "Female" markers, consistent with
longstanding legal definitions in Puerto Rico's Civil Code and vital records statutes. Nevertheless,
even assuming *arguendo* that a classification exists, Plaintiffs failed to meet their burden of
negating every conceivable basis supporting the policy. Still, the Court erroneously shifted the
burden onto Defendants to justify the policy's legitimacy, contrary to governing precedent. See
Heller v. Doe, 509 U.S. 312, 320 (1993).

Contrary to the Court's ruling, the Government's policy on the birth certificate format is
rationally related to multiple legitimate state interests, including preservation of historical records,
administrative consistency, fraud prevention, and the transferability of public documents across

5

**295**

jurisdictions. See Gore v. Lee, 107 F.4th 548, 561 (6th Cir. 2024) ("deferential standard does not require States to show that a classification is the only way, the best way, or even the most defensible way to achieve their interests;" instead "[i]t requires only that 'some plausible reason' supports the classification, no matter how imprudent or ineffective."). This is so because "[t]he promise of equal protection is limited to 'keep[ing] governmental decisionmakers from treating differently persons who are in all relevant respects alike.'" Kasper v. School Board of St. Johns County, 57 F.4th 791, 803 n.6 (11th Cir. 2023) (school policy requiring restroom access based on biological sex—not gender identity—did not violate the Equal Protection Clause or Title IX).

Further, Puerto Rico's birth certificate format reflects a deference to the legislative process. Viewed through that prism, Courts, especially when applying rational basis review, may not substitute their policy preferences for those of duly elected officials. See U.S. v. Skrmetti, 605 U.S. ___; 145 S.Ct. 1816, 1837 (2025) (holding that Equal Protection Clause does not resolve social policy disagreements over medical treatment; courts are not to judge a law's wisdom or fairness but only its constitutionality, leaving policy choices "to the people, their elected representatives, and the democratic process"). Similarly, in Dobbs v. Jackson Women's Health Org., the Supreme Court stressed the importance of returning policy matters to the people and their elected representatives. 597 U.S. 215 (2022) (the Constitution does not confer a right to abortion, overruling Roe v. Wade, 410 U.S. 113 (1973) and returning full regulatory authority over abortion to the states). Under the aegis of Dobbs, the Supreme Court emphasized: (i) a deep respect for state sovereignty; (ii) the need for courts to avoid fashioning rights not clearly grounded in the Constitution; and (iii) that states have a legitimate authority to regulate social and moral issues.

In addition, because, as outlined above, the very precedent the Court adopted no longer holds precedential value, as its been directly rejected by the Supreme Court. As such, the legal

landscape has materially shifted in Defendants' favor, who now have a substantially increased likelihood of success on the merits..

**C. Defendants Will Suffer Irreparable Harm Absent a Stay.**

Requiring the Department of Health to implement the Court's mandate before the appeal is resolved imposes irreversible harms. Particularly, absent a stay, the Department of Health will be compelled to alter the content and structure of a vital government document—the birth certificate —without legislative authority. This, on its own, raises profound separation of powers concerns. More still, the Department would be forced to implement a complex administrative change—including modifying forms, procedures, and recordkeeping protocols —with significant fiscal and logistical implications. Once altered, these changes would be difficult, if not impossible, to unwind should Defendants ultimately prevail on appeal.

Further, such court-mandated modifications interfere with Puerto Rico's sovereign authority over its own administrative processes.  Specifically, the *Opinion and Order* interferes with the public administration and requires expenditure of public funds. See Dugan v. Rank, 372 U.S. 609, 620 (1963) ("[t]he general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' […] or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'") (citing Land v. Dollar, 330 U.S. 731, 738 (1947) and Larson v. Domestic & Foreign Corp., 337 U.S. 682, 704 (1949)).

Because the potential for irreparable injury to Defendants absent a stay is substantial, they need only make a minimal showing of likelihood of success on appeal. See Doe v. Gonzáles, 546 U.S. 1301, 1306-07 (2005) ("Although there is a question as to the likelihood of [the Government's] success on the merits and some injury to [the applicants] if a stay is granted, the

**297**

[Government has] demonstrated that [it] will suffer irreparable harm and the public interest [will be] significantly injured if a stay is not granted. The balance of harms tilts in favor of [the Government].") (citing <u>Mohammed v. Reno</u>, 309 F.3d 95 (2d Cir. 2002).

