NO. 25-1638

**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

ÍNARU NADIA DE LA FUENTE DÍAZ; MARU ROSA HERNÁNDEZ; ANDRÉ RODIL; YEIVY VÉLEZ BARTOLOMEI; GÉ CASTRO CRUZ; DENI JUSTE,

*Plaintiffs-Appellees*,

v.

JENNIFFER A. GONZÁLEZ COLÓN, in her official capacity as Governor of the Commonwealth of Puerto Rico; DR. VÍCTOR RAMOS OTERO, in his official capacity as Secretary of the Department of Health of the Commonwealth; WANDA LLOVET DÍAZ, in her official capacity as the Director of the Division of Demographic Registry and Vital Statistics of the Commonwealth,

*Defendants-Appellants*

On Appeal from the United States District Court
for the District of Puerto Rico
[Hon. María Antongiorgi-Jordán, U.S. District Judge]

# BRIEF OF IDAHO, ARKANSAS, FLORIDA, GEORGIA, INDIANA, IOWA, KANSAS, LOUISIANA, MONTANA, NEBRASKA, NORTH DAKOTA, OHIO, OKLAHOMA, SOUTH CAROLINA, TENNESSEE, TEXAS, UTAH, WEST VIRGINIA, WYOMING, AND THE ARIZONA LEGISLATURE AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS AND REVERSAL


RAÚL R. LABRADOR
Attorney General

OFFICE OF THE IDAHO ATTORNEY GENERAL
700 W. Jefferson St.
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
michael.zarian@ag.idaho.gov
gader.wren@ag.idaho.gov

ALAN M. HURST
Solicitor General

MICHAEL A. ZARIAN
Deputy Solicitor General

GADER WREN
Assistant Solicitor General

*Counsel for Amicus State of Idaho*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTEREST OF THE *AMICI* STATES ........ 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ........ 1

ARGUMENT ........ 3

I. Puerto Rico's Birth Certificate Policy Doesn't Trigger Heightened Scrutiny. ........ 3

A. Discrimination on the basis of sex requires differential treatment based on biological sex, not gender identity. ........ 3

B. Puerto Rico's policy does not classify on the basis of sex. ........ 6

C. Puerto Rico's policy does not discriminate based on nonbinary identity. ........ 11

D. Nonbinary identity is not a suspect or quasi-suspect class. ........ 12

II. Federalism Requires Federal Courts to Respect Puerto Rico's Rational Bases for its Birth Certificate Policy. ........ 16

CONCLUSION ........ 24

## TABLE OF AUTHORITIES

### CASES

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*,
761 F. Supp. 3d 1159 (S.D. Ind. 2025) ........................................ 10

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
576 U.S. 787 (2015) ........................................ 18

*Astrue v. Capato ex rel. B.N.C.*,
566 U.S. 541 (2012) ........................................ 20

*Bacardi Corp. of Am. v. Domenech*,
311 U.S. 150 (1940) ........................................ 17

*Boivin v. Black*,
225 F.3d 36 (1st Cir. 2000) ........................................ 13

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ........................................ 2, 6, 9

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993) ........................................ 11

*Brown v. Bd. of Ed.*,
347 U.S. 483 (1954) ........................................ 14

*City of Grants Pass, Oregon v. Johnson*,
603 U.S. 520 (2024) ........................................ 23, 24

*Cleburne. v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ........................................ 13

*Cook v. Gates*,
528 F.3d 42 (1st Cir. 2008) ........................................ 13

*Doe v. Horne*,
115 F.4th 1083 (9th Cir. 2024) ........................................ 13

*Eubank v. Richmond*,
226 U.S. 137 (1912) ........................................ 17

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993) ........................................ 1, 18

*FERC v. Mississippi*,
456 U.S. 742 (1982) ........................................ 17

*Ferguson v. Skrupa*,
372 U.S. 726 (1963) ........................................ 23

*Fowler v. Stitt*,
104 F.4th 770 (10th Cir. 2024) .......... 9, 10

*Frontiero v. Richardson*,
411 U.S. 677 (1973) .......... 4, 5

*Geduldig v. Aiello*,
417 U.S. 484 (1974) .......... 4

*Gore v. Lee*,
107 F.4th 548 (6th Cir. 2024) .......... 10, 18, 21, 22

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .......... 17

*Heller v. Doe*,
509 U.S. 312 (1993) .......... 18

*Kahler v. Kansas*,
589 U.S. 271 (2020) .......... 23

*L. W. v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) .......... 3, 5, 9

*LCM Enters., Inc. v. Town of Dartmouth*,
14 F.3d 675 (1st Cir. 1994) .......... 18

*Lyng v. Castillo*,
477 U.S. 635 (1986) .......... 5, 13

*Massachusetts Bd. of Ret. v. Murgia*,
427 U.S. 307 (1976) .......... 13

*Mississippi Univ. for Women v. Hogan*,
458 U.S. 718 (1982) .......... 4

*New State Ice Co. v. Liebmann*,
285 U.S. 262 (1932) .......... 17

*Ohio Democratic Party v. Husted*,
834 F.3d 620 (6th Cir. 2016) .......... 20

*Orr v. Trump*,
778 F. Supp. 3d 394 (D. Mass. 2025) .......... 7, 10

*Pers. Adm'r of Massachusetts v. Feeney,*
442 U.S. 256 (1979) .......... 12

*Plyler v. Doe*,
457 U.S. 202 (1982) .......... 14

*Reed v. Reed*,
404 U.S. 71 (1971) ....................3, 4

*Reeves, Inc. v. Stake*,
447 U.S. 429 (1980) ....................17

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
411 U.S. 1 (1973) ....................13

