No. 25-1638

# In the United States Court of Appeals for the First Circuit

ÍNARU NADIA DE LA FUENTE DÍAZ; MARU ROSA HERNÁNDEZ; ANDRÉ RODIL;
YEIVY VÉLEZ BARTOLOMEI; GÉ CASTRO CRUZ; DENI JUSTE,

*Plaintiffs-Appellees*,

v.

JENNIFER A. GONZÁLEZ COLÓN, in the official capacity as Governor of the
Commonwealth of Puerto Rico; DR. VÍCTOR RAMOS OTERO, in the official capacity
as Secretary of the Department of Health of the Commonwealth; WANDA LLOVET
DÍAZ, in the official capacity as the Director of the Division of Demographic
Registry and Vital Statistics of the Commonwealth,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Puerto Rico,
No. 23-cv-01544, Hon. María Antongiorgi-Jordán

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF

Johanna M. Emmanuelli Huertas
P.O. Box 136
Villalba, Puerto Rico 00766
(787)342-6499
jmeh@mac.com

Omar Gonzalez-Pagan
Whit Washington
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Fl.
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org
wwashington@lambdalegal.org

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ................................................................................1

STATEMENT OF THE CASE ...............................................................2

  A.  Plaintiffs.........................................................................................2

  B.  Sex and Gender Identity ................................................................3

  C.  Nonbinary Identities Across Cultures............................................6

  D.  Importance of Having Accurate Identity Documents......................8

  E.  Puerto Rico's Birth Certificate Policy .........................................10

  F.  Harms of Not Having Accurate Identity Documents ...................12

  G.  Discrimination Against Transgender People in Puerto Rico ........16

  H.  Procedural Background ................................................................18

STANDARD OF REVIEW ..................................................................18

SUMMARY OF ARGUMENT.............................................................19

ARGUMENT ......................................................................................21

  I.   The Birth Certificate Policy Classifies Based on Sex and Is Therefore Subject to Heightened Scrutiny. ..................................................21

  II.  The Birth Certificate Policy Classifies Based on Transgender Status, Specifically Nonbinary Status, and Is Subject to Heightened Scrutiny. .......30

  III. Because the Birth Certificate Policy Discriminates Against Nonbinary Transgender People, It Is Subject to Intensified Scrutiny under *Massachusetts v. HHS*...................................................................37

  IV. Neither *Skrmetti* Nor the GVR of *Fowler* Affect the Analysis in this Case................................................................40

    A.  *Skrmetti* has no impact on Plaintiffs' Equal Protection claim....40

    B.  The GVR of *Fowler* does not equate to a rejection of *Fowler*'s reasoning. ................................................................42

  V.  The Birth Certificate Policy Does Not Survive Scrutiny. .............43

VI.    The Policy Cannot Be Explained by Anything but Animus. .....................54

VII.    If the Court Disagrees that the Policy Cannot Survive Equal Protection
        Scrutiny, the Court Should Remand Plaintiffs' Remaining Claims. ..........55

CONCLUSION ............................................................................................................56

CERTIFICATE OF COMPLIANCE........................................................................57

ADDENDUM…………………………………………………………………..Add.

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995) ..................................................................................23

*Adkins v. City of New York*,
143 F.Supp.3d 134 (S.D.N.Y. 2015) ............................................. 31, 34

*Agatha v. Trump*,
151 F.4th 9 (1st Cir. 2025) ......................................................................9

*Anvar v. Dwyer*,
82 F.4th 1 (1st Cir. 2023) .......................................................................19

*Arroyo González v. Rosselló Nevares*,
305 F.Supp.3d 327 (D.P.R. 2018) ................................................. 1, 10

*Bd. of Trs. of Univ. of Ala. v. Garrett*,
531 U.S. 356 (2001) ................................................................................49

*Bishop v. Smith*,
760 F.3d 1070 (10th Cir. 2014)..................................................... 37, 39

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) ...................................................... 19, 25, 27, 41

*Bowen v. Gilliard*,
483 U.S. 587 (1987) ........................................................................ 30, 34

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ........................................................................ 30, 38

*Cochran v. Quest Software, Inc.*,
328 F.3d 1 (1st Cir. 2003) .......................................................................47

*Communities for Equity v. Michigan High Sch. Athletic Ass'n*,
459 F.3d 676 (6th Cir. 2006)..................................................................42

*Corcoran v. Levenhagen*,
558 U.S. 1 (2009) ....................................................................................56

iii

*Craig v. Boren*,
    429 U.S. 190 (1976) ...................................................................... 38, 49

*D.T. v. Christ*,
    552 F.Supp.3d 888 (D. Ariz. 2021) ...................................................26

*Daggett v. Comm'n on Governmental Ethics & Election Pracs.*,
    172 F.3d 104 (1st Cir. 1999) ...............................................................3

*Dekker v. Weida*,
    679 F.Supp.3d 1271 (N.D. Fla. 2023) ...............................................31

*Delgado-Caraballo v. Hosp. Pavia Hato Rey, Inc.*,
    889 F.3d 30 (1st Cir. 2018) ...............................................................18

*Dep't of State v. Aids Vaccine Advoc. Coal.*,
    No. 25A269, 2025 WL 2740571 (U.S. Sept. 26, 2025)....................24

*Doe v. Austin*,
    755 F.Supp.3d 51 (D. Me. 2024) .......................................................26

*Doe v. Horne*,
    115 F.4th 1083 (9th Cir. 2024)...........................................................26

*Doe v. Mass. Dep't of Correction*,
    No. 17-cv-12255-RGS, 2018 WL 2994403 (D. Mass. June 14, 2018) ...............26

*Doe v. South Carolina*,
    No. 25-1787, 2025 WL 2375386 (4th Cir. Aug. 15, 2025) .................41

*Eisenstadt v. Baird*,
    405 U.S. 438 (1972) ..........................................................................49

*Evancho v. Pine-Richland Sch. Dist.*,
    237 F.Supp.3d 267 (W.D. Pa. 2017) ............................................ 28, 31

*F.C.C. v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) ..........................................................................52

*F.V. v. Barron*,
    286 F.Supp.3d 1131 (D. Idaho 2018). ................................... 29, 31, 35

*Fabian v. Hosp. of Cent. Conn.*,
172 F.Supp.3d 509 (D. Conn. 2016).....................................................28

*Flack v. Wis. Dep't of Health Servs.*,
328 F.Supp.3d 931 (W.D. Wis. 2018)..................................................31

*Fowler v. Stitt*,
104 F.4th 770 (10th Cir. 2024),
*cert. granted, vacated, and remanded*, 145 S.Ct. 2840 (2025) ............... 20, 26, 46

*Frontiero v. Richardson*,
411 U.S. 677 (1973).............................................................................37

*Geduldig v. Aiello*,
417 U.S. 484 (1974) ............................................................................40

*Geiger v. Kitzhaber*,
994 F.Supp.2d 1128 (D. Or. 2014)......................................................48

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011).................................................... 19, 28

*Golinski v. U.S. Off. of Pers. Mgmt.*,
824 F.Supp.2d 968 (N.D. Cal. 2012) ..................................................52

*Graham v. Richardson*,
403 U.S. 365 (1971) ..................................................................... 35, 37

*Griffith v. El Paso Cnty.*,
129 F.4th 790 (10th Cir. 2025) ...........................................................21

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020)..................................................... *passim*

*H.R. by & through Roe v. Cunico*,
745 F.Supp.3d 842 (D. Ariz. 2024) .............................................. 29, 46

*Hecox v. Little*,
104 F.4th 1061 (9th Cir. 2024), *cert. granted*, 145 S.Ct. 2871 (2025).......... 26, 36

*Heller v. Doe*,
509 U.S. 312 (1993) .............................................................................52

*In Re Childers-Gray*,
   2021 UT 13, 487 P.3d 96 (Utah 2021)..........................................................46, 47

*In re Heilig*,
   372 Md. 692, 699, 816 A.2d 68 (2003) ..................................................................3

*In re Tam*,
   808 F.3d 1321 (Fed. Cir. 2015)..........................................................................50

*J.E.B. v. Alabama ex rel. T.B.*,
   511 U.S. 127 (1994)............................................................................................23

*Johnson v. Sch. Dist. of Rhinelander Bd. of Educ.*,
   No. 23-cv-00761-WMC, 2025 WL 977610 (W.D. Wis. Mar. 27, 2025) .............29

*K.L. v. State, Dep't of Admin., Div. of Motor Vehicles*,
   No. 3AN-11-05431-CI, 2012 WL 2685183
   (Alaska Super. Ct. Mar. 12, 2012) ...............................................................47, 53

*Kadel v. Folwell*,
   100 F.4th 122 (4th Cir. 2024) (*en banc*),
   *cert. granted, vacated, and remanded*, 145 S.Ct. 2838 (2025) ....................26, 36

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019)............................................................................31

*Kenemore v. Roy*,
   690 F.3d 639 (5th Cir. 2012)..............................................................................42

*Klikno v. United States*,
   928 F.3d 539 (7th Cir. 2019)................................................................26, 42, 43

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
   567 U.S. 298 (2012) ...........................................................................................51

*Lange v. Houston Cnty.*,
   152 F.4th 1245 (11th Cir. 2025).........................................................................35

*Latta v. Otter*,
   771 F.3d 456 (9th Cir. 2014)..............................................................................34

*LeTray v. City of Watertown*,
   718 F.Supp.3d 192 (N.D.N.Y. 2024) ..................................................................26

*Lipsett v. Univ. of P.R.*,
  864 F.2d 881 (1st Cir. 1988) ...............................................26

*Love v. Johnson*,
  146 F.Supp.3d 848 (E.D. Mich. 2015) .................................46

*Loving v. Virginia*,
  388 U.S. 1 (1967) ...............................................................23

*Lucas v. Forty-Fourth Gen. Assembly of Colo.*,
  377 U.S. 713 (1964) ...........................................................44

*Lyng v. Castillo*, 477 U.S. 635 (1986)......................................34

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*,
  286 F.Supp.3d 704 (D. Md. 2018)........................................34

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*,
  682 F.3d 1 (1st Cir. 2012) ................................. 20, 37, 39, 40

*Matal v. Tam*,
  582 U.S. 218 (2017) ...........................................................50

*Mathews v. Lucas*,
  427 U.S. 495 (1976) ..................................................... 34, 36

*Miller v. Johnson*,
  515 U.S. 900 (1995) ...........................................................24

*Mills v. Habluetzel*,
  456 U.S. 91 (1982) .............................................................35

*Mississippi Univ. for Women v. Hogan*,
  458 U.S. 718 (1982) ...........................................................21

*Nyquist v. Mauclet*,
  432 U.S. 1, (1977) ..............................................................36

*Obergefell v. Hodges*, 576 U.S. 644 (2015) ...................... 28, 45

*Orr v. Trump*,
  778 F.Supp.3d 394 (D. Mass. 2025) ............................. *passim*

*PFLAG, Inc. v. Trump*,
    769 F.Supp.3d 405 (D. Md. 2025) ........................................................55

*Plyler v. Doe*,
    457 U.S. 202 (1982) .............................................................. 30, 38, 40

*Powers v. Ohio*,
    499 U.S. 400 (1991) .......................................................................23

*Ray v. McCloud*,
    507 F.Supp.3d 925 (S.D. Ohio 2020) ...............................................49

*Reed v. Reed*,
    404 U.S. 71 (1971) .........................................................................38

*Rhode Island Coal. Against Domestic Violence v. Kennedy*,
    No. 25-CV-342-MRD-PAS, 2025 WL 2899764 (D.R.I. Oct. 10, 2025) ..............51

*Romer v. Evans*, 517 U.S. 620 (1996) ................................... 18, 39, 54, 55

*Rosa v. Park West Bank & Trust Co.*,
    214 F.3d 213 (1st Cir. 2000) ...........................................................28

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973)...........................................................................35

*San Francisco A.I.D.S. Found. v. Trump*,
    786 F.Supp.3d 1184 (N.D. Cal. 2025) ......................................... 51, 52

*Schlacter v. United States*,
    No. 25-cv-01344-GLR, 2025 WL 2606101 (D. Md. Sept. 9, 2025) ....... 23, 24, 29

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017) .................................................................. 19, 27

*Shilling v. United States*,
    773 F.Supp.3d 1069 (W.D. Wash. 2025) ....................................... 44, 51

*Shurtleff v. City of Boston*,
    596 U.S. 243 (2022) .......................................................................51

*Smith v. Avanti*,
    249 F.Supp.3d 1194 (D. Colo. 2017)..................................................28

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ........................................................................27

*Talbott v. United States*,
   775 F.Supp.3d 283 (D.D.C. 2025) ............................................ *passim*

*Texas v. United States*,
   798 F.3d 1108 (D.C. Cir. 2015) ...................................................26

*Thompson v. Hebdon*,
   7 F.4th 811 (9th Cir. 2021).........................................................25

*Tirrell v. Edelblut*,
   748 F.Supp.3d 19 (D.N.H. 2024)............................................ 26, 27

*Trump v. Orr*,
   No. 25A319, 2025 WL 3097824 (U.S. Nov. 6, 2025)............. 9, 10, 24

*Trump v. Boyle*,
   145 S.Ct. 2653, 2654 (2025) ......................................................24

*U.S. Dep't of Agric. v. Moreno*,
   413 U.S. 528 (1973) ...................................................................38

*United States v. Bello*,
   194 F.3d 18 (1st Cir. 1999) ..........................................................2

*United States v. Gould*,
   536 F.2d 216 (8th Cir. 1976)......................................................2, 3

*United States v. Skrmetti*,
   145 S.Ct. 1816 (2025) ............................................................ *passim*

*United States v. Then*,
   56 F.3d 464 (2d Cir.1995)...........................................................38

*United States v. Virginia*,
   518 U.S. 515 (1996) ........................................................ 21, 43, 48

*United States v. Windsor*,
   570 U.S. 744 (2013) ............................................................. 38, 55

*Vincent v. Bondi*,
  127 F.4th 1263 (10th Cir. 2025) ........................................................................42

*W. Virginia State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ........................................................................................44

*Washington v. Trump*,
  768 F.Supp.3d 1239 (W.D. Wash. 2025) ..........................................................55

*Weber v. Aetna Cas. & Sur. Co.*,
  406 U.S. 164 (1972) ........................................................................................37

*Wengler v. Druggists Mut. Ins. Co.*,
  446 U.S. 142 (1980) ........................................................................................49

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017).........................................................................31

*Windsor v. United States*,
  699 F.3d 169 (2d Cir. 2012)............................................................. 30, 34, 38, 39

*Wolf v. Walker*,
  986 F.Supp.2d 982 (W.D. Wis. 2014), *aff'd sub nom.*
  *Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014)...............................................34

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ........................................................................................51

*Zzyym v. Pompeo*,
  958 F.3d 1014 (10th Cir. 2020)........................................................................29

**Statutes**

7 L.P.R.A. § 3123 ...................................................................................................9

9 L.P.R.A. § 5058(e) ...............................................................................................9

16 L.P.R.A. § 4569 .................................................................................................9

18 L.P.R.A. § 395(b) ..............................................................................................9

20 L.P.R.A. § 3457(h) .............................................................................................9

23 L.P.R.A. § 6822(i)(1) ...........................................................................9

24 L.P.R.A. § 10060(a)(3) .........................................................................9

24 L.P.R.A. § 1136 ..................................................................................12

25 L.P.R.A. § 462a(c)(5) ...........................................................................9

29 L.P.R.A. § 438 .....................................................................................9

29 L.P.R.A. § 476b ...................................................................................9

31 L.P.R.A. § 7632 .................................................................................10

31 L.P.R.A. § 7655 ........................................................................... *passim*

P.R. Law 63-2025 ...................................................................................17

## Regulatory Materials

Exec. Order 14168, *Defending Women From Gender Ideology
    Extremism and Restoring Biological Truth to the Federal Government*,
    90 Fed. Reg. 8615 (Jan. 20, 2025).................................................... 12, 17, 32, 33

Exec. Order 14183, *Prioritizing Military Excellence and Readiness*,
    90 Fed. Reg. 8757 (Jan. 27, 2025)........................................................33

Exec. Order 14187, *Protecting Children From Chemical and Surgical Mutilation*,
    90 Fed. Reg. 8771 (Jan. 28, 2025)........................................................33

Fed. R. Evid. 201 ......................................................................................2

Tenn. Op. Att'y Gen. No. 88-43, 1988 WL 410159 (Feb. 29, 1988)......................32

## Congressional Committee Materials

H.R. Rep. 82-1365, H.R. Rep. No. 1365, 82nd Cong., 2nd Sess. 1952,
    1952 U.S.C.C.A.N. 1653 ....................................................................32

**Other Authorities**

§ 10:1. Understanding transgender and nonbinary identities,
1 SEXUAL ORIENTATION AND THE LAW § 10:1 (2024)..............................................3

Taylor Adams, *The History of Native American Two Spirit People*,
METROMODE (Apr. 24, 2025),
https://www.metromodemagazine.com/stories/the-history-of-native-american-two-spirit-people..........................................................................................32

Am. Med. Ass'n, *Resolution: Conforming Sex and Gender Designation on Government IDs and Other Documents H-65.967* (2021),
https://tinyurl.com/73v3y88t ...............................................................15

Am. Psych. Ass'n, *APA Policy Statement on Affirming Evidence-Based Inclusive Care for Transgender, Gender Diverse, and Nonbinary Individuals, Addressing Misinformation, and the Role of Psychological Practice and Science* (Feb. 2024), https://www.apa.org/about/policy/transgender-nonbinary-inclusive-care.pdf .................................................................................................4

