# United States Court of Appeals
*for the*
# First Circuit

---

Case No. 25-1638

ÍNARU NADIA DE LA FUENTE DÍAZ, MARU ROSA HERNÁNDEZ, ANDRÉ RODIL, YEIVY VÉLEZ BARTOLOMEI, GÉ CASTRO CRUZ, DENI JUSTE,

*Plaintiffs-Appellees,*

v.

JENNIFER A. GONZÁLEZ COLÓN, in the official capacity as Governor of the Commonwealth of Puerto Rico, DR. VÍCTOR RAMOS OTERO, in the official capacity as Secretary of the Department of Health of the Commonwealth, WANDA LLOVET DÍAZ, in the official capacity as the Director of the Division of Demographic Registry and Vital Statistics of the Commonwealth,

*Defendants-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO, SAN JUAN, IN CASE NO. 23-CV-01544, HON. MARÍA ANTONGIORGI-JORDÁN

## AMICUS BRIEF OF ADVOCATES FOR TRANS EQUALITY EDUCATION FUND, FAMILY DIVERSITY PROJECTS, MAINETRANSNET, MASSACHUSETTS TRANSGENDER POLITICAL COALITION, AND 603 EQUALITY IN SUPPORT OF PLANTIFFS-APPELLEES AND AFFIRMANCE

SERAN GEE
ADVOCATES FOR TRANS
EQUALITY EDUCATION FUND
1800 R Street Northwest, C4
Washington, D.C. 20009
(646) 862-9396
sgee@transequality.org

*Counsel for Amici Curiae*



# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ iii

CORPORATE DISCLOSURE STATEMENT ................................... viii

STATEMENT OF INTEREST ........................................................ 1

SUMMARY OF ARGUMENT ........................................................ 3

ARGUMENT ............................................................................. 4

A.      What does it mean to be nonbinary? ................................... 5

B.      Nonbinary people frequently experience discrimination. ............ 10

    i.      *There is a long history of discrimination against nonbinary people in this country.* ........................................................ 10

    ii.     *Nonbinary people continue to experience discrimination across a wide range of contexts.* ...................................................... 12

    iii.    *Nonbinary people face discrimination in health care.* .......... 13

    iv.     *Nonbinary people face employment discrimination.* .............. 14

    v.      *Nonbinary people experience housing discrimination.* .......... 15

    vi.     *Nonbinary people face discrimination in schools.* ................. 16

    vii.    *Identification document policies often discriminate against nonbinary people.* ........................................................ 17

C.      Discrimination against nonbinary people necessarily involves sex discrimination. ............................................................. 19

    i.      *It is impossible to discriminate against nonbinary people without referencing sex.* ......................................................... 22

    ii.     *It is impossible to discriminate based on nonbinary status without relying on impermissible sex stereotypes.* ............................. 23

CONCLUSION ........................................................................ 27

CERTIFICATE OF COMPLIANCE .................................................. 28

CERTIFICATE OF SERVICE ........................................................ 29

TABLE OF AUTHORITIES

**Cases**

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2019)........................................................... 19, 20, 21, 22, 23, 24

*Craig v. Boren*,
  429 U.S. 190 (1976)....................................................................... 5, 21

*de la Fuente Díaz v. González Colón*,
  786 F.Supp.3d 453 (D.P.R. 2025) ...........................................................4

*Glenn v. Brumby*,
  663 F.3d 1312 (11th Cir. 2011) ...........................................................25

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ................... 5, 17, 25

*Higgins v. New Balance Athletic Shoe, Inc.*,
  194 F.3d 252 (1st Cir. 1999) ...........................................................25

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989)...........................................................24

*Smith v. City of Salem*,
  378 F.3d 566 (6th Cir. 2004)...........................................................25

*United States v. Skrmetti*,
  605 U.S. 495 (2025) ................................................................... 10, 21

*United States v. Virginia*,
  518 U.S. 515 (1996)................................................................... 23, 24

*Wood v. Fla. Dep't of Educ.*,
  729 F. Supp. 3d 1255 (N.D. Fla. 2024), *vacated and remanded*,
  142 F.4th 1286 (11th Cir. 2025).........................................................26

*Wood v. Fla. Dep't of Educ.*,
  730 F.Supp.3d 1232 (N.D. Fla. 2024)................................................... 26, 27

**Statutes & Regulations**

Ala. Code § 22-9A-19(d) ...................................................................18

Cal. Health & Safety Code § 103425(e) ...........................................17

Colo. Rev. Stat. § 25-2-113.8 ...........................................................17

Mass. Gen. Laws ch. 46, § 13 ...........................................................17

Mass. Gen. Laws ch. 90, § 8N ...........................................................18

N.D. Cent. Code § 23-02.1-13(7) ......................................................17

Okla. Stat. tit. 63, § 1-311(G) ............................................................17

W. Va. Code § 16-5-10(n) (2024).......................................................17

**Other Authorities**

A. Russell, *Bostock v. Clayton County: The Implications of Binary Bias*, 106 Cornell L. Rev. 1601 (2021) ...................................... 14, 22

Alexandra R. Johnson, *Curious Continuity: How Bostock Preserves Sex-Stereotyping Doctrine*, 23 Dukeminier Awards J. 235 (2024)..........................26

Am. Psychological Ass'n*, Report on the APA Task Force on Gender Identity and Gender Variance* (2009) ................................................................5

Andrew Gilden, *Preserving the Seeds of Gender Fluidity: Tribal Courts and the Berdache Tradition*, 13 Mich. J. Gender & L. 237 (2007) ........................11

Ankit Rastogi, et al., *Health and wellbeing: A report of the 2022 U.S. Transgender Survey*, Advocates for Trans Equality (2025)..............................13

Ann Haas, et al., *Suicide Attempts Among Transgender and Gender Non-Conforming Adults*, American Foundation for Suicide Prevention & Williams Institute (2014) https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-GNC-Suicide-Attempts-Jan-2014.pdf ........................12

Ann McGinley, et al., *Feminist Perspectives on Bostock v. Clayton County*, 53(1) Connecticut L. Rev. 1 (2020) ..................................................................24

Annie Schuver, *Scrutinizing the Bathroom Binary: Equal Protection Theories for Nonbinary Students*, 122 Mich. L. Rev. 1519 (2024)...................26

