No. 25-1638

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

ÍNARU NADIA DE LA FUENTE DÍAZ; MARU ROSA HERNÁNDEZ; ANDRÉ RODIL; YEIVY VÉLEZ BARTOLOMEI; GÉ CASTRO CRUZ; DENI JUSTE,

*Plaintiffs-Appellees*,

v.

JENNIFER A. GONZÁLEZ COLÓN, in the official capacity as Governor of the Commonwealth of Puerto Rico; DR. VÍCTOR RAMOS OTERO, in the official capacity as Secretary of the Department of Health of the Commonwealth; WANDA LLOVET DÍAZ, in the official capacity as the Director of the Division of Demographic Registry and Vital Statistics of the Commonwealth,

*Defendants-Appellants.*

---

On Appeal from the United States District Court for the District of Puerto Rico, No. 23-cv-01544, Hon. María Antongiorgi-Jordán

---

### *AMICUS CURIAE* BRIEF OF AMERICAN CIVIL LIBERTIES UNION AND AMERICAN CIVIL LIBERTY UNION OF PUERTO RICO IN SUPPORT OF PLAINTIFFS-APPELLEES

---

Barbara Schwabauer*
Jon Davidson**
Chase Strangio
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Phone: (212) 549-2515

*Admitted only in Ohio
** Admitted only in California

Fermín L. Arraiza-Navas
Annette Martínez-Orabona
Executive Director
AMERICAN CIVIL LIBERTIES UNION
 PUERTO RICO CHAPTER
Union Plaza, Suite 1105
416 Avenida Ponce de León
San Juan, Puerto Rico 00918
Phone: (787) 753-9493
Phone: (646) 740-3865

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Amici curiae are nonprofit entities operating under § 501(c)(3) of the Internal Revenue Code. Amici are not subsidiaries or affiliates of any publicly owned corporations and do not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to amici's participation.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ...................................... i

TABLE OF AUTHORITIES ................................................................. iv

INTEREST OF *AMICI CURIAE* ..........................................................1

INTRODUCTION ...............................................................................1

ARGUMENT ......................................................................................3

The Commonwealth's birth certificate policy triggers heightened scrutiny
    because it discriminates on the basis of transgender status.........................3

   A.    The Commonwealth's policy discriminates against nonbinary persons
       based on their transgender status...............................................4

     1.    Nonbinary people are a subgroup of transgender people.........................4

     2.    The policy's disparate treatment of nonbinary people is discrimination
        based on transgender status. ...................................................4

   B.    The Commonwealth's policy triggers heightened scrutiny because
       transgender status is a quasi-suspect classification. ................................7

     1.    Transgender people have faced a history of de jure discrimination. ........8

      a.  Laws prohibiting cross dressing. .............................................9

      b.  Liquor laws..........................................................................10

      c.  Immigration laws. .................................................................10

      d.  Laws controlling family life.................................................11

      e.  Exclusion from employment opportunity................................12

     2.    Transgender status has no bearing on one's ability to contribute to
       society................................................................................13

     3.    Transgender persons are a discrete, easily identifiable group. ...............14

4.  Transgender people are a minority lacking meaningful political power to protect their rights. ...................................................................16

CONCLUSION.........................................................................................18

CERTIFICATE OF COMPLIANCE........................................................19

CERTIFICATE OF SERVICE ................................................................20

# TABLE OF AUTHORITIES

## Cases

*Adkins v. City of New York*,
143 F. Supp. 3d 134 (S.D.N.Y. 2015) .......................................................... 3, 7, 14

*Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*,
208 F. Supp. 3d 850 (S.D. Ohio 2016) ............................................................ 2, 15

*Bos. All. of GLBT Youth v. U.S. Dep't of Health and Hum. Servs.*,
557 F. Supp. 3d 224 (D. Mass. 2021) ................................................................2, 7

*Bowen v. Gilliard*,
483 U.S. 587 (1987)....................................................................................... 7, 14-15

*Chaplaincy of Full Gospel Churches v. U.S. Navy (In re Navy Chaplaincy)*,
697 F.3d 1171 (D.C. Cir. 2012) ...............................................................................6

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985)............................................................................................ 7, 13

*City of New Orleans v. Dukes*,
427 U.S. 297 (1976).................................................................................................15

*Clark v. Jeter*,
486 U.S. 456 (1988).................................................................................................15

*Daly v. Daly*,
102 Nev. 66, 715 P.2d 56, (1986) .........................................................................12

*Doe 2 v. Shanahan*,
91 F.3d 694 (D.C. Cir. 2019) ................................................................................13