Sovereign or governmental harm cannot be fully remedied post hoc. The Supreme Court has noted that a state's, "inability to enforce [ ] duly enacted plans clearly inflicts irreparable harm." <u>California v. Trump</u>, No. 25-CV-10810-DJC, 2025 WL 1667949, at *17 (D. Mass. June 13, 2025) (citing <u>Abbott v. Perez</u>, 585 U.S. 579, 603 n.17 (2018); <u>see also</u> <u>Maryland v. King</u>, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("a state 'suffers a form of irreparable injury' if enjoined 'from effectuating statutes **enacted** by representatives of its people[.]'") (internal quotations omitted); <u>Louisiana v. Biden</u>, 55 F.4th 1017, 1033-35 (5th Cir. 2022) (affirming a district court's finding of irreparable harm based upon plaintiff states' diversion of resources to comply with an invalid regulation); <u>Kansas v. United States</u>, 249 F.3d 1213, 1227 (10th Cir. 2001) (noting that harms to a state's "sovereign interests and public policies" are irreparable). "[C]omplying with [an order] later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." <u>Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.</u>, 16 F.4th 1130, 1142 (5th Cir. 2021). It follows then that requiring governmental entities to implement policies later reversed imposed irreparable harm. This, because they cannot recoup the expenses or administrative burdens through future damages for monetary relief is unavailable, as such the damage to sovereignty and institutional integrity is done and would not be redressed even in the likely event that Defendants are successful on appeal.

Mandating compliance with the *Opinion and Order* hinged on a vacated case inflicts irreparable harm by disrupting sovereign policy decisions and potentially requiring costly, complex administrative changes that may be reversed on appeal. It orders the Government of

**298**

Puerto Rico, through its Department of Health, to alter its administrative rules for issuing vital documents that could be seen as interfering with public administration and thus infringing on Puerto Rico's sovereign authority under <u>Dugan</u>. To wit, the Court's mandate on Puerto Rico's administrative operations impermissibly infringes upon its sovereign authority in so far as it forces the Government of Puerto Rico to implement an overhaul of its administrative process (e.g., in vital statistics, health, education, etc.) while the appeal is pending and thus, if not stayed, would cause irreparable harm to its constitutional authority to self-govern, running in conflict with <u>Dobbs</u>. Such harm cannot be undone if the appellate process later reverses this Court's *Opinion and Order*.

### D. No Substantial Injury Will Befall Plaintiffs If a Stay Is Granted

While Plaintiffs have secured favorable judgment, a brief stay pending appeal merely preserves the status quo. Plaintiffs face no imminent harm from the continued application of the current birth certificate format for the duration of appellate review. Any relief they seek can be fully vindicated should the Court of Appeals affirm. By contrast, denial of a stay and requiring immediate compliance with judgment that may later be reversed could cause profound, lasting harm to the Commonwealth's institutional framework and administrative processes.

Additionally, the challenged birth certificate format does not implicate fundamental constitutional rights because there is no constitutionally enshrined right to include a third gender category (particularly one that is unrecognized by a majority of states and countries' official documents) on the Government of Puerto Rico's birth certificates.[3] Along that line, <u>Dobbs</u> shifted the focus from individual interests back to state-level democratic processes. <u>Id</u>., at 300. Moreover, <u>Dobbs</u> suggests courts must respect the balance of interests, including the right of the people—

---

[3] To that point, the Court's *Opinion and Order* evaluated Puerto Rico's birth certificate format under a rational review scrutiny precisely because Plaintiffs failed to show that they in fact where either (i) impermissibly classified as members of a suspect or quasi-suspect class, or (ii) that a fundamental constitutional right of theirs had been infringed.

**299**

through their government—to regulate sensitive matters. <u>Id</u>. However, if the stay is denied, it unjustly prioritizes individual claims over sovereign authority. Meanwhile, Plaintiffs will suffer no cognizable harm from maintaining the current policy during the pendency of the appeal—especially since the case relied on by the Court—<u>Fowler v. Stitt</u>—was vacated and remanded for further consideration.

### E. The Public Interest Favors a Stay

Finally, there are compelling public-interest considerations. Indeed, the Court itself recognized that "[i]t is not disputed that Puerto Rico has a legitimate interest in recording facts about its citizens at birth and maintaining accurate vital records." (Docket No. 59 at 18). Plaintiffs failed altogether to meet their burden of negating every conceivable basis supporting the policy. Not granting the requested stay of proceedings pending appeal would lead to the unwarranted consequence of causing the irreparable injury discussed in subsection C of this motion.