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*,
600 U.S. 181 (2023) ....................9

*Tingley v. Ferguson*,
144 S. Ct. 33 (2023) ....................21

*Tiwari v. Friedlander*,
26 F.4th 355 (6th Cir. 2022) ....................18

*United States v. Skrmetti*,
145 S. Ct. 1816 (2025) ....................3, 4, 6, 8, 9, 12–15, 21, 23

*United States v. Virginia*,
518 U.S. 515 (1996) ....................4, 8, 15

*Vacco v. Quill*,
521 U.S. 793 (1997) ....................7

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ....................11

*Watson v. Memphis*,
373 U.S. 526 (1963) ....................15

**STATUTES**

24 L.P.R.A. § 1133(4) ....................7

Fla. Stat. § 1006.205(3)(d) ....................22

Haw. Rev. Stat. § 707-701 ....................17

Idaho Admin. Code 02.04.05.120 ....................17

Minn. Stat. § 32D.13 ....................17

Nev. Rev. Stat. § 200.030 ....................17

N.M. Stat. § 3-21-1 ....................17

**OTHER AUTHORITIES**

Aditi Bhargava et al., *Considering Sex as a Biological Variable in Basic & Clinical Studies: An Endocrine Society Scientific Statement*, Endocrine Rev. (Mar. 11, 2021) ....................5

C. E. Roselli, *Neurobiology of gender identity and sexual orientation*, J. Neuroendocrinology (2018) ........ 22

Carl G. Streed Jr., *Health Communication and Sexual Orientation, Gender Identity, and Expression*, Med. Clin. N. Am. (2022) ........ 13

Chassitty N. Fiani & Heather J. Han, N*avigating identity: Experiences of binary and non-binary transgender and gender non-conforming (TGNC) adults*, Int. J. Transgenderism (2018) ........ 20

Claire Burgess et al., *Evolving Sex and Gender in Electronic Health Records*, Fed. Practitioner (June 2019) ........ 22

*Gender & Health*, World Health Org. ........ 5

Henry Carnell, *More than 35 Trans, Genderqueer Candidates Running Across U.S.*, Wash. Blade (Nov. 5, 2024) ........ 15

Jessica A. Clark, *Sex Assigned at Birth*, 122 Colum. L. Rev. 1821 (2022) ........ 13

Lachlan Driver & Alyson J. McGregor, *Bit-by-bit: Decoding Nonbinary Patients in the Emergency Department*, EM Resident (Dec. 3, 2024) ........ 14

Manuel A. Ocasio & M. Isabel Fernandez, *The Association Between Gender Identity Fluidity and Health Outcomes in Transgender and Gender Diverse People in New Orleans and Los Angeles, USA,* Preventive Med. Reports (2024) ........ 5

Michele R. Kaufman et al., *Differentiating sex and gender in health research to achieve gender equity*, Bull. of the World Health Org. (2023) ........ 22

Nita Bhatt et al., *Gender-affirming Care for Transgender Patients*, Innovations in Clinical Neuroscience (2022) ........ 14

*Non-Binary Birth Certificates and State IDs: Full Guide*, US Birth Certificates (Feb. 17, 2025) ........ 19

*Nonbinary? Intersex? 11 U.S. States Issuing Third Gender IDs*, Reuters (Jan. 31, 2019) ........ 11

Or. H.B. 2001 (2019) ........ 17

Rashad Rehman, *"Intersex" Does not Violate the Sex Binary*, The Linacre Quarterly (2023) ........ 22

*Request for Status Information Letter*, Selective Serv. Sys. ........ 22

Sabra L. Katz-Wise, *Gender Fluidity: What it Means and Why Support Matters*, Harvard Med. Sch. (Dec. 3, 2020) ........ 14

Shaziya Allarakha, *What are the 72 Other Genders?*, Med. Net (Medically Reviewed Feb. 9, 2024) ........ 5

Surya Monro, *Non-binary and Genderqueer: An Overview of the Field*,
In'l J. Transgender Health (2019) ....................15

*Understanding Transgender People, Gender Identity & Gender Expression*,
Am. Psych. Ass'n (July 8, 2024) ....................6

## INTEREST OF THE *AMICI* STATES

The States of Idaho, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Louisiana, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Utah, West Virginia, Wyoming, and the Arizona Legislature (*Amici* States) have enacted regulations governing how birth certificates are issued to citizens born within their boundaries and amended thereafter. Like Puerto Rico, almost all *Amici* States—in furtherance of their own policy objectives and considering the most effective use of their limited resources—have decided not to allow birth certificates to be amended to indicate "X" (signifying nonbinary) in the marker for sex.

*Amici* States have an interest in seeing that this policy decision is upheld as constitutional, but also in securing the proper respect for States' policy decisions more broadly. The district court's decision below, if followed by this Court, would set a dangerous precedent that would license judicial second-guessing of the "wisdom, fairness, or logic" of a whole host of State policy judgments. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Eight years ago, not a single State allowed citizens to amend their birth certificates to change the indicator for sex to "X" to signify a nonbinary gender identity. Today, only a third of States provide "X" as an option. Yet the district court held that the Constitution *requires* that Puerto Rico—and presumably 34 similarly situated

States—allow citizens to change the sex on their birth certificates to "X." According to the district court, there is no rational basis to do otherwise.

That the district court labeled irrational a policy that was universal eight years ago and is still in place in a supermajority of States should be the first sign that something went terribly wrong. A closer look at basic Equal Protection doctrines reveals just how errant the district court's conclusion was.