Am. Psych. Ass'n, *APA Resolution on Gender Identity Change Efforts* (Feb. 2021),
https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf.
..........................................................................................................4, 5

Am. Psych. Ass'n, *Guidelines for Psychological Practice With Transgender and Gender Nonconforming People*, 70 Am. Psych. 832 (2015)................... 4, 5, 6, 13

Am. Psych. Ass'n, *Resolution: Transgender, Gender Identity, and Gender Expression Non-Discrimination* (Aug. 2008),
https://www.apa.org/about/policy/transgender.pdf.............................................16

Am. Psychiatric Ass'n, *Position Statement on Conversion Therapy and LGBTQ+ Patients* (July 2024), https://tinyurl.com/duu5m3bu..............................................5

Am. Psychiatric Ass'n, *Position Statement on Treatment of Transgender (Trans) and Gender Diverse Youth* (2020), https://tinyurl.com/2mfhkvna......................13

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* (2022) ........................................13

Kevin M. Barry, et al., *A Bare Desire to Harm: Transgender People and the Equal Protection Clause*, 57 B.C. L. Rev. 507 (2016)............................31

Greta R. Bauer, et al., *Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada*, 15 BMC Public Health 525 (2015), https://doi.org/10.1186/s12889-015-1867-2 ..........................................................14

S. Baum, *Puerto Rico Enacts Most Extreme Care Ban in America, Targeting Trans People Under 21*, Erin In The Morning (Jul 20, 2025), https://www.erininthemorning.com/p/puerto-rico-enacts-most-extreme-care.....17

Genny Beemyn, "Transgender History in the United States," in TRANS BODIES, TRANS SELVES: A RESOURCE FOR THE TRANSGENDER COMMUNITY (Laura Erickson-Schroth, ed., 2014), https://tinyurl.com/4ete4eke ......................7

*Nonbinary*, BLACK'S LAW DICTIONARY (12th ed. 2024) ...........................................6

*Plausible*, BLACK'S LAW DICTIONARY (12th ed. 2024) ...........................................52

*Transgender*, BLACK'S LAW DICTIONARY (12th ed. 2024) .....................................25

Christopher Brito and Li Cohen, *Transgender people in Puerto Rico say they are invisible in the eyes of the island — and it's contributing to a culture of violence*, CBS News (Sept. 2, 2021 at 1:24 PM EDT), https://www.cbsnews.com/news/transgender-puerto-ricans-violence/ ...............17

Aaron-Andrew P. Bruhl, *The Remand Power and the Supreme Court's Role*, 96 Notre Dame L. Rev. 171 (2020) ............................................................... 42, 43

Cindy Burgos, *LGBT+ Students Left Unprotected in Puerto Rico's Public Schools*, Centro de Periodismo Investigativo (Oct. 23, 2025), https://tinyurl.com/4wkumjtk ...............................................................17

Jeremi M. Carswell, et al., *The Evolution of Adolescent Gender-Affirming Care: An Historical Perspective*, 95 Hormone Research Paediatrics 649 (2022), https://doi.org/10.1159/000526721 ........................................................................5

Eli Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (2022) https://doi.org/10.1080/26895269.2022.2100644 ....................................... *passim*

Kathleen Deagan, *Reconsidering Taíno Social Dynamics after Spanish Conquest: Gender and Class in Culture Contact Studies*, 69 Am. Antiquity 597 (2004), https://www.jstor.org/stable/4128440.....................................................................8

Jack Drescher and Am. Psychiatric Ass'n, *What is Gender Dysphoria?*
(July 2025), https://www.psychiatry.org/patients-families/gender-
dysphoria/what-is-gender-dysphoria .....................................................5

M. Paz Galupo, et al., *"There Is Nothing to Do About It":*
*Nonbinary Individuals' Experience of Gender Dysphoria,*
6 Transgender Health 101 (2021), https://doi.org/10.1089/trgh.2020.0041 ..........6

Garima Garg, et al., "Gender Dysphoria" (2023), in STATPEARLS
(StatPearls Publ'g, 2025), https://www.ncbi.nlm.nih.gov/books/NBK532313/
(accessed Oct. 31, 2025)......................................................................13

Julie A. Greenberg, *Defining Male and Female: Intersexuality and*
*the Collision Between Law and Biology*, 41 Ariz. L. Rev. 265 (1999) .................3

Tamika Haynes Robinson, "The Evolution of Sexual Behaviour in the Caribbean:
A Psychological Perspective," in PERSPECTIVES IN CARIBBEAN PSYCHOLOGY
(Frederick W. Hickling, et al., eds., 2008).............................................8

Gilbert Herdt, "Preface," in THIRD SEX, THIRD GENDER: BEYOND SEXUAL
DIMORPHISM IN CULTURE AND HISTORY (Gilbert Herdt ed., 1996) .......................6

Jody L. Herman and Andrew R. Flores, *How Many Adults and Youth Identify as*
*Transgender in the United States?*, The Williams Institute (Aug. 2025),
https://williamsinstitute.law.ucla.edu/publications/trans-adults-united-states/....35

Julian Honkasalo, *When boys will not be boys: American eugenics and the*
*formation of gender nonconformity as psychopathology*, 11 NORMA 270 (2016),
https://doi.org/10.1080/18902138.2016.1260261 ...............................................32

Trudie Jackson, "Two Spirit Health in North America," in
A HISTORY OF TRANSGENDER MEDICINE IN THE UNITED STATES:
FROM MARGINS TO MAINSTREAM (CAROLYN WOLF-GOULD, ET AL., EDS., 2025) ..7

Sandy E. James, et al., *Early Insights: A Report of the 2022 U.S. Transgender*
*Survey* (2024), https://tinyurl.com/3fk8c22v................................................. 15, 16

Sandy E. James, et al., *The Report of the 2015 U.S. Transgender Survey* (2016),
https://tinyurl.com/4fp9u2tu......................................................................... 15, 16

Sonia K. Katyal & Ilona M. Turner, *Transparenthood,*
117 Mich. L. Rev. 1593 (2019) ...........................................................32

José J. Martínez-Vélez, et al., *A Preliminary Assessment of Selected Social Determinants of Health in a Sample of Transgender and Gender Nonconforming Individuals in Puerto Rico*, 4 Transgender Health 9 (2019), https://doi.org/10.1089/trgh.2018.0045 ............16

Emmie Matsuno and Stephanie L. Budge, *Non-binary/Genderqueer Identities: A Critical Review of the Literature*, 9 Current Sexual Health Rep. 116 (2017), https://doi.org/10.1007/s11930-017-0111-8 ................................................. 4, 6, 7

*Transgender*, MERRIAM-WEBSTER DICTIONARY (accessed Oct. 6, 2025) ..............25

Movement Advancement Project, *Equality Maps: Identity Document Laws*, www.mapresearch.org/equality-maps/identity_documents (accessed Oct. 23, 2025).........................................................................9

Movement Advancement Project, *Under Fire: Banning Medical Care and Legal Recognition for Transgender People* (Sept. 2023), https://tinyurl.com/mr36ppnx ................................................................33

Serena Nanda, "Precolonial Gender Identities and the International Roots of Transitional Practices," in A HISTORY OF TRANSGENDER MEDICINE IN THE UNITED STATES: FROM MARGINS TO MAINSTREAM (Carolyn Wolf-Gould, et al., eds., 2025) ..............................................7

Nat'l Acad. of Sci., Eng'g, and Med., MEASURING SEX, GENDER IDENTITY, AND SEXUAL ORIENTATION (2022), https://doi.org/10.17226/26424.........................3, 4

Nat'l Acad. of Sci., Eng'g, and Med., UNDERSTANDING THE WELL-BEING OF LGBTQI+ POPULATIONS (2020), https://doi.org/10.17226/25877 ................. 8, 14

Erin Owens, *The Lavender Scare: How Fear and Prejudice Impacted a Nation in Crisis*, 10 Armstrong Undergraduate J. Hist. 115 (2020), https://digitalcommons.georgiasouthern.edu/aujh/vol10/iss2/8 .........................32

C.L. Quinan, *Rise of X: Governments Eye New Approaches for Trans and Nonbinary Travelers*, Migration Pol'y Inst. (Aug. 17, 2022), https://tinyurl.com/3n47du54 ...............................................................10

Lou Rich, *Gender Transgressions: Nonbinary Spaces in Greco-Roman Antiquity and Ancient China*, 51 Women's Stud. Q. 113  (2023), https://www.jstor.org/stable/27300143 .................................................7

Kate Redburn, *Before Equal Protection: The Fall of Cross-Dressing Bans and the Transgender Legal Movement, 1963–86*, 40 L. & Hist. Rev. 679 (2022)............31

Arjee Restar, et al., *Legal gender marker and name change is associated with lower negative emotional response to gender-based mistreatment and improve mental health outcomes among trans populations.* 11 SSM Population Health 1 (2020), https://doi.org/10.1016/j.ssmph.2020.100595 ........................................14

Sheilla L. Rodríguez-Madera, et al., *Experiences of Violence Among Transgender Women in Puerto Rico: An Underestimated Problem*, 64 J. Homosexuality 209 (2016), https://doi.org/10.1080/00918369.2016.1174026....................................16

Charles E. Roselli, *Neurobiology of Gender Identity and Sexual Orientation*, 30 J. Neuroendocrinology e12562 (2018), https://doi.org/10.1111/jne.12562 ......5

Cristiano Scandurra, et al., *Health of Non-binary and Genderqueer People: A Systematic Review*, 10 Frontiers Psych. 1 (2019), https://doi.org/10.3389/fpsyg.2019.01453 ........................................................5, 6

Ayden I. Scheim, et al., *Gender-concordant identity documents and mental health among transgender adults in the USA: a cross-sectional study*, 5 Lancet Public Health e196 (2020), https://doi.org/10.1016/S2468-2667(20)30032-3 ...............14

Zach C. Schudson and Thekla Morgenroth, *Non-binary gender/sex identities*, 48 Current Op. Psych. 101499 (2022), https://doi.org/10.1016/j.copsyc.2022.101499 ......................................................6

World Health Org., *International Classification of Diseases, 11th Revision* (2019), https://icd.who.int/browse/2025-01/mms/en#411470068 ....................................13

## INTRODUCTION

Birth certificates are critical and foundational identity documents. More than mere records of historical facts or observations, they communicate who we are. They are used to prove identity in many circumstances, such as enrolling in school, seeking employment, or accessing government services. Puerto Rico frequently requires the provision of birth certificates to prove identity.

Notwithstanding their ubiquitous use as identity documents, the Commonwealth prohibits nonbinary transgender persons from amending the gender on their birth certificates used for identification purposes, which are distinct from the "original birth records" in which the "sex at birth" cannot be amended (hereafter the "Birth Certificate Policy" or "Policy"). 31 L.P.R.A. § 7655; App.252-253. In so doing, the Commonwealth prohibits only nonbinary transgender persons from obtaining a birth certificate that accurately reflects their gender consistent with their gender identity. It does so despite permitting other corrections and updates to birth certificates, including name, parentage, and, critically, gender if male or female.

But nonbinary people have always existed. They are part of our society, our communities, and our families. As such, "we must heed their voices." *Arroyo González v. Rosselló Nevares*, 305 F.Supp.3d 327, 334 (D.P.R. 2018). They are who they say they are: neither male nor female.

Plaintiffs are six nonbinary persons born in Puerto Rico seeking to obtain birth certificates for identification purposes that reflect their nonbinary gender identity through a neutral gender marker, such as an "X". Through the Birth Certificate Policy, Defendants deny them the ability to do so.

The Policy erases their very identities, misrepresenting who they are and leading to significant harms. In doing so, it discriminates against nonbinary transgender persons like Plaintiffs based on sex and transgender status in violation of the Fourteenth Amendment. What is more, as the District Court found, the Policy cannot satisfy even the most deferential level of review as it is not rationally related to any legitimate state interest. This Court should affirm.

## STATEMENT OF THE CASE[1]

### A. Plaintiffs

Plaintiffs Inarú Nadia de la Fuente Díaz, Maru Rosa Hernández, André "Pó" Rodil, Yeivy Vélez Bartolomei, Gé Castro Cruz, and Deni Juste are six nonbinary

---

[1] The background information about sex, gender identity, transgender people, and nonbinary identity included herein constitutes "legislative facts"–they are "fact[s] useful in formulating common law policy or interpreting a statute." *United States v. Bello*, 194 F.3d 18, 22 (1st Cir. 1999); *see also* 1972 Advisory Committee Notes, Fed. R. Evid. 201 ("Legislative facts … are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court."). They are not "adjudicative facts" as they "do not relate specifically to the activities or characteristics of the litigants." *United States v. Gould*, 536 F.2d 216, 220 (8th Cir. 1976); *see also Bello*, 194 F.3d at 22. "[S]o-called 'legislative facts,' which go to the justification for a statute, usually are

persons born in Puerto Rico.  App.113-118.  They each have a nonbinary gender

identity, meaning that their identity is neither male nor female.  *Id.*; App.165-66

(admitting each Plaintiff identifies as a nonbinary person).  And each of them desires

to obtain identity documents, including the birth certificate used for purposes of

identification, consistent with their nonbinary identities.  App.113-118.

## B. Sex and Gender Identity

Each person has multiple sex-related characteristics, including hormones,

external and internal morphological features, external and internal reproductive

organs, chromosomes, and gender identity.[2]  The phrase "sex assigned at birth" refers

to the sex recorded on a person's birth record at the time of birth.  Typically, that sex

---

not proved through trial evidence but rather by material set forth in the briefs."
*Daggett v. Comm'n on Governmental Ethics & Election Pracs.*, 172 F.3d 104, 112
(1st Cir. 1999).  "A court generally relies upon legislative facts when it purports to
develop a particular law or policy and thus considers material wholly unrelated to
the activities of the parties."  *Gould*, 536 F.2d at 220.  As such, the District Court
was right to, and this Court can and should, consider these legislative facts to inform
its legal reasoning.

[2]     *See In re Heilig*, 372 Md. 692, 699, 816 A.2d 68, 73 (2003); *see also* § 10:1.
Understanding transgender and nonbinary identities, 1 SEXUAL ORIENTATION AND
THE LAW § 10:1 (2024) ("Defining a person's sex is not just a straightforward matter
of genitalia: sex is actually made up of a range of factors that include reproductive
organs, hormones, secondary sex characteristics, gender role, gender expression, and
gender identity."); Nat'l Acad. of Sci., Eng'g, and Med., MEASURING SEX, GENDER
IDENTITY, AND SEXUAL ORIENTATION 20 (2022), https://doi.org/10.17226/26424
(hereafter "*Measuring Sex*"); Julie A. Greenberg, *Defining Male and Female:
Intersexuality and the Collision Between Law and Biology*, 41 Ariz. L. Rev. 265, 278
(1999).

is assigned solely based on the appearance of external genitalia at the time of birth.[3]

However, it is well established that "sex traits may not all correspond to the same

sex or with the[] binary categories [of male or female], and thus with sex assigned

at birth."[4]  *See also*, *e.g.*, App.168 ("[I]t is admitted that an intersex individual is

someone born with the reproductive or sexual anatomy and/or chromosomal pattern

that does not fit typical definitions of male or female.").  Indeed, "gender diversity

is present throughout the lifespan and has been present throughout history."[5]

Gender identity refers to a person's core internal sense of their own gender.[6]

App.168 (admitted).  Every person has a gender identity.  Medical consensus

---

[3]    Eli Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1, S252 (2022), https://doi.org/10.1080/26895269.2022.2100644.

[4]    *Measuring Sex*, *supra* note 2 at 20; *id.*, at vii-viii.

[5]    Am. Psych. Ass'n, *APA Policy Statement on Affirming Evidence-Based Inclusive Care for Transgender, Gender Diverse, and Nonbinary Individuals, Addressing Misinformation, and the Role of Psychological Practice and Science* (Feb. 2024), https://www.apa.org/about/policy/transgender-nonbinary-inclusive-care.pdf; *see also* Coleman, *supra* note 3 at S15; Am. Psych. Ass'n, *APA Resolution on Gender Identity Change Efforts* 2 (Feb. 2021) (hereafter "APA GICE Resolution"), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf.

[6]    Coleman, *supra* note 3 at S252; Am. Psych. Ass'n, *Guidelines for Psychological Practice With Transgender and Gender Nonconforming People*, 70 Am. Psych. 832, 834 (2015) (hereafter "APA Guidelines"), https://www.apa.org/practice/guidelines/transgender.pdf; Emmie Matsuno and Stephanie L. Budge, *Non-binary/Genderqueer Identities: a Critical Review of the Literature*, 9 Current Sexual Health Rep. 116, 116-117 (2017), https://doi.org/10.1007/s11930-017-0111-8.

recognizes that gender identity is innate and has biological underpinnings.[7]  Gender identity cannot be voluntarily changed, and "attempts to change a gender identity (sometimes referred to as gender identity conversion efforts [GICE] or 'gender identity conversion therapy') have been linked to adverse mental health outcomes."[8]

For most people, their gender identity matches their sex assigned at birth. These people are known as cisgender.[9]  App.167 (admitted).  Hence, utilizing external genitalia as a proxy to determine a person's sex is accurate in most, but not all, circumstances.  For transgender people, their gender identity diverges from their sex assigned at birth.[10]  App.167 (admitted).

"Not all transgender individuals have a binary identity."[11]  The term nonbinary "refers to individuals who have a gender identity that does not fall exclusively in

---

[7]    Jeremi M. Carswell, et al., *The Evolution of Adolescent Gender-Affirming Care: An Historical Perspective*, 95 Hormone Research Paediatrics, 649, 650-51 (2022),  https://doi.org/10.1159/000526721;  *see also*  Charles E. Roselli, *Neurobiology of Gender Identity and Sexual Orientation*, 30 J. Neuroendocrinology e12562 (2018), https://doi.org/10.1111/jne.12562.