Brief for Elliot Page, et al. as *Amici Curiae*, *United States v. Skrmetti*, 605 U.S. 495 (2025)...........................................................................9

Brief of The Am. Psych. Ass'n, et al. as *Amici Curiae*, *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2019) ...............................................................5

Clare Sears, *Arresting Dress* (2015).........................................................12

Elizabeth M. Inman, et al*., Reports of Negative Interactions with Healthcare Providers among Transgender, Nonbinary, and Gender-Expansive People assigned Female at Birth in the United States: Results from an Online, Cross-Sectional Survey*, 20 Int. J. Environ. Res. Public Health 1 (2023) ......................................................................................13

Fed. R. App. P. 26.1...........................................................................viii

Fed. R. App. P. 29.................................................................................1

Gilbert Herdt, *Third Sex, Third Gender: Beyond Sexual Dimorphism in Culture and History* (2020)...............................................................8

interACT, *What is Intersex?,* https://interactadvocates.org/faq/#definition (last accessed: Nov. 4, 2025) ...........................................................7

James Lykens, et al*., Healthcare Experiences Among Young Adults Who Identify as Genderqueer or Nonbinary*, 5 LGBT Health 191 (2018)...............13

Jessica Clarke, *They, Them, and Theirs*, 132 Harv. L. Rev. 894 (2019)...............6, 8

Jody Herman & Andrew Flores, *How Many Adults and Youth Identify as Transgender in the United States?* The Williams Institute, UCLA School of Law (August 2025) ........................................................................6

John Yang & Ellen Stolzenberg, *Discrimination, Harassment, and Bias in Higher Education: Disaggregating the Experiences of LGBTQ+ Students*, 2025 New Directions for Higher Education 37 (2025).....................16

Kathryn Wichelns, *From "The Scarlet Letter" to Stonewall: Reading the 1629 Thomas(ine) Hall Case, 1978–2009*, 12 Early Am. Studies 500 (2014).........................................................................................8

v

Kim Barrett, *Languages Adapt to the Nonbinary*, 27 Gay & Lesbian Rev.
　　Worldwide 27 (2020) ........................................................................8

Laura Snapes, *Sam Smith on being non-binary: "I'm changing my pronouns
　　to they/them"*, The Guardian (Sept. 13, 2019)
　　https://www.theguardian.com/music/2019/sep/13/sam-smith-on-being-
　　non-binary-im-changing-my-pronouns-to-theythem .........................................7

Maayan Sudai, *The Medico-Legalization of Sex in the Nineteenth-Century
　　United States*, 41(4) Law and History Review 745 (2023) ..............................12

Marc Stein, *Law and Politics* in *The Routledge History of Queer America
　　Routledge* (2018) ...............................................................................12

Meredith Severtson, *Let's Talk About Gender: Nonbinary Title VII Plaintiffs
　　Post-Bostock*, 74 Vanderbilt L. Rev. 1507 (2021) ...........................................24

National Academies of Sciences, et al., *Measuring Sex, Gender Identity, and
　　Sexual Orientation*, National Academies Press (US) (March 9, 2022)
　　https://www.ncbi.nlm.nih.gov/books/NBK581039/ ..........................................6

National Association for the Deaf, *FAQ*, https://www.nad.org/about-us/faq/
　　(last accessed: Nov. 4, 2025) ....................................................................6

North Dakota Dep't of Transportation, Driver's License Gender Designation
　　Form SFN 61146 (2-2022), https://www.dot.nd.gov/forms/sfn61146.pdf ........18

Rachel Slepoi, *Bostock's Inclusive Queer Frame*, 107 Va. L. Rev. Online 67
　　(2021) ...............................................................................................24

Sandy James, et al., *The Report of the 2015 U.S. Transgender Survey,
　　National Center for Transgender Equality* (2015) ....... 12, 14, 15, 16, 17, 18, 19

Sarah Hunt, *An Introduction to the Health of Two-Spirit People: Historical,
　　Contemporary and Emergent Issues*, Nat'l Collaborating Ctr. for
　　Indigenous Health (2016), https://www.ccnsa-
　　nccah.ca/docs/emerging/RPT-HealthTwoSpirit-Hunt-EN.pdf .....................8, 11

Serena Nanda, *Hijras: An Alternative Sex and Gender Role in India*, In
　　*Third Sex Third Gender* (2020) .................................................................8

Skylar Davidson, *Gender Inequality: Nonbinary Transgender People in the
　　Workplace*, 2 Cogent Soc. Sci. 1 (2016) ......................................................14

Surya Monro, *Non-binary and Genderqueer: An Overview of the Field*, 20
   Int. J. of Transgenderism 126 (2019)..................................................................6

Susan Stryker, *Transgender History* (2008) ...........................................................12

*Trans and Gender Non-Conforming Homelessness*, National Alliance to End
   Homelessness (July 13, 2020) https://endhomelessness.org/trans-and-
   gender-non-conforming-homelessness/...................................................... 15, 16

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *Amici Curiae* hereby certify that they have no parent corporation and that no publicly held corporation owns 10% or more of its stock.

## STATEMENT OF INTEREST[1]

Below *amici curiae* are organizations that serve nonbinary and transgender community members who would be directly impacted by a reversal of the district court's decision.

**Advocates for Trans Equality Education Fund** (A4TE) is a non-profit organization seeking to end discrimination against transgender people. A4TE's work includes a wide range of topics, including fighting for access to accurate identity documents.

**Family Diversity Projects** is a non-profit devoted to eliminating prejudice, stereotyping, bullying, and harassment of people who are discriminated against for their identities. It tells the stories of real people presented in traveling photo-text exhibits — touring communities nationwide in schools, colleges, houses of worship, libraries, workplaces, museums, conferences, and community gatherings.

**MaineTransNet** is a community-based organization that supports and empowers transgender people to create a world where they can thrive. It provides peer-to-peer support groups, social and community events, advocacy for the

---

[1] *Amici* hereby certify that no party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person—other than amici, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29 (a)(4)(E). The parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

transgender community across Maine, and training for medical, mental health, and social service providers.