*Doe v. Ladapo*,
676 F. Supp. 3d 1205 (N.D. Fla. 2023) ................................................................17

*Fleuti v. Rosenberg*,
   302 F.2d 652 (9th Cir. 1962) ...............................................................11

*Frontiero v. Richardson*,
   411 U.S. 677 (1973) ..................................................................... 16, 17

*Fuqua v. Raak*,
   120 F.4th 1346 (9th Cir. 2024) ...............................................................6

*Gore v. Lee*,
   107 F.4th 548 (6th Cir. 2024) ................................................................14

*Graham v. Richardson*,
   403 U.S. 365 (1971)..............................................................................16

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020) ......................................................... passim

*Hernandez-Montiel v. INS*,
   225 F.3d 1084 (9th Cir. 2000) ...............................................................15

*In re Est. of Gardiner*,
   273 Kan. 191, 42 P.3d 120 (2002).........................................................12

*In re Opinion of the Justices*,
   230 Ala. 543, 162 So. 123 (1935)..........................................................12

*Kantaras v. Kantaras*,
   29 Fla. L. Weekly D1669, 884 So. 2d 155 (D. Ct. App. 2004)...............11

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) .............................................................2, 7

*Lesbian/Gay Freedom Day Comm., Inc. v. U.S.I.N.S*,
   541 F. Supp. 569 (N.D. Cal. 1982) ........................................................10

*Little v. Hecox*,
  145 S. Ct. 2871 (2025) ..........................................................................1

*Littleton v. Prange*,
  9 S.W.3d 223 (Tex. App. 1999) ...........................................................12

*Love v. Johnson*,
  146 F. Supp. 3d 848 (E.D. Mich. 2015) ................................................1

*Lyng v. Castillo*,
  477 U.S. 635 (1986) ..............................................................................7

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*,
  286 F. Supp. 3d 704 (D. Md. 2018) ..................................................2, 7

*Mathews v. Lucas*,
  427 U.S. 495 (1976) ......................................................................... 5, 14

*M.B. v. D.W.*,
  236 S.W.3d 31 (Ky. Ct. App. 2007) ....................................................12

*Michael H. v. Gerald D.*,
  491 U.S. 110 (1989) ............................................................................15

*Obergefell v. Hodges*,
  576 U.S. 644 (2015) ..............................................................................6

*Ray v. McCloud*,
  507 F. Supp. 3d 925 (S.D. Ohio. 2020) ................................................1

*Rice v. Cayetano*,
  528 U.S. 495 (2000) ..............................................................................5

*Schroer v. Billington*,
  577 F. Supp. 2d 293 (D.D.C. 2008) .....................................................13

*Sessions v. Morales-Santana*,
  582 U.S. 47 (2017) ...................................................................................15

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) .................................................................................16

*Talbott v. United States*,
  775 F. Supp. 3d 283 (D.D.C. 2025) .........................................................17

*Trump v. Orr*,
  No. 25A319, 2025 WL 3097824 (Nov. 6, 2025).........................................3

*United States v. Skrmetti*,
  145 S. Ct. 1816 (2025) ............................................................... 1, 4, 8, 16

*West Virginia v. B.P.J.*,
  No. 24-43, 2025 WL 1829164 (S. Ct. July 3, 2025)...................................1

*Windsor v. United States*,
  699 F.3d 169 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013) ................... 7, 15

**Statutes**

Pub. L. No. 64-301, § 3,
  39 Stat. 874 (1917)...................................................................................11

Pub. L. No. 82-414, § 212(a)(4),
  66 Stat. 163 (1952)...................................................................................11

Pub. L. No. 89-236, § 15(b)-(c),
  79 Stat. 911 (1965)...................................................................................11

**Executive Orders**

Exec. Order No. 10450, 18 Fed. Reg. 2489 (Apr. 27, 1953)...................................13

Exec. Order No. 14183, 90 Fed. Reg. 8757 (Jan. 7, 2025).....................................13

**Regulations**

N.J. Dep't of Law & Pub. Safety Div. of Alcoholic Beverages, Rules and
  Regulations Effective July 1, 1950, Reg. 20, Rule 4,
  https://dspace.njstatelib.org/server/api/core/bitstreams/b7436758-3577-4864-
  bd77-d5bc8205ba24/ [https://perma.cc/W3TY-7XVG]......................................10