A stay protects the integrity of the democratic process and preserves public trust in the orderly administration of government, especially in the sensitive context of vital records. Courts should be cautious when mandating governmental action that would override or displace legislative prerogatives. As the Supreme Court has underscored, matters that involve evolving social and policy questions are best resolved through representative bodies, not through judicial fiat. <u>See</u> <u>Dobbs</u>, 597 U.S. at 274, 300 (citing <u>Ferguson v. Skrupa</u>, 372 U.S. 726, 730 (1963); see also <u>Dandridge v. Williams</u>, 397 U.S. 471, 484-486 (1970). That is, the public interest favors a stay to allow Puerto Rico's political branches—not the courts—to resolve contested policy questions. Imposing premature judicial mandate undercuts democratic legitimacy and harms public trust.

Moreover, the Defendants have many compelling interests implicated in this case be it

10

**300**

maintaining consistent and historically accurate vital records based on objective and administratively verifiable criteria; the accuracy of the Government of Puerto Rico's speech through its birth certificate records; prevention of fraud and administrative uniformity; and the transferability and marketability of Puerto Rico's public records with those of other jurisdictions that do not recognize nonbinary gender designations. These interests directly serve the public good and thus to avoid administrative confusion and preserve governmental resources the instant case should, at a minimum, be stayed to allow the appellate process to resolve these ever-shifting constitutional questions. Further, the Supreme Court's recent pronouncements in <u>Fowler</u>, <u>Skrmetti</u>, and even to some extent <u>Dobbs</u> show that equal protection standards in gender-identity cases are in active flux (and perhaps betray that the winds of change, in the judicial realm at least, do not flow to Plaintiffs' benefit). Viewed through this lens, public institutions should not be required to make permanent changes while the law remains unsettled.  Thus, the public interest weighs in favor of granting Defendants request to stay proceedings pending appeal.

## IV. CONCLUSION

In light of the above stated, Defendants respectfully request that this Honorable Court stay the *Opinion and Order* entered on May 30, 2025, and the corresponding *Judgment* of June 2, 2025, pending resolution of their appeal before the First Circuit.

As a summary, it is unquestionable that a stay pending appeal should be granted for several compelling reasons. **First**, Defendants have demonstrated a strong likelihood of success on the merits on appeal. Particularly, the present case involves legitimate and important governmental interests concerning vital records that meets the rational basis review under the Equal Protection Clause and Courts must consider the deference owed to legislative judgments and the permissible scope of judicial intervention in the domain of state vital records. **Second**, there is a potential for

**301**

irreparable institutional harm to the Puerto Rico's vital record systems by compelling Defendants to amend Puerto Rico's birth certificate forms based on an order that may later be reversed on appeal. **Third**, the stay poses no substantial harm on Plaintiffs since it merely preserves the status quo and does not implicate fundamental constitutional rights. **Fourth**, the stay serves a bevy of compelling public interests, some of which were recognized by the Court itself in its *Opinion and Order* (Docket No. 59). Therefore, given the significance of the issues at stake and the balance of harms, it is essential for the Court to grant the motion for a stay pending appeal.

Lastly, the recent Supreme Court decision in <u>Stitt v. Fowler</u>, vacating the Tenth Circuit's decision in <u>Fowler v. Stitt</u>, and <u>Dobbs</u> strengthened Defendants' argument that a stay pending appeal is warranted. This is particularly true when the underlying appeal concerns state or territorial sovereignty, especially where a court has mandated changes to local governance or administrative authority. Respectfully, Defendants contend that, contrary to this Court's holding, the Supreme Court calls for deference to local institutions and weighs against expansive judicial remedies.

**WHEREFORE**, appearing co-defendants respectfully request that the Court take notice of the above and **GRANT** the present motion, staying the enforcement of the *Opinion and Order* (Docket No. 59) and corresponding *Judgment* (Docket No. 60) in the captioned case until after the US Court of Appeals for the First Circuit resolves the pending appeal (Docket No. 64).

**I HEREBY CERTIFY** that the undersigned attorney electronically filed the foregoing with the Clerk of the Court via CM/ECF System, which will send notification of such filing to all attorneys of record.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 18th day of July 2025.

**302**

**LOURDES L. GÓMEZ TORRES**
Secretary of Justice

**ANTONIO M. CINTRÓN ALMODÓVAR**
Deputy Secretary of Civil Litigation

**SUSANA I. PEÑAGARÍCANO BROWN**
Director of Federal Litigation and
Bankruptcy Division

*S/ Diana I. Pérez-Carlo*
**DIANA I. PÉREZ-CARLO**
USDC No. 307313
Email: *diana.perez@justicia.pr.gov*
Tel. (787) 721-2900, ext. 1419

**DEPARTMENT OF JUSTICE
OF PUERTO RICO**
Federal Litigation and Bankruptcy Division
PO Box 9020192
San Juan Puerto Rico, 00902-0192

**303**