For starters, the district court should not have suggested that heightened scrutiny should apply. Heightened scrutiny applies only to regulations that discriminate on the basis of a protected class, like sex (meaning male or female). But Puerto Rico's policy does no such thing—nobody, male or female, can obtain a birth certificate with an "X" listed as the sex. The law is entirely evenhanded across the two sexes.

The evenhanded nature of the law also prevents any claim of discrimination on the basis of gender identity—a concept that is "distinct" from sex and tracks an individual's own sense of self rather than the individual's genetic makeup. *Bostock v. Clayton County*, 590 U.S. 644, 669 (2020). Again, no citizen can change a birth certificate to place "X" as the sex, no matter the citizen's gender identity. Moreover, those who identify as nonbinary are not a protected class, and discrimination against those who identify as nonbinary cannot be recharacterized as discrimination on the basis of sex.

Rational basis is therefore the appropriate level of scrutiny for reviewing Puerto Rico's policy, and limiting the sex marker of a birth certificate to one of the two sexes is an entirely reasonable position. States have taken differing approaches on what role

gender identity—a relatively new concept about which there is currently a "fierce scientific and policy debate[]," *United States v. Skrmetti*, 145 S. Ct. 1816, 1837 (2025)—should have in setting indicators on a birth certificate. But "[t]he Equal Protection Clause does not resolve these disagreements" nor give courts a "license to decide them as [they] see best." *Id.* Instead, a proper respect for federalism and the role of the judiciary dictates that such decisions be left to the political branches.

## ARGUMENT

### I. Puerto Rico's Birth Certificate Policy Doesn't Trigger Heightened Scrutiny.

Puerto Rico's policy requires all—male, female, nonbinary-identifying, and those who self-identify as any other gender identity—to select either male or female as the sex to be listed on their birth certificate, and nobody is allowed to select "X" to indicate a nonbinary gender identity. That evenhanded policy does not discriminate on the basis of sex or nonbinary identity—the latter of which is not a quasi-suspect class triggering heightened scrutiny to begin with.

#### A. Discrimination on the basis of sex requires differential treatment based on biological sex, not gender identity.

Laws discriminate on the basis of sex and trigger heightened scrutiny when they prescribe "different treatment" for males and females. *Reed v. Reed*, 404 U.S. 71, 75–76 (1971). This occurs when a law "prefer[s] one sex over the other," bestows benefits or burdens on one sex but not the other, or applies one rule for men and a different one for women. *L. W. v. Skrmetti*, 83 F.4th 460, 480 (6th Cir. 2023) (collecting many

examples), *aff'd*, *United States v. Skrmetti*, 145 S. Ct. 1816 (2025); *e.g.*, *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 730 n.16 (1982) (noting State's failure to "justify its differing treatment of men and women seeking nurses' training").

In assessing sex-based discrimination, the Supreme Court has always compared the way in which a law treats members of each biological sex—that is, the Court has always invoked the binary concept of male and female in making the comparison. *United States v. Virginia*, 518 U.S. 515, 532–33 (1996) (collecting cases). The Court has explained that the Equal Protection Clause is meant to prohibit "a mandatory preference to members of *either* sex over members of *the other*," *Reed*, 404 U.S. at 76 (emphases added), as well as "invidious discrimination against the members of *one* sex or *the other*." *Geduldig v. Aiello*, 417 U.S. 484, 496–97 n.20 (1974) (emphases added)); *see also Virginia*, 518 U.S. at 533 ("[T]he *two* sexes are not fungible; a community made up exclusively of *one* [sex] is different from a community composed of *both*." (emphases added)).

Indeed, assessing sex-based discrimination on the basis of biological sex comports with broader Equal Protection principles. "[S]ex, like race and national origin"—groups designated by the Supreme Court as suspect or quasi-suspect classes for Equal Protection purposes—"is an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality). It is defined by the "inherent" and "enduring" "[p]hysical differences between men and women." *Virginia*, 518 U.S. at 533. The Equal Protection Clause is meant to ensure that these sorts of "obvious, immutable, or distinguishing characteristics" are not used as

the basis for differential treatment without exceedingly good cause. *Lyng v. Castillo*, 477 U.S. 635, 638 (1986).

Gender identity, on the other hand, is not an obvious or immutable characteristic. Gender identity is a subjective concept that "refers to a person's deeply felt, internal and individual experience of gender, which may or may not correspond to the person's physiology or designated sex at birth." *Gender & Health*, World Health Org., https://perma.cc/EP5S-SYR6. Unlike sex—which is an unalterable characteristic genetically coded into every cell of the human body—gender identity, however, is "fluid" and unfixed. Manuel A. Ocasio & M. Isabel Fernandez, *The Association Between Gender Identity Fluidity and Health Outcomes in Transgender and Gender Diverse People in New Orleans and Los Angeles, USA,* Preventive Medicine Reports (2024), https://tinyurl.com/5n8k38dk. Some people—like Plaintiff—claim a gender identity that does not align with either sex, identifying instead as "nonbinary." *See* Opening Br. Add. 1; Shaziya Allarakha, *What are the 72 Other Genders?*, Med. Net (Medically Reviewed Feb. 9, 2024), https://perma.cc/W9WH-R26F.