[8]    Jack Drescher and Am. Psychiatric Ass'n, *What is Gender Dysphoria?* (July 2025),        https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria;  *see also*  Am. Psychiatric Ass'n, *Position Statement on Conversion Therapy and LGBTQ+ Patients* (July 2024), https://tinyurl.com/duu5m3bu; APA GICE Resolution, *supra* note 5 at 2.

[9]    Coleman, *supra* note 3 at S252; APA Guidelines, *supra* note 6 at 861.

[10]    Coleman, *supra* note 3 at S252; APA Guidelines, *supra* note 6 at 863.

[11]    Cristiano Scandurra, et al., *Health of Non-binary and Genderqueer People: A Systematic Review*, 10 Frontiers Psych. 1, 2 (2019), https://doi.org/10.3389/fpsyg.2019.01453.

man/male or woman/female normative categories."[12]   "Nonbinary transgender individuals may identify with both genders, with a gender different from female or male, outside the gender binary, or as not having a gender altogether."[13]  Nonbinary identities thus "fall[] under [the] broader transgender umbrella, which encompasses gender/sex identities that diverge from the gender associated with a person's assigned sex at birth."[14]

### C. Nonbinary Identities Across Cultures

"Nonbinary genders have long been recognized historically and cross-culturally."[15]  From the Bugis peoples of Indonesia to the Hijra people in India, from

---

[12]    *Id.*; *see also* Coleman, *supra* note 3 at S252; *Nonbinary*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "nonbinary" as "Of, relating to, or involving someone who does not identify as either male or female.").

[13]    M. Paz Galupo, et al., *"There Is Nothing to Do About It": Nonbinary Individuals' Experience of Gender Dysphoria*, 6 Transgender Health 101, 101 (2021), https://doi.org/10.1089/trgh.2020.0041; APA Guidelines, *supra* note 6 at 834-835; Coleman, *supra* note 3 at S252.

[14]    Zach C. Schudson and Thekla Morgenroth, *Non-binary gender/sex identities*, 48 Current Op. Psych. 101499, at 1 (2022), https://doi.org/10.1016/j.copsyc.2022.101499.

    While not all nonbinary people identify as transgender, *see* Coleman, *supra* note 3 at S80, from a medical and legal perspective, all nonbinary people fall within the umbrella term of transgender, as their gender identity, *by definition*, is incongruent with their sex assigned at birth.

[15]    Coleman, *supra* note 3 at S80; *see also* APA Guidelines, *supra* note 6 at 834-35; Matsuno and Budge, *supra* note 6 at 117; Gilbert Herdt, "Preface," in THIRD SEX, THIRD GENDER: BEYOND SEXUAL DIMORPHISM IN CULTURE AND HISTORY 11 (Gilbert Herdt ed., 1996).

the Muxe people of Zapotec cultures in Oaxaca to the Chuckchi within Siberia, Bakla within the Philippines, and Quariwarmi within Peru, communities around the world have recognized and accorded legal recognition to nonbinary gender identities.[16]

This includes many Native American societies.[17] "Within most Native American cultures, male- and female-assigned individuals who assumed different genders were not considered to be women or men; rather, they constituted separate genders that combined female and male elements."[18] These indigenous groups recognized "a two-spirit identity for people who are both masculine and feminine."[19]

The same is true for Taíno people, the original inhabitants of Puerto Rico. "Research on Taíno gender constructions demonstrates that gender roles among the

---

[16]    *See* Lou Rich, *Gender Transgressions: Nonbinary Spaces in Greco-Roman Antiquity and Ancient China*, 51 Women's Stud. Q. 113, 114 (2023), https://www.jstor.org/stable/27300143; Serena Nanda, "Precolonial Gender Identities and the International Roots of Transitional Practices," in A HISTORY OF TRANSGENDER MEDICINE IN THE UNITED STATES: FROM MARGINS TO MAINSTREAM 16 (Carolyn Wolf-Gould, et al., eds., 2025); Matsuno and Budge, *supra* note 6 at 117; Coleman, *supra* note 3 at S18-S19.

[17]    *See* Genny Beemyn, "Transgender History in the United States," in TRANS BODIES, TRANS SELVES: A RESOURCE FOR THE TRANSGENDER COMMUNITY 503 (Laura Erickson-Schroth, ed., 2014), https://tinyurl.com/4ete4eke; Trudie Jackson, "Two Spirit Health in North America," in A HISTORY OF TRANSGENDER MEDICINE IN THE UNITED STATES, *supra* note 16 at 128.

[18]    Beemyn, *supra* note 17 at 503.

[19]    Matsuno and Budge, *supra* note 6 at 117.

Taíno were generally fluid."[20]  And in encountering such gender diversity, Columbus's doctor, Diego Álvarez Chanca, described in his 1495 notes Taíno people who defied Western notions of gender roles and the gender binary as "transsexuals, transvestites, eunuchs, and other third-gendered groupings."[21]

### D. Importance of Having Accurate Identity Documents

Identity documents in general, and birth certificates in particular, play a critical and ubiquitous role in modern life.  People rely on them to prove to others that they are who they say they are "for a broad range of life activities: access to important public goods, services, shelters or other facilities; acquiring benefits; travel; financial transactions; registering to vote; and securing employment."[22]

A birth certificate is an essential government-issued document used to prove identity, age, and citizenship, among other things, and often serves as a "prerequisite[] to the acquisition of other identity documents (e.g., passports)."[23]

---

[20]     Tamika Haynes Robinson, "The Evolution of Sexual Behaviour in the Caribbean: A Psychological Perspective," in PERSPECTIVES IN CARIBBEAN PSYCHOLOGY 362 (Frederick W. Hickling, et al., eds., 2008); *see also* Kathleen Deagan, *Reconsidering Taíno Social Dynamics after Spanish Conquest: Gender and Class in Culture Contact Studies*, 69 Am. Antiquity 597, 601 (2004), https://www.jstor.org/stable/4128440.

[21]     Haynes Robinson, *supra* note 20 at 363.

[22]     Nat'l Acad. of Sci., Eng'g, and Med., UNDERSTANDING THE WELL-BEING OF LGBTQI+ POPULATIONS 108 (2020), https://doi.org/10.17226/25877 (hereafter "*Understanding LGBTQI+ Populations*").

[23]     *Id.*

Puerto Rico law often *requires* birth certificates as proof of identity. *See*, *e.g.*, 9 L.P.R.A. § 5058(e) (to obtain driver's license); 18 L.P.R.A. § 395(b) (to participate in Teacher's Retirement System); 20 L.P.R.A. § 3457(h) (for paramedic or medical technician license); 24 L.P.R.A. § 10060(a)(3) (for license to serve as substance use prevention assistant). The uses *by the Commonwealth* of birth certificates as *proof of identity* are plenty and varied, from banking, 7 L.P.R.A. § 3123, employment, *e.g.*, 29 L.P.R.A. §§ 438, 476b, and business, 23 L.P.R.A. § 6822(i)(1) (tourism license), to exercising fundamental rights like the rights to vote, 16 L.P.R.A. § 4569, or bear arms, 25 L.P.R.A. § 462a(c)(5).

Recognizing the importance of having congruent identity documents, sixteen states and DC permit "X" gender markers on birth certificates, while twenty-two states and DC do so for driver's licenses.[24] App.169 (admitted); App.266. So did the federal government for passports until recently. *See Orr v. Trump*, 778 F.Supp.3d 394 (D. Mass. 2025), *stay denied sub nom. Agatha v. Trump*, 151 F.4th 9 (1st Cir. 2025), *stay granted sub nom. Trump v. Orr*, No. 25A319, 2025 WL 3097824 (U.S.

---

[24]     *See* Movement Advancement Project, *Equality Maps: Identity Document Laws*, www.mapresearch.org/equality-maps/identity_documents (accessed Oct. 23, 2025).

Nov. 6, 2025).  And so do over a dozen countries, including Australia, Canada, Iceland, India, New Zealand, and Pakistan.[25]  App.169 (admitted).

### E. Puerto Rico's Birth Certificate Policy

Notwithstanding its recognition and use of birth certificates as identity documents, the Commonwealth prohibits nonbinary persons from obtaining birth certificates consistent with their nonbinary gender identity.

The Civil Code requires that a person's birth certificate contain the sex of person.  *See* 31 L.P.R.A. § 7632.  Since 2018, the Commonwealth has allowed transgender people who identify as male or female to obtain a birth certificate consistent with their gender identity.  This followed the decision in *Arroyo González v. Rosselló Nevares*, 305 F.Supp.3d 327, which held that Puerto Rico's then-policy prohibiting such amendments violated the decisional and informational privacy rights of the plaintiffs.  Because of this decision, which defendants (rightly) did not appeal, the Commonwealth adopted a new policy permitting the correction of the gender marker on a transgender person's birth certificate, allowing them to be changed from male to female or female to male, as appropriate.  App.107, 163.  To obtain a corrected birth certificate, a binary transgender person must submit an

---

[25]    *See* C.L. Quinan, *Rise of X: Governments Eye New Approaches for Trans and Nonbinary Travelers*, Migration Pol'y Inst. (Aug. 17, 2022), https://tinyurl.com/3n47du54.

"Application for Gender Change" accompanied by one of the following: (i) Driver's license showing change in gender; (ii) Passport showing change in gender; (iii) Certification issued by a health or behavior professional who has a Physician-Patient relationship with the applicant. App.107; *see also* App.164; 31 L.P.R.A. § 7655.

Following *Arroyo González* and the aforementioned policy change, in 2020, the Puerto Rico legislature completed its decades-long process for updating and adopting a new Civil Code. App.252. The updated Civil Code did two critical things: First, it distinguished between a person's "*original birth record*," which reflects a person's "*sex at birth*," and their "*birth certificate*" used for identification purposes (hereafter, "identification birth certificate"), which reflects a person's "*gender*." *Contrast* 31 L.P.R.A. § 7655, First Para. ("No amendments to the *sex at birth* of a person on the *original birth record* may be authorized.") (emphasis added), *with id.*, Second Para. ("Nothing herein instituted undermines the process established in cases of a request for a change of *gender* to be reflected in the *birth certificate*.") (emphasis added); *accord* Plaintiffs' Add. 002 (certified translation); Defendants' Add. 5-6 (court's translation); App.227-28 (Defendants' (noncertified) translation). Second, the legislature codified a person's ability to change the gender marker on their birth certificate to reflect their gender identity, without any reference to male or female. *See* 31 L.P.R.A. § 7655, Second Para.

Additionally, the Commonwealth permits other changes to birth certificates: an intersex person may request that the gender marker be modified "when medical experts recognize the ambiguity of sex at birth," App.168 (admitted); 31 L.P.R.A. § 7655, First Para, and changes to a person's parentage are permitted following an adoption. 24 L.P.R.A. § 1136.

Nonetheless, the Commonwealth prohibits nonbinary persons born in Puerto Rico from obtaining a birth certificate consistent with their nonbinary gender identity. App.252-53; *see also* App.219.

In justifying this policy, the Commonwealth has relied upon and adopted the Trump Administration's views pertaining to transgender people. Gov't Br. 23. The executive order underlying the guidance cited by Defendants expressly defines sex to "not include the concept of gender identity" and asserts that transgender identities are "false" identities that "[do] not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." Exec. Order 14168, §§ 2(a), (f)-(g), *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615, 8615-16 (Jan. 20, 2025) ("Gender Order").

### F. Harms of Not Having Accurate Identity Documents

For all people, including binary and nonbinary transgender people, the ability to live consistent with one's gender identity is critical to their health and wellbeing.

12

Accordingly, nonbinary transgender people—like all people—require access to identity documents, including birth certificates, that accurately reflect who they are.

Further, many transgender people experience clinically significant distress resulting from the incongruence between their assigned sex and gender identity. App.169 (admitted). Gender dysphoria is the medical condition associated with such distress. *Id.* It is codified in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition*, published in 2013 and revised in 2022.[26] App.169 (admitted). Without appropriate treatment, gender dysphoria can result in distress, anxiety, depression, self-harm, and suicidal ideation.[27] App.169 (admitted).

Social transition (i.e., living in a manner consistent with one's gender identity, rather than their sex assigned at birth) is a key aspect of treatment for gender dysphoria.[28] The ability to access identity documents consistent with one's gender identity is important to social transition and necessary for a person's optimal health.[29]

---

[26] It is also codified as "gender incongruence" within the World Health Organization's *International Classification of Diseases, 11th Revision* (2019), https://icd.who.int/browse/2025-01/mms/en#411470068.

[27] *See* Am. Psychiatric Ass'n, *Position Statement on Treatment of Transgender (Trans) and Gender Diverse Youth* (2020), https://tinyurl.com/2mfhkvna; Garima Garg, et al., "Gender Dysphoria" (2023), in STATPEARLS (StatPearls Publ'g, 2025), https://www.ncbi.nlm.nih.gov/books/NBK532313/ (accessed Oct. 31, 2025).

[28] Coleman, *supra* note 3 at S107; APA Guidelines, *supra* note 6 at 863.

[29] Arjee Restar, et al., *Legal gender marker and name change is associated with lower negative emotional response to gender-based mistreatment and improve*

Depriving nonbinary transgender people of birth certificates consistent with their gender identity harms their health and wellbeing. Indeed, research has found that having access to identity documents congruent with a transgender person's identity is associated with reductions in psychological distress, as well as suicidal ideation and suicide planning.[30]

Additionally, having identity documents incongruent with one's gender identity—and incongruent with other identification documents like their passport, as is the case for Plaintiff de la Fuente Díaz, App.113—exposes transgender people to invasions of privacy. Having a binary gender marker on their birth certificates discloses the sex assigned at birth of a nonbinary transgender person, which is an intimate and private fact.

Having incongruent identity documents likewise exposes transgender people to discrimination, harassment, and even violence.[31] In the 2015 U.S. Transgender Survey, a survey of 27,715 transgender adults in the United States, 32% of

---

*mental health outcomes among trans populations.* 11 SSM Population Health 1, 2 (2020), https://doi.org/10.1016/j.ssmph.2020.100595.

[30] *See* Ayden I. Scheim, et al., *Gender-concordant identity documents and mental health among transgender adults in the USA: a cross-sectional study*, 5 Lancet Public Health e196, e201-e202 (2020), https://doi.org/10.1016/S2468-2667(20)30032-3; Restar, *supra* note 29 at 6-7; Greta R. Bauer, et al., *Intervenable factors associated with suicide risk in transgender persons: a respondent driven sampling study in Ontario, Canada*, 15 BMC Public Health 525 (2015), https://doi.org/10.1186/s12889-015-1867-2.

[31] *Understanding LGBTQI+ Populations*, *supra* note 22 at 108.

respondents who had presented an identity document that did not match their gender identity and expression had at least one negative experience, including verbal harassment (25%), denial of service (16%), being asked to leave a venue (9%), and assault (2%).[32]  The early insights gleaned from the 2022 U.S. Transgender Survey are similarly alarming.  This survey including 84,170 transgender adults in the United States, including Puerto Rico, found that nearly a quarter of all respondents reported being verbally harassed, assaulted, asked to leave a location, or denied services when they have shown someone an ID that did not match their presentation.[33]

Thus, medical organizations like the American Medical Association have expressed support for "policies that allow for a sex designation or change of designation on all government IDs to reflect an individual's gender identity," including "an undesignated or nonbinary gender option for government records and forms of government-issued identification, which would be in addition to 'male' and 'female.'"[34]

---

[32]     Sandy E. James, et al., *The Report of the 2015 U.S. Transgender Survey* 89-90 (2016), https://tinyurl.com/4fp9u2tu.

[33]     Sandy E. James, et al., *Early Insights: A Report of the 2022 U.S. Transgender Survey* 22 (2024), https://tinyurl.com/3fk8c22v.

[34]     Am. Med. Ass'n, *Resolution: Conforming Sex and Gender Designation on Government IDs and Other Documents H-65.967* (2021), https://tinyurl.com/73v3y88t; *see also* Am. Psych. Ass'n, *Resolution: Transgender,*

### G. Discrimination Against Transgender People in Puerto Rico

On top of these harms that flow from having incongruent identity documents, transgender people in Puerto Rico experience alarming rates of *de facto* and *de jure* discrimination, harassment, and violence.

Research on social determinants of health for transgender and gender nonconforming people in Puerto Rico documents "pervasive experiences of discrimination in multiple social settings, mainly at school, when requesting health care services, when accessing a public bathroom facility, and at work," as well as "high rates of physical, verbal, and sexual violence because of being transgender."[35] This is consistent with national data.[36] And reports indicate that "transgender people are targets of violence from both Puerto Rican citizens and from local police for expressing their gender identity, and that police are often dismissive of crime victims who are transgender."[37]

_____

*Gender Identity, and Gender Expression Non-Discrimination* (Aug. 2008), https://www.apa.org/about/policy/transgender.pdf.

[35]    José J. Martínez-Vélez, et al., *A Preliminary Assessment of Selected Social Determinants of Health in a Sample of Transgender and Gender Nonconforming Individuals in Puerto Rico*, 4 Transgender Health 9, 14-15 (2019), https://doi.org/10.1089/trgh.2018.0045; *see also* Sheilla L. Rodríguez-Madera, et al., *Experiences of Violence Among Transgender Women in Puerto Rico: An Underestimated Problem*, 64 J. Homosexuality 209 (2016), https://doi.org/10.1080/00918369.2016.1174026.