**Massachusetts Transgender Political Coalition** is the oldest active transgender advocacy organization in the United States. It works to advance lived equity for transgender and nonbinary people in Massachusetts, not just equality under the law. It educates the public, advocates at state, local, and systemic levels; and through collective action it mobilizes community, engages in capacity building, and advances community wellness and prosperity.

**603 Equality** is a community driven, statewide organization that works to promote the well-being of LGBTQIA+ people in New Hampshire by advocating for inclusive legislation and policy change through direct advocacy, community empowerment, education, and coalition-building.

### SUMMARY OF ARGUMENT

The Commonwealth's Birth Certificate Policy ("the Policy")

unconstitutionally excludes nonbinary people from recognition by offering only

"male" or "female" gender markers. This exclusion violates the Equal Protection

Clause because it discriminates based on sex, which requires heightened judicial

scrutiny.

Nonbinary people are transgender people who either identify as neither male

nor female or as a combination of the two. Like other transgender people (i.e.,

transgender men and transgender women), they seek alignment between their

identity documents and their gender identity.

Nonbinary people face pervasive discrimination in nearly every aspect of

life, including employment, housing, education, health care, and access to accurate

identification. This discrimination underscores the need for robust legal protection.

Discrimination against nonbinary people necessarily constitutes sex

discrimination for at least two reasons. First, it is impossible to discriminate

against nonbinary people without reference to sex. Second, it is impossible to

discriminate against nonbinary people without relying on impermissible

stereotypes about sex.

The Equal Protection Clause prohibits laws like the Policy that deny

recognition to nonbinary people based on sex. The district court correctly found

3

that the Policy lacks any legitimate justification, let alone sufficient justification to withstand heightened scrutiny. This Court should affirm.

**ARGUMENT**

In the court below, six nonbinary plaintiffs born in Puerto Rico challenged the Policy, which allows transgender people to amend their gender marker to male or female but provides no option for those who are neither male nor female.[2] The plaintiffs argued that this exclusion violates the Equal Protection Clause.[3]

Although the court was persuaded by the argument that heightened scrutiny should apply to discrimination against nonbinary people, it applied rational basis review because the Policy could not survive even that deferential standard.[4] Applying rational basis review, the court found no legitimate justification for treating nonbinary people differently from binary transgender people.[5] Accordingly, the court ruled that the Policy violated the Equal Protection Clause.[6]

As this Court considers whether to uphold the district court's decision, *amici*, organizations that advocate for members of the lesbian, gay, bisexual, transgender, and queer ("LGBTQ") communities, seek to provide their expertise on sex and gender identity to explain three things. First, nonbinary people are

---

[2] *de la Fuente Díaz v. González Colón*, 786 F.Supp.3d 453, 457 (D.P.R. 2025).
[3] *Id.*
[4] *Id.* at 462–63, 467.
[5] *Id.*
[6] *Id.* at 460.

transgender people who either identify as neither male nor female or as a combination of the two. Second, nonbinary people frequently experience discrimination, making them dependent on legal protection. Third, discrimination against nonbinary people necessarily involves sex discrimination. Because sex discrimination triggers heightened scrutiny,[7] these insights support the application of heightened scrutiny here.

### A. What does it mean to be nonbinary?

Nonbinary people are members of the broader transgender community. Being transgender means that a person's gender identity (i.e., one's internal understanding of their gender)[8] does not match the sex they were assigned at birth.[9] Stated another way, transgender people are people who "consistently, persistently, and insistently" express a gender different from their sex assigned at birth.[10] For example, a transgender woman is someone who was assigned male at birth and identifies as a woman. A transgender man is someone who was assigned female at

---

[7] *Craig v. Boren*, 429 U.S. 190 (1976).

[8] Brief of The Am. Psych. Ass'n, et al. as *Amici Curiae* at 8, *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2019); quoting Am. Psychological Ass'n*, Report on the APA Task Force on Gender Identity and Gender Variance* 28 (2009) ("[g]ender identity 'refers to a person's basic sense of being male, female, or of indeterminate sex.'").

[9] *Id*. at 9–10.

[10] *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020), *as amended* (Aug. 28, 2020).

birth and identifies as a man. A nonbinary person is a transgender person who identifies as neither male nor female or some combination of both.[11]

Research indicates that roughly a third (33.1%) of transgender people are nonbinary, and approximately 707,100 adults in the United States are nonbinary.[12] "Current medical standards of care recommend identifying a binary gender [(i.e., male or female)] with which [an infant] is most likely to identify, with the understanding that this may shift over time."[13] As a result, nonbinary people are transgender by definition because their gender identities do not match the sex they were assigned at birth (i.e., male or female).[14] This is the case even though not all nonbinary people personally refer to themselves as transgender.[15] This is like how many members of the Deaf community consider themselves to be part of a linguistic minority and do not necessarily see themselves as disabled, even while being deaf or hard of hearing satisfies the legal definition of having a disability.[16]

---

[11] *See* Surya Monro, *Non-binary and Genderqueer: An Overview of the Field*, 20 Int. J. of Transgenderism 126, 126 (2019).

[12] Jody Herman & Andrew Flores, *How Many Adults and Youth Identify as Transgender in the United States?* The Williams Institute, UCLA School of Law 2 (August 2025).

[13] National Academies of Sciences, et al., *Measuring Sex, Gender Identity, and Sexual Orientation*, National Academies Press (US) (March 9, 2022) https://www.ncbi.nlm.nih.gov/books/NBK581039/.

[14] While it is theoretically possible for a person who was assigned neither male nor female sex at birth to identify as nonbinary, such that their gender identity does not differ or is not incongruent with the sex assigned at birth, *amici* are unfamiliar with even a single instance of this occurring.

[15] Jessica Clarke, *They, Them, and Theirs*, 132 Harv. L. Rev. 894, 897–98 (2019) ("not all nonbinary people identify as transgender").

[16] *See* National Association for the Deaf, *FAQ*, https://www.nad.org/about-us/faq/ (last accessed: Nov. 4, 2025).

There are many ways to be transgender and many ways to be nonbinary, each reflecting different conceptions of how sex and gender relate to one another. For example, Sam Smith, an award-winning nonbinary musician, has described their gender identity by saying that they are "not male or female, [they] think [they] flow somewhere in between."[17] Some see their gender identity as simply a sex characteristic rooted in brain chemistry, while others conceive of it on other terms, such as a spiritual gift or aspect of their cultural heritage. Ultimately, though, these understandings of what it means to be nonbinary are different ways of comprehending an experience outside of the male-female dichotomy.