**Other Authorities**

1952 U.S.C.C.A.N. 1653 ..........................................................................11

1965 U.S.C.C.A.N. 3328 ..........................................................................11

ACLU, *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures in 2024*
  (Dec. 6, 2024), https://www.aclu.org/legislative-attacks-on-lgbtq-rights-2024
  [https://perma.cc/F7ET-J8J7] ...............................................................17

Francisco Valdes, *Queers, Sissies, Dykes, and Tomboy:  Deconstructing the
  Conflation of "Sex," "Gender," and "Sexual Orientation" in Euro-American
  Law and Society*, 83 Cal. L. Rev. 1 (1995).............................................8

Jana Leslie-Miller, *From Bell to Bell: Responsible Reproduction in the Twentieth
  Century*, 8 Md. J. of Contemp. Legal Issues 123 (1997)........................12

Jennifer Levi & Daniel Redman, *The Cross-Dressing Case for Bathroom Equality*,
  34 Seattle L. Rev. 133 (2010) ....................................................... 9, 10

Kate Redburn, *Before Equal Protection: The Fall of Cross-Dressing Bans and the
  Transgender Legal Movement*, 40 L. & Hist. Rev. 679 (2022)...................... 9, 10

Robert J. Cynkar, *Buck v. Bell: "Felt Necessities" v. Fundamental Values?* 81
  Columbia L. Rev. 1418 (1981) ............................................................12

William N. Eskridge, *Gaylaw: Challenging the Apartheid
  of the Closet* 27 (1999).............................................................................9

## INTEREST OF *AMICI CURIAE*[1]

The American Civil Liberties Union Foundation (ACLU) is a nationwide, nonprofit, nonpartisan organization with nearly two million members and supporters dedicated to advancing the principles of liberty and equality embodied in the Constitution.  The ACLU of Puerto Rico is an affiliate of the ACLU.  As relevant here, amici advocate for the rights of lesbian, gay, bisexual, transgender, and queer (LGBTQ) people and others to be free from discrimination based on sex, sexual orientation, gender identity, and transgender status.  Amici have participated in many cases nationwide litigating the application of the Equal Protection Clause to discrimination based on transgender status, including cases involving access to identity documents.[2]

## INTRODUCTION

The Commonwealth of Puerto Rico allows individuals to obtain a birth certificate that accurately reflects their gender identity unless their gender identity

---

[1] The parties have consented to the filing of this brief. No party's counsel authored the brief in whole or in part; no party or party's counsel contributed money to fund its preparation or submission; and no person other than *amicus curiae*, their members, or their counsel made monetary contributions to its preparation or submission.

[2] *E.g.*, *West Virginia v. B.P.J.*, No. 24-43, 2025 WL 1829164 (S. Ct. July 3, 2025); *Little v. Hecox*, 145 S. Ct. 2871 (2025); *United States v. Skrmetti*, 145 S. Ct. 1816 (2025); *Ray v. McCloud*, 507 F. Supp. 3d 925 (S.D. Ohio. 2020); *Love v. Johnson*, 146 F. Supp. 3d 848 (E.D. Mich. 2015).

is nonbinary. The district court correctly held that the Commonwealth's failure to provide an option for an "X" marker (used to indicate a person is nonbinary) on its Application for Gender Change form to issue an amended birth certificate ("birth certificate policy") violated plaintiffs-appellees' right to equal protection. The court conducted only rational basis review to reach this conclusion, even though it was persuaded that discrimination against transgender people, including nonbinary people, triggered heightened equal protection scrutiny. But without binding First Circuit precedent, the court declined to apply heightened scrutiny to classifications based on transgender status. This Court should join the Fourth and Ninth Circuits, and numerous district courts, including in this Circuit, in holding that transgender status, which by definition encompasses the status of being nonbinary, meets all the indicia of a quasi-suspect classification and consequently, that the Commonwealth's birth certificate policy is subject to heightened equal protection scrutiny. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611-612 (4th Cir. 2020); *Karnoski v. Trump*, 926 F.3d 1180, 1200-1201 (9th Cir. 2019); *see also, e.g., Bos. All. of GLBT Youth v. U.S. Dep't of Health and Hum. Servs.*, 557 F. Supp. 3d 224, 244 (D. Mass. 2021); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 719-720 (D. Md. 2018); *Bd. of Educ. of the Highland Loc. Sch. Dist.*

*v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139-40 (S.D.N.Y. 2015).[3]

## ARGUMENT

### The Commonwealth's birth certificate policy triggers heightened scrutiny because it discriminates on the basis of transgender status.