So while sex is "immutable" and "determined solely by the accident of birth," *Frontiero*, 411 U.S. at 686 (plurality), gender identity "is not necessarily immutable" and "is not definitively ascertainable at the moment of birth." *Skrmetti*, 83 F.4th at 487 (cleaned up). As one prominent medical organization that advocates for transgender rights explained, "[s]ex is an essential part of vertebrate biology," while "gender is a human phenomenon." Aditi Bhargava et al., *Considering Sex as a Biological Variable in Basic*

*& Clinical Studies: An Endocrine Society Scientific Statement*, Endocrine Rev. (Mar. 11, 2021), https://perma.cc/V99Y-PJP2. "[S]ex often influences gender, but gender cannot influence sex." *Id.*[1]

Reflecting this reality, the Supreme Court has never conflated gender identity with sex when assessing a claim of sex-based discrimination, even in cases involving individuals who identify as transgender. In *Bostock v. Clayton County,* the Court recognized "sex" as an objective characteristic that is a fundamentally "distinct concept" from an individual's subjective "gender identity" and resulting "transgender status." 590 U.S. 644, 669 (2020). And in *United States v. Skrmetti*, the Court explained that to identify as "transgender" means that one's "gender identity does not align with their biological sex." 145 S. Ct. at 1824.

### B. Puerto Rico's policy does not classify on the basis of sex.

Assessing sex-based discrimination in this case therefore requires a comparison of whether biological males and females are treated differently on the basis of their sex. Plainly, they are not.

[1] *See also* Bhargava, *supra* ("Sex is a biological concept.… all mammals have 2 distinct sexes…. Sex is dichotomous, with sex determination in the fertilized zygote stemming from unequal expression of sex chromosomal genes."); *Understanding Transgender People, Gender Identity & Gender Expression*, Am. Psych. Ass'n (July 8, 2024), https://perma.cc/PN4Y-QZQ3 (sex "refers to one's biological status as either male or female, and is associated primarily with physical attributes such as chromosomes, hormone prevalence, and external and internal anatomy").

The evenhandedness of Puerto Rico's policy is self-evident. Puerto Rico provides two sex options on birth certificates: male and female. Opening Br. 9; 24 L.P.R.A. § 1133(4). Individuals of *both* sexes are allowed to amend their birth certificates to change the listed sex from male to female or vice versa to align the birth certificate with the individual's gender identity. And *neither* sex can amend a birth certificate to indicate a "nonbinary" gender identity. Thus, Puerto Rico's policy applies the same rules to both sexes and does not trigger heightened scrutiny. *Vacco v. Quill*, 521 U.S. 793, 800 (1997) ("Generally speaking, laws that apply evenhandedly to all 'unquestionably comply' with the Equal Protection Clause.") (cleaned up).

Although the district court didn't ultimately hold that the policy classified based on sex, it suggested as much based on: (1) another district court's conclusion that a similar policy classified based on sex, and (2) a handful of cases concluding that discrimination based on transgender identity amounted to sex discrimination. Opening Br. Add. 9–12. Neither reason withstands scrutiny.

*First*, the reasoning of the district court case that the court below cited is badly flawed. In *Orr v. Trump*, the court addressed an executive order directing the Secretary of State to require government-issued identification documents like passports to accurately reflect the holder's sex. 778 F. Supp. 3d 394, 411 (D. Mass. 2025). The order reversed a policy implemented four years prior that allowed citizens to put an "X" (nonbinary) as the sex on a passport. *Id.* at 410. The district court concluded that the

executive order classified on the basis of sex because the policy adopted a "binary" view of sex rather than a "more expansive conception of sex." *Id.* at 410–11.

But a law does not classify based on sex simply because it invokes one "conception of sex" or the other. For government documents like passports and birth certificates to be able to indicate sex at all, the government has to adopt *some* conception of sex. *Orr*'s approach to sex-based classifications would therefore subject all government documents that track sex to heightened scrutiny. *But see Skrmetti*, 145 S. Ct. at 1829 ("This Court has never suggested that mere reference to sex is sufficient to trigger heightened scrutiny"). It would be particularly strange to subject a policy adopting a binary conception of sex to heightened scrutiny since that's the conception that the Supreme Court itself uses. *See Virginia*, 518 U.S. at 533 ("[T]he *two* sexes are not fungible" (emphasis added)).

*Orr* should have stuck to long-established Equal Protection principles. A law discriminates on the basis of sex only if it calls for "differential treatment" between men and women or prefers one sex over another. *Id.* at 532. That's not the case here, just like it wasn't the case in *Orr*.

*Second*, the cases regarding transgender discrimination on which the district court relied do not translate to alleged discrimination on the basis of nonbinary identity. These cases have imported the Supreme Court's decision in *Bostock v. Clayton County,* wholesale into the Equal Protection Clause and concluded that it is "impossible to discriminate against a person for being … transgender without discriminating against that individual

based on sex." *Fowler v. Stitt*, 104 F.4th 770, 789–90 (10th Cir. 2024) (quoting *Bostock*, 590 U.S. at 660), *cert. granted, judgment vacated*, 145 S. Ct. 2840 (2025).

*Bostock* should not be imported into the Equal Protection Clause—its "text-driven" but-for causation analysis is specifically based on Title VII. *Skrmetti*, 83 F.4th at 484; *see also Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring) ("That such differently worded provisions … should mean the same thing is implausible on its face."). But the Court does not need to decide that question here because the result here is the same even if *Bostock* does apply to Equal Protection.

*Bostock*'s conclusion that discrimination on the basis of transgender identity necessarily entails sex-based discrimination rested on the following reasoning—if "an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female," but "retains an otherwise identical employee who was identified as female at birth," then "the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." 590 U.S. at 660. In other words, it is sex-based discrimination if changing the employee's sex—while keeping the gender that the employee identifies as constant—would change the hiring or firing decision.