[36]    *See* James, *supra* note 32 at 12-13, 15-17; James, *supra* note 33 at 21.

[37]    Christopher Brito and Li Cohen, *Transgender people in Puerto Rico say they are invisible in the eyes of the island — and it's contributing to a culture of violence*,

Aside from turning a blind eye to this targeted violence, in the past year, the Commonwealth has adopted laws and policies targeting transgender people for discrimination and opprobrium.[38]  For example, Puerto Rico has enacted the most draconian law in the country targeting health care for transgender people, criminalizing gender-affirming medical care for minors and adults under 21 years of age.  *See* P.R. Law 63-2025.[39]   And it has prohibited coverage for such care regardless of age in the government's public health plan.[40]   Moreover, the Government hid for years the results of its *own study* documenting LGBTQ students' alarming rates of anxiety, depression, suicidality, and school harassment.[41]   The Government's response: to *eliminate* protections based on sexual orientation and gender identity from protocols addressing bullying in public schools.[42]

---

CBS News (Sept. 2, 2021 at 1:24 PM EDT), https://www.cbsnews.com/news/transgender-puerto-ricans-violence/.

[38]    Add. 016-020.

[39]    S. Baum, *Puerto Rico Enacts Most Extreme Care Ban in America, Targeting Trans People Under 21*, Erin In The Morning (Jul 20, 2025), https://www.erininthemorning.com/p/puerto-rico-enacts-most-extreme-care.

[40]    Add. 006 (citing Gender Order); *id.* at 016-020.

[41]    Cindy Burgos, *LGBT+ Students Left Unprotected in Puerto Rico's Public Schools*, Centro de Periodismo Investigativo (Oct. 23, 2025), https://tinyurl.com/4wkumjtk.

[42]    *Id.*

## H. Procedural Background

Plaintiffs filed their original complaint on October 27, 2023, asserting claims under the Equal Protection and Due Process Clauses as well as the First Amendment. App.1-20. They filed the operative amended complaint on November 15. App.85-105. Defendants answered on March 18, 2024. App.161-180.

On May 30, 2025, the District Court granted Plaintiffs' motion for summary judgment and denied Defendants' cross-motion. Defendants' Add. 1-19. The District Court held that the Birth Certificate Policy violates the Equal Protection Clause because it fails even rational basis review. Defendants' Add. 12-19. It further held that because it could "[]not conceive of any rational basis for the Policy's current distinction between binary and nonbinary individuals," it was "forced to make 'the inevitable inference that the [classification] is born of animosity toward the class of persons affected.'" Defs.' Add. 18-19 (quoting *Romer v. Evans*, 517 U.S. 620, 634 (1996), alteration by district court). The court entered its judgment on June 2, 2025. Defendants' Add. 20.

## STANDARD OF REVIEW

This Court "normally review[s] summary-judgment decisions with fresh eyes ('*de novo*,' in law-speak)." *Delgado-Caraballo v. Hosp. Pavia Hato Rey, Inc.*, 889 F.3d 30, 34 (1st Cir. 2018). "Cross motions simply require [the Court] to determine

whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Anvar v. Dwyer*, 82 F.4th 1, 7 (1st Cir. 2023) (cleaned up).

## SUMMARY OF ARGUMENT

The District Court correctly held that the Policy violates the Fourteenth Amendment's Equal Protection Clause.

I.      The Policy discriminates based on sex and is therefore subject to heightened scrutiny. *See Sessions v. Morales-Santana*, 582 U.S. 47, 58-59 (2017). Not only does the Policy classify based on sex on its face, but it also turns on transgender status. Nonbinary persons are transgender. And as the Supreme Court has explained, "it is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020). Moreover, the Policy is premised on stereotypical notions about gender. Indeed, "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes." *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011).

II.     The Policy is also subject to heightened scrutiny because classifications based on transgender status are at least quasi-suspect. All indicia supporting the application of heightened scrutiny are present here.

III.    At a minimum, the Policy must be subjected to "intensified scrutiny" under *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 10 (1st Cir.

2012). Such scrutiny, which calls for "a more careful assessment of the justifications than the light scrutiny offered by conventional rational basis review," is appropriate when "the protesting group [is] historically disadvantaged or unpopular," as is the case with transgender people. *Id.* at 10, 11.

IV.    Neither the Supreme Court's decision in *United States v. Skrmetti*, 145 S.Ct. 1816 (2025), nor the GVR of the Tenth Circuit's decision in *Fowler v. Stitt*, 104 F.4th 770 (10th Cir. 2024), *cert. granted, vacated, and remanded*, 145 S.Ct. 2840 (2025), undermine the District Court's decision or Plaintiffs' argument herein. This case does not concern the regulation of medical treatment as *Skrmetti* did. And a GVR does not speak to the merits of the underlying decision.

V.    The Policy fails any form of constitutional scrutiny. The Policy is not related to either of the two interests asserted by Defendants below. Nor do any of the interests asserted after the District Court's decision, which may not be considered on appeal, pass rational basis review.

VI.    The District Court correctly found that because the Policy cannot be explained by any rational basis, the inevitable conclusion is that it is based on animus towards transgender people. Moreover, the Government's argument erasing Plaintiffs' nonbinary identities and its adoption of President Trump's animus-laden Gender Order as a justification for the Policy buttress that the Policy is based on animus.

VII.   Finally, to the extent this Court disagrees that the Policy violates the Constitution's promise of equality under law, the Court should remand the case for consideration of Plaintiffs' remaining claims.

## ARGUMENT

### I.   The Birth Certificate Policy Classifies Based on Sex and Is Therefore Subject to Heightened Scrutiny.

"Gender-based classifications invoke intermediate scrutiny and must be substantially related to achieving an important governmental objective." *Massachusetts*, 682 F.3d at 9.[43]  When the State employs a sex classification, "the reviewing court must determine whether the proffered justification is 'exceedingly persuasive.'" *United States v. Virginia*, 518 U.S. 515, 533 (1996) (quoting *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)).  This "burden of justification is demanding and it rests entirely on the State." *Id.*

Here, there can be no real question that the Commonwealth's Birth Certificate Policy classifies based on sex.  The Policy regulates amendments to the gender marker on identification birth certificates, which are permitted under the Civil Code, 31 L.P.R.A. § 7655, allowing them for those with male or female gender identities

---

[43]    In the equal protection context, "courts, including the Supreme Court, at times refer to sex and gender interchangeably."  *Griffith v. El Paso Cnty.*, 129 F.4th 790, 808 n.9 (10th Cir. 2025); *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 n.8 (4th Cir. 2020).

and barring them for those with nonbinary, i.e., neither male nor female, gender identities. Gov't Br. 2. The Policy therefore classifies based on sex *on its face*.

1.     The Policy cannot be stated, much less understood, without referencing sex.  And a policy that "cannot be stated without referencing sex" is a paradigmatic example of a sex-based classification.  *See*, *e.g.*, *Grimm*, 972 F.3d at 608 (holding that school policy barring transgender male student from boys' facilities based on his "biological gender" discriminated based on sex).  While the *Skrmetti* Court noted that "mere reference to sex" in "the medical context" does not necessarily trigger heightened scrutiny, 145 S.Ct. at 1820, this Policy differs dramatically.  It is, at its essence, a sex *classification*, sorting and identifying individuals based on gender.

2.     The Policy treats nonbinary persons differently from persons who identify as male or female.  A person who identifies as male or female can obtain an identification birth certificate that is consistent with their male or female identity, either because it aligns with their birth sex (cisgender persons) or it can be amended to reflect their male or female gender identity when it does not (binary transgender persons).  However, the Policy categorically bars a nonbinary transgender person from acquiring a birth certificate with a gender marker that matches their identity, namely, a birth certificate with a gender-neutral marker.  This discordance between their nonbinary identity and binary gender categories results in their denial of accurate birth certificates.   Sex, therefore, "plays a necessary role in the

22

Government's decision to deny [identification birth certificates] to individuals that match their gender identity." *Schlacter v. United States*, No. 25-cv-01344-GLR, 2025 WL 2606101, at *11 (D. Md. Sept. 9, 2025). "Viewed from any angle, that amounts to a classification based on sex." *Orr*, 778 F.Supp.3d at 410.

The Government argues that the Policy "treats all individuals equally insofar as it gives every person the option of amending between the two existing sexes." Gov't Br. 17. But "classifications do not become legitimate on the assumption that all persons suffer them in equal degree." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). "[T]hat is like saying that racially segregated bathrooms treated everyone equally, because everyone was prohibited from using the bathroom of a different race." *Grimm*, 972 F.3d at 609; *see also Loving v. Virginia*, 388 U.S. 1, 8 (1967) (rejecting that "the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations"). Defendants discard half a century of case law in arguing that the Policy is nondiscriminatory because it "applies equally." Gov't Br. 18. The "neutral phrasing of the Equal Protection Clause, extending its guarantee to 'any person,' reveals its concern with the rights of individuals, not groups." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 152 (1994) (Kennedy, J., concurring); *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). "It is not enough for the government to disclaim a sex classification because, in its

telling, males as a group and females as a group are treated equally." *Orr*, 778 F.Supp.3d at 411. "Rather, the focus of the inquiry must be whether, as applied to an individual, there exists a classification based on sex." *Id.*; *see also Miller v. Johnson*, 515 U.S. 900, 911 (1995).

While the Policy's requirement that identification birth certificates reflect a binary sex designation applies to binary and nonbinary persons alike, it *only affects* nonbinary individuals like Plaintiffs. *See Schlacter*, 2025 WL 2606101, at *11 ("A policy that requires passports to reflect the sex designations on an individual's original birth certificate would *apply* to cisgender and transgender individuals equally but would only *affect* transgender individuals, because cisgender people typically would not apply for a gender on their passport that does not match their sex assigned at birth."); *cf. Orr*, 778 F.Supp.3d at 412.[44]

---

[44]    The Supreme Court's stay order in *Orr* does not help Defendants. For one, "consistent with the standards for interim relief," the order "should not be read as a final determination on the merits." *Dep't of State v. Aids Vaccine Advoc. Coal.*, No. 25A269, 2025 WL 2740571 (U.S. Sept. 26, 2025); *see also Trump v. Boyle*, 145 S.Ct. 2653, 2654 (2025) ("our interim orders are not conclusive as to the merits"). For another, and critically, it is inapplicable. The order is premised on the questionable notion that the passport policy "is merely attesting to a historical fact without subjecting anyone to differential treatment." *Orr*, 2025 WL 3097824, at *1. Such is not the case here where identification birth certificates do not attest to a historical fact but rather to the gender with which a person identifies and the Policy allows binary-identified people, but not nonbinary people, to change the gender marker on an identification birth certificate consistent with their gender identity.

3.    The Policy discriminates based on transgender status and therefore sex. As the Supreme Court has explained, "discrimination based on … transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." *Bostock*, 590 U.S. at 669.  And, as noted, nonbinary status is a subset of transgender status, *see supra* Statement of the Case, Section B, which is defined as "being a person whose gender identity differs from the sex the person was identified as having at birth." *Transgender*, MERRIAM-WEBSTER DICTIONARY (accessed Oct. 6, 2025);[45] *Transgender*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "transgender" as "Of, relating to, or designating a person who does not unambiguously self-identify as male or female but has characteristics of both"); App.167.

The Government largely ignores *Bostock*, citing it only once to acknowledge *Fowler*'s reliance on it.  Gov't Br. 32.  But *Bostock*'s reasoning applies here with equal measure.  Lower courts are "bound by more than just the express holding of a case"; their decisions "must comport with the 'reasoning or theory,' not just the holding, of Supreme Court decisions." *Thompson v. Hebdon*, 7 F.4th 811, 827 (9th Cir. 2021) (citation omitted).  And though *Bostock* arose under Title VII, its reasoning applies in the equal protection context. *See Talbott v. United States*, 775

---

[45]    https://www.merriam-webster.com/dictionary/transgender.

F.Supp.3d 283, 316-17 (D.D.C. 2025); *Tirrell v. Edelblut*, 748 F.Supp.3d 19, 34

(D.N.H. 2024) ("While Bostock concerned Title VII, its analysis of the logical

relationship between sex discrimination and transgender discrimination extends to

other contexts."). Indeed, this Court has "recognized that the analytical framework

for proving discriminatory treatment under Title VII is equally applicable to

constitutional … claims." *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 896 (1st Cir. 1988)

(cleaned up). As such, several courts have held, following *Bostock*'s reasoning, that

discrimination based on transgender status necessarily constitutes discrimination

based on sex for purposes of the Equal Protection Clause. *See*, *e.g.*, *Doe v. Horne*,

115 F.4th 1083, 1107 (9th Cir. 2024); *Hecox v. Little*, 104 F.4th 1061, 1079-80 (9th

Cir. 2024), *cert. granted*, 145 S.Ct. 2871 (2025); *Doe v. Austin*, 755 F.Supp.3d 51,

69 (D. Me. 2024); *Tirrell*, 748 F.Supp.3d at 36; *LeTray v. City of Watertown*, 718

F.Supp.3d 192, 205 (N.D.N.Y. 2024); *D.T. v. Christ*, 552 F.Supp.3d 888, 896 (D.

Ariz. 2021);[46] *cf. Doe v. Mass. Dep't of Correction*, No. 17-cv-12255-RGS, 2018

WL 2994403, at *9 (D. Mass. June 14, 2018).

---

[46]    So too have the Fourth and Tenth Circuits. *See Fowler*, 104 F.4th at 788-93;
*Kadel v. Folwell*, 100 F.4th 122, 153-54 (4th Cir. 2024) (*en banc*), *cert. granted,
vacated, and remanded*, 145 S.Ct. 2838 (2025); *id.* at 177-81 (Richardson, J.,
dissenting). Though *Kadel* and *Fowler* were GVR'd in light of *Skrmetti*, as
explained further herein (*see infra* Section IV.B), it is "well-settled" that a GVR
order "has no precedential weight," *Texas v. United States*, 798 F.3d 1108, 1116
(D.C. Cir. 2015), and that it does not "signal[] that [] earlier decisions … were
wrong." *Klikno v. United States*, 928 F.3d 539, 544 (7th Cir. 2019).

Any distinctions between Title VII and the Equal Protection Clause typically concern whether sex discrimination is permissible[47]—not whether a sex classification exists in the first place. "To discriminate against someone because they are transgender entails discrimination based on sex in the equal protection context as much as it does in the Title VII context." *Tirrell*, 748 F.Supp.3d at 36. Nothing in the differences between Title VII and the Fourteenth Amendment "prevent[s] *Bostock*'s commonsense reasoning—based on the inextricable relationship between transgender status and sex—from applying to the initial inquiry of whether there has been discrimination on the basis of sex in the equal protection context." *Id.* (quotation and citation omitted).

4.     The Policy also rests on stereotypical notions about gender. Blackletter law holds that discrimination based on "sex" encompasses discrimination based on the failure to conform to sex stereotypes. "For close to a half century," the Supreme Court "has viewed with suspicion laws that rely on … fixed notions concerning [a particular] gender's roles and abilities." *Sessions*, 582 U.S. at 62 (cleaned up).

This Court recognized this over a quarter century ago in a case involving a transgender litigant. *See Rosa v. Park West Bank & Trust Co.*, 214 F.3d 213, 215

---

[47]     Sex discrimination under Title VII is categorically prohibited; a sex classification may be permissible under Equal Protection if it satisfies heightened scrutiny. *Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308-309 (2023) (Gorsuch, J., concurring).

(1st Cir. 2000) (observing that it would be unlawful sex discrimination for bank to deny a loan to a person assigned male at birth because they presented as female). Such discrimination "is not only discrimination because of maleness and discrimination because of femaleness," it also includes "discrimination because of the properties or characteristics by which individuals may be classified." *Fabian v. Hosp. of Cent. Conn.*, 172 F.Supp.3d 509, 526 (D. Conn. 2016). It also includes "discrimination based on applying gender stereotypes to someone who was assigned a certain sex … at birth." *Smith v. Avanti*, 249 F.Supp.3d 1194, 1201 (D. Colo. 2017). In other words, "discrimination based on transgender status … is essentially the epitome of discrimination based on gender nonconformity, making differentiation based on transgender status akin to discrimination based on sex." *Evancho v. Pine-Richland Sch. Dist.*, 237 F.Supp.3d 267, 285-86 (W.D. Pa. 2017); *see also Glenn*, 663 F.3d at 1316.

By forcing Plaintiffs to have identity documents inconsistent with their nonbinary gender identity, the Commonwealth enforces binary notions about how persons should identify. While many may share these preconceived notions about what sex and gender mean, "in interpreting the Equal Protection Clause, the Court has recognized that new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed and unchallenged." *Obergefell v. Hodges*, 576 U.S. 644, 673 (2015). Today, it cannot

be denied that people exist who fall outside the gender binary. *See supra* Statement of the Case, Section C. The Commonwealth does not and cannot deny the existence of nonbinary people, whose gender identity is neither male nor female. *See* Defendants' Add. 14 ("Nonbinary people exist, and many state and federal agencies across the country and the world have adopted the use of an "X" gender marker to reflect this reality. Defendants have conceded that nonbinary people exist."); *Zzyym v. Pompeo*, 958 F.3d 1014, 1024 (10th Cir. 2020) (noting "that some individuals are born neither male nor female"). And "discrimination based on a nonbinary individual's nonconformance with sex gender stereotypes is discrimination based on sex." *Johnson v. Sch. Dist. of Rhinelander Bd. of Educ.*, No. 23-cv-00761-WMC, 2025 WL 977610, at *4 (W.D. Wis. Mar. 27, 2025). To conclude that discrimination based on nonbinary status "is not discrimination based on sex is to depart from advanced medical understanding in favor of archaic reasoning." *F.V. v. Barron*, 286 F.Supp.3d 1131, 1144 (D. Idaho 2018).