Being nonbinary means that a person is neither exclusively a man nor woman, but it is not the same thing as being intersex. Intersex refers to differences in specific sex traits (e.g., external genitalia, chromosomal karyotypes, and varied responsiveness to testosterone or estrogen)  that people are born with or develop in childhood.[18] "There are many possible differences in genitalia, hormones, internal anatomy, or chromosomes, compared to the usual two ways [(i.e., male or female)] that human bodies develop."[19] While some nonbinary people are intersex, many

---

[17] Laura Snapes, *Sam Smith on being non-binary: "I'm changing my pronouns to they/them"*, The Guardian (Sept. 13, 2019) https://www.theguardian.com/music/2019/sep/13/sam-smith-on-being-non-binary-im-changing-my-pronouns-to-theythem.
[18] interACT, *What is Intersex?,* https://interactadvocates.org/faq/#definition (last accessed: Nov. 4, 2025).
[19] *Id.*

intersex people identify as men or women.[20] In short, being intersex has to do with variations in certain sex characteristics while being nonbinary is dependent on a person's gender identity.

Nonbinary identities have existed in various forms and under different names across history and cultures.[21] For instance, of the two hundred Indigenous languages spoken in North America, two-thirds of them had terms used to describe individuals who existed outside the gender binary.[22] Likewise, the *hijras* of India— who "are neither male nor female, man nor woman"[23]—are even referred to in ancient Hindu and Sanskrit texts.[24] Moreover, even in cultures that did not embrace nonbinary people, people have defined themselves outside the gender binary throughout history.[25] This extensive record makes clear that people who we would call nonbinary today in English-speaking nations have always existed.

---

[20] Clarke, *They, Them, and Theirs* at 898.

[21] Gilbert Herdt, *Third Sex, Third Gender: Beyond Sexual Dimorphism in Culture and History* 11 (2020) ("For centuries the existence of people who did not fit the sex/gender categories male and female have been known but typically dismissed from reports of certain non-Western societies, while in the Western European tradition they have been marginalized, stigmatized and persecuted.").

[22] Sarah Hunt, *An Introduction to the Health of Two-Spirit People: Historical, Contemporary and Emergent Issues*, Nat'l Collaborating Ctr. for Indigenous Health 7 (2016), https://www.ccnsa-nccah.ca/docs/emerging/RPT-HealthTwoSpirit-Hunt-EN.pdf.

[23] Serena Nanda, *Hijras: An Alternative Sex and Gender Role in India*, In *Third Sex Third Gender* 373, 373 (2020).

[24] *Id.* at 377.

[25] *See, e.g.*, Kathryn Wichelns, *From "The Scarlet Letter" to Stonewall: Reading the 1629 Thomas(ine) Hall Case, 1978–2009*, 12 Early Am. Studies 500, 500–501 (2014) (describing a 1629 case in colonial Virginia about the "ambiguous gender" of Thomas(ine) Hall who self-identified as "both man and woman . . . ."); Kim Barrett, *Languages Adapt to the Nonbinary*, 27 Gay & Lesbian Rev. Worldwide 27 (2020) (explaining that "people have lived outside the gender

As organizations with nonbinary leaders, members, and clients, *amici* can attest that today nonbinary people are a diverse group and hold a wide range of roles in their communities around the country. For example, sixty-four transgender individuals recently filed an amicus brief to the U.S. Supreme Court explaining how access to gender-affirming health care positively affected their lives.[26] Many of these individuals are nonbinary, and their brief biographies illustrate how they come from many different walks of life. For instance, Shain Neumeier is an autistic trial lawyer in Massachusetts with a craniofacial condition.[27] Wen Brovold is a Communications Director in Minnesota who shared how access to transgender-related healthcare positively affected their mental health.[28] Nick Romano works in Information Technology in Tennessee.[29] La Sarmiento is a mindfulness teacher in Maryland.[30] Their stories illustrate some of the breadth of nonbinary experiences in the United States and underscore that nonbinary people are deeply embedded in every part of civic life.

---

binary throughout human history. One example is the Public Universal Friend, who lived in the U.S. at the end of the 18th century. The Friend eschewed gender after a near-death experience and asked not to be referred to by any gendered pronoun.").

[26] Brief for Elliot Page, et al. as *Amici Curiae*, *United States v. Skrmetti*, 605 U.S. 495 (2025).

[27] *Id.* at 4a, 17.

[28] *Id.* at 1a, 17.

[29] *Id.* at 4a.

[30] *Id.*

**B. Nonbinary people frequently experience discrimination.**

As victims of widespread discrimination, nonbinary people require legal

protections, such as those afforded by the Equal Protection Clause, to fully and

equally participate in civic life. Additionally, the evidence of widespread

discrimination against nonbinary people is relevant for finding that these

discriminatory laws trigger heightened scrutiny independent of the fact that they

discriminate based on sex. Although the Supreme Court has not yet addressed

whether transgender people, including nonbinary people, constitute a quasi-suspect

class,[31] the history of *de jure* discrimination experienced by transgender people

illustrates why courts should do so. *Amici* thus offer their expertise as LGBTQ

advocacy organizations to help clarify that nonbinary people specifically and

transgender people more generally have historically experienced discrimination in

this country and continue to experience it today.

i. *There is a long history of discrimination against nonbinary people in this*
   *country.*

Soon after the Founding, the United States government attempted to

undermine the traditional gender beliefs and corresponding cultural practices of the

---

[31] *See United States v. Skrmetti*, 605 U.S. 495 (2025) (declining to reach the question of whether transgender people constitute a quasi-suspect class).