The Commonwealth's birth certificate policy prevents nonbinary people from obtaining a birth certificate that accurately reflects their gender identity, while allowing all other Puerto Ricans to obtain accurate birth certificates. That policy denies plaintiff-appellees a government benefit because their gender identity does not align with their sex assigned at birth or, in short, because they are transgender. Because this denial results from discrimination based on transgender status, and transgender status meets all the indicia of a quasi-suspect classification, this Court should hold that government discrimination against transgender people triggers heightened equal protection scrutiny.

---

[3] The Supreme Court's Order granting a stay in *Trump v. Orr*, No. 25A319, 2025 WL 3097824 (Nov. 6, 2025), does not resolve this appeal. In *Orr*, the question of whether the State Department's passport policy classified based on transgender status was not fully briefed before the Court and was not the basis for the district court's grant of a preliminary injunction. Accordingly, the Supreme Court's abbreviated and preliminary Order on the emergency docket does not govern the level of scrutiny the Court applies here where there is a different underlying rule that subjects transgender people to disparate treatment.

**A.    The Commonwealth's policy discriminates against nonbinary persons based on their transgender status.**

**1.    Nonbinary people are a subgroup of transgender people.**

People whose gender identity is nonbinary are a subgroup of transgender people.  A person's gender identity is their "internal sense of their own gender." Op. and Order 7. The term "transgender" refers to any person whose "gender identity does not align" with their sex assigned at birth.  *United States v. Skrmetti*, 145 S. Ct. 1816, 1824 (2025).  By contrast, a person whose gender identity matches their sex assigned at birth is cisgender.  Individuals who have a gender identity that is something other than the mutually exclusive options of man or a woman are nonbinary.  Those individuals with a nonbinary gender identity are by definition transgender because they have a gender identity that does not align with the male or female sex they were assigned at birth.

**2.    The policy's disparate treatment of nonbinary people is discrimination based on transgender status.**

There are two ways to obtain a birth certificate from the Commonwealth that accurately reflects a person's gender identity: (1) having an accurate, original birth certificate or (2) applying for an amended birth certificate.  The first option is available only to cisgender people, who, by definition, have a gender identity that is male or female that matches their sex assigned at birth.  A binary transgender person can use the second option to obtain a birth certificate that correctly matches

4

their gender identity as male or female if they have another identity document or a medical certification reflecting that gender identity.  *See* Op. and Order 5-6 (citing 31 L.P.R.A. § 7655 (2020)).  Under the Commonwealth's policy, even with documentation reflecting their nonbinary gender identity, a nonbinary person cannot obtain a birth certificate reflect their nonbinary gender identity.  *Id.* at 7. Thus, the policy singles out one group – nonbinary people – and denies them access to accurate identification.

That denial is disparate treatment against nonbinary people, and it constitutes discrimination on the basis of transgender status under the Equal Protection Clause.  That some transgender people can obtain an accurate birth certificate does not make the policy neutral with respect to transgender status.  The challenged discrimination does not have to affect every member of a class to discriminate based on membership in that class.  *See, e.g.*, *Rice v. Cayetano*, 528 U.S. 495, 516-17 (2000) ("Simply because a class . . . does not include all members of [a] race does not suffice to make the classification race neutral."); *Mathews v. Lucas*, 427 U.S. 495, 504 n.11 (1976) ("That the statutory classifications challenged here discriminate among illegitimate children does not mean, of course, that they are not also properly described as discriminating between legitimate and illegitimate children.").  Consider a law that discriminates against just one denomination of a particular religion—that law still discriminates

based on religion even though others of the same religion are not affected.  *See, e.g.*, *Fuqua v. Raak*, 120 F.4th 1346, 1349-56 (9th Cir. 2024) (permitting equal protection claim to proceed based on denial of kosher dietary option to inmate with "Christian-Israelite" beliefs "made available to members of another denomination"); *Chaplaincy of Full Gospel Churches v. U.S. Navy (In re Navy Chaplaincy)*, 697 F.3d 1171, 1173 (D.C. Cir. 2012) (remanding to district court to analyze discrimination claim differentiating between "liturgical" and "nonliturgical Protestants").  The same is true for discrimination against nonbinary people as a subset of transgender people.

The Commonwealth's argument that the birth certificate policy treats "all individuals equally" because "every person has the option of amending" their birth certificate to reflect a male or female marker, and therefore, it does not discriminate against nonbinary individuals, is unavailing.  Defs. Appellants' Br. 17.  That argument is akin to the argument that bans on same-sex marriage do not discriminate based on sexual orientation because every individual is free to marry someone of the opposite sex.  The Supreme Court rejected that argument, recognizing that for lesbians and gay men who seek to participate in the institution of marriage, "same-sex marriage is their only real path to this profound commitment."  *Obergefell v. Hodges*, 576 U.S. 644, 658 (2015).  For nonbinary

individuals, their only "real path" to accurate identification is identification that reflects their gender identity with an "X" sex designation.