But that reasoning doesn't work for alleged nonbinary discrimination. In that situation, changing the person's sex yields the same result. *Orr*'s misguided attempt to apply a *Bostock*-esque hypothetical demonstrates the difference—*Orr* claimed that

"Drew Hall and Sawyer Soe cannot obtain a passport reflecting their nonbinary gender identity, simply because they were assigned, respectively, male and female at birth." 778 F. Supp. 3d at 412. Not so. If instead Drew Hall had been "assigned" female at birth and Sawyer Soe had been "assigned" male, they *still* would not be able to obtain a passport "reflecting their nonbinary gender identity." *Id.* So too here—switching a person's sex could never entitle the person to a birth certificate with an "X" (for nonbinary) because *nobody* in Puerto Rico is entitled to such a birth certificate.

Thus, it's not accurate to claim, as the district court did, that "[m]any courts have held, in a variety of contexts, that gender identity-based discrimination amounts to sex discrimination." Opening Br. Add. 11. The cases the district court cited all involved alleged transgender-based discrimination. "The terms transgender and nonbinary are not interchangeable," and neither is the legal analysis applying to each group. *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 761 F. Supp. 3d 1159, 1164 (S.D. Ind. 2025).[2]

[2] For this reason, this case is more straightforward than *Gore v. Lee*, 107 F.4th 548 (6th Cir. 2024) and *Fowler v. Stitt*, 104 F.4th 770 (10th Cir. 2024). Those cases address birth certificate policies that allegedly discriminated on the basis of transgender identity because they didn't allow individuals identifying as transgender to change the sex listed on their birth certificate from one biological sex to another. Here, Puerto Rico allows such changes.

### C. Puerto Rico's policy does not discriminate based on nonbinary identity.

Puerto Rico's policy does not discriminate on the basis of nonbinary identity either. As explained, the policy is evenhanded—no one, regardless of gender identity (nonbinary or otherwise), can obtain a birth certificate bearing an "X" sex marker.

There are situations where a facially evenhanded law can nonetheless be discriminatory. These situations are known as proxy discrimination, and they involve situations where a law targets "an irrational object of disfavor that … happen[s] to be engaged in exclusively or predominantly by a particular class of people," such that "an intent to disfavor that class can readily be presumed." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). An example is "[a] tax on wearing yarmulkes," which may apply evenhandedly, but is really "a tax on Jews." *Id.* Generally, however, such cases are "rare," and they require a "stark" impact on the group. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (collecting cases).

Here, there is nothing to suggest that Puerto Rico's policy targets "an irrational object of disfavor." Puerto Rico tracks only male and female sex markers on birth certificates just like most other states, *see* Opening Br. Add. 15, and like *all* jurisdictions did until very recently. *Nonbinary? Intersex? 11 U.S. States Issuing Third Gender IDs*, Reuters (Jan. 31, 2019), https://tinyurl.com/45ksmmyx. And there are many reasons a government may choose not to permit an "X" marker on a birth certificate—to name two, the government may not wish to bear the administrative expense of adding an

additional marker to its documents, or may simply conclude that it lacks a state interest in tracking individuals' nonbinary gender identities. *See infra* Section II.

An evenhanded law may also trigger heightened scrutiny as a "mere pretext[]" for discrimination where there is evidence to show that it was motivated by animus toward a protected class—where the government acts "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Skrmetti*, 145 S. Ct. at 1833 (first quote); *Pers. Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 279 (1979) (second quote). Here, however, there is no evidence suggesting that Puerto Rico's policy was the product of animus toward those identifying as nonbinary (assuming they are a protected class). Rather, Puerto Rico's goal was merely to stay the course by adhering to its centuries-old policy of placing only male or female on birth certificates. Opening Br. 34.

### D. Nonbinary identity is not a suspect or quasi-suspect class.

Finally, even if Puerto Rico's policy did classify or discriminate on the basis of nonbinary identity, those identifying as nonbinary are not a suspect or quasi-suspect class receiving heightened scrutiny. No federal circuit court has held otherwise.

The Supreme Court has reserved suspect and quasi-suspect monikers for a narrow set of classifications—so far, only classes with inalienable characteristics like "race, sex, and alienage." *Skrmetti*, 145 S.Ct. at 1850 (Barrett, J., concurring). Beyond those groups, the list of protected classes has remained "virtually closed" for nearly 50 years, and the Court "has repeatedly declined" to add to it. *Id.*; *e.g.*, *San Antonio Indep.*

*Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973) (wealth); *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (*per curiam*) (age); *Cleburne. v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985) (intellectually disabled). This Court has likewise refused to recognize new suspect or quasi-suspect classes. *See Boivin v. Black*, 225 F.3d 36, 42 (1st Cir. 2000) (prisoners); *Cook v. Gates*, 528 F.3d 42, 61 (1st Cir. 2008), *cert. denied*, 556 U.S. 1289 (2009) (sexual orientation).

To qualify as a suspect or quasi-suspect class, the subject class must (1) "exhibit obvious, immutable or distinguishing characteristics that define them as a discrete group"; (2) "[a]s a historical matter, … have … been subjected to discrimination"; and (3) be "a minority or politically powerless." *Lyng*, 477 U.S. at 638. Nonbinary identity does not meet any of these requirements.

***Obvious, immutable, or distinguishing characteristics***. Unlike race and sex, which are "defined by a trait that is definitively ascertainable at the moment of birth," *Skrmetti*, 145 S. Ct. at 1851 (Barrett, J., concurring), those identifying as nonbinary do not exhibit an obvious or distinguishing characteristic of a discrete group. Nonbinary identity is a form of "gender identity that is neither entirely male nor female," *Doe v. Horne*, 115 F.4th 1083, 1092 (9th Cir. 2024), that cannot be "assumed based on name or outward appearances." Carl G. Streed Jr., *Health Communication and Sexual Orientation, Gender Identity, and Expression*, Med. Clin. N. Am. (2022), https://tinyurl.com/2fa8d3mz. This is because nonbinary identity is one's "own internal sense of" self, Jessica A. Clark, *Sex Assigned at Birth*, 122 Colum. L. Rev. 1821, 1823 (2022), and "there is no one idea

of what a [nonbinary] person 'should look like.'" Lachlan Driver & Alyson J. McGregor, *Bit-by-bit: Decoding Nonbinary Patients in the Emergency Department*, EM Resident (Dec. 3, 2024), https://tinyurl.com/4zrwjnu5.