*    *    *    *    *

The Policy classifies based on sex and, like other sex-based classifications regarding identity documents, is therefore subject to heightened scrutiny. *See, e.g.*, *Schlacter*, 2025 WL 2606101, at *10-11; *Orr*, 778 F.Supp.3d at 412; *H.R. by & through Roe v. Cunico*, 745 F.Supp.3d 842, 849-50 (D. Ariz. 2024); *F.V.*, 286 F.Supp.3d at 1144.

## II. The Birth Certificate Policy Classifies Based on Transgender Status, Specifically Nonbinary Status, and Is Subject to Heightened Scrutiny.

The Commonwealth's Policy is independently subject to heightened scrutiny because it discriminates based on transgender status, namely, nonbinary status. As already noted (*see supra* Statement of the Case, Section B), definitionally, nonbinary status is a subset of transgender status. Here, the Policy categorically bars nonbinary people and only nonbinary people from acquiring an identification birth certificate consistent with their gender identity. App.219.

As numerous courts have held, classifications based on transgender status are independently subject to heightened scrutiny because transgender people constitute, at a minimum, a quasi-suspect class. Heightened scrutiny is required where the government targets a class that (1) has been historically "subjected to discrimination," *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); (2) has a defining characteristic bearing no "relation to ability to perform or contribute to society," *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985); (3) has "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Bowen*, 483 U.S. at 602; and (4) is "a minority or politically powerless," *id.*; *see also Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012) (cleaned up). Not all considerations need point toward heightened scrutiny, and the first two alone may be dispositive. *See Plyler v. Doe*, 457 U.S. 202, 216 n.14 (1982).

30

Most courts to consider the question, including the Fourth and Ninth Circuits, have found transgender status classifications to be quasi-suspect. *See*, *e.g.*, *Grimm*, 972 F.3d at 608; *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019); *Talbott*, 775 F.Supp.3d at 319-22; *Dekker v. Weida*, 679 F.Supp.3d 1271, 1290-91 (N.D. Fla. 2023); *F.V.*, 286 F.Supp.3d at 1145; *Flack v. Wis. Dep't of Health Servs.*, 328 F.Supp.3d 931, 953 (W.D. Wis. 2018); *Evancho*, 237 F.Supp.3d at 288; *Adkins v. City of New York*, 143 F.Supp.3d 134, 140 (S.D.N.Y. 2015).

"There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *see also Grimm*, 972 F.3d at 611-612.

This history is longstanding, whether *de facto* or *de jure*. It ranges from cross-dressing bans first enacted in the mid-nineteenth century[48] to explicit exclusions from federal civil rights protections.[49] It also includes the persecution of Two-Spirit

---

[48]     *See*, *e.g.*, Kate Redburn, *Before Equal Protection: The Fall of Cross-Dressing Bans and the Transgender Legal Movement, 1963–86*, 40 L. & Hist. Rev. 679 (2022).

[49]     *See generally* Kevin M. Barry, et al., *A Bare Desire to Harm: Transgender People and the Equal Protection Clause*, 57 B.C. L. Rev. 507 (2016).

Native Americans,[50] the exclusion of gender nonconforming immigrants,[51] the institutionalization and sterilization of transgender people in state psychiatric hospitals,[52] the loss of marriage benefits and child custody because of gender nonconformity,[53] and the firing and prosecution of gender nonconforming people during the "Lavender Scare."[54]

This history is also not yet history, as transgender people continue to experience *de facto* and *de jure* discrimination.  *See*, *e.g.*, *supra* Statement of the Case, Sections F and G.  This year alone, the federal government has sought to erase any recognition of transgender people from any part of the federal government and has demanded the same from federal contractors and grantees;[55] sought to undermine existing protections for transgender people and enacted myriad affirmative policies

---

[50]     Taylor Adams, *The History of Native American Two Spirit People*, METROMODE (Apr. 24, 2025), https://www.metromodemagazine.com/stories/the-history-of-native-american-two-spirit-people.

[51]     *See* H.R. Rep. 82-1365, H.R. Rep. No. 1365, 82nd Cong., 2nd Sess. 1952, 1952 U.S.C.C.A.N. 1653, 1701.

[52]     *See* Julian Honkasalo, *When boys will not be boys: American eugenics and the formation of gender nonconformity as psychopathology*, 11 NORMA 270 (2016), https://doi.org/10.1080/18902138.2016.1260261.

[53]     *See* Sonia K. Katyal & Ilona M. Turner, *Transparenthood*, 117 Mich. L. Rev. 1593 (2019); *see also*, *e.g.*, Tenn. Op. Att'y Gen. No. 88-43, 1988 WL 410159 (Feb. 29, 1988).

[54]     *See* Erin Owens, *The Lavender Scare: How Fear and Prejudice Impacted a Nation in Crisis*, 10 Armstrong Undergraduate J. Hist. 115 (2020), https://digitalcommons.georgiasouthern.edu/aujh/vol10/iss2/8.

[55]     *See*, *e.g.*, Gender Order §§ 3, 4.

to discriminate against transgender people in education, employment, health care, and housing, *see Talbott*, 775 F.Supp.3d at 331-32; banned transgender people from serving in the military;[56] and directed the immediate defunding of medical institutions that provide gender-affirming medical care to transgender young people, under the premise that expressing a gender identity contrary to one's birth-assigned sex constitutes a "false claim."[57]

"[T]hese attacks are part of a much larger, coordinated effort to erase transgender people entirely."[58] They "are part of a coordinated and rapid rollback of rights and protections previously afforded to transgender Americans, suggesting that these challenged actions are built on a foundation of irrational prejudice toward fellow citizens whose gender identity does not match their sex assigned at birth." *Orr*, 778 F.Supp.3d at 417-18.

"[O]ne would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment, than transgender people." *Grimm*,

---

[56]    Exec. Order 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025).

[57]    Exec. Order 14187, *Protecting Children From Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025); Gender Order § 2(f).

[58]    Movement Advancement Project, *Under Fire: Banning Medical Care and Legal Recognition for Transgender People* 2 (Sept. 2023), https://tinyurl.com/mr36ppnx.

972 F.3d at 610-11; *see also M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F.Supp.3d 704, 720 (D. Md. 2018).

As to the second factor, a person's transgender status is unrelated to their value to society. *See Grimm*, 972 F.3d at 612. Defendants have presented no "data or argument suggesting that a transgender person, simply by virtue of transgender status, is any less productive than any other member of society." *Adkins*, 143 F.Supp.3d at 139.

Because "[i]mmutability and lack of political power are not strictly necessary factors to identify a suspect class," *Windsor*, 699 F.3d at 181, these first two factors alone can be dispositive. The last two factors also favor Plaintiffs, however.

The third factor is not limited to immutability. "No 'obvious badge' is necessary." *Id.* at 183 (quoting *Mathews v. Lucas*, 427 U.S. 495, 506 (1976)). Indeed, "the test is broader," *id.*, as it also includes whether individuals exhibit "distinguishing characteristics that define them as a discrete group." *Bowen*, 483 U.S. at 602; *see also Lyng v. Castillo*, 477 U.S. 635, 638 (1986).[59] For example, courts have held that "classifications based on alienage … are inherently suspect"

---

[59] "Rather than asking whether a person could change a particular characteristic, the better question is whether the characteristic is something that the person should be required to change [in order to avoid government discrimination] because it is central to a person's identity." *Wolf v. Walker*, 986 F.Supp.2d 982, 1013 (W.D. Wis. 2014), *aff'd sub nom. Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014); *see also Latta v. Otter*, 771 F.3d 456, 464 n.4 (9th Cir. 2014).

even though alienage is obviously not an immutable characteristic. *Graham v. Richardson*, 403 U.S. 365, 372 (1971). The same holds true for illegitimacy. *See Mills v. Habluetzel*, 456 U.S. 91, 98-99 (1982). And as Judge Nancy Abudu has keenly observed, even race is not such an obvious badge. "Our nation's history shows that not everyone considered 'white' today was always viewed that way" and that "the phenomenon of mixed-raced people 'passing' as white is well-documented." *Lange v. Houston Cnty.*, 152 F.4th 1245, 1284 n.18 (11th Cir. 2025) (Abudu, J., dissenting). Thus, transgender people, including nonbinary people, meet the third factor, as transgender people are easily a distinguishable and discrete group in the legal context.

As to the final factor, "[t]he question is whether transgender persons … have been 'relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.'" *Talbott*, 775 F.Supp.3d at 322 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973)). Under this rubric, "transgender people are unarguably a politically vulnerable minority." *F.V.*, 286 F.Supp.3d at 1145. Transgender people comprise less than 1% of the United States adult population.[60] And just in the past three years,

---

[60]     Jody L. Herman and Andrew R. Flores, *How Many Adults and Youth Identify as Transgender in the United States?*, The Williams Institute (Aug. 2025), https://williamsinstitute.law.ucla.edu/publications/trans-adults-united-states/.

over 1,650 anti-LGBTQ laws have been proposed in state legislatures, and over 200 of them have become law.[61]  These laws, among other things, prohibit the mention of transgender people in schools, ban or restrict the provision or coverage of gender-affirming medical care, prohibit transgender people from accessing sex-designated facilities in a manner consistent with their gender identity, and, as here, prohibit transgender people from obtaining identity documents consistent with their gender identity.  *Id.*; *see also Grimm*, 972 F.3d at 612.  "[T]hese attacks are part of a much larger, coordinated effort to erase transgender people entirely."[62]  It cannot therefore be stated, with any seriousness, that transgender people are not a politically powerless group, *particularly today*.

Finally, it is of no moment that the Policy only affects a subset of transgender persons, i.e., nonbinary people.  "A law is not immune to an equal protection challenge if it discriminates only against some members of a protected class but not others."  *Hecox*, 104 F.4th at 1079.  Indeed, the Supreme Court "has consistently taken the view that discrimination within a certain class does not mean there is no discrimination between classes."  *Kadel*, 100 F.4th at 144; *see also*, *e.g.*, *Mathews v. Lucas*, 427 U.S. 495, 504 n.11 (1976); *Nyquist v. Mauclet*, 432 U.S. 1, 3-4, 12 (1977);

---

[61]     ACLU, Mapping Attacks on LGBTQ Rights in U.S. State Legislatures, https://www.aclu.org/legislative-attacks-on-lgbtq-rights (accessed Oct. 6, 2025).

[62]     Movement Advancement Project, *supra* note 57.

*Frontiero v. Richardson*, 411 U.S. 677, 678-79, 690-91 (1973); *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 167-68 (1972); *Graham v. Richardson*, 403 U.S. 365, 366-67, 376 (1971).

The Court should hold that discrimination based on an individual's transgender status, including nonbinary status, triggers heightened scrutiny.

## III.    Because the Birth Certificate Policy Discriminates Against Nonbinary Transgender People, It Is Subject to Intensified Scrutiny under *Massachusetts v. HHS*.

Even if the Court were to determine that the Policy does not involve a "suspect" or "quasi-suspect" classification, the Policy is still subject to "intensified scrutiny." *Massachusetts*, 682 F.3d at 10. As then Chief Judge Boudin aptly observed, "the Supreme Court has now several times struck down state or local enactments without invoking any suspect classification." *Id.* In each case, as with nonbinary transgender people here, "the protesting group was historically disadvantaged or unpopular, and the statutory justification seemed thin, unsupported or impermissible." *Id.*

These cases, sometimes referred to as "animus cases," are ones in which "the Supreme Court took up equal-protection challenges to government action that distinguished between people on the basis of characteristics that the Court had not deemed suspect or quasi-suspect." *Bishop v. Smith*, 760 F.3d 1070, 1097-98 (10th Cir. 2014) (Holmes, J., concurring). "[S]everal courts have read the Supreme

Court's recent cases in this area to suggest that rational basis review should be more demanding when there are 'historic patterns of disadvantage suffered by the group adversely affected by the statute.'" *Windsor*, 699 F.3d at 180 (quoting *Massachusetts*, 682 F.3d at 10-11); *see also United States v. Then*, 56 F.3d 464, 468 (2d Cir.1995) (Calabresi, J., concurring).

Examples of the Supreme Court's invalidation of laws involving classifications other than those it recognized as suspect or quasi-suspect at the time abound. In each case, the Court struck down laws rooted in "a bare … desire to harm a politically unpopular group," *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), "irrational prejudice," *Cleburne*, 473 U.S. at 450, or "singl[ing] out a class of persons" and "impos[ing] a disability on the class," *United States v. Windsor*, 570 U.S. 744, 755 (2013).

Illustrative cases include those involving: (1) sex classifications *prior to* such classifications being considered quasi-suspect, *see*, *e.g.*, *Reed v. Reed*, 404 U.S. 71 (1971)[63]; (2) classifications involving households containing unrelated individuals, *see*, *e.g.*, *Moreno*, 413 U.S. 528; (3) classifications involving the intellectually disabled, *see*, *e.g.*, *Cleburne*, 473 U.S. at 448; and (4) classifications involving undocumented children, *see*, *e.g.*, *Plyler v. Doe*, 457 U.S. 202 (1982).

---

[63]    Such recognition did not occur until five years later. *See Craig v. Boren*, 429 U.S. 190 (1976).

Two more recent examples involve classifications based on sexual orientation. In *Romer*, despite not having yet recognized sexual orientation classifications to be suspect or quasi-suspect, the Supreme Court struck down a Colorado constitutional provision prohibiting regulations to protect gay people from discrimination, after finding it was a "status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests." 517 U.S. at 632-33, 635. And in *Windsor*, the Supreme Court invalidated the Defense of Marriage Act, which denied federal recognition to marriages of same-sex couples, after scrutinizing the law's justifications. 570 U.S. at 770. This Court did the same in *Massachusetts*.

"These [] decisions did not adopt some new category of suspect classification or employ rational basis review in its minimalist form; instead, the Court rested on the case-specific nature of the discrepant treatment, the burden imposed, and the infirmities of the justifications offered." *Massachusetts*, 682 F.3d at 10. And "[r]ather than relying upon the various post-hoc rationalizations that could conceivably have justified the laws, the Court focused on the motivations that actually lay behind the laws." *Bishop*, 760 F.3d at 1099 (Holmes, J., concurring). For example, in *Moreno*, the Court "disregard[ed] purported justifications that [] households [containing unrelated individuals] were more likely to under-report income and to evade detection" and "closely scrutinized the legislation's fit."

*Massachusetts*, 682 F.3d at 10.  And in *Plyler*, the Court demanded that the statute "further[] some substantial goal of the State."  457 U.S. at 223-24.

Here, because transgender people constitute a historically disadvantaged or unpopular group, *see supra* Section II, the Policy's justifications must be subjected to more than the rational basis scrutiny reserved for "ordinary economic legislation." *Massachusetts*, 682 F.3d at 11.

## IV.    Neither *Skrmetti* Nor the GVR of *Fowler* Affect the Analysis in this Case.

### A. *Skrmetti* has no impact on Plaintiffs' Equal Protection claim.

The recent decision in *Skrmetti*, 145 S.Ct., does not control the outcome of Plaintiffs' Equal Protection claim here.  In *Skrmetti*, the Court upheld the Sixth Circuit's decision to reverse a preliminary injunction against Tennessee's ban on gender-affirming medical care for minors, holding that Tennessee's law, "[o]n its face," classified based on age and medical condition, not sex or transgender status. *Id.* at 1829.  The Court further relied on *Geduldig v. Aiello*, 417 U.S. 484 (1974), to hold that Tennessee's ban "does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions." *Skrmetti*, 145 S.Ct. at 1833.  That is not the case here where the Policy specifically hinges on sex and transgender status.  *See supra* Section I.

*Skrmetti* is fairly limited in scope and breadth. It turned on the arguments, facts, and context of that case. It is therefore important to note what *Skrmetti* did not do:

1.     The *Skrmetti* Court did not back away from *Bostock*'s holding that "discrimination based on … transgender status necessarily entails discrimination based on sex." 590 U.S. at 669. To the contrary, it reaffirmed it. *See Skrmetti*, 145 S.Ct. at 1834.

2.     *Skrmetti* also did not reject Plaintiffs' arguments here that *Bostock*'s reasoning applies in the equal protection context. *See Skrmetti*, 145 S.Ct. at 1834. If anything, *Skrmetti* supports Plaintiffs' arguments for how to detect sex discrimination. Here, changing only Plaintiffs' sex between binary and nonbinary changes whether they receive a birth certificate consistent with their gender identity.

The Fourth Circuit has confirmed that this reasoning remains in full force after *Skrmetti*. *See Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386, at *8, *8 n.11 (4th Cir. Aug. 15, 2025) (noting that *Grimm* "remains the law of this Circuit" and had not been abrogated by the Supreme Court); *id.* at *10 (Diaz, J., concurring) (explaining that *Skrmetti* "has little to say about the issues *Grimm* addressed").

3.     *Skrmetti* also did not reject Plaintiffs' arguments that classifications based on transgender status are subject to heightened scrutiny; it simply concluded the question had not been raised there. *See* 145 S.Ct. at 1832; *supra* Section II.

4.     And finally, *Skrmetti* reaffirmed that "where a law's classifications are neither covertly nor overtly based on sex," it is still subject to "heightened review" if "it was motivated by an invidious discriminatory purpose." 145 S.Ct. at 1832. The Court noted that "[n]o such argument ha[d] been raised [t]here." *Id.*

In short, nothing in *Skrmetti* undermines Plaintiffs' arguments or the District Court's reasoning here.