Indigenous peoples of this land.[32] Two-Spirit people (i.e., indigenous people who fall outside of the gender binary—historically referred to with various derogatory terms, like *berdache*)[33] were subjected to cruel forced assimilation policies. Federal agents operating under the Dawes Act forced Two-Spirit people to adopt male dress and cut their hair short like a white man.[34] One anthropologist, S. C. Simms, reports in 1902 that a federal agent had "endeavored to compel [Two-Spirit persons in the Crow reservation], under threat of punishment, to wear men's clothing, but [the agent's] efforts were unsuccessful."[35] Another report from this era indicates that Native American children were punished for wearing clothing that was inconsistent with their sex assigned at birth.[36]

Transgender people, including nonbinary members of the community were also targeted for their gender-nonconformity through laws like cross-dressing bans. For example, beginning in the 1840s, cities across the country passed laws making it a crime to appear in public in clothes traditionally not associated with the

---

[32] Andrew Gilden, *Preserving the Seeds of Gender Fluidity: Tribal Courts and the Berdache Tradition*, 13 Mich. J. Gender & L. 237, 248 (2007).
[33] In 1990, the word Two-Spirit was adopted at the Annual Native American Gay and Lesbian Gathering in Winnipeg, Manitoba, Canada as a pan-Indigenous term that incorporated traditional gender diversity, gender fluidity, sexual identity, and other identities that existed outside heteronormativity and gender conformity. Hunt, *An Introduction to the Health of Two-Spirit People* at 7. Two-Spirit individuals often held respected roles, including as healers and spiritual leaders. *Id*. This cultural sanctioning of the Two-Spirit role exhibits the wide divergence between European and Native American understandings of sex and gender. Gilden, *Preserving the Seeds of Gender Fluidity* at 242.
[34] *Id.* at 249.
[35] Jonathan Katz, *Gay American History: Lesbians and Gay Men in the U.S.A.* 319 (1976).
[36] *See id.* at 313.

individual's sex assigned at birth.[37] These laws were enforced for over a century, often with the express purpose of policing gender identity and expression.[38] Enforcement of these laws often entailed humiliating and invasive searches to verify sex assigned at birth.[39]

    *ii.   Nonbinary people continue to experience discrimination across a wide range of contexts.*

       Research on discrimination against nonbinary people has focused on how they are treated in health care contexts, employment, housing, education, and identity document policies. Research has also shown that nonbinary people are at heightened risk of physical and sexual violence.[40] These findings have very real consequences for nonbinary people because experiences of anti-transgender discrimination and violence are linked to increased risk of suicidal ideation and behavior.[41]

---

[37] Clare Sears, *Arresting Dress* 3 (2015); Marc Stein, *Law and Politics* in *The Routledge History of Queer America Routledge* 315–26 (2018); Susan Stryker, *Transgender History* 32–33 (2008).
[38] Stein, *Law and Politics* at 316.
[39] Maayan Sudai, *The Medico-Legalization of Sex in the Nineteenth-Century United States*, 41(4) Law and History Review 745, 745–71, 760 (2023).
[40] Sandy James, et al., *The Report of the 2015 U.S. Transgender Survey, National Center for Transgender Equality* 205, 214 (2015) (Hereinafter, "USTS") (reporting that 55% of nonbinary adults have experienced sexual assault and that 39% of nonbinary people have experienced discrimination, violence, or harassment while using public transportation).
[41] Ann Haas, et al., *Suicide Attempts Among Transgender and Gender Non-Conforming Adults*, American Foundation for Suicide Prevention & Williams Institute 2 (2014) https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-GNC-Suicide-Attempts-Jan-2014.pdf.

### iii.    *Nonbinary people face discrimination in health care.*

Research indicates that nonbinary people face significant hurdles accessing health care. A majority (55%) of nonbinary people assigned female at birth and over a third (38%) of nonbinary people assigned male at birth reported having had negative experiences with health care providers.[42] Moreover, nonbinary people are frequently denied access to health care. For example, 17% of nonbinary people report being denied transition-related surgery coverage by insurers in the past.[43]

Nonbinary people also experience unique challenges in accessing health care. For example, many nonbinary people report "that providers—even those with training in transgender care—lack the knowledge, training, and experience to provide them with the healthcare they need."[44] This is consistent with how research has shown that even providers that serve the transgender community may be dismissive toward the needs of nonbinary patients.[45] Unsurprisingly, as compared to binary transgender people, nonbinary people are "more frequently reported among those without a history of gender-affirming care."[46]

---

[42] Ankit Rastogi, et al., *Health and wellbeing: A report of the 2022 U.S. Transgender Survey*, Advocates for Trans Equality 31 (2025).
[43]  *Id*. at 35.
[44] James Lykens, et al., *Healthcare Experiences Among Young Adults Who Identify as Genderqueer or Nonbinary*, 5 LGBT Health 191, 194 (2018).
[45] *Id.*
[46] Elizabeth M. Inman, et al*., Reports of Negative Interactions with Healthcare Providers among Transgender, Nonbinary, and Gender-Expansive People assigned Female at Birth in the United States: Results from an Online, Cross-Sectional Survey*, 20 Int. J. Environ. Res. Public Health 1, 8 (2023).

*iv.    Nonbinary people face employment discrimination.*

Nonbinary people face unique challenges in the workplace. For example, "nonbinary employees are almost twice as likely as their binary transgender counterparts to refrain from asking their employers to refer to them by the correct pronouns out of fear of discrimination."[47] Additionally, while nonbinary people "are less likely to be unemployed," they are "more likely to have been denied a promotion" than other employees.[48] This data could be interpreted as indicating that a nonbinary person's gender identity may not be known when they applied for a job but they "are penalized if they come out later on."[49]

The continued heightened level of discrimination experienced by nonbinary people in employment is unsurprising given that, "[d]ue to the relative paucity of attention paid to nonbinary people within the legal field, employers are often in the position of developing workplace antidiscrimination policies regarding a growing nonbinary workforce with little guidance from the law."[50]

---

[47] USTS at 154.

[48] Skylar Davidson, *Gender Inequality: Nonbinary Transgender People in the Workplace*, 2 Cogent Soc. Sci. 1, 10 (2016).

[49] *Id*. at 7.

[50] A. Russell, *Bostock v. Clayton County: The Implications of Binary Bias*, 106 Cornell L. Rev. 1601, 1607–08 (2021).