**B.      The Commonwealth's policy triggers heightened scrutiny because transgender status is a quasi-suspect classification.**

The Commonwealth's birth certificate policy requires heightened review because transgender status qualifies as a quasi-suspect classification under Supreme Court precedent.  *See Grimm*, 972 F.3d at 611-12; *Karnoski*, 926 F.3d at 1200-01; *see also GLBT Youth*, 557 F. Supp. 3d at 244; *M.A.B.*, 286 F. Supp. 3d at 719-20; *Adkins*, 143 F. Supp. 3d at 139-40.  The Court has traditionally considered four factors when analyzing whether a classification is quasi-suspect:  (1) whether the class has historically "been subjected to discrimination," *Lyng v. Castillo*, 477 U.S. 635, 638 (1986); (2) whether the class has a defining characteristic that "frequently bears no relation to [the] ability to perform or contribute to society," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985) (citation modified); (3) whether members of the class have "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng*, 477 U.S. at 638; and (4) whether the class is a minority or lacks political power, *see Bowen v. Gilliard*, 483 U.S. 587, 602 (1987).  *See also Windsor v. United States,* 699 F.3d 169, 181 (2d Cir. 2012) (explaining that "immutability and political power are not strictly necessary factors" for heightened scrutiny to apply), *aff'd*, 570 U.S. 744

(2013).  Transgender status is a quasi-suspect classification because discrimination

against transgender people satisfies all of those criteria.

### 1.  Transgender people have faced a history of de jure discrimination.

Transgender people have long experienced discrimination that has relegated

them to the margins of society.  As the Fourth Circuit has observed, transgender

people "suffer[] from high rates of employment discrimination, economic

instability, and homelessness," "frequently experiences harassment in [public]

places," and are "more likely to be the victim of violent crimes."  *Grimm*, 972 F.3d

at 611-12.  This history of discrimination includes a broad array of laws targeting

transgender persons for their gender nonconformity.  *See Skrmetti*, 145 S. Ct. at

1853 (Barrett, J., concurring) (emphasizing the centrality of *de jure* discrimination

to this criterion).

Many of these discriminatory laws predate the common usage of the term

"transgender" to refer to individuals with a gender identity that differs from their

sex assigned at birth; instead, transgender status has historically been "understood,

acknowledged, and treated as a sexual orientation phenomenon, both culturally and

legally."  Francisco Valdes, *Queers, Sissies, Dykes, and Tomboy:  Deconstructing

the Conflation of "Sex," "Gender," and "Sexual Orientation" in Euro-American

Law and Society*, 83 Cal. L. Rev. 1, 313 (1995).  As a result, past discriminatory

laws referring to sexual orientation typically incorporate discrimination based on transgender status as well.

a. *Laws prohibiting cross dressing*.  The mid-nineteenth century saw a "tidal wave of laws against cross-dressing" in the United States, which served to criminalize transgender people's presence in public space. William N. Eskridge, *Gaylaw: Challenging the Apartheid of the Closet* 27 (1999); *see* Kate Redburn, *Before Equal Protection: The Fall of Cross-Dressing Bans and the Transgender Legal Movement*, 40 L. & Hist. Rev. 679, 718-21 (2022) (listing nineteenth-century cross-dressing prohibitions).  These laws were an overt effort to regulate "*gender deviance*" by policing "people who violated gender roles."  Eskridge, *supra*, at 28.  At least two States and twenty-eight cities passed cross-dressing laws in the nineteenth century.  *Id.* at 27; Jennifer Levi & Daniel Redman, *The Cross-Dressing Case for Bathroom Equality*, 34 Seattle L. Rev. 133, 152 (2010).  Among these were major cities like Chicago, Charleston, Kansas City, and St. Louis. Eskridge, *supra*, at 27; Redburn, *supra*, 718-21.  St. Louis, for instance, made it a crime for people to appear in a public place "in a dress not belonging to their sex." Redburn, *supra*, at 718.  Likewise, both New York and California enacted state criminal prohibitions against cross dressing in the 1870s.  Eskridge, *supra*, at 27. By the "middle of the twentieth century," cross-dressing bans "were ubiquitous in

urban America," Redburn, *supra*, at 681, with one enacted in Cincinnati as recently as 1974, Levi & Redman, *supra*, at 152.