Moreover, a nonbinary gender identity is not immutable, but fluid. According to those who promote the concept of gender identity, individuals' gender identity "is subject to change and is not necessarily a permanent quality." Nita Bhatt et al., *Gender-affirming Care for Transgender Patients*, Innovations in Clinical Neuroscience (2022), https://tinyurl.com/msak75pc. A person may "identify as a boy until they are in their 20s, and then identify as nonbinary, and then identify as a boy again later in adulthood." Sabra L. Katz-Wise, *Gender Fluidity: What it Means and Why Support Matters*, Harvard Med. Sch. (Dec. 3, 2020), https://tinyurl.com/yu5smdyw. The fact that individuals can "move into and out of the [nonbinary] class" means the class cannot be suspect or quasi-suspect. *Skrmetti*, 145 S. Ct. at 1861 (Alito, J., concurring in part); *see also Plyler v. Doe*, 457 U.S. 202, 220 (1982) (holding that undocumented status is not a suspect class as it bears no "absolutely immutable characteristic").

***Historical discrimination***. The Supreme Court has recognized suspect and quasi-suspect classes only when a class was historically subjected to de jure discrimination. *Skrmetti*, 145 S. Ct. at 1853 (Barrett, J., concurring). The Court recognized race as a protected class because of widespread legal discrimination against black people, first with slavery and then with Jim Crow—in voting, transportation, schools, and public accommodations. *See Brown v. Bd. of Ed.*, 347 U.S. 483, 487–88

(1954); *Watson v. Memphis*, 373 U.S. 526, 528 (1963). Likewise, women lacked the right to vote until the 20th century, and even then, they faced laws that limited their participation in many aspects of society. *See Virginia*, 518 U.S. at 531.

Those who identify as nonbinary, on the other hand, have not faced historical de jure discrimination. There is no history of segregating such individuals, no history of suppressing their voting rights, and no history of limiting their legal ability to participate in society. Indeed, the law "historically" has said nothing at all about individuals identifying as nonbinary—the concept of nonbinary was not even discussed until the turn of the twenty-first century. Surya Monro, *Non-binary and Genderqueer: An Overview of the Field*, In'l J. Transgender Health (2019), https://tinyurl.com/yc8np728 ("The earliest use of terms referring directly to non-binary seems to be around 2000.").

***Politically powerless***. De jure discrimination is also the "more precise[]" means of measuring political powerlessness since discrimination results in the subject class "lack[ing] a vote" in the political process. *Skrmetti*, 145 S. Ct. at 1854–55 (Barrett, J., concurring). So the fact that nonbinary individuals have never been subject to de jure discrimination severely undermines the idea that they are politically powerless. Besides, nonbinary identifying individuals have begun gaining political power recently, with nonbinary-identifying individuals serving in state legislatures, city councils, and county school boards. Henry Carnell, *More than 35 Trans, Genderqueer Candidates Running Across U.S.*, Wash. Blade (Nov. 5, 2024), https://tinyurl.com/27rs53yk.

* * *

The district court was right to hesitate before concluding that Puerto Rico's policy triggered heightened scrutiny. As explained, the arguments the district court was considering relying on are all fundamentally flawed. Puerto Rico's evenhanded policy does not allow *anyone* to obtain a birth certificate with an "X" as the marker for sex, so it does not discriminate on the basis of sex or nonbinary identity. And those who identify as nonbinary are not a protected class in all events.

## II. Federalism Requires Federal Courts to Respect Puerto Rico's Rational Bases for its Birth Certificate Policy.

On rational basis review, upholding Puerto Rico's policy should have been straightforward. Puerto Rico maintains vital records to improve the health and welfare of its citizens, and like most States, it does not allow a nonbinary "X" marker in the "sex" field of birth certificates. The administrative concerns and impediments to accurate recordkeeping that are associated with creating a new marker, updating procedures and protocols, and maintaining duplicate sets of records should have been a rational enough basis for Puerto Rico's policy. But accounting for the unsettled and contentious nature of the very concept of nonbinary, rational basis is an even easier call.

It is important to recognize the federalism considerations that underlie rational basis review. In our "system of dual sovereignty between the States and the Federal Government," States and Puerto Rico possess a police power that may be used to enact "regulations which promote the public health, morals, and safety," as well as "those

which promote the public convenience or the general prosperity." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991) (first quote); *Eubank v. Richmond*, 226 U.S. 137, 142 (1912) (second and third quote); *see Bacardi Corp. of Am. v. Domenech*, 311 U.S. 150, 167 (1940) (Puerto Rico has police power). This power is "the most essential of powers, at times the most insistent, and always one of the least limitable of the powers of government." *Eubank*, 226 U.S. at 142–43 (citation omitted).

Not all States will enact the same regulations with their police power, but that is a feature, not a bug, of federalism. States have widely divergent legal codes, taking different approaches to matters like criminal law,[3] zoning regulations,[4] and health codes.[5] But "local experimentation and self-determination are essential aspects of the federal system." *FERC v. Mississippi*, 456 U.S. 742, 766 n.29 (1982); *Reeves, Inc. v. Stake*, 447 U.S. 429, 441 (1980) ("Denial of [State's] right to experiment may be fraught with serious consequences to the Nation." (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting))).