### B. The GVR of *Fowler* does not equate to a rejection of *Fowler*'s reasoning.

The Supreme Court's GVR of *Fowler* in light of *Skrmetti* likewise does not assist Defendants.  Notwithstanding the ink spent by Defendants arguing otherwise, the GVR of *Fowler* does not amount to a repudiation of the reasoning of either *Fowler* or the District Court here.   It is well-established that a GVR "doesn't necessarily signal a disagreement with the panel's reasoning or result."  *Vincent v. Bondi*, 127 F.4th 1263, 1264 n.1 (10th Cir. 2025); *see also*, *e.g.*, *Klikno*, 928 F.3d at 544 (rejecting that a GVR "signaled that [] earlier decisions … were wrong"); *Kenemore v. Roy*, 690 F.3d 639, 642 (5th Cir. 2012); *Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 459 F.3d 676, 680 (6th Cir. 2006) ("[A] GVR does not indicate, nor even suggest, that the lower court's decision was erroneous.").

Indeed, "a healthy proportion of GVR'd judgments are, *wholly appropriately*, reinstated on remand."  Aaron-Andrew P. Bruhl, *The Remand Power and the Supreme Court's Role*, 96 Notre Dame L. Rev. 171, 220 (2020).  "Moreover, a GVR

does not even necessarily indicate that the prior analysis has become invalid, for the new decision may turn out to be irrelevant." *Id.* A GVR order is simply "an efficient way for the Supreme Court to obtain the views of the lower courts on the effect of a new decision, whatever those views might be." *Klikno*, 928 F.3d at 544.

Simply put, Defendants put much stock in the GVR of *Fowler*, but the truth is that the Supreme Court has not repudiated *Fowler*'s reasoning.

## V.    The Birth Certificate Policy Does Not Survive Scrutiny.

Because the Commonwealth's Birth Certificate Policy discriminates based on sex and transgender status, it is subject to heightened scrutiny.  At a minimum, it must be subjected to "intensified scrutiny" under *Massachusetts*.  Nonetheless, the Policy fails even the most basic of constitutional scrutiny in that it does not even have a rational basis.

Importantly, for heightened scrutiny purposes, "[t]he justification must be genuine, not hypothesized or invented *post hoc* in response to litigation," and "it must not rely on overbroad generalizations." *Virginia*, 518 U.S. at 533.  As such, the Government is limited to the justifications it advanced before the District Court.  The Commonwealth only advanced two justifications below during the summary judgment briefing: (1) the Commonwealth's "policy and practice to maintain legislative integrity and authority," App.237; *see also* Add. 13, and (2) "an interest

in maintaining the integrity of public records" and "in consistency and historical accuracy of its vital statistic records," App.238, 240; Defs.' Add. 16.

The Birth Certificate Policy is not rationally related to either of these stated interests, and it certainly does not "significantly further" any important governmental interests.

Defendants' first asserted interest amounts to an argument that finding the Policy unconstitutional usurps legislative prerogatives. Gov't Br. 27-28. But this argument is tautological at best. As the District Court observed: "If accepted, Defendants' proposed 'separation of powers' rationale would exempt every imaginable state statute from judicial review, no matter its unconstitutionality." Defs.' Add. 14. "The very purpose of a Bill of Rights," however, "was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943). The right to equal protection therefore "may not be submitted to vote," it "depend[s] on the outcome of no elections." *Id.*; *see also Lucas v. Forty-Fourth Gen. Assembly of Colo.*, 377 U.S. 713, 736-37 (1964) ("A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be."); *Shilling v. United States*, 773 F.Supp.3d 1069, 1098 (W.D. Wash. 2025) (rejecting "[t]he government's 'better luck next administration' argument" while

holding that discriminatory policy "fails any level of Equal Protection scrutiny"). Indeed, "[t]he dynamic of our constitutional system is that individuals need not await legislative action" before seeking redress for an equal protection violation. *Obergefell*, 576 U.S. at 677. "An individual can invoke a right to constitutional protection when [one] is harmed, even if the broader public disagrees and even if the legislature refuses to act." *Id.*

Second, the Policy is not rationally related to the interest in maintaining the integrity of public records and consistency and historical accuracy of vital statistic records. Gov't Br. 23. Defendants fail to explain how such interests are in any way rationally furthered by prohibiting a nonbinary transgender person from acquiring an identification birth certificate that is consistent with their nonbinary identity. The connection between these interests and the Birth Certificate Policy is completely severed, at the very least, by Puerto Rico's Civil Code which prohibits amendments to the "*sex* at birth" on the "*original* birth *record*" (the "acta de nacimiento"), but allows "changes" to the "*gender*" on the distinct identification "birth *certificate*" (the "certificación [certificado] de nacimiento"). 31 L.P.R.A. § 7655; Plaintiffs' Add. 001-002. Whatever interest exists in those documents, the Commonwealth will continue to have access to them without any alteration, just as it did during the many years preceding the Policy and has done since the Policy has been adopted, and just as it does for other types of alterations apart from sex that are made to birth

certificates. *See* Defendants' Add. 16 ("But it is uncontested that an existing scheme is already in place to protect the integrity of vital records in circumstances where a birth certificate has been amended."); *see also Fowler*, 104 F.4th at 795; *see also H.R.*, 745 F.Supp.3d at 852 (rejecting government's justification for refusing to provide amended birth certificates because amendment does not destroy the original). "Thus, while Puerto Rico may have a legitimate state interest in maintaining accurate records of its citizens' sex at birth, Defendants have failed to articulate why this particular interest is furthered by treating nonbinary individuals differently than binary individuals." Defs.' Add. 17. This reality eviscerates any connection between the Policy and a purported interest in having an accurate record of Plaintiffs' assigned sex, for instance.

Moreover, the Policy as applied to nonbinary transgender persons undermines the goal of accurate birth certificates because it forces them to have inaccurate documents. Multiple courts have concluded as much. *See H.R.*, 745 F.Supp.3d at 852 (recognizing that identity documents discordant with one's gender identity "would be misleading and likely unhelpful in accurately verifying identity"); *Love v. Johnson*, 146 F.Supp.3d 848, 856-57 (E.D. Mich. 2015) (government's refusal to correct gender markers on driver's licenses "undermines Defendant's interest in accurately identifying Plaintiffs"); *In Re Childers-Gray*, 2021 UT 13, ¶ 40, 487 P.3d 96, 108 (Utah 2021) ("These changes are not just symbolic; they help avoid the

46

confusion that can result when people hold themselves out as having one name or as being one sex but have government identification that says differently."); *id.* at 2021 UT at ¶ 40, 487 P.3d at 108 n.19 (depriving transgender people of identity documents matching their gender identity creates confusion and "obviate[s] the very purpose of legal identification"); *K.L. v. State, Dep't of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431-CI, 2012 WL 2685183, at *7 (Alaska Super. Ct. Mar. 12, 2012).

Defendants now raise additional interests on appeal that they only first raised in their motion for reconsideration. App.279-282. "Litigation is not a game of hopscotch," however. *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir. 2003). Just like Defendants "may not, on a motion for reconsideration, advance a new argument that could (and should) have been presented prior to the district court's original ruling," "it is a virtually ironclad rule that a party may not advance for the first time on appeal either a new argument or an old argument that depends on a new factual predicate." *Id.* In any event, these interests fail to pass muster under heightened or intensified scrutiny, as well as under rational basis review.

On appeal, Defendants argue that "the Government has a legitimate interest in maintaining a consistent and historical definition of sex on its birth certificates." Gov't Br. 24. Defendants thus contend that "the inclusion of a neutral sex marker would transform Puerto Rico's birth certificates from objective records of biological sex into subjective declarations of personal identity." *Id.* at 24-25. But this argument

is a circular one that the Supreme Court has already rejected.  In *Virginia*, the defendants argued that excluding women from the Virginia Military Institute served the "important governmental objective" in "[s]ingle-sex education."  518 U.S. at 545.  The Court held that such "notably circular" reasoning "bent and bowed" the heightened scrutiny test, recognizing that accepting such an argument would give states a blank check to engage in invidious discrimination by claiming an interest in doing so.  *Id*.  Moreover, "[i]f tradition alone was sufficient to withstand rational basis review, the right to equal protection would be quite hollow."  *Geiger v. Kitzhaber*, 994 F.Supp.2d 1128, 1142 (D. Or. 2014).  "'Tradition' would simply turn rational basis review into a rubber stamp condoning discrimination against longstanding, traditionally oppressed minority classes everywhere."  *Id.*

Defendants' argument about an "interest in maintaining a consistent and historical definition of sex" nonetheless fails for at least two other reasons.  For one, the Commonwealth already (rightly) permits binary transgender people to obtain an identification birth certificate that reflects their gender identity.  31 L.P.R.A. § 7655; Gov't Br. 2.  Similarly, the Commonwealth "allows the substitution to the sex assigned at birth when medical experts recognize the ambiguity of sex at birth."  App.168.  The fact these amendments are allowed to correct for information that has changed or has been discovered after the "moment in time" of birth demonstrates there is no rational basis for the Policy with respect to sex. *See Bd. of Trs. of Univ.*

*of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001) ("[P]urported justifications for the ordinance made no sense in light of how the city treated other groups similarly situated in relevant respects."); *Eisenstadt v. Baird*, 405 U.S. 438, 449 (1972) (no rational basis where law was "riddled with exceptions"); *see also Ray v. McCloud*, 507 F.Supp.3d 925, 938 (S.D. Ohio 2020).

Even ignoring that others can amend the gender marker on their birth certificates, the government's aim to impose a uniform definition of sex across the government "does not … rank as an important governmental interest that can sustain the constitutionality of the [] Policy." *Orr*, 78 F.Supp.3d at 413. "Settled precedent instructs that a mere claim that a discriminatory policy is justified by an administrative convenience, like a desire for uniformity in data, cannot justify sex- and gender-based classifications." *Id.*; *see also*, *e.g.*, *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 152 (1980) ("the requisite showing has not been made" under heightened scrutiny "by the mere claim that it would be inconvenient to individualize determinations about widows as well as widowers"); *Craig*, 429 U.S. at 198 (Supreme Court decisions "have rejected administrative ease and convenience as sufficiently important objectives to justify gender-based classifications").

The Government also now contends "the content of a birth certificate constitutes government speech which naturally implies that the Government has an interest in the accuracy of its speech." Gov't. Br. 26. But the District Court's

49

decision pertains to Plaintiffs' Equal Protection claim; it did not address Plaintiffs' First Amendment claim.  The Court should not countenance Defendants' attempt to bootstrap what amounts to a First Amendment argument here.

In any event, however, birth certificates do not constitute governmental speech.  Courts must "exercise great caution before extending … government-speech precedents" because the doctrine "is susceptible to dangerous misuse." *Matal v. Tam*, 582 U.S. 218, 235 (2017).  And in *Tam*, the Federal Circuit cited birth certificates as an example of private speech.  *See In re Tam*, 808 F.3d 1321, 1348 (Fed. Cir. 2015).  That makes eminent sense.  Birth certificates have always been used as forms of identification and not merely as recordings of historical facts.  This is particularly so here where Puerto Rico's laws distinguish between the "original birth record" and the "birth certificate" used for identification purposes.  Nor can there be any dispute that birth certificates communicate who a person is, including their gender—matters determined in relation to the person themself, not the Government.

As noted, Puerto Rico routinely permits amendments to birth certificates. This includes name changes, parentage changes post-adoption, corrections to the sex designation for people born with ambiguous genitalia, and gender marker changes for binary transgender people.  *See supra* Statement of the Case, Section E.  The Commonwealth does not control what name a person will have or whom their

parents are, nor can it control the gender by which any person identifies. These factors show that birth certificates can be understood as private speech. *See Shurtleff v. City of Boston*, 596 U.S. 243, 253-58 (2022).

Moreover, to the extent the Commonwealth provides a forum in their birth certificates for others to convey their binary identity, whether cisgender, transgender, or intersex, through changes to their gender, the Commonwealth cannot exclude nonbinary persons from doing the same. To do so amounts to viewpoint discrimination. *See id.* at 258-59; *San Francisco A.I.D.S. Found. v. Trump*, 786 F.Supp.3d 1184, 1219-20 (N.D. Cal. 2025) ("*SFAF*"); *Rhode Island Coal. Against Domestic Violence v. Kennedy*, No. 25-CV-342-MRD-PAS, 2025 WL 2899764, at *8 (D.R.I. Oct. 10, 2025); *Shilling*, 773 F.Supp.3d at 1100 (by prohibiting Plaintiffs from "effectively, identifying with [] a gender different than their birth sex, the Policy imposes a restriction on gender expression").

In any event, even if birth certificates constitute governmental speech, the Commonwealth does not have a legitimate interest in compelling private citizens to convey its speech. Here, the Commonwealth routinely uses and even requires the production of birth certificates as forms of identification. *See supra* Statement of the Case, Section D. "The government may not … compel the endorsement of ideas that it approves," however. *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012); *see also Wooley v. Maynard*, 430 U.S. 705, 715 (1977).

The Commonwealth's argument that there are only two genders (Gov't Br. 23, 26) is wholly irrational and divorced from reality. First, it is foreclosed by Defendants' admission that nonbinary and intersex people exist. App.165-66, 168. Second, the Commonwealth has no legitimate interest in ignoring reality by burying its head in the sand. Even under the most deferential forms of review, the government's justification must be "plausible." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). For something to be "plausible," it must be "[c]onceivably *true* or successful; possibly *correct* or even *likely*." *Plausible*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added). In other words, "even the standard of rationality as we so often have defined it must find some footing in *the realities of the subject* addressed by the legislation." *Heller v. Doe*, 509 U.S. 312, 321 (1993); *see also Golinski v. U.S. Off. of Pers. Mgmt.*, 824 F.Supp.2d 968, 996 (N.D. Cal. 2012) ("[T]he justification for the law may not rely on factual assumptions that exceed the bounds of rational speculation."). It is simply just a fact of life that people whose gender is neither male nor female exist and have existed throughout history. *See supra* Statement of the Case, Sections B and C.

Nor does the government have a legitimate interest in erasing the identities of Plaintiffs and other nonbinary transgender Puerto Ricans. *See SFAF*, 786 F.Supp.3d at 1216 ("[T]he Gender Order's express purpose is to disapprove of transgender people and declare their existence as 'unmoored from biological facts' and 'false.'

52

This facially discriminatory objective … is not a legitimate government interest[.]" (citation omitted)).

Similarly, following the District Court's decision, Defendants argue that "the Government has a legitimate interest in safeguarding the accuracy of documents used to determine benefit eligibility and prevent fraud." Gov't Br. 26. But there is no rational connection between the Policy and fraud prevention. "[T]he fact that criminals currently perpetuate fraud using birth certificates *generally* does not require the Court to therefore conclude that allowing transgender individuals to change their sex marker will lead to more fraud any more than allowing a person's legally changed name to be put on the birth certificate would." *Ray*, 507 F.Supp.3d at 939. Further, "the absence of any procedure" for obtaining a nonbinary marker on an individual's birth certificate "can create discrepancies and inaccuracies between" Puerto Rico's birth certificates and "other forms of government issued identification," like passports. *K.L.*, 2012 WL 2685183, at *7. Such is the case with Plaintiff de la Fuente Díaz. App.113. And because individuals bearing identity documents with X markers issued by other jurisdictions, whether a birth certificate, driver's license, or passport, can present such documents to determine benefit eligibility in Puerto Rico, whether a birth certificate has a binary or nonbinary gender marker is not rationally related to benefit eligibility.

Finally, it is undisputed that dozens of jurisdictions within and outside the United States issue birth certificates with nonbinary gender markers. *See supra* Statement of the Case, Section D; App.169. This reality negates any arguments about "transferability" now raised by Defendants. Gov't Br. 27. So does the Full Faith and Credit Clause in Article IV, Section 1 of the U.S. Constitution.

In sum, because the Policy is so irrational that it cannot survive even the most deferential rational basis review, it cannot pass muster under the heightened scrutiny required here or the "intensified scrutiny" recognized by *Massachusetts*.

## VI.    The Policy Cannot Be Explained by Anything but Animus.

The District Court correctly concluded that because there is no "rational basis for the Policy's current distinction between binary and nonbinary individuals, we are forced to make 'the inevitable inference that the [classification] is born of animosity toward the class of persons affected.'" Defs.' Add. 18 (quoting *Romer*, 517 U.S. at 634). Here, not only is there no conceivable plausible justification for the Policy, but the Commonwealth's primary contention is that there are only two genders, thereby erasing nonbinary transgender people's identities. In doing so, the Commonwealth has relied upon and incorporated the reasoning of President Trump's Gender Order. "This Order denies the very existence of transgender people and instead seeks to erase them from the federal vocabulary altogether." *Washington v.*

54

*Trump*, 768 F.Supp.3d 1239, 1250 (W.D. Wash. 2025).[64]  The Commonwealth is thus "candid in its rejection of the identity of an entire group—[nonbinary] transgender Americans—who have always existed and have long been recognized in, among other fields, law and the medical profession." *Orr*, 778 F.Supp.3d at 415.

But "[t]he Constitution's guarantee of equality must at the very least mean that a bare [] desire to harm a politically unpopular group cannot justify disparate treatment of that group." *Windsor*, 570 U.S. at 770 (cleaned up); *see also Romer*, 517 U.S. at 634.  And one "cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." *PFLAG, Inc. v. Trump*, 769 F.Supp.3d 405, 444 (D. Md. 2025).

## VII.   If the Court Disagrees that the Policy Cannot Survive Equal Protection Scrutiny, the Court Should Remand Plaintiffs' Remaining Claims.