*v.   Nonbinary people experience housing discrimination.*

Although there is limited data specific to nonbinary people, research shows that transgender people more generally face significant hurdles in accessing housing. For example, "[n]early one-quarter (23%) of respondents experienced some form of housing discrimination in the past year, such as being evicted from their home or denied a home or apartment because of being transgender."[51] Given this statistic, it is unsurprising that "[n]early one-third (30%) of respondents have experienced homelessness during their lifetime."[52] Moreover, of the respondents who experienced homelessness in the last year, "[m]ore than one-quarter (26%) did not seek shelter because they feared being mistreated" due to being transgender. This makes sense given the fact that "[s]even out of ten (70%) respondents who stayed at a shelter in the past year faced some form of mistreatment, such as being forced out, harassed, or attacked because of being transgender."[53] Moreover, gender-nonconforming people (presumably including nonbinary people) face the highest rates of being unsheltered when experiencing homelessness. Among cisgender people who experienced homelessness in 2019, only 49% were unsheltered.[54] By contrast, 63% of transgender people who experienced

---

[51] USTS at 176.
[52] *Id.* at 178.
[53] *Id.* at 181.
[54] *Trans and Gender Non-Conforming Homelessness*, National Alliance to End Homelessness (July 13, 2020) https://endhomelessness.org/trans-and-gender-non-conforming-homelessness/.

homelessness were unsheltered and a staggering 80% of gender-nonconforming people who experienced homelessness were unsheltered.[55]

vi.    *Nonbinary people face discrimination in schools.*

Research shows that transgender people, including nonbinary people, experience pervasive discrimination in schools. For example, over half (52%) of transgender people report not being allowed to dress in clothing that matched their gender identity in their K-12 years.[56] Additionally, "[f]ifty-four percent (54%) of people who were out or perceived as transgender in K-12 were verbally harassed."[57] In college, "transgender students [are] nearly twice as likely to experience threats of physical violence (12.2% vs. 6.4%) and cyberbullying (19.8% vs. 13.0%) at their current institution."[58] Additionally, transgender students in college report higher rates of verbal harassment than their cisgender peers (50.3% vs 31.6%).[59] Likewise, "transgender [college] students experience[] higher rates of sexual harassment (18.7%) compared to [cisgender] students (13.3%)."[60]

---

[55] *Id.*
[56] USTS at 132.
[57] *Id.* at 131.
[58] John Yang & Ellen Stolzenberg, *Discrimination, Harassment, and Bias in Higher Education: Disaggregating the Experiences of LGBTQ+ Students*, 2025 New Directions for Higher Education 37, 41–42 (2025).
[59] *Id.* at 42.
[60] *Id.*

Although research specific to nonbinary people is limited, there is strong evidence that nonbinary people face discrimination in school. For example, 16% of nonbinary people have been physically attacked because they were perceived as being gender-nonconforming while in school before finishing the twelfth grade.[61] Additionally, 15% of nonbinary people report leaving a K-12 school due to mistreatment.[62] Moreover, even when actions are taken to benefit other transgender students, nonbinary students' needs are often left unaddressed or not even elaborated upon.[63]

vii.    *Identification document policies often discriminate against nonbinary people.*

Laws, like the Policy, make it exceedingly difficult for nonbinary people to update their legal identification documents. Indeed, despite many jurisdictions offering accurate birth certificates to nonbinary people without apparent problem,[64] three states expressly ban gender neutral markers on birth certificates.[65] Moreover,

---

[61] USTS at 133.

[62] *Id.* at 135.

[63] *See e.g.*, *Grimm*, 972 F.3d at 596 ("[T]oday's question is limited to how school bathroom policies implicate the rights of transgender students who 'consistently, persistently, and insistently' express a binary gender.").

[64] *E.g.*, Cal. Health & Safety Code § 103425(e) (permitting a person to update their sex on their birth certificate to male, female, or nonbinary); Colo. Rev. Stat. § 25-2-113.8 (permitting amended birth certificates to change sex designation to "X"); Mass. Gen. Laws ch. 46, § 13 (permitting people to update the sex designation on their birth certificates to another sex, including, but not limited to, "male," "female," or "X").

[65] W. Va. Code § 16-5-10(n) (2024); Okla. Stat. tit. 63, § 1-311(G); N.D. Cent. Code § 23-02.1-13(7).

across the country, "[u]pdating the gender marker on any ID or record is typically a

distinct process from updating the name, and may require documentation regarding

gender transition from a healthcare provider, a court order of gender change, an

updated birth certificate, or other documentation."[66] There is likewise no uniform

approach for updating gender markers on drivers' licenses, and some states have

unfortunately adopted policies that make it burdensome or impossible to update

gender markers.[67]

The consequences of having an ID that doesn't match one's gender can be

dire. Indeed, among transgender survey respondents (including men, women, and

nonbinary people), "nearly one-third (32%) of individuals who have shown IDs

with a name or gender that did not match their presentation reported negative

experiences, such as being harassed, denied services, and/or attacked. One-quarter

(25%) of these respondents reported being verbally harassed."[68] Additionally, 10%

of nonbinary respondents "who showed IDs with a name or gender that did not

---

[66] USTS at 87.

[67] *See e.g.*, Ala. Code § 22-9A-19(d) (requiring a person to provide a certified court order "indicating that the sex of an individual born in this state has been changed by surgical procedure and that the name of the individual has been changed" to update gender on a driver's license); North Dakota Dep't of Transportation, Driver's License Gender Designation Form SFN 61146 (2-2022), https://www.dot.nd.gov/forms/sfn61146.pdf (permitting applicants to designate their gender as either male or female and requiring certification from certain licensed medical providers); Mass. Gen. Laws ch. 90, § 8N (a person may change a gender designation on a driver's license application without supporting documentation).

[68] USTS at 89.

match the gender they present in were denied services or benefits."[69] Similarly, 6% of nonbinary respondents who have identification that does not match their gender identity have been asked to leave a place of business after presenting incongruent identification.[70] Moreover, as noted by one nonbinary respondent, not being able to update identity documents "is really disheartening, dysphoria inducing, and . . . dehumanizing."[71]

The Equal Protection Clause plays an important role in preventing discriminatory policies that dehumanize people in this way.