b. *Liquor laws*. When legal liquor sales resumed after the repeal of Prohibition, many States passed new regulations to "prevent bars and restaurants from becoming 'disorderly' by prohibiting various 'persons of ill repute' from congregating there." Redburn, *supra*, at 690 (citation omitted). In turn, some "liquor officials interpreted their mandate to include regulating gender and sexual deviance," including expression of a gender identity that differed from one's birth sex. *Id.* A New Jersey regulation, for example, made licensure contingent on a prohibition against serving "person[s] of ill repute" that expressly included "female impersonator[s]" among them. N.J. Dep't of Law & Pub. Safety Div. of Alcoholic Beverages, Rules and Regulations Effective July 1, 1950, Reg. 20, Rule 4, https://dspace.njstatelib.org/server/api/core/bitstreams/b7436758-3577-4864-bd77-d5bc8205ba24/ [https://perma.cc/W3TY-7XVG].

c. *Immigration laws*. Immigration laws in the United States have prohibited entry to transgender individuals via restrictions that excluded gay persons as pathologically inferior. Gay persons "were first considered to be statutorily excluded from entry into the United States by the Immigration Act of 1917." *Lesbian/Gay Freedom Day Comm., Inc. v. U.S.I.N.S*, 541 F. Supp. 569, 571-72 (N.D. Cal. 1982) (citing Pub. L. No. 64-301, § 3, 39 Stat. 874). That law excluded

10

gay persons by prohibiting the entry of "persons of constitutional psychopathic inferiority" certified by a physician to be "mentally . . . defective." Pub. L. No. 64-301, § 3, 39 Stat. 874 (1917). In 1952, Congress passed the Immigration and Nationality Act, which barred entry of persons with "psychopathic personality." Pub. L. No. 82-414, § 212(a)(4), 66 Stat. 163. The Act's legislative history shows that Congress viewed "persons suffering from disturbances in sexuality" as "included within the classification of 'psychopathic personality.'" 1952 U.S.C.C.A.N. 1653, 1701. Congress amended the statute again after the Ninth Circuit held that the psychopathic personality exclusion could not be applied to gay persons. *See Fleuti v. Rosenberg*, 302 F.2d 652 (9th Cir. 1962). The amendment explicitly added "aliens afflicted with . . . sexual deviation" to the list of immigrants excluded from admission to the United States. Pub. L. No. 89-236, § 15(b)-(c), 79 Stat. 911 (1965). The Senate Report explained that the amendment "specifically provide[s] for the exclusion of homosexuals and sex perverts." 1965 U.S.C.C.A.N. 3328, 3337.

d. *Laws controlling family life.* The law has also long discriminated against transgender persons with respect to their ability to marry as well as bear and raise children. In more recent history, courts have invalidated or prohibited marriage between transgender women and cisgender men and vice versa. *See Kantaras v. Kantaras*, 29 Fla. L. Weekly D1669, 884 So. 2d 155, 161 (D. Ct. App. 2004); *In re*

11

*Est. of Gardiner*, 273 Kan. 191, 213-14, 42 P.3d 120, 136 (2002); *Littleton v.*

*Prange*, 9 S.W.3d 223, 231 (Tex. App. 1999). Furthermore, by 1925, with the

popularization of eugenics, 23 States adopted forced sterilization laws to prevent

certain disfavored groups from bearing children. Robert J. Cynkar, *Buck v. Bell:*

*"Felt Necessities" v. Fundamental Values?* 81 Columbia L. Rev. 1418, 1433

(1981). Among those considered "socially unfit" for parenthood were gay and

gender-nonconforming persons. Jana Leslie-Miller, *From Bell to Bell:*

*Responsible Reproduction in the Twentieth Century*, 8 Md. J. of Contemp. Legal

Issues 123, 130-31 (1997) (addressing California's sterilization of "sexual

perverts"); *In re Opinion of the Justices*, 230 Ala. 543, 544, 162 So. 123, 125

(1935) (discussing Alabama's discretion to use sterilization to treat "the physical,

mental or moral condition of any sexual pervert, Sadist, homosexualist, Masochist,

Sodomist, or any other grave form of sexual perversion . . . to be sterilized").

States have also infringed upon the rights of transgender individuals to raise

children by invoking an individual's transgender status as a basis for termination of

parental rights. *See M.B. v. D.W.*, 236 S.W.3d 31, 36-38 (Ky. Ct. App. 2007);

*Daly v. Daly*, 102 Nev. 66, 71, 715 P.2d 56, 59 (1986).

     e. *Exclusion from employment opportunity.* Federal law has often barred

transgender people from obtaining equal employment opportunity. For example,

the federal government had a policy of excluding transgender people from

12

employment by the federal government.  *See* Exec. Order No. 10450*,* 18 Fed. Reg.