---

[3] *Compare* Nev. Rev. Stat. § 200.030 (adopting the felony murder rule), *with* Haw. Rev. Stat. § 707-701 (abolishing the felony murder rule),

[4] *Compare* N.M. Stat. § 3-21-1 (vesting all zoning power in local governments), *with* Or. H.B. 2001 (2019) (requiring certain cities to allow duplexes).

[5] *Compare* Idaho Admin. Code 02.04.05.120 (allowing bacterial limit of 80,000 per milliliter for A grade raw milk), *with* Minn. Stat. § 32D.13 (allowing bacterial limit of 100,000 per milliliter for A grade raw milk).

This explains why rational basis review must be the "paradigm of judicial restraint." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993). "Deference to state lawmaking allows local policies more sensitive to the diverse needs of a heterogeneous society." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015) (cleaned up). Courts applying rational basis review must therefore "refrain from setting aside a statutory discrimination if any state of facts reasonably may be conceived to justify it." *LCM Enters., Inc. v. Town of Dartmouth*, 14 F.3d 675, 679 (1st Cir. 1994) (cleaned up). "So long as some 'plausible' reason exists for the law—any plausible reason, even one that did not inspire the enacting legislature—the law must stand, no matter how unfair, unjust, or unwise the judges may see it as citizens." *Tiwari v. Friedlander*, 26 F.4th 355, 361 (6th Cir. 2022) (quoting *Heller v. Doe*, 509 U.S. 312, 324 (1993)).

The district court's application of rational basis, however, exhibited no respect for Puerto Rico's policy judgments.

Like every State, Puerto Rico keeps records of birth certificates and tracks sex as an indicator on those certificates, with the goal of gaining "insights about population changes, demographics, fertility rates, infant mortality, and other medical issues." *Gore*, 107 F.4th at 551. But each State has different rules on when and how a citizen can amend their birth certificate—some States do not allow changes to the listed sex, while others permit changes (1) only if the individual has undergone surgery, (2) only if the individual provides evidence like a declaration by a medical professional, or (3) upon

the individual's own declaration of gender identity. *Id.* at 553 (collecting State statutes and regulations). Two-thirds of the States, as well as Puerto Rico, do not allow individuals to amend their birth certificates to indicate "X" (for nonbinary) as their sex. *See* Opening Br. Add. 13.

Instead of deferring to Puerto Rico's decision, the district court second-guessed it, holding that Puerto Rico—and apparently every State that does not allow citizens to amend their birth certificate sex to "X," which includes 34 States today and *all 50* States as of eight years ago—has no rational basis for that policy. *Id.*; *Non-Binary Birth Certificates and State IDs: Full Guide*, US Birth Certificates (Feb. 17, 2025), https://tinyurl.com/9js5n7dz. The principal reason for the court's federalism-eroding decision was that allowing an amendment to "X" entails no administrative cost or impairment to accurate record-keeping because "an existing scheme is already in place" in Puerto Rico to issue amended birth certificates for citizens' "own use" while retaining the original certificate "in the [Demographic] Registry in a sealed envelope." Opening Br. Add. 5 n.5, 16–17.

As a factual matter, the district court is simply wrong. As many *Amici* States can attest, keeping duplicate records is administratively cumbersome. At a minimum, Puerto Rico would need to create new forms, develop new internal and external procedures, dedicate additional time and resources to processing requests, change recordkeeping protocols, and devote office space and/or computer storage to tracking an expanded second set of records. *See* Opening Br. 32. Courts have regularly held that avoiding

administrative burdens like these is a legitimate government interest that satisfies rational basis review. *Astrue v. Capato ex rel. B.N.C.*, 566 U.S. 541, 557 (2012); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016).

The district court's decision would also be limitless. If allowing citizens to amend a birth certificate were really costless, there would be no rational basis for a State with an amendment process in place to deny an amendment request for any one of the 343 genders recognized by some organizations. Chassitty N. Fiani & Heather J. Han, N*avigating identity: Experiences of binary and non-binary transgender and gender non-conforming (TGNC) adults*, Int. J. Transgenderism (2018), https://tinyurl.com/z8pbrctn. If an individual wanted a birth certificate that has a birthdate that tracks a non-Gregorian calendar, lists a mother-like figure with no legal relationship as a parent, or includes a new indicator for the doctor who performed the delivery, the State could never defend the constitutionality of its existing birth-certificate protocol on the grounds that it strives to keep accurate records and minimize administrative costs—the State would always have to provide citizens the certificate they desire for their "own use" and keep a second set of accurate certificates. Opening Br. Add. 17.

The district court's opinion hints at the real reason it believes the request for nonbinary is different: it is convinced that "nonbinary people exist," and birth certificates should "reflect this reality." *Id.* 14. Respectfully, what information should appear on a birth certificate is a judgment that must be left to the political branches under rational basis review.

It's no secret that the topic of gender identity is subject to ongoing "fierce scientific and policy debate[]." *Skrmetti*, 145 S. Ct. at 1837. Some believe that individuals' gender identity is essential to their sense of self, and that "gender-affirming medical care" and psychological treatment to help individuals transition to live in accordance with their preferred gender identity "can meaningfully improve . . . health and wellbeing." *Id.*at 1870 (Sotomayor, J., dissenting). But not all share that view. Others regard it as harmful to "replace[] the biological category of sex with an ever-shifting concept of self-assessed gender identity," Executive Order 14168 (Jan. 20, 2025), and earnestly believe that individuals whose gender identity does not match their sex are most likely to find satisfaction through counseling to help them become "comfortable with their biological sex." *Tingley v. Ferguson*, 144 S. Ct. 33 (2023) (Thomas, J., dissenting from denial of certiorari) (noting "fierce public debate").