In granting summary judgment to Plaintiffs, the District Court only addressed Plaintiffs' equal protection claim (Count I, App.97-100), and not Plaintiffs' due process and First Amendment claims (Counts II and III, App.100-103).  Thus, should this Court disagree that the Policy cannot survive equal protection scrutiny.  The

---

[64]    Defendants have therefore adopted its animus.  The Gender Order is "part of a constellation of close-in-time executive actions directed at transgender Americans that contained powerfully demeaning language," which "in tone and language, conveys a fundamental moral disapproval of transgender Americans." *Orr*, 778 F.Supp.3d at 417; *see also Talbott*, 775 F.Supp.3d at 331.

Court should remand these claims for consideration by the District Court in the first instance. *See Corcoran v. Levenhagen*, 558 U.S. 1, 2 (2009).

## CONCLUSION

For the foregoing reasons, Defendants' appeal should be denied in its entirety.

Dated this 7th day of November 2025.

Respectfully submitted,

*/s/ Omar Gonzalez-Pagan*

Johanna M. Emmanuelli Huertas
P.O. Box 136
Villalba, Puerto Rico 00766
Telephone: (787)342-6499
jmeh@mac.com

Omar Gonzalez-Pagan
Whit Washington
LAMBDA LEGAL DEFENSE
   AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: (212) 809-8585
Facsimile: (855) 535-2236
ogonzalez-pagan@lambdalegal.org
wwashington@lambdalegal.org

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,995 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

Dated this 7th day of November 2025.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan

No. 25-1638

# In the United States Court of Appeals for the First Circuit

ÍNARU NADIA DE LA FUENTE DÍAZ; MARU ROSA HERNÁNDEZ; ANDRÉ RODIL; YEIVY VÉLEZ BARTOLOMEI; GÉ CASTRO CRUZ; DENI JUSTE,

*Plaintiffs-Appellees*,

v.

JENNIFER A. GONZÁLEZ COLÓN, in the official capacity as Governor of the Commonwealth of Puerto Rico; DR. VÍCTOR RAMOS OTERO, in the official capacity as Secretary of the Department of Health of the Commonwealth; WANDA LLOVET DÍAZ, in the official capacity as the Director of the Division of Demographic Registry and Vital Statistics of the Commonwealth,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Puerto Rico, No. 23-cv-01544, Hon. María Antongiorgi-Jordán

## ADDENDUM TO PLAINTIFFS-APPELLEES' ANSWERING BRIEF

Johanna M. Emmanuelli Huertas
P.O. Box 136
Villalba, Puerto Rico 00766
(787)342-6499
jmeh@mac.com

Omar Gonzalez-Pagan
Whit Washington
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Fl.
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org
wwashington@lambdalegal.org

*Counsel for Plaintiffs-Appellees*

## TABLE OF CONTENTS TO THE ADDENDUM TO PLAINTIFFS-APPELLEES' ANSWERING BRIEF

**Page**

**Statutes**

31 L.P.R.A. § 7655…………………………………………………………Add. 001

    Notarized Certified Translation …………………………………….Add. 002

**Other Materials**

ASES Carta Normativa 25-0929 (Sept. 29, 2025)…………………………Add. 005

    Notarized Certified Translation …………………………………….Add. 006

Génesis Ibarra Vázquez, *Denuncian "campaña sistemática"*
*de la administración de Jennifer González contra la comunidad*
*trans, intersex y no binaria*, El Nuevo Día (Oct. 7, 2025)………………...Add. 009

    Notarized Certified Translation…………………………………….Add. 016

31 L.P.R.A. § 7655

LEYES DE PUERTO RICO ANOTADAS Currentness

TÍTULO 31. CÓDIGO CIVIL

SUBTÍTULO 7. LAS INSTITUCIONES FAMILIARES

PARTE XI. EL REGISTRO DEL ESTADO CIVIL DE LAS PERSONAS NATURALES y DE OTRAS CONSTANCIAS DEMOGRÁFICAS

CAPÍTULO 550. CORRECCIÓN, ENMIENDA y SUSTITUCIÓN DE LAS CONSTANCIAS VITALES

**§ 7655 Modificación del nombre y de sexo en el acta de nacimiento**

31 L.P.R.A. § 7655

La modificación del nombre constituye una enmienda voluntaria admisible que solo puede efectuarse en los casos y con las formalidades que la ley especial establece.

En el acta de nacimiento original no pueden autorizarse enmiendas sobre el sexo de nacimiento de una persona. El tribunal puede, mediante sentencia, autorizar al registrador a realizar una anotación al margen de la inscripción original del sexo de la persona cuando proceda una enmienda debido al cambio o modificación posterior del sexo de nacimiento. En estos casos, sin embargo, no se autorizará la sustitución del hecho histórico, vital, del sexo de nacimiento. Solo en los casos en que peritos médicos determinen la ambigüedad del hecho del sexo de origen al momento del nacimiento y ese hecho conste inscrito en las actas del Registro Demográfico, podrá la autoridad judicial ordenar la sustitución del sexo de nacimiento en su origen en las actas del Registro Demográfico.

Nada de lo aquí instituido menoscaba el proceso establecido en los casos de una solicitud para que se refleje un cambio de género en la certificación de nacimiento. Estas solicitudes se acompañarán con el pasaporte, la licencia de conducir o una certificación emitida por un profesional de la salud que tenga relación médico-paciente con el solicitante que acredite el género. En estos casos el Registro deberá expedir la certificación, salvaguardando los derechos a la privacidad.

NOTAS, REFERENCIAS, Y ANOTACIONES

-Junio 1, 2020, Núm. 55, art. 694, ef. 180 días después de Junio 1, 2020.

31 L.P.R.A. § 7655, PRS ST T. 31 § 7655

ESTA SECCION ESTA CORRIENTE PARA EL SUPLEMENTO DE 2024 (SESION DE LA ASAMBLEA LEGISLATIVA DE 2023) Y LAS LEYES 1 a 225 DE 2024

LAWS OF PUERTO RICO ANNOTATED Copyright (c) 1955-2025, by The Secretary of State of Puerto Rico and LEXISNEXIS of Puerto Rico, Inc. All rights reserved. Thomson Reuters is not providing legal advice by providing this product. The information contained herein is not a substitute for the advice of an attorney. If you require legal or other expert advice, you should seek the services of a competent attorney or other professional.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 25-1638     Document: 00118364068     Page: 78     Date Filed: 11/07/2025     Entry ID: 6763927

31 L.P.R.A. § 7655

PUERTO RICO LAWS ANNOTATED Currentness

TITLE 31. CIVIL CODE

SUBTITLE 7. FAMILY INSTITUTIONS

PART XI. REGISTRATION OF THE CIVIL STATUS OF NATURAL PERSONS AND OF OTHER DEMOGRAPHIC RECORDS.

CHAPTER 550. CORRECTION, AMENDMENT, AND SUBSTITUTION OF VITAL RECORDS

**§ 7655 Change of name and sex on birth certificate**

31 L.P.R.A. § 7655

The modification of the name constitutes an admissible voluntary amendment which may only be made in the cases and with the formalities established by special law.

No amendments to the sex at birth of a person on the original birth record may be authorized. The court may, by judgment, authorize the registrar to make an annotation in the margin of the original registration of the sex of the person when an amendment is necessary due to a subsequent change or modification of the sex at birth. In these cases, however, the substitution of the historical, vital fact of the sex at birth will not be authorized. Only in cases in which medical experts determine the ambiguity of the fact of the sex of origin at the time of birth and that fact is recorded in the records of the Demographic Registry, may the judicial authority order the substitution of the sex of birth in its origin in the records of the Demographic Registry.

Nothing herein instituted undermines the process established in cases of a request for a change of gender to be reflected in the birth certificate. These applications shall be accompanied by a passport, driver's license, or a certification issued by a health professional who has a doctor-patient relationship with the applicant attesting to the gender. In these cases, the Registry shall issue the certification, safeguarding privacy rights.

NOTES, REFERENCES, AND ANNOTATIONS

-June 1, 2020, No. 55, Sec. 694, eff. 180 days after June 1, 2020. 31

L.P.R.R.A. § 7655, PRS ST T. 31 § 7655.

THIS SECTION IS CURRENT FOR THE SUPPLEMENT OF 2024 (2023 SESSION
OF THE LEGISLATIVE ASSEMBLY) AND LAWS 1 to 225 OF 2024.

LAWS OF PUERTO RICO ANNOTATED Copyright (c) 1955-2025, by The Secretary of State of Puerto Rico and LEXISNEXIS of Puerto Rico, Inc. All rights reserved. Thomson Reuters is not providing legal advice by providing this product. The information contained herein is not a substitute for the advice of an attorney. If you require legal or other expert advice, you should seek the services of a competent attorney or other professional.



Connected Translation LLC
Reno, NV 89502 | United States of America
info@connectedtranslation.com
+1 (888)–855–2598
www.connectedtranslation.com

## TRANSLATOR'S CERTIFICATE OF ACCURACY

October 8, 2025

I, **Laura De Gante B.,** hereby certify that the attached document has been translated by Connected Translation from **Spanish** to **English**, and that this translation represents a faithful and accurate rendition of the original document.

I affirm that I possess the necessary proficiency in both the source and target languages to carry out and certify the accuracy of this translation. I further affirm that this translation has not been produced for or on behalf of a family member, friend, or business associate.

This certification pertains solely to the accuracy of the translation and does not imply any claims or guarantees regarding the authenticity or content of the original document. Connected Translation assumes no responsibility for the usage of this translation by the customer or any third party, including end-users of the translation.

*Laura De Gante B*



Authorized Translator
Connected Translation LLC
ATA #280031

Add. 003

# ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____**ORANGE**_____ .

On, October 8th, 2025 _____ before me, _____**KAREN RYAN Notary Public**_____

(Insert name and title of the officer)

personally appeared          **LAURA DE GANTE**                                    ,

who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

KAREN RYAN
Commission # 2516798
Notary Public - California
ORANGE County
My Comm. Expires MAY 7, 2029

Signature

**(Notary Public Seal)**

Add. 004



ADMINISTRACIÓN DE
SEGUROS DE SALUD

## ASES

GOBIERNO DE PUERTO RICO

**Carta Normativa 25-0929**

29 de septiembre de 2025

**A:**     **Organizaciones de Manejo de Cuidado Dirigido (MCO), Aseguradoras, Administrador del Beneficio de Farmacia, Farmacias, Grupos Médicos Primarios y Proveedores Participantes del Plan Vital**

**Asunto:**     **Reinstalación de restricción por género en los formularios de medicamentos de Plan Vital**

Con base en la Orden Ejecutiva 14168, emitida por el Gobierno Federal se revierten las iniciativas relacionadas con el género y el sexo establecidas en la Carta Normativa 21-0114 de 14 de enero de 2021. Esta Orden dispone en la sección 2 que: "Es política de los Estados Unidos reconocer dos sexos, masculino y femenino. Estos sexos son inmutables y se basan en una realidad fundamental e incontrovertible. Por su parte en la sección 3. Inciso (b) se indica que: "Cada agencia y todos los empleados federales deberán hacer cumplir las leyes que rigen los derechos, protecciones, oportunidades y adaptaciones basados en el sexo para proteger a hombres y mujeres como sexos biológicamente distintos. Por lo tanto, cada agencia deberá otorgar a los términos "sexo", "masculino", "femenino", "hombres", "mujeres", "niños" y "niñas" los significados establecidos en la sección 2 de esta orden al interpretar o aplicar estatutos, reglamentos o directrices, y en todas las demás actividades, documentos y comunicaciones oficiales de la agencia."

En consecuencia, a partir del 6 de octubre de 2025, se reinstauran las restricciones sobre el uso de medicamentos utilizados en tratamientos de reafirmación de género, aplicables a toda la población, sin distinción de edad. Esto significa que los pacientes solo podrán acceder a dichos medicamentos de acuerdo con las indicaciones autorizadas y conforme al sexo asignado al nacer.

| Nombre del medicamento al que se le reinstala édito de género | |
|---|---|
| FLUTAMIDE CAP 125 mg | MEDROXYPROGESTERONE ACETATE TAB 2.5 mg, 5mg, 10 mg |
| FINASTERIDE TAB 5 mg | TERCONAZOLE VAGINAL CREAM 0.4%, 0.8 % |
| ESTRADIOL TAB 0.5 mg, 1mg, 2 mg | METRONIDAZOLE VAGINAL GEL 0.75% |
| NORETHINDRONE & ETHINYL ESTRADIOL TAB 1mg- 35 mcg | ESTRADIOL VAGINAL TAB 10 mcg |
| NORGESTREL & ETHINYL ESTRADIOL TAB 0.3 mg- 30 mcg | CLINDAMYCIN PHOSPHATE VAGINAL CREAM 2% |
| ESTRADIOL & NORETHINDRONE ACETATE TAB 1-0.5 mg | TESTOSTERONA CYPIONATE 100 mg/ml ,200 mg/ml IM SOLN |

Agradecemos su colaboración en ayudar a diseminar este asunto.

Cordialmente,

Lcdo. Carlos A. Santiago Rosario, JD, LL.M. (Health Law), MHSA, FACHE, CHC
Director Ejecutivo

Add. 005

# D&T Translations – Professional Translation Agency

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

**Tel** +1 (973)-241-3614

911 Memorial Drive,
Belleville, NJ, 07109
*(By appointment only, email for more details)*

www.dttranslations.com
support@dttranslations.com



[Official coat of arms of the Commonwealth of Puerto Rico]

**HEALTH INSURANCE ADMINISTRATION (ASES)**

GOVERNMENT OF PUERTO RICO

## Regulatory Letter 25-0929

**September 29, 2025**

**To:**
Managed Care Organizations (MCOs), Insurers, Pharmacy Benefit Administrators, Pharmacies, Primary Medical Groups, and Participating Providers of the Plan Vital

**Subject:**
Reinstatement of Gender-Based Restrictions in the Medication Forms of Plan Vital

Based on Executive Order 14168, issued by the Federal Government, the initiatives related to gender and sex established in Regulatory Letter 21-0114 of January 14, 2021, are hereby reversed. This Order provides in section 2 that: "*It is the policy of the United States to recognize two sexes, male and female. These sexes are immutable and are based on a fundamental and incontrovertible reality.*" Furthermore, section 3, subsection (b), states: "*Each agency and all federal employees shall enforce the laws governing rights, protections, opportunities, and accommodations based on sex in order to protect men and women as biologically distinct sexes. Therefore, each agency shall assign to the terms 'sex,' 'male,' 'female,' 'men,' 'women,' 'boys,' and 'girls' the meanings established in section 2 of this order when interpreting or applying statutes, regulations, or directives, and in all other activities, documents, and official communications of the agency.*"

Accordingly, as of October 6, 2025, the restrictions on the use of medications utilized in gender-affirming treatments will be reinstated, applicable to the entire population, without distinction of age. This means that patients will only be able to access such medications in accordance with authorized indications and based on the sex assigned at birth.

| Name of the medication for which the gender restriction is reinstated ||
|---|---|
| Flutamide capsules 125 mg | Medroxyprogesterone Acetate tablets 2.5 mg, 5 mg, 10 mg |
| Finasteride tablets 5 mg | Terconazole vaginal cream 0.4%, 0.8% |
| Estradiol tablets 0.5 mg, 1 mg, 2 mg | Metronidazole vaginal gel 0.75% |
| Norethindrone and Ethinyl Estradiol tablets 1 mg – 35 mcg | Estradiol vaginal tablets 10 mcg |
| Norgestrel and Ethinyl Estradiol tablets 0.3 mg – 30 mcg | Clindamycin Phosphate vaginal cream 2% |
| Estradiol and Norethindrone Acetate tablets 1–0.5 mg | Testosterone Cypionate 100 mg/ml, 200 mg/ml intramuscular solution |

## D&T Translations – Professional Translation Agency

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

**Tel** +1 (973)-241-3614 | 911 Memorial Drive, Belleville, NJ, 07109 (By appointment only, email for more details) | www.dttranslations.com support@dttranslations.com



We appreciate your cooperation in helping to disseminate this matter.

Sincerely,

[Signature]

**Carlos A. Santiago Rosario, JD, LL.M. (Health Law), MHSA, FACHE, CHC**
Executive Director

**D&T Translations** – Professional Translation Agency

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

**Tel** +1 (973)-241-3614          911 Memorial Drive,          www.dttranslations.com
                                   Belleville, NJ, 07109          support@dttranslations.com
                                   (By appointment only, email for more details)



# Certification of Translation Accuracy

I, Eduardo Cherñajovsky, a contract translator at D&T Translations, certify that I am competent and fluent to translate from Spanish into English, and that the attached translation of a document entitled "Regulatory Letter" is complete and accurate. This translation was not performed by a family member, friend, or business associate.

Date: November 1, 2025          Signature: *Eduardo Ch*

I, Doniyor Askarov, a project manager at D&T Translations, hereby certify that the above-named translator is a verified specialist with appropriate qualifications to provide professional translations.

D&T Translations does not vouch for the authenticity of the aforementioned copy(ies) of the document(s) or statements contained therein. D&T Translations, including its translators and project managers, are not liable for any actions/losses taken by the holder of this translation.

Date: 11/05/2025

Signature:

*Doniyor Askarov*

Project manager, Doniyor Askarov,
D&T Translations
Phone: +1 (973)-241-3614
Email: support@dttranslations.com
Mailing address: 1110 Hamilton Street, Belleville,
NJ, 07109, USA. (By appointment only, please email for more details)

State of New Jersey.

County of Passaic.