## C. Discrimination against nonbinary people necessarily involves sex discrimination.

In *Bostock v. Clayton County*, the Supreme Court explained that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."[72] The Court reasoned that discrimination based on sexual orientation or transgender status is sex discrimination because an employer who fires an employee for being gay or transgender necessarily takes the employee's sex into account.[73] For example, a

---

[69] *Id.*
[70] *Id.* at 90.
[71] *Id.* at 85.
[72] *Bostock*, 590 U.S. at 660.
[73] *Id.* at 655 ("When an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex.").

female employee attracted to women would not be fired if she were male.[74]
Likewise, a transgender woman or nonbinary employee who was assigned male
sex at birth would not be fired for wearing a dress if she were assigned female sex
at birth.[75]

Writing for the majority, Justice Gorsuch explained that an employer could
not refuse to hire a person on the basis of their transgender status or sexual
orientation without referencing the applicant's sex.[76] Indeed, even if the employer
were to ask prospective employees to merely check a box on a form if they were
transgender or gay, "[t]here is no way for an applicant to decide whether to check
the homosexual or transgender box without considering sex."[77] This is because it is
impossible to write out "instructions for who should check the box without using
the words man, woman, or sex (or some synonym)."[78] Simply put, "[b]y
discriminating against homosexuals, the employer intentionally penalizes men for
being attracted to men and women for being attracted to women.[79] Likewise, "[b]y
discriminating against transgender persons, the employer unavoidably
discriminates against persons with one sex identified at birth and *another* today."[80]

---

[74] *Id.* at 668.
[75] *See id.*
[76] *Id.* at 668.
[77] *Id.*
[78] *Id.* at 668–69.
[79] *Id.*
[80] *Id.* (emphasis added). This language applies equally to nonbinary people who have "one sex identified at birth and another today." *Id.*

Given *Bostock*'s reasoning, laws that discriminate based on transgender status should trigger heightened scrutiny. As discrimination based on transgender status necessarily involves sex discrimination,[81] a law that discriminates on transgender status must therefore discriminate based on sex. And, because sex classifications trigger heightened scrutiny,[82] laws that discriminate based on sex need to be reviewed under heightened scrutiny.[83] Although the Court has yet to apply *Bostock* outside of Title VII, it has explained how its analysis of sex discrimination in an equal protection case is consistent with *Bostock*.[84]

Because nonbinary people are part of the transgender community, *Bostock*'s reasoning must logically apply to them.  There are two avenues illustrating why discrimination against nonbinary people is necessarily sex discrimination. First, it is impossible to discriminate against nonbinary people without referencing sex. Second, it is impossible to discriminate against nonbinary people without relying on impermissible sex stereotypes. Accordingly, laws that discriminate based on nonbinary status trigger heightened scrutiny because they rely on sex-based classifications.

---

[81] *Id*. at 660.

[82] *See Craig*, 429 U.S. at 197.

[83] Although the Supreme Court has declined to apply heightened scrutiny to a case in which a law prohibited the provision of gender-affirming care to minors discriminates on the basis of medical condition and age, it clarified that *Bostock*'s reasoning would not apply to the case because the law did not classify based on his sex or transgender status. *Skrmetti*, 605 U.S. at 519–21.

[84] *Id.*

i.   *It is impossible to discriminate against nonbinary people without referencing sex.*

As explained earlier, the *Bostock* Court's "checkbox test" reveals that discrimination based on transgender status is sex discrimination because "transgender status [is] inextricably bound up with sex."[85] The same is true for discrimination on the basis of nonbinary status: "nonbinary status, just like [binary] transgender status, inherently necessitates a consideration of sex; therefore, discrimination based on this trait likewise equally constitutes discrimination based on sex."[86] Since being nonbinary can only be defined in relation to sex,[87] the aforementioned "checkbox" test "results in the inclusion of nonbinary individuals in" the *Bostock* Court's characterization of sex discrimination.[88]

This analysis applies with equal force to discrimination directed at nonbinary people. Consider, for example, a policy that prohibits a government agency from hiring anyone who prefers to be referred to with gender neutral pronouns. This is essentially a policy stating that the agency will not hire nonbinary people—just as a policy to not hire people who use feminine pronouns would be a statement that the agency will not hire women. Because nonbinary

---

[85] *Bostock*, 590 U.S. at 660–61.
[86] Russell, *Implications of Binary Bias* at 1623.
[87] *Supra* p. 5 ("A nonbinary person is a transgender person who identifies as neither male nor female or some combination of both.").
[88] Russell, *Implications of Binary Bias* at 1623.

people are transgender, this policy discriminates based on transgender status, which is sex discrimination.[89]

It is also irrelevant that a policy might discriminate equally against nonbinary people who are assigned male at birth and nonbinary people who are assigned female at birth. The *Bostock* Court made clear that an employer cannot escape liability simply by treating men and women equally poorly because of sex—for example, by refusing to hire a woman for being insufficiently feminine and a man for being insufficiently masculine.[90] Doing both merely doubles the sex discrimination.[91] The same logic applies to nonbinary people: refusing to hire both assigned-male-at-birth and assigned-female-at-birth nonbinary applicants for using gender neutral pronouns is still discrimination because of sex.

ii.    *It is impossible to discriminate based on nonbinary status without relying on impermissible sex stereotypes.*

The Equal Protection Clause forbids laws from relying on "overbroad generalizations about the different talents, capacities, or preferences of males and females."[92] Moreover, even if a law relies on putatively "inherent differences" among the sexes, the Equal Protection Clause still prohibits the government from

---

[89] *See Bostock*, 590 U.S. at 660.
[90] *Id.* at 659.
[91] *Id.*
[92] *United States v. Virginia*, 518 U.S. 515, 533 (1996).

creating or perpetuating a system of "legal, social, and economic inferiority" based on sex.[93] Accordingly, transgender plaintiffs, including nonbinary people, should be able to challenge discriminatory laws when these laws rely on or perpetuate sex stereotypes in ways that lead to inequality.

The *Bostock* Court made clear that penalizing a gay or transgender person for not conforming to traditional sex stereotypes is impermissible sex discrimination.[94] This is consistent with the Court's framework for prohibiting sex stereotypes as a form of sex discrimination, as established in *Price Waterhouse v. Hopkins*.[95] Under *Price Waterhouse*, requiring someone to conform to gendered expectations—whether clothing, pronouns, or presentation—is unlawful sex discrimination.[96]

---

[93] *Id.* at 533–34.