2489 (Apr. 27, 1953); *Schroer v. Billington*, 577 F. Supp. 2d 293, 301 n.3 (D.D.C.

2008) (relying on EO 10450 in denying transgender woman's employment at the

Library of Congress).  Federal law has also prohibited transgender people from

serving in the U.S. armed forces.  *See* Exec. Order No. 14183, 90 Fed. Reg. 8757

(Jan. 7, 2025); *Doe 2 v. Shanahan*, 91 F.3d 694, 696 (D.C. Cir. 2019) ("Prior to

2015, the Department of Defense (DoD) effectively banned all transgender persons

from either joining or remaining in the military."); *id.* at 698 (discussing President

Trump's first-term ban on transgender individuals serving in the U.S. military).

### 2. Transgender status has no bearing on one's ability to contribute to society.

Being transgender "bears no relation to [that person's] ability to perform or

contribute to society."  *City of Cleburne*, 473 U.S. at 441 (citation omitted).  To be

sure, "some transgender individuals experience gender dysphoria, and that could

cause some level of impairment," but the status of being transgender does not

hinder one's ability to contribute to society.  *Grimm*, 972 F.3d at 612.  Transgender

status does not make someone less capable of pursuing a career, raising a family,

or making their own decisions.  And requiring the government to satisfy

heightened scrutiny will ensure that transgender individuals are free to reach their

full potential on the same terms as all other people in the United States.

13

###### 3.    Transgender persons are a discrete, easily identifiable group.

Transgender individuals share "obvious, immutable, or distinguishing characteristics."  *Gilliard*, 483 U.S. at 602.  Transgender status—specifically, having a gender identity that does not align with one's sex assigned at birth—is "a sufficiently discernible characteristic to define a discrete minority class."  *Adkins*, 143 F. Supp. 3d at 139.  True, an individual person may use a term other than transgender (or another term in addition to transgender) to name or describe their own gender identity (*e.g.*, nonbinary, genderqueer etc.).  *See Gore v. Lee*, 107 F.4th 548, 558 (6th Cir. 2024) (concluding that transgender status does not satisfy the third factor because *individuals* may use different language to describe their own gender identity).  But as long as that person's gender identity does not match their sex assigned at birth, then they belong squarely within the defined boundaries of this discrete minority group.

Importantly, this Court is *not* required to find that transgender status is also immutable to hold that transgender people constitute a quasi-suspect class.[4] Immutability under this factor does not refer to whether a certain characteristic is

---

[4] Similarly, this Court does not have to separately find that the defining characteristic of transgender people is "obvious."  The Supreme Court applies heightened scrutiny to illegitimacy, which the Court has observed "does *not* carry an obvious badge, as race or sex do."  *Mathews v. Lucas*, 427 U.S. 495, 506 (1976) (emphasis added).

the result of a voluntary choice but whether that characteristic is one that the government requires be changed to obtain equal treatment. *See Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000); *Highland*, 208 F. Supp. 3d at 874; *see also Windsor*, 699 F.3d at 183 n.4 (observing that "a trait [is] effectively immutable if changing it would involve great difficulty, such as requiring a major physical change or a traumatic change of identity") (citation modified); *Grimm*, 872 F.3d at 612 (noting that "being transgender is not a choice"). And transgender status satisfies this definition because gender identity is "innate and has biological underpinnings" as plaintiffs-appellees explain in their brief. Pls. Br. 4-5.

Regardless, the Supreme Court does not require that the class's defining characteristic be absolutely "immutable." *See Gilliard*, 483 U.S. at 602 (grammatically indicating "obvious," "immutable," and "distinguishing" as alternatives by using the conjunction "or"). For instance, the Court has held that classifications burdening children "based on [their] parents' marital status . . . are subject to the same heightened scrutiny as distinctions based on gender." *Sessions v. Morales-Santana*, 582 U.S. 47, 76 n.25 (2017); *see Clark v. Jeter*, 486 U.S. 456, 461 (1988). It has done so even though "[i]llegitimacy is a legal construct, not a natural trait" and can change if a child's biological parents marry. *Michael H. v. Gerald D.*, 491 U.S. 110, 131 (1989). Likewise, "religion" is a "suspect distinction[]," *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976),

15

notwithstanding that people can change faiths. And "classifications based on alienage . . . are inherently suspect" even though alienage—i.e., the status of being a noncitizen—is mutable. *Graham v. Richardson*, 403 U.S. 365, 372 (1971).