This public debate has led some States to change their policies on amending birth certificates. It was not until the concept of gender identity gained prominence in social discourse that California, Oregon, and Washington became the first States to allow citizens to amend their birth certificates to indicate a nonbinary sex in 2017. *Gore*, 107 F.4th at 552. Other States have concluded there is no reason to track gender identity on birth certificates and that a birth certificate's sex indicator should always track biological

sex (which does not change).[6] *See id.* Tracking sex on birth certificates is helpful to determine appropriate medical care, athletic eligibility, and necessity for military draft registration.[7]

Other States still have been comfortable changing their policies to allow gender-identity-inspired changes to a birth certificate that fit within the binary concept of sex, but do not believe anything other than traditional two options of male or female (like "X") should fill the "sex" indicator of a birth certificate. *See Gore*, 107 F.4th at 552. After all, every person is born either a male or female—even those born with a disorder of sex development. *See* Rashad Rehman, *"Intersex" Does not Violate the Sex Binary*, The Linacre Quarterly (2023), https://tinyurl.com/36nhemn6.

But the Court need not wade through the literature or take sides in the policy debate. The point is that the States are the ones entitled to decide the extent to which the concept of gender identity will be reflected in their legal codes and, more specifically, their vital records. It is not the role of the Court to "substitute [its] social and economic beliefs for the judgment of legislative bodies" by declaring that the majority of States

---

[6] Michele R. Kaufman et al., *Differentiating sex and gender in health research to achieve gender equity*, Bull. of the World Health Org. (2023), https://tinyurl.com/bncer2mu (noting that sex is "based on genetics and observed physiological and anatomical sex traits"); C. E. Roselli, *Neurobiology of gender identity and sexual orientation*, J. Neuroendocrinology (2018), https://tinyurl.com/4m6s8hk5 (acknowledging only two sexes).

[7] Claire Burgess et al., *Evolving Sex and Gender in Electronic Health Records*, Fed. Practitioner (June 2019), https://tinyurl.com/487w2v3e (medical care); Fla. Stat. § 1006.205(3)(d) (athletic eligibility); *Request for Status Information Letter*, Selective Serv. Sys., https://tinyurl.com/3mpbrrr2 (last visited Sept. 17, 2025) (military).

are acting irrationally by not fully embracing one side of a contentious social issue. *Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963).

Weighing in on the policy debate surrounding gender identity is particularly dangerous because it risks "freez[ing] the dialogue between law and psychiatry into a rigid constitutional mold." *Kahler v. Kansas*, 589 U.S. 271, 281 (2020) (cleaned up). Gender identity is a psychological phenomenon, and "uncertainties about the human mind loom large"—"[e]ven as some puzzles get resolved, others emerge." *Id.* "[N]othing … could be less fruitful than for this Court to try to resolve for the Nation profound questions like" those surrounding the psychology of gender identity "under a provision of the Constitution that does not speak to them." *City of Grants Pass, Oregon v. Johnson*, 603 U.S. 520, 551 (2024) (cleaned up).

In other words, the concept of being nonbinary is both novel and indeterminate. *See Skrmetti*, 145 S. Ct. at 1841 (Thomas, J., concurring) ("[T]he concept of gender dysphoria as a medical condition is relatively new") (cleaned up). Questions persist about why people identify as a gender that does not align with their sex and how medicine and society should respond to such self-identification. Answers to these questions have been complicated by "high desistance rates" (particularly among youth), "the tragic 'regret' of detransitioners," and the "lack of medical consensus over [the] risks and benefits" of medical interventions. *Id.* at 1832 (quoting Brief of Respondents at 26–27) (first two quotes); *id.* at 1841 (Thomas, J., concurring) (third quote). Given this uncertainty around gender identity, the Court should not entrench any particular

viewpoint into the Constitution. *See Grants Pass*, 603 U.S. at 551 (recognizing that the Constitution leaves many issues to the democratic process).

## CONCLUSION

The Court should reverse the district court and hold that Puerto Rico's policy does not violate the Equal Protection Clause.

Dated: September 17, 2025

Respectfully submitted,

RAÚL R. LABRADOR
ATTORNEY GENERAL

/s/ *Alan M. Hurst*

ALAN M. HURST
SOLICITOR GENERAL

MICHAEL A. ZARIAN
DEPUTY SOLICITOR GENERAL

GADER WREN
ASSISTANT SOLICITOR GENERAL

*Counsel for Amicus State of Idaho*

**ADDITIONAL SIGNATORIES**

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRIS CARR
Attorney General
State of Georgia

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW H. WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

GENTNER DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

JONATHAN SKRMETTI
Attorney General
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

DEREK BROWN
Attorney General
State of Utah

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

KEITH G. KAUTZ
Attorney General
State of Wyoming

WARREN PETERSON
President of the Senate
State of Arizona

By counsel:
Rusty D. Crandell
Majority General Counsel
Arizona State Senate
1700 W. Washington St.
Phoenix, Arizona 85007
rcrandell@azleg.gov
(602) 926-3137

STEVE MONTENEGRO
Speaker of the House of Representatives
State of Arizona

By counsel:
Linley Wilson
Majority General Counsel
Arizona House of Representatives
1700 W. Washington St.
Phoenix, Arizona 85007
lwilson@azleg.gov
(602) 926-5418

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5). This brief contains 6,025 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Fed. R. App. P. 32(f). I certify that this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Garamond font.

Dated: September 17, 2025

/s/ *Alan M. Hurst*
Alan M. Hurst

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

/s/ *Alan M. Hurst*
Alan M. Hurst