Signed (or attested) before me using two-way audio and video on (date) 11/05/2025 by

Doniyor Askarov

(Name(s) of individual(s))

*Gabrielle Georges*

Signature of notarial officer

Notarized online using audio-video communication

Gabrielle Georges
Electronic Notary Public
State of New Jersey
Commission #: 50217433
Commission Expires: 01/04/2029

Add. 008



**Noticias** ▸ **Locales** | Gobierno    Legislatura    Política        Más ⌄    ➕ Suscriptores

 **NOTICIA**

# Denuncian "campaña sistemática" de la administración de Jenniffer González contra la comunidad trans, intersex y no binaria

Entre los reclamos, la Federación LGBTQ+ exigió la revocación de una orden de la ASES que eliminó la cubierta médica de tratamientos hormonales para este sector de la población en el Plan Vital

7 de octubre de 2025 - 3:54 PM
↳ Actualizado el 7 de octubre de 2025 - 4:31 PM

◄ COMPARTIR    💬 7

Se adhiere a los criterios de  **The Trust Project**

Add. 009



Integrantes de la Federación LGBTQ+ de Puerto Rico reclamaron un cese a lo que entienden es una "campaña sistemática" de parte del gobierno contra las personas trans, intersex y no binarias. (Xavier Araújo)



**Por Génesis Ibarra Vázquez**
Periodista de Noticias
genesis.ibarra@gfrmedia.com

La **Federación LGBTQ+ de Puerto Rico** denunció este martes una "campaña sistemática" de parte de la administración de **Jenniffer González** contra las personas trans, intersex y no binarias, al tiempo que exigió la revocación de una nueva carta normativa de la **Administración de Seguros de Salud** (ASES) que eliminó la cubierta médica de tratamientos hormonales para este sector de la población en el **Plan Vital** del gobierno.

**RELACIONADAS**

**NOTICIAS**

"Esto no es solo una cuestión política, **sino un ataque directo al bienestar y la supervivencia de la comunidad**

Add. 010

Federación LGBTQ+ impugnará en los tribunales ley que prohíbe tratamientos de afirmación de género en menores
*Por Génesis Ibarra Vázquez*

**NOTICIAS**
➕ A 10 años del matrimonio igualitario en Puerto Rico: la histórica lucha y las nuevas amenazas contra la comunidad LGBTQ+
*Por Génesis Ibarra Vázquez*

**NOTICIAS**
➕ "Aquí estamos": Iglesias de Puertas Abiertas reafirman su defensa de la comunidad LGBTQ+
*Por Génesis Ibarra Vázquez*

trans y no binaria", expresó la trabajadora social **Shakira González Hernández**, en conferencia de prensa, en el **Colegio de Abogados y Abogadas de Puerto Rico**.

"Como gobierno, tiene el deber fiduciario de proteger a todos los ciudadanos sin discriminación. Pero esta acción (de la ASES) demuestra un abandono explícito de las personas más vulnerables. **El mensaje que envían es devastador: nuestras vidas no importan"**, añadió la mujer de experiencia trans. "Estoy harta de que nos traten como un debate político en lugar de seres humanos con derechos, harta de que se cuestionen tratamientos que salvan vidas, harta de que nuestra existencia sea constantemente puesta en tela de juicio. No estamos pidiendo privilegio ninguno, sino exigiendo el derecho fundamental a vivir con dignidad".

La **Carta Normativa 25-0929**, emitida el 29 de septiembre por el licenciado **Carlos Santiago Rosario**, director ejecutivo de la ASES, entró en vigor el 6 de octubre. Según el documento, esta acción responde, a su vez, a la **orden ejecutiva** del presidente **Donald Trump** que dispone: "Es política de Estados Unidos reconocer dos sexos, masculino y femenino". **"Esto significa que los pacientes solo podrán acceder a dichos medicamentos (de afirmación de género) de acuerdo con las indicaciones autorizadas y conforme al sexo asignado al nacer"**, establece la ASES en la carta.

Add. 011



A la derecha, Pedro Julio Serrano, presidente de la Federación LGBTQ+. (Xavier Araújo)

"Los tratamientos hormonales salvan vidas. Son autorizados por profesionales de la salud y avalados por todas las asociaciones médicas nacionales e internacionales. **Exigimos que el gobierno revierta esta orden, que literalmente nos está quitando opciones de vida. Nos quieren llevar al clandestinaje, a privarnos de nuestra salud, a la precariedad. No lo vamos a permitir**. Próximamente, llevaremos a cabo acciones comunitarias para revertir esta orden", expresó, por su parte, la activista **Ivana Fred Millán**, directora de la Federación LGBTQ+.

La Federación LGBTQ+ –compuesta por más de 100 organizaciones– enumeró otras instancias en las que el gobierno ha "declarado la guerra" a las comunidades trans, intersex y no binaria, entre ellas, la presunta legalización del discrimen por libertad religiosa –a través de la **Ley 14-2025**–, la **prohibición** de tratamientos de afirmación de género en menores de 21 años, la **apelación del Departamento de Justicia** a la decisión federal que permite corregir el

Add. 012

encasillado de sexo en los certificados de nacimiento de las personas no binarias y el ataque contra los **baños inclusivos**, entre otras.

**"Desde que comenzó este gobierno, ha habido un ataque sistemático en contra de las comunidades trans, intersex y no binaria. Es un ataque que ha sido concertado para tratar de deshumanizar, desproteger e invisibilizar a la comunidad trans, intersex y no binaria"**, comentó **Pedro Julio Serrano**, presidente de la Federación LGBTQ+, al criticar también las acciones de la Legislatura, dominada por el **Partido Nuevo Progresista**, y con el apoyo de **Proyecto Dignidad** y algunos miembros del **Partido Popular Democrático**.

**"En la administración de la gobernadora Jenniffer González, se respetan los derechos de todas personas y la integridad del ser humano. En el gobierno, no se le niega a nadie los servicios por su religión o identidad de género**. Cualquier persona que acuda a cualquier sala de emergencia está protegida por leyes y tiene el derecho de ser atendido; así como para recibir los servicios del gobierno", dijo el secretario de Asuntos Públicos, **Hiram Torres Montalvo**, en respuesta a una solicitud de reacción a la gobernadora.

**El Nuevo Día** también solicitó una reacción al director ejecutivo de la ASES y los presidentes legislativos, **Thomas Rivera Schatz** y **Carlos "Johnny" Méndez**, pero no obtuvo respuesta.

La organización líder de la comunidad LGBTQ+ anticipó que evalúan acudir a los tribunales para impugnar algunos de los decretos del gobierno, entre ellos, la **Ley 63 de 2025**, que prohíbe los tratamientos de afirmación de género en menores de edad.

**"En este momento, lo que hay son oídos sordos, crueldad y manipulación política. Si no nos van a escuchar en la Asamblea Legislativa, nosotros vamos a ir a los tribunales**. Es en los tribunales donde la justicia se ha hecho en Puerto Rico, y una y otra vez se ha dejado atrás el discrimen que el gobierno ha

Add. 013

querido intentar. El gobierno de Puerto Rico negó el matrimonio igualitario a los puertorriqueños y fue el tribunal de Puerto Rico y el Tribunal Supremo de Estados Unidos (los que lo aprobaron); negó que familias pudieran adoptar, parejas del mismo sexo, y fue por el tribunal que se logró. El gobierno de Puerto Rico negó los certificados de nacimiento para las personas trans y fue en los tribunales que personas como Ivana Fred y la comunidad trans lo lograron", repasó **Samy Nemir Olivares**, miembro del Consejo Asesor de la Federación LGBTQ+.



La Federación LGBTQ+ está compuesta por más de 100 organizaciones. (Xavier Araújo)

## Piden investigación

Serrano aprovechó el encuentro con los medios para solicitar a las autoridades una investigación responsable de los asesinatos de cinco hombres –tres en **Carolina** y dos en **Santurce**– en la madrugada del martes.

Add. 014

Según la Policía, los cuerpos en ambas escenas fueron encontrados desnudos. Al momento, se desconoce la identidad de las víctimas.

"En la historia de nuestra comunidad, hemos visto cuando asesinan a personas de nuestra comunidad LGBTQ+, en muchas ocasiones estas son las circunstancias en que aparecen nuestros cuerpos, así que **le pedimos a la Policía y las autoridades que investiguen a la saciedad y no descarten ningún ángulo en esta investigación que apenas comienza** y que no tenemos muchos detalles", exhortó.

TAGS

\# COMUNIDAD LGBTQ+   \# COMUNIDAD TRANSGÉNERO   \# JENNIFFER GONZÁLEZ
\# PEDRO JULIO SERRANO   \# ASES

ACERCA DEL AUTOR



GÉNESIS IBARRA VÁZQUEZ →

genesis.ibarra@gfrmedia.com

Génesis Ibarra Vázquez es periodista graduada en Comunicaciones de la Universidad Interamericana de Puerto Rico, con experiencia en periodismo digital, radio y prensa escrita.

Realizó su transición del mundo académico al… Leer más

VER 7 COMENTARIOS

Add. 015

**D&T Translations** – Professional Translation Agency

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

**Tel** +1 (973)-241-3614 | 911 Memorial Drive, Belleville, NJ, 07109 *(By appointment only, email for more details)* | www.dttranslations.com  support@dttranslations.com



# They Denounce a "Systematic Campaign" by the Administration of Jenniffer González Against the Trans, Intersex, and Non-Binary Community

Among the grievances, the LGBTQ+ Federation demanded the repeal of an order issued by ASES that eliminated medical coverage for hormone treatments for this sector of the population under the Plan Vital.

*October 7, 2025 – 3:54 PM*
*Updated on October 7, 2025 – 4:31 PM*



Members of the LGBTQ+ Federation of Puerto Rico called for an end to what they consider a "systematic campaign" by the government against trans, intersex, and non-binary people. (Xavier Araújo)



**D&T Translations** – **Professional Translation Agency**

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

**Tel** +1 (973)-241-3614 | 911 Memorial Drive, Belleville, NJ, 07109 *(By appointment only, email for more details)* | www.dttranslations.com support@dttranslations.com



By Génesis Ibarra Vázquez

News Journalist
genesis.ibarra@gfrmedia.com

The **LGBTQ+ Federation of Puerto Rico** denounced on Tuesday what it described as a "systematic campaign" by the administration of **Jenniffer González** against trans, intersex, and non-binary people, while also demanding the repeal of a new regulatory letter from the **Health Insurance Administration (ASES)** that eliminated medical coverage for hormone treatments for this sector of the population under the government's **Plan Vital**.

"This is not just a political issue, **but a direct attack on the well-being and survival of the trans, intersex, and non-binary community,**" said social worker **Shakira González Hernández** during a press conference at the **Puerto Rico Bar Association**.

"As a government, it has a fiduciary duty to protect all citizens without discrimination. But this action by ASES shows an explicit abandonment of the most vulnerable people. **The message they are sending is devastating: our lives do not matter,**" said the woman of trans experience. "I'm tired of being treated as part of a political debate instead of as human beings with rights; tired of seeing life-saving treatments questioned; tired of our very existence being constantly called into question. We are not asking for any special privilege, but demanding the fundamental right to live with dignity."

**Regulatory Letter 25-0929**, issued on September 29 by attorney **Carlos Santiago Rosario**, Executive Director of ASES, took effect on October 6. According to the document, this action in turn responds to an **executive order by President Donald Trump**, which states: "It is the policy of the United States to recognize two sexes, male and female." **"This means that patients will only be able to access such medications (gender-affirming treatments) in accordance with authorized indications and based on the sex assigned at birth,"** ASES states in the letter.



## D&T Translations – Professional Translation Agency

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

**Tel** +1 (973)-241-3614    911 Memorial Drive,    www.dttranslations.com
Belleville, NJ, 07109    support@dttranslations.com
(By appointment only, email for more details)



On the right, Pedro Julio Serrano, president of the LGBTQ+ Federation. (Xavier Araújo)

"Hormone treatments save lives. They are prescribed by health professionals and endorsed by all national and international medical associations. **We demand that the government overturn this order, which is taking away our life-saving options. They want to drive us underground, deprive us of our health, push us into precariousness. We will not allow it.** Soon, we will conduct community actions to overturn this order," stated activist **Ivana Fred Millán**, director of the LGBTQ+ Federation**.**

The LGBTQ+ Federation (made up of more than 100 organizations) listed other instances in which the government has "declared war" on trans, intersex, and non-binary communities. Among them are the alleged legalization of discrimination under the guise of religious freedom (through **Law 14-2025**), the **prohibition o**f gender-affirming treatments for people under 21, the **Department of Justice's appeal** of the federal decision allowing the correction of the sex designation on birth certificates for non-binary people, and the attack against **inclusive bathrooms**, among others.

**"Since this administration began, there has been a systematic attack against trans, intersex, and non-binary communities. It has been a coordinated effort to dehumanize, deprive of protection, and erase the trans, intersex, and non-binary community,"** said **Pedro Julio Serrano**, president of the LGBTQ+ Federation, who also criticized the actions of the Legislature, dominated by the **New Progressive Party**, with the support of **Project Dignity** and some members of the **Popular Democratic Party**.



**D&T Translations** – **Professional Translation Agency**

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

**Tel** +1 (973)-241-3614     911 Memorial Drive,     www.dttranslations.com
                             Belleville, NJ, 07109     support@dttranslations.com
                             (By appointment only, email for more details)

---

**"In Governor Jenniffer González's administration, the rights of all people and the integrity of the human being are respected. In this government, no one is denied services because of their religion or gender identity.** Any person who goes to an emergency room is protected by law and has the right to be treated, as well as to receive government services," said the Secretary of Public Affairs, **Hiram Torres Montalvo**, in response to a request for comment to the governor.

**El Nuevo Día** also requested a response from the Executive Director of ASES and the legislative presidents, **Thomas Rivera Schatz** and **Carlos "Johnny" Méndez**, but received no reply.

The leading organization representing the LGBTQ+ community indicated that it is considering taking legal action to challenge some of the government's decrees, including **Law 63 of 2025**, which prohibits gender-affirming treatments for minors.

**"At this moment, what we are facing is deaf ears, cruelty, and political manipulation. If they will not listen to us in the Legislative Assembly, we will go to the courts.** It is in the courts where justice has been achieved in Puerto Rico, time and again overcoming the discrimination that the government has tried to impose. The Puerto Rican government denied marriage equality to Puerto Ricans, and it was the Puerto Rico court and the United States Supreme Court that approved it; it denied families the right to adopt, same-sex couples, and it was through the courts that this right was won. The Puerto Rican government denied birth certificates to trans people, and it was through the courts that individuals such as Ivana Fred and the trans community achieved that recognition," explained **Samy Nemir Olivares**, member of the Advisory Council of the LGBTQ+ Federation.



The LGBTQ+ Federation is made up of more than 100 organisations. (Xavier Araújo)



**D&T Translations** – **Professional Translation Agency**

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

**Tel** +1 (973)-241-3614    911 Memorial Drive,    www.dttranslations.com
Belleville, NJ, 07109    support@dttranslations.com
(By appointment only, email for more details)

## They Call for an Investigation

Serrano used the meeting with the media to call on the authorities to conduct a thorough investigation into the murders of five men (three in **Carolina** and two in **Santurce**) in the early hours of Tuesday.

According to the Police, the bodies at both scenes were found naked. At this time, the identities of the victims remain unknown.

"In the history of our community, we have seen people from our LGBTQ+ community murdered, and many times these are the same circumstances in which our bodies are found. That is why **we are asking the Police and the authorities to conduct a thorough investigation and not rule out any angle in this case, which is just beginning** and about which we still have very few details," he urged.

---

## ABOUT THE AUTHOR



**Génesis Ibarra Vázquez**
genesis.ibarra@gfrmedia.com

Génesis Ibarra Vázquez is a journalist with a degree in Communications from the Interamerican University of Puerto Rico, with experience in digital journalism, radio, and print media.

## D&T Translations – Professional Translation Agency

*(D&T Translations is a trade name of Global Hand Consulting LLC)*

**Tel** +1 (973)-241-3614

911 Memorial Drive,
Belleville, NJ, 07109
(By appointment only, email for more details)

www.dttranslations.com
support@dttranslations.com



# Certification of Translation Accuracy

I, Eduardo Chernãjovsky, a contract translator at D&T Translations, certify that I am competent and fluent to translate from Spanish into English, and that the attached translation of a document entitled "News Article" is complete and accurate. This translation was not performed by a family member, friend, or business associate.

Date: November 1, 2025                Signature: *Eduardo Ch*

I, Doniyor Askarov, a project manager at D&T Translations, hereby certify that the above-named translator is a verified specialist with appropriate qualifications to provide professional translations.

D&T Translations does not vouch for the authenticity of the aforementioned copy(ies) of the document(s) or statements contained therein. D&T Translations, including its translators and project managers, are not liable for any actions/losses taken by the holder of this translation.

Date: 11/05/2025

Signature:

*Doniyor Askarov*

Project manager, Doniyor Askarov,
D&T Translations
Phone: +1 (973)-241-3614
Email: support@dttranslations.com
Mailing address: 1110 Hamilton Street, Belleville,
NJ, 07109, USA. (By appointment only, please email for more details)

State of <u>New Jersey.</u>

County of <u>Passaic.</u>

Signed (or attested) before me using two-way audio and video on (date) <u>11/05/2025</u>  by

<u>Doniyor Askarov</u>.

(Name(s) of individual(s))

*Gabrielle Georges*
Signature of notarial officer

Notarized online using audio-video communication

Gabrielle Georges
Electronic Notary Public
State of New Jersey
Commission #: 50217433
Commission Expires: 01/04/2029