[94] *See Bostock*, 590 U.S. at 662 ("[J]ust as an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability, an employer who fires both Hannah and Bob for being gay or transgender does the same."); *see also* Rachel Slepoi, *Bostock's Inclusive Queer Frame*, 107 Va. L. Rev. Online 67, 77–78 (2021) ("*Bostock's* theory of sex discrimination is nothing new. . . . *Bostock* makes clear, once and for all, that [its reasoning and sex stereotyping theories of sex discrimination] are one and the same. Sex stereotyping is per se 'because of sex' . . .").

[95] *Price Waterhouse v. Hopkins*, 490 U.S. 228, 256–57 (1989) (explaining that it is impermissible for an employer to object to an employee's failure to adhere to gendered expectations of how members of her sex should behave, move, speak, and dress).

[96] *See id.*; *see also* Meredith Severtson, *Let's Talk About Gender: Nonbinary Title VII Plaintiffs Post-Bostock*, 74 Vanderbilt L. Rev. 1507, 1531(2021) (explaining that sex stereotypes underly the assumption that "a person can or should be exclusively masculine or feminine."); Ann McGinley, et al., *Feminist Perspectives on Bostock v. Clayton County*, 53(1) Connecticut L. Rev. 1, 19 (2020) ("*Price Waterhouse* and its progeny tell us that sex includes gender, and that discrimination for failure to conform to a gender stereotype is sex discrimination under Title VII.").

For over two decades, circuit courts have recognized LGBTQ plaintiffs' sex stereotyping claims. In 2004, for example, the Sixth Circuit explained that "discrimination against a plaintiff who is [transgender]—and therefore fails to act and/or identify with his or her gender—is no different from the discrimination directed against [the plaintiff] in *Price Waterhouse*, who, in sex-stereotypical terms, did not act like a woman."[97] Likewise, the Eleventh Circuit has made clear that "[a]ll persons, whether transgender or not, are protected from discrimination on the basis of gender stereotype."[98] The Fourth Circuit has similarly noted that sex stereotyping was one of several independent reasons that a policy targeting transgender people discriminated based on sex.[99] Moreover, although this Court held that a gay man had waived his sex-stereotyping argument by not raising it in the district court,[100] it indicated that such a claim would have been available to him.[101]

The sex-stereotyping case law makes clear that discrimination against nonbinary people constitutes sex discrimination. Indeed, scholars argue that the sex-stereotyping doctrine "naturally extends" to nonbinary plaintiffs, as their

---

[97] *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004).
[98] *Glenn v. Brumby*, 663 F.3d 1312, 1318 (11th Cir. 2011).
[99] *Grimm*, 972 F.3d at 609.
[100] *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261 (1st Cir. 1999).
[101] *See id*. at 261 n.4.

nonconformity challenges the binary expectations of gender.[102] A sound

interpretation of *Bostock,* informed by *Price Waterhouse*, holds that sex

discrimination occurs whenever an employee fails to conform to sex stereotypes.[103]

Because a nonbinary person who uses gender neutral pronouns fails to conform to

stereotypes associated with their sex assigned at birth (regardless of whether that

sex is male or female), penalizing this nonconformity is necessarily discriminatory

sex stereotyping.

Applying this framework in its equal protection analysis, a court recently

explained that a policy prohibiting a nonbinary teacher from using titles and

pronouns that do not "correspond to" their sex assigned at birth (e.g., Mx. instead

of Ms. or Mr., or "they" instead of "she" or "he") is sex discrimination.[104] The

district court explained that "[t]he idea that certain titles and pronouns 'correspond

to' a certain sex is a gender stereotype. Thus, [the policy] discriminates on the basis

---

[102] Alexandra Johnson, *Curious Continuity: How Bostock Preserves Sex-Stereotyping Doctrine*, 23 Dukeminier Awards J. 235, 269 (2024); *see also* Annie Schuver, *Scrutinizing the Bathroom Binary: Equal Protection Theories for Nonbinary Students*, 122 Mich. L. Rev. 1519, 1530 (2024) ("Nonbinary people reject not only the stereotypes associated with their sex assigned at birth but also the stereotypes associated with either binary gender.").

[103] Johnson, *Curious Continuity* at 269 ("Unlike *Bostock* itself, which describes behavior an employer would tolerate in an employee of a different sex, *Price Waterhouse*'s stereotyping doctrine does not require tolerance of those traits elsewhere.").

[104] *Wood v. Fla. Dep't of Educ.*, 730 F.Supp.3d 1232, 1241 (N.D. Fla. 2024). In *Wood*, the district court issued a separate preliminary injunction order on distinct First Amendment grounds. *See Wood v. Fla. Dep't of Educ.*, 729 F. Supp. 3d 1255 (N.D. Fla. 2024), *vacated and remanded*, 142 F.4th 1286 (11th Cir. 2025). The Eleventh Circuit's reversal of that decision was "narrow" and limited solely to whether the speech at issue was government speech, 142 F.4th at 1293, it therefore did not address or undermine the district court's later analysis regarding the equal protection claim.

of gender stereotypes associated with sex."[105] The policy thus triggered intermediate scrutiny.[106] This reasoning clearly articulates how it is impossible to discriminate on the basis of nonbinary status without relying on sex stereotypes.

CONCLUSION

Nonbinary people exist and always have existed as part of the spectrum of transgender experience. The Policy, which denies nonbinary people recognition and equal treatment under law, thus rests on unconstitutional sex-based distinctions that are grounded in mere stereotypes. Because discrimination against nonbinary individuals is necessarily discrimination because of sex, it must be subject to heightened scrutiny under the Equal Protection Clause. The judgment of the district court should therefore be affirmed.

Dated: November 14, 2025

ADVOCATES FOR TRANS EQUALITY EDUCATION FUND

/s/ Seran Gee
Seran Gee
ADVOCATES FOR TRANS EQUALITY EDUCATION FUND
1800 R Street Northwest, C4
Washington, D.C. 20009
Tel.: (646) 862-9396
Counsel for Amici Curiae

---

[105] *Wood*, 730 F.Supp.3d at 1241.
[106] *Id.*

### CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,213 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

Dated: November 14, 2025                        */s/ Seran Gee*
                                                Seran Gee

**CERTIFICATE OF SERVICE**

I certify that I electronically filed this document through the CM/ECF

system and that it will be thereby sent electronically to the registered participants

in this appeal who are registered CM/ECF users.

*/s/ Seran Gee*
Seran Gee