Nor must quasi-suspect classifications be tied to traits that are "definitively ascertainable at the moment of birth." *Skrmetti*, 145 S. Ct. at 1851 (Barrett, J., concurring) (citation modified). Indeed, not even race—the most suspect of all classifications—meets that standard. As Justice Thomas has explained, "it is impossible to look at an individual and know definitively his or her race," and individuals "may . . . identify as members of particular races for any number of reasons." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 276 (2023) (Thomas, J., concurring).

### 4. Transgender people are a minority lacking meaningful political power to protect their rights.

Transgender people have not "yet been able to meaningfully vindicate their rights through the political process" in much of the Nation. *Grimm*, 972 F.3d at 613. They are "underrepresented in this Nation's decision-making councils," *Frontiero v. Richardson*, 411 U.S. 677, 686 n.17 (1973). There has been just one openly transgender member of the House of Representatives. No Senators. No federal judges. The staggering surge in recent state laws targeting transgender people and the wide swath of federal policies singling them out for discrimination substantiate their lack of political power. *See* ACLU, *Mapping Attacks on LGBTQ*

*Rights in U.S. State Legislatures in 2024* (Dec. 6, 2024), https://www.aclu.org/

legislative-attacks-on-lgbtq-rights-2024 [https://perma.cc/F7ET-J8J7]; *Talbott v.*

*United States*, 775 F. Supp. 3d 283, 330-31 (D.D.C. 2025) (summarizing recent

executive orders). Were these outcomes alone not enough to illustrate the distorted

political process that transgender people face, the vitriolic rhetoric spoken in

support of these laws makes it abundantly clear.  Legislators have called

transgender Americans "mutants," "demons," and "imps." *Doe v. Ladapo*, 676 F.

Supp. 3d 1205, 1223 n.62 (N.D. Fla. 2023).

That transgender people have experienced some improved circumstances in

recent history does not undermine their qualification as a quasi-suspect class.  For

instance, when the Supreme Court held that sex-based classifications warranted

heightened scrutiny, women had "improved" their position in society "markedly,"

including through the passage of a constitutional amendment ensuring their right to

vote and multiple federal statutes forbidding sex discrimination. *Frontiero*, 411

U.S. at 685.  Despite that progress, the Court recognized that "women still face

pervasive, although at times more subtle, discrimination" and, thus, needed judicial

protection. *Id.* at 686.  The same is true here.  And this Court should not hesitate to

find that transgender people are a quasi-suspect class simply because their efforts

in an uphill battle to improve their circumstances have at times been successful.

As the present realities demonstrate, many of those modest successes are tenuous, at best.

## CONCLUSION

For the foregoing reasons, this Court should hold that the Commonwealth's birth certificate policy discriminates on the basis of transgender status and is therefore subject to heightened scrutiny.

Respectfully submitted,

/s/*Barbara Schwabauer*
Barbara Schwabauer*
 (1st Cir. Bar No. 1189891)
Jon Davidson**
Chase Strangio
AMERICAN CIVIL LIBERTIES UNION
 FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Phone: (212) 549-2515
bschwabauer@aclu.org
jdavidson@aclu.org
cstrangio@aclu.org

*Admitted only in Ohio
** Admitted only in California

/s/*Fermín L. Arraiza-Navas*
Fermín L. Arraiza-Navas
 (1st Cir. Bar No. 73810)
Annette Martínez-Orabona
Executive Director
AMERICAN CIVIL LIBERTIES UNION
 PUERTO RICO CHAPTER
Union Plaza, Suite 1105
416 Avenida Ponce de León
San Juan, Puerto Rico 00918
Phone: (787) 753-9493
Phone: (646) 740-3865
farraiza@aclu.org

Dated:  November 18, 2025

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[x] this brief or other document contains [less than 6500] words.

[ ] this brief uses monospaced type and contains [state number of] lines.

2.    This brief complies with the typeface and type style requirements because:

[x] this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Times New Roman.

 [ ] this brief or other document has been prepared in a monospaced typeface using [identify word processing program]

Dated:  November 18, 2025            /s/*Barbara Schwabauer*            
                                    Counsel for Amicus Curiae

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of November, 2025, I filed the foregoing Brief with the Clerk of the Court using the CM/ECF system, which will automatically serve electronic copies upon all counsel of record.

/s/*Barbara Schwabauer*
Counsel for Amicus Curiae