# United States Court of Appeals
## For the First Circuit

———————————

### No. 25-1638

ÍNARU NADIA DE LA FUENTE DÍAZ; MARU ROSA HERNÁNDEZ; ANDRÉ RODIL; YEIVY VÉLEZ BARTOLOMEI; GÉ CASTRO CRUZ; DENI JUSTE,

Plaintiffs – Appellees,

v.

JENNIFFER A. GONZÁLEZ COLÓN, in the official capacity as Governor of the Commonwealth of Puerto Rico; Dr. VÍCTOR RAMOS OTERO, in his official capacity as Secretary of the Department of Health of the Commonwealth; WANDA LLOVET DÍAZ, in the official capacity as the Director of the Division of Demographic Registry and Vital Statistics of the Commonwealth,

Defendants – Appellants,

———————————

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

[Hon.  María Antongiorgi-Jordán, U.S. District Judge]

———————————

### REPLY BRIEF FOR DEFENDANTS-APPELLANTS JENNIFFER A. GONZÁLEZ COLÓN, DR. VICTOR RAMOS OTERO AND WANDA LLOVET DÍAZ

**OMAR ANDINO-FIGUEROA**
Solicitor General of Puerto Rico
USCA No. 1197240
PO Box 9020192
San Juan, Puerto Rico 00902-0192
Telephone: (787) 721-2900
E-mail: *omar.andino@justicia.pr.gov*

**FRANK A. ROSADO MÉNDEZ**
Deputy Solicitor General
USCA No. 1209179
PO Box 9020192
San Juan, Puerto Rico 00902-0192
Telephone: (787) 721-2900
Email: *frank.rosado@justicia.pr.gov*

December 9, 2025

# TABLE OF CONTENTS

**PAGE(S)**

**I. PRELIMINARY STATEMENT** .................................................................. 2-5

**II. ARGUMENT** .......................................................................................... 6-42

    **A. Puerto Rico's birth certificate format does not trigger heightened scrutiny because it does not treat members of one sex differently than members of the other sex.** ...................................................................... 6-12

    **B. Puerto Rico's birth certificate format does not discriminate and neither nonbinary nor transgender individuals qualify as a quasi-suspect class.** ........................................................................................ 12-28

        **i. Appellees waived the argument that transgender or nonbinary individuals are a quasi-suspect class** ............................................. 13-15
        **ii. Puerto Rico's birth certificate format does not classify on the basis of transgender or nonbinary status.** .............................................. 15-19
        **iii. Neither nonbinary individuals nor transgender individuals qualify as a quasi-suspect class** ....................................................... 20-28

    **C. Puerto Rico's birth certificate format survives rational scrutiny.** ................................................................................................ 29-42

        **i. The district court misapplied the rational basis scrutiny** .......... 30-31
        **ii. Puerto Rico's birth certificate format is rationally related to legitimate state interests that were properly raised before the district court** ...................................................................................... 31-38
        **iii. Puerto Rico's birth certificate format is not supported by animus against any group, much less transgender or nonbinary individuals.** ................................................................................... 38-42

**CERTIFICATE OF FILING AND SERVICE** ................................................43

**CERTIFICATE OF COMPLIANCE WITH RULE 32(G)** .............................44

Page (s)

**Cases:**

A.C. by Waithe v. McKee, 23 F.4th 37 (1st Cir. 2022) ...........................................29

Agatha v. Trump, 151 F.4th 9 (1st Cir. 2025) .......................................................18

Adkins v. City of N.Y., 143 F.Supp.3d 134 (S.D.N.Y. 2015) ................................21

Armour v. City of Indianapolis, Ind., 566 U.S. 673 (2012)............................. 30, 37

Arroyo-González v. Rosselló-Nevares, 305 F.Supp.3d 327 (D.P.R. 2018) ... *passim*

Ass'n to Pres. and Protect Local Livelihoods v. Sidman, 147 F.4th 40
   (1st Cir. 2025) ..................................................................................................29

Bankers Life & Cas. Co. v. Crenshaw, 486 U.S. 71 (1988) ..................................29

Bd. of Tr. of Univ. of Ala. v, Garrett, 531 U.S. 356 (2001) ..................................27

Bowen v. Gilliard, 483 U.S. 587 (1987) ................................................................25

Bostock v. Clayton County, 590 U.S. 644 (2020) ......................................... *passim*

City of Cleburne Tex. v. Cleburne Living Center, 473 U.S. 432 (1985) ........ *passim*

Clark v. Jeter, 486 U.S. 456 (1988) ......................................................................13

Corbitt v. Secretary of the Alabama Law Enforcement Agency,
   115 F.4th 1335 (11th Cir. 2024) .......................................................................36

Dandridge v. Williams, 397 U.S. 471 (1970) .........................................................32

D'Angelo v. N.H. Supreme Court, 740 F.3d 802 (1st Cir. 2014) ...........................29

Dekker v. Weida, 679 F.Supp.3d 1271 (N.D. Fla. 2023) .......................................21

Dobbs v. Jackson Women's Health Org., 597 U.S. 215 (2022) ……………4, 24, 42

Donahue v. City of Boston, 371 F.3d 7 (1st Cir. 2004) ..........................................29

Eknes-Tucker v. Governor of Ala., 80 F.4th 1205 (11th Cir. 2023)  ...................7, 8

Evancho v. Pine-Richland Sch. Dist., 237 F.Supp.3d 267 (W.D. Penn. 2017) ......21

FCC v. Beach Commc'ns Inc., 508 U.S. 307 (1993)........................................ 12, 29

Flack v. Wis. Dept. of Health Servs., 328 F.Supp.3d 931 (W.D. Wis. 2018)........21

Fowler v. Stitt, 104 F.4th 770 (10th Cir. 2024) ......................................................41

F.V. v. Barron, 286 F.Supp.3d 1131 (D. Idaho 2018)............................................21

Gore v. Lee, 107 F.4th 548 (6th Cir. 2024) ..................................................... passim

Grimm v. Gloucester Cnty School Bd., 972 F.3d 586, 596 (4th Cir. 2020)............20

Hecox v. Little, 104 F.4th 1061 (9th Cir. 2024) ......................................................22

Heller v. Doe by Doe, 509 U.S. 312 (1993) ...........................................................31

Hope v. Comm'r of Ind. Dep't of Corr., 66 F.4th 647 (7th Cir. 2023) ........... 22, 32

Igartua-De la Rosa v. U.S., 417 F.3d 145 (1st Cir. 2005) .......................................42

In re Tam, 808 F.3d 1321 (Fed. Cir. 2025) ...................................................... 35, 36

Karnoski v. Trump, 926 F.3d 1180 (9th Cir. 2019)................................................21

Kittery Motorcycle, Inc. v. Rowe, 320 F.3d 42 (1st Cir. 2003) .............................32

Kluge v. Brownsburg Cmty. Sch. Corp., 150 F.4th 792 (7th Cir. 2025) ...............21

Lawrence v. Tex., 539 U.S. 558 (2003) ........................................................ 14, 24

L.W. by and through Williams v. Skrmetti, 83 F.4th 460, 480-481 (6th Cir. 2023)
............................................................................................................. 11, 26

Lyng v. Castillo, 477 U.S. 635 (1986) ....................................................27

Mass. Bd. of Ret. v. Murgia, 427 U.S. 307 (1976) ........................... 23, 24

Mass. v. HHS, 682 F.3d 1, 10 (1st Cir. 2012) .......................................40

Matal v. Tam, 582 U.S. 218 (2017) .......................................................36

Meriwether v. Hartop, 992 F.3d 492 (6th Cir. 2021) .............................7

Mulero-Carrillo v. Román-Hernández, 790 F.3d 99 (1st Cir. 2015).......................33

Obergefell v. Hodges, 576 U.S. 644 (2015) ..................................... 14, 24

Ondo v. City of Cleveland, 795 F.3d 597 (6th Cir. 2015) ......................25

Orr v. Trump, 778 F.Supp.3d 394 (D. Mass 2025) ........................ passim

Pagán v. Calderón, 448 F.3d 16, 36 (1st Cir. 2006) ..............................28

Pelcha v. MW Bancorp, Inc., 988 F.3d 318 (6th Cir. 2021) ....................7

Reed v. Reed, 404 U.S. 71 (1971) .........................................................23

Rivera-Díaz v. Humana Ins. of P.R., Inc., 748 F.3d 387 (1st Cir. 2014) ..............13

Rodríguez v. Municipality of San Juan, 659 F.3d 168 (1st Cir. 2011) ...................14

Romer v. Evans, 517 U.S. 620 (1996) ...................................................23

Stitt v. Fowler, 145 S. Ct. 2840 (2025), 2025 WL 1787695 ...............4, 41

Talbott v. U.S., 775 F.Supp.3d 283 (D.D.C. 2025) ...............................21

Teamsters Union Local No. 59 v. Superline Transp. Co., 953 F.2d 17
   (1st Cir. 1992) ................................................................................13

Trimble v. Gordon, 430 U.S. 762 (1977) ..............................................23

<u>Trump v. Orr</u>, __ S. Ct.___ (2025), 2025 WL 3097824 (Nov. 6, 2025) ........ *passim*

<u>U.S. v. Skrmetti</u>, 605 U.S. 495 (2025)............................................................ *passim*

<u>U.S. v. Slade</u>, 980 F.2d 27 ....................................................................14

<u>U.S. v. Windsor</u>, 570 U.S. 744 (2013) ........................................... 14, 24

<u>U.S. v. Zannino</u>, 895 F.2d 1 (1st Cir. 1990) ..........................................15

<u>Vance v. Bradley</u>, 440 U.S. 93 (1979) .................................................12

<u>Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.</u>, 858 F.3d 1034 (7th Cir. 2017) ..........................................................................21

**Statutes (Federal):**

Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1)............................... 7-8

**Statutes (State):**

Puerto Rico Civil Code, Article 682, P.R. Laws Ann. tit. 31, § 7632 ......................9

**Other Sources:**

Jo Yurcaba, *Sarah McBride becomes the first out transgender person elected to Congress*, NBC News (Nov. 5, 2024) https://www.nbcnews.com/nbc-out/out-politics-and-policy/sarah-mcbride-first-transgender-congress-delaware-rcna177878...........................................................................................28

Department of Health & Human Services, Defining Sex: Guidance Federal Agencies, External Partners, and the Public Implementing Executive Order 14158, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.......................................................38

# United States Court of Appeals
## For the First Circuit
———————————

### No. 25-1638

ÍNARU NADIA DE LA FUENTE DÍAZ; MARU ROSA HERNÁNDEZ; ANDRÉ
RODIL; YEIVY VÉLEZ BARTOLOMEI; GÉ CASTRO CRUZ; DENI JUSTE,

Plaintiffs – Appellees,

v.

JENNIFFER A. GONZÁLEZ COLÓN, in the official capacity as Governor of the
Commonwealth of Puerto Rico; Dr. VÍCTOR RAMOS OTERO, in his official
capacity as Secretary of the Department of Health of the Commonwealth;
WANDA LLOVET DÍAZ, in the official capacity as the Director of the Division
of Demographic Registry and Vital Statistics of the Commonwealth,

Defendants – Appellants,

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. María Antongiorgi-Jordán, <u>U.S. District Judge</u>]
———————————

### REPLY BRIEF FOR DEFENDANTS-APPELLANTS

**TO THE HONORABLE COURT:**

**COME NOW** Defendants-Appellants, Jenniffer A. González-Colón, in her

official capacity as Governor of Puerto Rico; Dr. Victor Ramos-Otero, in his official

capacity as Secretary of the Department of Health of Puerto Rico; and Wanda

Llovet-Díaz, in her official capacity as the Director of the Division of Demographic

Registry and Vital Statistics of Puerto Rico ("Appellants"), through the undersigned counsel, and most respectfully state and pray as follows:

## I.    PRELIMINARY STATEMENT

To distance themselves from the district court's misapplication of the rational review standard —or perhaps in recognizing the precarity of their arguments under such a deferential standard— Plaintiffs-Appellees ("Appellees")[1] center the vast majority of their argumentation around attempting to convince this Court that a heightened degree of scrutiny applies to their claims. A conclusion that the district court —ruling in their favor— was hesitant to reach, to the point it expressly declined to rule on the issue. As the most recent Supreme Court case law makes eminently clear, the district court's instinct in abstaining from applying a higher degree of scrutiny to this matter was correct. Gender identity and sex are different concepts, thus even accepting, for the sake of argument, appellees' framing that the Puerto Rico birth certificate format classifies individuals on the basis of gender identity, that would not be the same as a sex-based classification that would trigger intermediate scrutiny. The Supreme Court's holding in <u>Bostock v. Clayton Cnty, Ga</u>, 590 U.S. 644 (2020) does not change this calculus.

---

[1] Appellees are Ínaru Nadia de la Fuente Díaz; Maru Rosa Hernández; André Rodil; Yeivy Vélez Bartolomei; Gé Castro Cruz; and Deni Juste who are all Puerto Rico citizens that identify as transgender nonbinary individuals.

Further, for the first time, Appellees now contend that transgender or nonbinary individuals themselves are a quasi-suspect class and thus laws that classify on that basis must warrant heightened scrutiny. Setting aside the fact that this argument is unquestionably waived as Appellees never brought it before the district court, the Puerto Rico birth certificate format cannot qualify on the basis of transgenderism because it explicitly allows all individuals to change the *sexual* designation to that better comports with their identity. In so doing, the birth certificate format provides all individuals, including transgender (or nonbinary) citizens, the option to amend their birth certificate within the constraints of a biological reality, that is, the two *sexes*.

In sum, Appellees put forth the unsustainable notion that a birth certificate format that allows all transgender and nonbinary individuals to amend these documents to reflect the sex that better comports with their identity —and that was enshrined into law as the Government of Puerto Rico's ("Government") earnest attempt to comply with a case that recognized them such a right— somehow targets transgender individuals as a class. Nevertheless, setting aside the incongruence of such a concept for the moment, transgender nor nonbinary individuals —as an alleged subset of transgender individuals or on their own— do not rise to the degree of powerlessness of which the Supreme Court has, on exceedingly rare occasion, entertained granting "quasi-suspect" class status to. On the contrary, despite having

been presented with the question of whether gender identity or sexual orientation minorities are a quasi-suspect class on multiple occasions, the Supreme Court has routinely refrained from issuing such a sweeping proclamation.

As thoroughly discussed in Appellants' opening brief, the most recent Supreme Court case law has been steadfast in recognizing state governments' discretion to legislate in the area of "economics and social welfare" so long as it does not rely on prohibited criteria to do so nor impinge upon fundamental rights. See, U.S. v. Skrmetti, 605 U.S. 495, 525-526 (2025); Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 236 (2022); Stitt v. Fowler, 145 S.Ct. 2840 (June 30, 2025). In fact, during the pendency of this appeal, the Supreme Court issued yet another blow to the district court's *Opinion and Order* appealed herein by granting a stay pending appeal of Orr v. Trump, 778 F.Supp.3d 394 (D. Mass 2025), a case which the district court had cited favorably in reaching its decision. See, Trump v. Orr, __ S. Ct.___ (2025), 2025 WL 3097824 (Nov. 6, 2025).

In that context, returning to what is truly at issue in this appeal (i.e., whether Puerto Rico's birth certificate format creates a classification and, where such classification found to exist, whether it infringes on Appellees' Equal Protection Clause rights through the prism of the deferential rational review standard) nothing in Appellees' brief, nor the multiple *Amici Curiae* briefs filed in their support, discredits the fact that it does not. Puerto Rico's birth certificate format is supported

by multiple sound governmental interests, all of which have been properly raised to this Court. Moreover, as they did before the district court, Appellees put forth nothing but the naked assertion itself that the birth certificate format is motivated by animus towards transgender individuals. This failure, however, is not surprising but rather demonstrative. Simply put, there is no evidence in the record before this court, nor outside of it, that Puerto Rico's reasonable birth certificate format came about as a result of anything other than the Government's good-faith effort to fulfill the district court's mandate in Arroyo-González v. Rosselló-Nevares, 305 F.Supp.3d 327 (D.P.R. 2018). Ultimately, Appellants' refusal to disregard the Puerto Rico legislative assembly's mandate and unilaterally amend the format —as Appellees would have them do— is not evidence of animus, but an adherence to the basic principles of separations of powers and respect to a co-equal branch of government. If Appellees wish to change the law, they must do so through the political arena, because the U.S. Constitution —and by extension the courts— does not provide them the result they desire.

For these and other reasons, this Circuit should reverse the district court's *Opinion and Order* and dismiss Appellees' claims.

## II. ARGUMENT

**A. Puerto Rico's birth certificate format does not trigger heightened scrutiny because it does not treat members of one sex differently than members of the other sex**.

From Appellees' perspective, applying a stretched interpretation of the Supreme Court's holding in <u>Bostock</u>, the Puerto Rico birth certificate format infringes on their rights under the Fourteenth Amendment's Equal Protection Clause because it purportedly discriminates against them on account of their status as transgender nonbinary individuals. Divorcing <u>Bostock</u> from its Title VII context, Appellees proffer that insofar as the birth certificate supposedly distinguishes nonbinary individuals from binary transgender individuals, the Government enforces "stereotypical notions about gender." *Responding Brief*, at 19. Accordingly, Puerto Rico's birth certificate format would, to Appellees' way of thinking, trigger intermediate scrutiny because to classify based on nonbinary identification or transgender identification is equivalent to classifying on the basis of sex. Nonetheless, properly read, <u>Bostock</u> does not save Appellees claims from having to be judged through the rational basis standard's deferential paradigm.

Despite <u>Bostock</u> being a relatively recent case, the Supreme Court has been quick to caution that its ruling was made in a Title VII labor employment discrimination context, not equal protection, and that the question of whether its reasoning reaches beyond that specific context remains as of now very much open.

Skrmetti, 605 U.S. at 520 ("We have not yet considered whether Bostock's reasoning reaches beyond the Title VII context, and we need not do so here").[2] Further, a precise reading of Bostock does not support extending its conclusion to the markedly different equal protection context. Particularly so within the factual background at issue in this appeal.

In broad strokes, in an opinion penned by Justice Gorsuch, Bostock held that an employer that discriminates against an employee "because of" their homosexuality or transgender status runs afoul of Title VII of the Civil Rights Act's protections against sex-based workplace discrimination. Bostock, 590 U.S. at 680. This result, in the Supreme Court's own words, comes as a result of a hyper-textualist approach and a strict adherence to the "ordinary public meaning" of Title VII's terms as drafted by Congress. Bostock, 590 U.S. at 655. This statute, the Court explains, proscribes "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of" such individual's sex, among other prohibited criterion. Id., at 655, 659 (quoting Title VII

---

[2] It bears mentioning though, that while the Supreme Court has presently declined to conclusively resolve the question, several courts have limited Bostock's holding to the Title VII context. See, Eknes-Tucker v. Governor of Ala., 80 F.4th 1205, 1229 (11th Cir. 2023) (The Equal Protection Clause contains none of the text that the Court interpreted in Bostock. [...]. Because Bostock therefore concerned a different law (with materially different language) and a different factual context, it bears minimal relevance to the instant case"); Pelcha v. MW Bancorp, Inc., 988 F.3d 318, 324 (6th Cir. 2021) (refusing to apply Bostock to the Age Discrimination in Employment Act); Meriwether v. Hartop, 992 F.3d 492, 510 n. 4 (6th Cir. 2021) (reasoning that Title VII analysis does not apply to Title IX).

of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1)). The Court's analysis, constrained to Title VII's text and context, found that these employers, by discriminating on account of homosexuality or transgenderism, discriminated against the individual based on traits or conduct that they tolerated in members of the opposite sex.[3] Still, as the Eleventh Circuit noted, it would make little functional sense to strike down a law or policy by virtue of the Equal Protection Clause but informed by the Supreme Court's strict adherence to another statute with different language. See, Eknes-Tucker, 80 F.4th at 1229.

With this in mind, Appellees' talismanic invocation of Bostock is fundamentally flawed. Take, for instance, the Supreme Court's more recent opinion in Skrmetti. To briefly recap the case exhaustively discussed in Appellants' opening brief, a Tennessee statute prohibited gender-affirming treatments for minors who suffered from certain diagnoses which are only linked to transgender individuals. Skrmetti, 605 U.S. at 519.[4] In so doing, the Court expressly distinguished that case

---

[3] For example, the Supreme Court explained that an employer that terminates a male homosexual employee because of his homosexuality discriminates against him on the basis of sex because it treats him worse than it would a female employee for engaging in the same conduct (i.e., being attracted to men). Likewise, the same logic holds true if a transgender woman that had been registered as male at birth is later terminated by her employer on account of her identity because it would do so relying on conduct that the employer would tolerate from a cisgender woman (i.e., identifying and presenting in society as female). Bostock, 560 U.S. at 660.

[4] Justice Gorsuch, Bostock's author, joined the majority opinion in Skrmetti.

from Bostock because "changing a minor's sex or transgender status does not alter the application of SB1." Id., at 520. Such is the case here.

Puerto Rico's birth certificates are simple, one-page documents that list only the following information: (i) the certificate number; (ii) the person's name; (iii) dwelling; (iv) birthdate; (v) registration date; (vi) birthplace; (vii) **sex**; (viii) the father's name, birthplace, and age at the time of the individual's birth; (ix) the mother's name, birthplace, and age at the time of the individual's birth; and (x) the date the certificate was issued.[5] For most individuals, the document lists their sex at birth. However, in compliance with the Arroyo-González opinion, the Government allows individuals to change the sex listed on their birth certificate when certain requirements are met. Thus, even if Bostock's reasoning applied to this case, the Puerto Rico birth certificate format does not "tolerate" any conduct from one sex that it does not tolerate from the other. To wit, if a transgender woman registered male at birth wishes to change the sex on her birth certificate from male to female, she is free to do so if she complies with Puerto Rico law. Likewise, she may choose to make no alteration at all and leave the sexual designation of male on her birth certificate as it was recorded at the time birth if that is her preference. Invert the

---

[5] See Article 682 of the Puerto Rico Civil Code which specifically enumerates data that the Puerto Rico Demographic Registry must record which includes names, **sex at birth**, parental information, marriage, among others. P.R. Laws Ann. tit. 31, § 7632. The article makes no mention of gender or other similar information.

sexes of this hypothetical scenario where now the applicant is a transgender man registered female at birth, the result is exactly the same. He may obtain an amended birth certificate that lists him as male or he may leave the document unaltered. The same is the case for a nonbinary person. None of the individuals in this example, whatever their sex or gender may be, may change their *sexual designation* to an X or reference anything other than the two sexes: male or female.

Essentially, using <u>Bostock</u>'s analytical framework —which as we have stated is both foreign and inapposite to the equal protection context— Puerto Rico's birth certificate "tolerates" males with either "male" or "female" on their birth certificates. The same holds true for females. Based on this, Puerto Rico's birth certificate treats both sexes the same, it neither favors nor disfavors one sex over the other. What Puerto Rico's birth certificate format does not encompass is any person (regardless of their sex) listing another signifier (or any other signifier that would represent anything that is not the two sexes) within the document's sexual designation. Appellees' shell game notwithstanding, gender and sex are two distinct concepts. On that basis, were the Puerto Rico birth certificate format to create a classification —which as Appellants have exhaustively explained in their brief it does not— with this fact pattern, sex cannot possibly be the line of demarcation even when

examining the birth certificate format under Title VII's standards as these were interpreted by the <u>Bostock</u> court.[6]

Aside from their <u>Bostock</u>-centric argumentation, Appellees contend that the Puerto Rico birth certificate format engages on sex-based discrimination because it enforces "stereotypical notions about gender" upon nonbinary individuals. Setting aside the irrationality of the notion that a birth certificate format that allows for individuals born one sex to later change their designation within the existing framework could somehow be rooted in "stereotypical notions about gender," the question of sexual discrimination in an equal protection context fixates on whether a statute or policy distinguishes between the two biological sexes, not the individual's gender identity. <u>See</u>, <u>Gore v. Lee</u>, 107 F.4th 548, 555 (6th Cir. 2024) ("Th[e] [challenged] policy does not impose any special restraints on, and does not provide any special benefits to, applicants due to their sex. It does not impose 'one rule for' males and 'another for' females"); <u>L.W. by and through Williams v. Skrmetti</u>, 83 F.4th 460, 480-481 (collecting cases), <u>aff'd</u>, <u>Skrmetti</u>, 605 U.S. at 526. In fact, even <u>Bostock</u>'s bright-line test revolved around

---

[6] In a literal way of speaking the document classifies sex because it quite literally lists an individual's birth sex, or the one they amend it to were they to go through the process of amending the birth certificate. But the mechanical act of classifying sex for vital record purposes is not the same as classifying individuals "on the basis of" sex. As we explain throughout this reply, the latter requires differential treatment between the two sexes, a charge which not even Appellees' most uncharitable framing of the Puerto Rico birth certificate format can make.

the conduct employers tolerated in males *vis a vis* females (or vice versa). Were impact on gender identity sufficient to trigger a sexual discrimination inquiry, the Bostock court's analysis would have been much simpler. The Supreme Court in Bostock or even Skrmetti could have accepted Appellees' framing that gender identity and sex are inexorably tied and thus purported discrimination based on gender identity automatically implicates sex, which requires intermediate scrutiny. But that is not what the law is, sex-based classifications invite heightened scrutiny but gender-based ones do not. For an alleged classification to implicate sex, boiled down to its most basic element, the baseline must be that it treats females and males differently from one another. Puerto Rico's birth certificate format quite simply does no such thing. On that basis, Appellees' contention that any policy that would involve or conceivably burden any individual's gender identity is tantamount to sexual discrimination triggering an intermediate scrutiny is unsupported by existing precedent.

**B. Puerto Rico's birth certificate format does not discriminate and neither nonbinary nor transgender individuals qualify as a quasi-suspect class**.

Faced with the inconvenient truth that on rational basis review challenged laws bear a "strong presumption of validity,"[7] Appellees now contend that

---

[7] See, FCC v. Beach Commc'ns Inc., 508 U.S. 307, 314 (1993); Vance v. Bradley, 440 U.S. 93, 97 (1979) ("The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.")

transgenderism (or nonbinary status) itself is a quasi-suspect class because they claim to be in a position of political powerlessness compared to what they describe as a coordinated and rapid rollback of rights directed at these individuals.[8] *Resp. Brief*, at 30-36.

### i. Appellees waived the argument that transgender or nonbinary individuals are a quasi-suspect class.

As a threshold matter, Appellees have waived the argument that transgender and/or nonbinary individuals by themselves qualify as a quasi-suspect class. The fact that "legal theories not raised squarely in the lower court cannot be broached for the first time on appeal" is a basic tenet of appellate practice. Rivera-Díaz v. Humana Ins. of P.R., Inc., 748 F.3d 387, 391 (1st Cir. 2014) (quoting Teamsters Union Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992)). To make matters worse, even when Appellants repeatedly argued that neither transgenderism nor gender identity are quasi-suspect classes, Appellees never countered such assertion. *App*. 134-135, 236-239. In fact, prior to their brief on appeal, Appellees only used the term quasi-suspect twice, and then only to put forth the broad and conclusory assertion that gender and illegitimacy are quasi-suspect classes that trigger intermediate scrutiny. *App*. 191, 209.[9] Further, as can be read from their

---

[8] This conceptual error is shared by most *Amici Curiae* filed in support of Appellees.

[9] This is plainly incorrect. Intermediate scrutiny has generally only been applied to "classifications based on sex or illegitimacy." Clark v. Jeter, 486 U.S. 456, 461 (1988). On occasion, primarily in older cases, the Supreme Court has used the term "gender" in reference to intermediate scrutiny

argumentation at that point, they claimed that gender discrimination triggers intermediate scrutiny because, in their view, gender and sex are intertwined. *App.* 190-192. Nothing about transgender individuals—nor nonbinary individuals as an alleged subset of transgenders persons— purported powerlessness or targeting by the "majoritarian political process" was ever mentioned by Appellees until now.[10] *Resp. Brief*, at 35. This blatant omission is precisely what the waiver rule penalizes. See, Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) ("It should go without saying that we deem waived claims not made or claims adverted to in a cursory fashion, unaccompanied by developed argument"). The fact that the issue had been preemptively argued by Appellants does not preserve Appellees' argument. See, U.S. v. Slade, 980 F.2d 27, 31 (1st Cir. 1992) (arguments brought for the first time on appeal not preserved "simply because the general issue was before the district court"). In any event, even if Appellees were to counter that their argument is preserved because they alluded to gender being a quasi-suspect class

---

but only as the term has been historically used as a synonym of an individual's sex. See e.g., City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 440-441 (1985). The Supreme Court has never held that the more modern conception of gender identity and sexual orientation are quasi-suspect classes that trigger intermediate scrutiny. To that point, even the landmark cases generally associated with LGBT rights did not employ heightened scrutiny in those contexts, where relevant. See e.g., Obergefell v. Hodges, 576 U.S. 644 (2015); U.S. v. Windsor, 570 U.S. 744 (2013); Lawrence v. Tex., 539 U.S. 558 (2003).

[10] Further, in illustrating such alleged powerlessness and to challenge the Puerto Rico birth certificate format's motives in general, Appellees —echoed by their *Amici Curiae*— raise on appeal several hardships that the Puerto Rico birth certificate format purportedly imposes on them. But, before the district court, Appellees asserted the hardships that the format allegedly subjected them to in more general terms centered around gender dysphoria. *App.* 198.

and transgender or nonbinary identity are concepts related to an individual's gender identity, they never mentioned any of these new arguments as to why gender, divorced from sex, requires intermediate scrutiny. See, U.S. v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

### ii. Puerto Rico's birth certificate format does not classify on the basis of transgender or nonbinary status.

Appellees and their *Amici Curiae*'s insistence on granting quasi-suspect status to transgender or nonbinary individuals puts the cart before the horse. To summarize, Appellees contend that nonbinary individuals are a subset of transgender individuals and since, to their way of thinking, the Puerto Rico birth certificate format classifies on the basis of nonbinary status, then the birth certificate ergo creates a classification based on transgender identification. *Resp. Brief*, at 4-5, 30. From Appellees' point of view, because the format presumably "bars nonbinary people and only nonbinary people from acquiring an identification birth certificate consistent with their gender identity," then this must mean that the format uses their nonbinary identity as the dividing line for birth certificate amendments. *Resp. Brief*, at 30.

First of all, Puerto Rico's birth certificate format, following Arroyo-González's direction —as its judgment was later adopted by the legislature— operates to explicitly allow individuals to change their sexual designation if they comply with the requirements of the Puerto Rico Civil Code. Thus, from the outset,

it is a vexing proposition to suggest that such a format classifies against transgender individuals.

Second, to the extent some nonbinary individuals such as Appellees may propose that the format "bars" them from obtaining a certificate "consistent with their gender identity," what the document truly does is list only the biological reality of sex. Based on this, any individual, be they transgender, nonbinary or any other identification, may request to change the *sex* listed on the document. The format does not exclude nonbinary individuals from requesting a change between those options, it does not make a value judgment of any sort nor express an opinion of any kind on the validity or existence of a nonbinary *gender* expression. Likewise, this format does not prevent nonbinary individuals from identifying and expressing their gender identity in their private lives or in public.[11]

More importantly, insofar as the Puerto Rico Civil Code commands the Demographic Registry to register an individual's sex, the two options must be male

---

[11] Several *Amici Curiae* proffer that the birth certificate format "impedes" social transition for nonbinary individuals. <u>See e.g.</u>, *Amicus Brief for Waves Ahead et al*, at 13-18. Conclusory assertions aside, Puerto Rico's birth certificates have never listed anything other than the two existing sexes, yet Appellees and their *Amici Curiae* uniformly claim that nonbinary gender identity expressions have been expressed across cultures unimpeded, including Puerto Rico, since time immemorial. Moreover, as the district court itself recognized, most states do not recognize nonbinary gender identities on their official documents. Lastly, a birth certificate is merely a government-issued vital record. It does not restrict nor governs anybody's expression or the way they live their life in society.

or female simply because those are the only two *sexes* that are known to exist.[12] On that basis, the Puerto Rico birth certificate format does not classify individuals based on transgender status. To hold otherwise would mean that any state in the nation that lists sex on their birth certificates incurs in a *per se* classification against transgender individuals because doing so would purportedly exclude both transgender and nonbinary persons from, in Appellees' words, obtaining a birth certificate "consistent with their gender identity." *Resp. Brief*, at 4-5. In sum, if the Puerto Rico birth certificate as applied to nonbinary individuals is ruled to infringe upon the Equal Protection Clause, then —taking the argument to its logical conclusion— as highlighted by the *Amicus Curiae Brief of Idaho, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Louisiana, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Utah, West Virginia, Wyoming, and the Arizona Legislature*, a supermajority of states would have to amend their birth

---

[12] Throughout their brief, Appellees employ a sort of sleight of hand to accuse Appellants of "burying their heads in the sand" and attempting to "erase" nonbinary individuals by claiming that there are "two genders." *Resp. Brief*, at 52. Setting aside the gender identity debate which is wholly unnecessary for the purposes of this appeal, Appellants' claim is that there are only two *sexes*. See *Op. Brief*, at 23 ("it is imperative that government documents reflect only the male or female *sex* markers because the federal government solely recognizes these two *sexes*") (emphasis added); id., at 26 ("maintaining the [Puerto Rico birth certificate] format relates to the Government's interest in expressing the undeniable viewpoint that, *without undermining nor questioning the validity of the many ways individuals may identify themselves*, there are only two *sexes*, and that is all that the Puerto Rico birth certificate format was designed to reflect for *all citizens*.") (emphasis added).

certificates so that it lists an individual's gender and not their sex. See, *Amicus Curiae Brief of Idaho et al*, at 2.

Along those lines, in a case cited favorably by the district court —and even now by Appellees— the District of Massachusetts granted a group of transgender and nonbinary individual's request for preliminary injunction on the federal government's reversal of a recent policy that permitted gender non-conforming applicants to select an "X" as the sex marker on their passports. Orr, 778 F.Supp.3d at 433. The federal government sought a stay pending appeal of several of the District of Massachusetts's orders, including its preliminary injunction, which this Court denied. See, Agatha v. Trump, 151 F.4th 9 (1st Cir. 2025). The federal government then sought stay relief from the Supreme Court, which granted its request on November 6, 2025. Trump, 2025 WL 3097824, at *1. In so doing, the Supreme Court held that the federal government "is likely to succeed on the merits" because in reflecting only binary sexes, the federal government "is merely attesting to a historical fact without subjecting anyone to differential treatment." Id. Further, the Court added, "nor are respondents likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow." Id.

While of course the Trump case's stay order does not resolve the question definitively, and the merits of the federal government's appeal are to be decided by

this Court in due course, the Supreme Court's express determination that the federal government is likely to prevail on the merits is highly illustrative to the case at hand. In short, the Supreme Court's ruling in <u>Trump</u> signals that listing the two sexes does not subject anyone to differential treatment. However, in an attempt to get ahead of the <u>Trump</u> court's ruling, Appellees counter that since Puerto Rico's birth certificate format allows for amendments, then its ruling is somehow more discriminatory. But how can that be? If, as Appellees and several *Amici Curiae* proffer, listing binary sexes on its face classifies against transgender (or nonbinary) individuals because it purportedly forces them to live with "inaccurate" documents, then how can a format that allows transgender individuals to choose which of those two options better aligns with their identity classify on the basis of transgender status? In other words, from Appellees' and their *Amici Curiae*'s point of view —using their framing of the situation on this occasion for illustrative purposes only— a format that "excludes" every single transgender individual from amending their passport and purportedly allows only cisgender individuals to have "accurate" passports may not classify on the basis of transgender status, yet puzzlingly, a format that allows all transgender or nonbinary individuals to change their birth certificates, within the confines of the two existing *sexual* options, does somehow classify on the basis of transgender status.

### iii. Neither nonbinary individuals nor transgender individuals qualify as a quasi-suspect class.

In defining the purported "class" the Puerto Rico birth certificate format allegedly discriminates against, Appellees constantly move the goal posts of which is the "affected" class. Initially, Appellees' claim that nonbinary identity is essentially a subset of transgender individuals,[13] thus discrimination against nonbinary individuals is discrimination against transgenders writ large.[14] Most of the time, Appellees argue that the format affects only nonbinary individuals.[15] Yet when citing case law as to why the Puerto Rico birth certificate format triggers heightened scrutiny, all Appellees cite to are cases regarding specifically transgender individuals, or laws which presumably targeted individuals on the basis of their transgender status.[16] This despite the fact that the Puerto Rico birth certificate format

---

[13] This statement is not as clear cut as Appellees make it out to be for, as some *Amici Curiae* proffer, not all nonbinary individuals identify as transgender. See, *Amicus Brief of Advocates for Trans Equality Fund et al¸* at 6. In any event, assuming that all nonbinary individuals are in fact transgender as Appellees claim, it does not change the result because the Puerto Rico birth certificate format passes constitutional muster.

[14] See e.g., *Resp. Brief*, at 6 ("Nonbinary identities thus fall under the broader transgender umbrella") (cleaned up); 30 ("because [the format] discriminates based on transgender status, namely, nonbinary status.").

[15] See e.g., *Resp. Brief*, at 22 ("The Policy treats nonbinary persons differently from persons who identify as male or female"); 24 ("While the Policy's requirement that identification birth certificates reflect a binary sex designation applies to binary and nonbinary persons alike, it only affects nonbinary individuals like Plaintiffs"); 30 ("Here, the Policy categorically bars nonbinary people and only nonbinary people from acquiring an identification birth certificate consistent with their gender identity").

[16] None of the cases Appellees cite to support the notion that transgender individuals are a suspect or quasi-suspect class make any finding as to nonbinary individuals. Grimm v. Gloucester Cnty School Bd., 972 F.3d 586, 596 (4th Cir. 2020) ("This is not to suggest that people are either

does not discriminate against transgender individuals, on the contrary, it allows them to change the sex on the document so long as they comply with the applicable requirements and process. It is clear then that Appellees attempt to piggyback on recent case law regarding transgender individuals to claim that they as nonbinary persons should be considered as a quasi-suspect class subject to heightened scrutiny.

On the other hand, with the instant fact pattern, Puerto Rico's birth certificate format cannot "classify on the basis of transgender" status because it quite literally allows everybody, including transgender individuals to change the sex on their birth certificates.[17] To wit, how can a format that allows a group of individuals to change the sex on their birth certificates create a classification against that same group of

_____

cisgender or transgender, and that everyone identifies as binary. Of course, there are other gender-expansive youth who may identify as nonbinary [or other identities]. . .. But today's question is limited to how school bathroom policies implicate the rights of transgender students who 'consistently, persistently, and insistently' express a binary gender"); Karnoski v. Trump, 926 F.3d 1180 (9th Cir. 2019) (no mention of nonbinary individuals); Talbott v. U.S., 775 F.Supp.3d 283 (D.D.C. 2025) (no mention of nonbinary individuals); Dekker v. Weida, 679 F.Supp.3d 1271 (N.D. Fla. 2023) (found a classification based on gender nonconformity as applied to cisgender and transgender children, but no mention of nonbinary individuals); F.V. v. Barron, 286 F.Supp.3d 1131 (D. Idaho 2018) (no mention of nonbinary individuals); Flack v. Wis. Dept. of Health Servs., 328 F.Supp.3d 931 (W.D. Wis. 2018) (no mention of nonbinary individuals); Evancho v. Pine-Richland Sch. Dist., 237 F.Supp.3d 267 (W.D. Penn. 2017) (no mention of nonbinary individuals); Adkins v. City of N.Y., 143 F.Supp.3d 134 (S.D.N.Y. 2015) (no mention of nonbinary individuals); Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858 F.3d 1034 (7th Cir. 2017) (no mention of nonbinary individuals; case abrogated as recognized by Kluge v. Brownsburg Cmty. Sch. Corp., 150 F.4th 792 (7th Cir. 2025)). Even Bostock is silent as to nonbinary individuals.

[17] According to several *Amici Curiae*, around thirty percent to a third of transgender individuals identify as nonbinary. See e.g., *Amicus Brief of Advocates for Trans Equality Fund et al¸* at 6; *Amicus Brief for Waves Ahead et al*, at 3-4.

individuals?[18] Reviewing relevant case law, there is little to support the notion that nonbinary individuals themselves are quasi-suspect class. In that context, it is unsurprising that Appellees try to frame the question before this Court as whether the challenged format classifies against transgender individuals as a whole instead of whether the format classifies against nonbinary individuals. Faced with this realization, Appellees contend that discrimination against some members of a class can still be discrimination against a class. See e.g., Hecox v. Little, 104 F.4th 1061 (9th Cir. 2024) (ban on transgender women in female's sports held to discriminated against transgenders even when the policy permitted transgender men to compete in men's sports).[19] But the challenged format here does not give anybody benefits that it does not give to another group. It merely allows all groups to change their sex within the only existing sexes.[20] In any event, regardless of how the purported "classification" in this case is framed, this is a distinction without a difference,

---

[18] To be clear, the Puerto Rico birth certificate format allows transgender and nonbinary individuals to amend their birth certificates within the appropriate guidelines. However, we use Appellees' framing in this instance that the Puerto Rico birth certificate format "prevents" nonbinary individuals from amending their birth certificates to illustrate the point that, even viewed in its most uncharitable characterization, the birth certificate format cannot classify on the basis of transgender status.

[19] The Supreme Court granted the Governor of Idaho's petition for *certiorari* and the matter of Hecox v. Little is presently scheduled for arguments in January 2026.

[20] Moreover, rational scrutiny, which is what applies here, allows for laws that are over or underinclusive. Hope v. Comm'r of Ind. Dep't of Corr., 66 F.4th 647, 651 (7th Cir. 2023).

because no matter if appellees are defined as a subset of transgender individuals or as a class of their own, none of these groups qualify as a quasi-suspect class.

Glossing over Appellees failure to properly raise the argument before this Court, that transgender or nonbinary individuals are a quasi-suspect class is closer to judicial wish casting than an accepted legal conclusion. To date, the Supreme Court has recognized only two quasi-suspect classes: sex and illegitimacy. See, Reed v. Reed, 404 U.S. 71 (1971) (holding classifications based on sex calls for heightened standard of review); Trimble v. Gordon, 430 U.S. 762 (1977) (holding that classifications based on legitimacy were not inherently suspect but that "[i]n a case like this, the Equal Protection Clause requires more than the mere incantation of a proper state purpose"). Throughout its history, the Supreme Court has steadfastly declined to recognize a new quasi-suspect class despite the question having been raised on multiple occasions. See City of Cleburne, Tex., 473 U.S. at 445-446 (refusing to recognize mental disabilities as a quasi-suspect classification, as "it would be difficult to find a principled way to distinguish" that classification from "a variety of other groups"); Mass. Bd. of Ret. v. Murgia, 427 U.S 307 (1976) (holding that age classifications are subject to rational basis review); Romer v. Evans, 517 U.S. 620, 633 (1996) (avoiding the question of whether a classification

based on sexual orientation merits heightened scrutiny); <u>Skrmetti</u>, 605 U.S. at 517.[21] As highlighted before, not even in recent case law that expanded the rights of LGBT populations did the Supreme Court dare to grant gender identity a quasi-suspect class status. <u>Bostock</u>, 590 U.S. at 644; <u>Obergefell</u>, 576 U.S. at 644; <u>Windsor</u>, 570 U.S. at 744; <u>Lawrence</u>, 539 U.S. at 558.

This result is not surprising. Creating a new quasi-suspect class would have grave implications on the ability of state legislatures to address matters over which the courts have traditionally granted a fair amount of deference to. Moreover, in a post-<u>Dobbs</u> context, the Supreme Court has prioritized protecting the democratic and legislative processes and deferring to the states and to the people's judgment even when "the laws at issue concern matters of great social significance and moral substance." <u>Dobbs</u>, 597 U.S. at 300.

Amongst this backdrop, for a group to be classified as a suspect or quasi-suspect class, it must have been subjected to discrimination; exhibit obvious, immutable, or distinguishing characteristics that define them as a discreet group; and considered a minority that is politically powerless. <u>See e.g.</u>, <u>City of Cleburne, Tex.</u>, 473 U.S. at 438; <u>Mass. Bd. of Ret. v. Murgia</u>, 427 U.S. 307, 313-314 (1976). Although, it bears noting that the Supreme Court "has never defined a suspect or

---

[21] As Justice Barrett notes, the Supreme Court has never recognized a new suspect class under this framework. <u>See</u>, <u>Skrmetti</u>, 605 U.S. at 550 (Barrett, J., concurring) ("In fact, as far as I can tell, we have *never* embraced a new suspect class under this test") (emphasis in original).

quasi-suspect class on anything other than a trait that is definitively ascertainable at the moment of birth." <u>Ondo v. City of Cleveland</u>, 795 F.3d 597, 609 (6th Cir. 2015).

Viewed through this prism, transgender or nonbinary individuals cannot plausibly argue that they fall within the sex–based quasi-suspect class. This conclusion follows readily from the fact that Appellees do not identify with either of the two sexes recognized by the Government (as well as the Supreme Court and the federal government). In any case, these groups "do not exhibit obvious, immutable, or distinguished characteristics that define them as a discrete group." <u>Bowen v. Gilliard</u>, 483 U.S. 587 (1987) (cleaned up). To wit transgender identity refers to "a huge variety of gender identities and expressions." <u>Gore</u>, 107 F.4th at 558. Moreover, as Appellees themselves proffer, nonbinary individuals "may identify with both genders, with a gender different from female or male, outside the gender binary, or as not having a gender altogether." *Resp. Brief*, at 6; <u>see also</u> *Amicus Brief of Advocates for Trans Equality Education Fund et al*, at 6 (explaining that gender identity may "shift over time"; <u>id</u>., at 7 ("There are many ways to be transgender and many ways to be nonbinary, each reflecting different conceptions of how sex and gender relate to one another"). Put more simply, transgender status —particularly if it were to include those that are nonbinary— as a trait is not ascertainable at the moment of birth and can change over time. <u>Id</u>. As such, it is not an obvious or

immutable characteristic and so cannot meet the criteria to qualify as a suspect class.

L.W. by and through Williams, 83 F.4th at 486-88.

With regards to the discrimination prong, while Appellees cite several instances of what they describe as historical discrimination against *transgender* individuals, what is dispositive is not whether a certain class has faced discrimination, but rather the pervasiveness of such discrimination. To that point, in his Skrmetti concurrence, Justice Alito explains:

> Transgender status is not "immutable," and as a result, persons can and do move into and out of the class. Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class. And transgender individuals have not been subjected to a history of discrimination that is comparable to past discrimination against the groups we have classified as suspect or "quasi-suspect."
> […]
> Although transgender persons have undoubtedly experienced discrimination, the plaintiffs and their many *amici* have not been able to show a history of widespread and conspicuous discrimination that is similar to that experienced by racial minorities or women. Instead, they provide little more than conclusory statements. But as we explained in *Cleburne*, heightened scrutiny cannot be justified on the ground that a proposed class has suffered from some degree of prejudice from at least part of the public at large. Rather, a higher level of scrutiny is reserved for those groups, like racial minorities and women, who have suffered from a long history of discrimination that is both severe and pervasive.
> Furthermore, there is no evidence that transgender individuals, like racial minorities and women, have been excluded from participation in the political process. It is certainly true that the very small size of the transgender population means that the members of this group cannot wield much political clout simply by casting their votes. But that is true of a variety of other groups […] who cannot themselves mandate the desired legislative responses. And despite the small size of

the transgender population, the members of this group have had notable
success in convincing many lawmakers to address their problems.

Skrmetti, 605 U.S. at 566, 575-576 (Alito, J., concurring) (cleaned up).

Taking at face value Appellees and their several A*mici Curiae*'s contention
that transgender (or even nonbinary individuals) may have faced and could continue
to face discrimination in their day-to-day lives, the pervasiveness of this
discrimination does not rise to the level of the classes to which heightened scrutiny
has generally been reserved for (e.g., race or sex, both of which required
constitutional amendments to integrate into the political process). Take, for instance,
the cases where the Supreme Court explicitly declined from extending quasi-suspect
status to certain classes.

As alluded to earlier, in City of Cleburne, Tex., the Supreme Court declined
to extend quasi-suspect status to mentally disabled individuals even when the Court
conceded that these individuals may face "invidious" discrimination and that they
were a political minority. City of Cleburn, Tex., 473 U.S. at 445-446. Similarly, in
the context of physically disabled individuals, the Court reached the same
conclusion. Bd. of Tr. of Univ. of Ala. v. Garrett, 531 U.S. 356, 367-368 (2001).
Viewing close family units through the aforementioned factors led the Supreme
Court to the same result. Lyng v. Castillo, 477 U.S. 635, 638 (1986) (Close relatives
such as parents, children and sibling were not a quasi-suspect class). Further, in
tackling this framework, this Court held that "[t]he universe of suspect or quasi-

suspect classifications does not encompass legislative classifications such as classifications premised on political affiliation." Pagán v. Calderón, 448 F.3d 16, 36 (1st Cir. 2006).

In following the above trend, the political powerlessness that the quasi-suspect class doctrine look towards is not merely the concept of low numbers or political minority. City of Cleburne, Tex., 473 U.S. at 432 ("Any minority can be said to be powerless to assert direct control over the legislature, but if that were a criterion for higher level scrutiny by the courts, much economic and social legislation would now be suspect"). Essentially, to be powerless under this standard is more akin to being excluded from the political process and concerns "laws burdening those who lacked a vote." Skrmetti, 605 U.S. at 556 (Barrett, J., concurring). Meanwhile, transgender or nonbinary individuals have the right to participate fully in the democratic process by exercising the right to vote, advocating for laws or policies they deem just, or running for office themselves.[22] As such, transgender or nonbinary individuals are not the political powerless group covered by the quasi-suspect class doctrine.

---

[22] As an example, as recently as the last congressional election, the first openly transgender person was elected to the United States Congress. Jo Yurcaba, *Sarah McBride becomes the first out transgender person elected to Congress*, NBC News (Nov. 5, 2024) https://www.nbcnews.com/nbc-out/out-politics-and-policy/sarah-mcbride-first-transgender-congress-delaware-rcna177878.

**C. Puerto Rico's birth certificate format survives rational scrutiny**.

Law and policies that do not impinge upon fundamental rights nor distinguish between citizens on account of proscribed classification will be upheld so long as they are supported by rational basis. See, Beach Commc'ns Inc., 508 U.S. at 313 ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification"). This so-called rational basis review (or rational scrutiny) is forgiving and highly "deferential" to state legislative action. D'Angelo v. N.H. Supreme Court, 740 F.3d 802, 806 (1st Cir. 2014). Under this lens, "the state will prevail so long as it articulates some reasonably conceivable state of facts that could provide a rational basis for the action." A.C. by Waithe v. McKee, 23 F.4th 37, 46 (1st Cir. 2022) (cleaned up). These facts need not be supported by the evidentiary record because "any plausible justification will suffice, and effectively ends the analysis." Donahue v. City of Boston, 371 F.3d 7, 15 (1st Cir. 2004) (cleaned up); see also, Ass'n to Pres. and Protect Local Livelihoods v. Sidman, 147 F.4th 40, 55 (1st Cir. 2025) (explaining that on rational scrutiny a legislative or policy choice "is not subject to courtroom fact-finding") (quoting Bankers Life & Cas. Co. v. Crenshaw, 486 U.S. 71, 85 (1988)). This framework places the burden on "the one attacking the

legislative arrangement to negat[e] every conceivable basis which might support it." <u>Armour v. City of Indianapolis, Ind.</u>, 566 U.S. 673, 681 (2012).

Unsurprisingly then, Appellees expend the majority of their bullets in diverting this Court's gaze from the applicable scrutiny towards other, more exacting albeit irrelevant scrutiny. Still, as Appellants have made clear throughout their opening brief and this reply, the Puerto Rico birth certificate format does not classify individuals on any basis, much less along suspect or quasi-suspect lines. Further, it is undeniable that the birth certificate format does not burden a fundamental right. Accordingly, rational basis is the correct lens through which to adjudicate the constitutionality of the Puerto Rico birth certificate format.

### i. The district court misapplied the rational basis scrutiny

From the outset, rational scrutiny case law makes perfectly clear that it is not the state who bears the burden of defending a challenged statute or policy, but rather the party that argues against its presumed validity. Based on this, it was Appellees' duty to reject any conceivable basis that would support the Puerto Rico birth certificate format or that it was motivated by animus. Instead, Appellees submitted no evidence nor legislative record citations that would support a finding of animus or ill-will, other than, of course, the naked assertion that it was. With a proper application of the rational basis standard the constitutional inquiry should have ended there. Despite this, the district court, without any basis on the record,

immediately leapt towards the conclusion that the challenged format could only be explained by "animus" towards nonbinary individuals and ultimately found that it was unsupported by a rational basis. *Appellants' Add.*, at 13-19.

Appellees, putting all their eggs in the heightened scrutiny basket, do not even address the district court's incorrect application of the rational basis standard. As such, any argument against it is waived. Based on this, in light of Appellees' unquestioned failure to put the district court in position to address the constitutionality of Puerto Rico's birth certificate format, this Court's equal protection inquiry may as well end here. Nevertheless, for this Court's benefit, we address Appellees' remaining arguments.

### ii. Puerto Rico's birth certificate format is rationally related to legitimate state interests that were properly raised before the district court.

Throughout this litigation Appellants have raised several legitimate state interests that are rationally related to and furthered by Puerto Rico's birth certificate format as it currently exists. In their attempts to discredit these interests, Appellees' minutely parse the reasonings and logic behind these interests. But this approach is mistaken. Under rational review courts accept a "legislature's generalizations even when there is an imperfect fit between means and ends." <u>Heller v. Doe by Doe</u>, 509 U.S. 312, 321 (1993). Likewise, under this highly deferential standard a classification will survive rational scrutiny even if it "is not made with mathematical

nicety or because in practice it results in some inequality." Id., (quoting Dandridge v. Williams, 397 U.S. 471 (1970)). Moreover, even if the supposed classification is deemed by some to be "overinclusive or underinclusive" this too is permitted under the rational basis standard. Hope, 66 F.4th at 651; Kittery Motorcycle, Inc. v. Rowe, 320 F.3d 42, 49 (1st Cir. 2003) (rational scrutiny does not require surgical precision, nor a "mathematical fit" between the classification and the legitimate government purpose). In sum, this standard, rooted in judicial restraint, must be applied this way because "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." Skrmetti, 605 U.S. at 510 (quoting City of Cleburne, Tex., 473 U.S. at 440)).

Amongst this backdrop, the conceptual error outlined above (i.e., that Puerto Rico's interests in its birth certificate format need not be surgically precise nor perfectly tailored to the stated interest) applies to every single of Appellees' arguments against Puerto Rico's listed interests.[23] Still, we address several of

---

[23] In fact, Appellees' arguments regarding the Government's interest on the transferability of public documents and the prevention of fraud can be soundly rejected with just the fact that the rational basis standard does not require the exacting perfection they would have it require. More importantly, these arguments are not waived because: (a) they stem from Appellants' arguments regarding the importance of the accuracy of such documents; and (b) serve to explain why the district court's conclusion that the accuracy of the documents issue is resolved by merely keeping the original. Specifically, the issue of the transferability of documents became of particular relevance when the district court used the fact that some states permitted nonbinary identifiers as a basis for her ruling.

Appellees' arguments as to the Government's interests in the Puerto Rico birth certificate format in turn.

To properly begin responding to Appellees' arguments as to the Government's interests behind the Puerto Rico birth certificate format we must first counter Appellees' contention that most of the interests stated by the Government are waived because they were purportedly first raised on Appellants' motion for reconsideration. First, this statement is outright mistaken. The interests raised by Appellants have been consistent throughout the litigation and have been thoroughly discussed before the district court. To the extent that additional arguments were brought in the motion for reconsideration it was where necessary to respond to the conclusions and assertions made by the court in the *Opinion and Order* subject to this appeal. Second, it bears remembering that, as the party that sought to declare the alleged unconstitutionality of the birth certificate format, it was Appellees who had the burden of rejecting any "conceivable basis" for it and putting the court in position of adjudicating the Government's justifications. <u>See</u>, <u>Mulero-Carrillo v. Román-Hernández</u>, 790 F.3d 99, 107-108 (1st Cir. 2015) (if the plaintiff fails to carry his burden courts need not delve into what "such reasonably conceivable state of facts may be," thus the Government's reasoning behind a challenged policy may only be questioned *if* the challenger carries their burden). In that procedural context,

Appellants did not need to exhaustively delve into the reasonings behind the challenged format.

That being said, turning towards the Government's interest in the historical accuracy of its birth certificates, this interest rationally supports the birth certificate format because it is entirely legitimate for the Government to wish for its documents to be accurate and offer a correct and historical definition of sex. Appellees attempt to discredit this interest with three main arguments: (a) that the interest is waived; (b) that tradition on its own does not support preserving purportedly discriminatory practices; and (c) that the Government's interest is preserved by its practice of conserving the original birth certificate unaltered. But, as Appellees themselves recognize, Appellants discussed the Government's interest in the accuracy of its documents extensively throughout its papers before the district court —such as their motion to dismiss, cross motion for summary judgment and opposition to preliminary injunction— not just on their motion for reconsideration. See, *Resp. Brief*, at 43-44; *App*. 135, 152, 238.[24] As for Appellees' contention that tradition itself does not warrant discriminatory practices, this is irrelevant to Appellants' argument. What the Government intends is that the document remains accurate by

---

[24] Appellees seem to understand that the historical accuracy of its definition of sex, and the accuracy of vital records are somehow two distinct interests. But these are one and the same. Moreover, in light of the *Opinion and Order* determination that Puerto Rico's interest was served exclusively by keeping the original birth certificate without alterations, on reconsideration, Appellants addressed this conclusion by expounding upon this interest. *App*. 279.

listing the only two *sexes* that exist. This statement is not discriminatory, it is true, and that precisely was the Supreme Court's message in <u>Trump</u>, 2025 WL 3097824 at *1 (attesting to the historical fact of the existing sexes at birth not discriminatory); <u>see also</u>, <u>Gore</u>, 107 F.4th at 559 ("Tennessee's use of 'sex' as speech about a biological and historical fact of birth and ensures a uniform practice across Tennessee birth certificates"). This is precisely why the safekeeping of the original document does not address the government's interest in preserving this accuracy.[25]

On similar, equally mistaken grounds, Appellees object to the Government's interest in its own speech. For starters, they present the incorrect assertion that Appellants first raised that birth certificates are government speech in their motion for reconsideration. Yet, the first time Appellants broached the topic was as far back as their motion to dismiss. *App*. 136, 138.

Appellees arguments on this point can be boiled down to suggesting that a throwaway line in <u>In re Tam</u>, 808 F.3d 1321, 1348 (Fed. Cir. 2025) supersedes the

---

[25] Additionally, Appellees propose that the Government's interest in an accurate definition is defeated by permitting of amendments transgender individuals. However, even in the case of transgender individuals, the birth certificate lists a sex, regardless if it's one that does not match the sex recorded at the date of the individual's birth. Conversely, if Appellees were to have their way, Puerto Rico's birth certificates would list their sex as the letter "X" or "nonbinary." While some individuals may very well identify their *gender identity* as nonbinary, there is no such thing as a nonbinary *sex*. Thus, if the documents were to read: "Sex: X," this would simply be a profound conceptual error that Appellants are not willing to endorse. Still, if the district court could have perhaps agreed with such statement, or at least found it sympathetic, it is not the purview of the courts to impose such viewpoint on the states' duly elected governments through the guise of interpreting the Constitution.

reasoned analysis of the Sixth and Eleventh Circuits that documents such as driver's licenses and birth certificates are government speech. <u>Gore</u>, 107 F.4th at 559; <u>Corbitt v. Secretary of the Alabama Law Enforcement Agency</u>, 115 F.4th 1335, 1352 (11th Cir. 2024) (regarding state-issued driver's licenses). Furthermore, Appellees' assertions of viewpoint discrimination are waived. Despite Appellees' alleging that the Puerto Rico birth certificate format violated their first amendment rights, and the fact that the Government has put forth that argument since the pleading stages, now on appeal is the first time they ever claim the Government engages in viewpoint discrimination. In any event, even if their reading of <u>In re Tam</u> dicta has any bearing on this case —which it does not— government speech need not be viewpoint neutral. <u>See</u>, <u>Matal v. Tam</u>, 582 U.S. 218, 234 (2017) ("imposing a requirement of viewpoint-neutrality on government speech would be paralyzing" because when the government "embarks on a course of action, it necessarily takes a particular viewpoint and rejects others").

On the Government's interest in administrative uniformity of official documents,[26] Appellees, citing <u>Orr</u>, argue that this is not an important interest and

---

[26] Appellants raised this interest for the first time as far back as their opposition to Appellees' request for preliminary injunction. *App*. 143. It also relates to Appellants' claims that the existing framework within Puerto Rico's administrative regime recognized only binary sexes. *App*. 231-232. Moreover, the argument responds to the district court's assertion that including the letter "X" on Puerto Rico's birth certificates already mirrored existing schemes for amending these documents. *Appellants' Add*. 5 n.5, 16–17.

that administrative inconvenience cannot support a policy that discriminates on sex. *Resp. Brief*, at 49. This argument incorrectly presumes that: (a) the Puerto Rico birth certificate format discriminates on sex and (b) is to be reviewed on heightened scrutiny. Properly examined on rational scrutiny however, "administrative concerns" are enough to survive such a deferential standard. <u>Armour</u>, 566 U.S. at 684-685.

In a similar fashion, Appellees misstate the Government's argument in preserving legislative prerogatives and interpreting its own laws. In sum, Appellees contend that governments cannot use its interest in the separation of powers to shield otherwise unconstitutional laws from judicial inquiry. *Resp. Brief*, at 44-45. Essentially, it seems that Appellees interpret the argument simply as "the Government has an interest in having the Puerto Rico birth certificate format not be declared unconstitutional" but this has never been Appellants' position. What Appellants proffer is that it has a legitimate interest in following the Legislative Assembly and the Puerto Rico Civil Code's direction to list an individual's sex on Puerto Rico's birth certificates. Since Puerto Rico law does not contemplate listing the existence of a nonbinary sex, were Appellees to be successful, Appellants would have to —with no legislative or legal support— decide that the Puerto Rico birth certificate format is wrong and amend it via unilateral administrative action. Respecting and abiding by the existing legal framework is undoubtedly a legitimate

government interest that is rationally related to maintaining the Puerto Rico birth certificate format as it currently exists. See, Trump, 2025 WL 3097824, at *1 ("Nor are respondents likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow").

### iii. Puerto Rico's birth certificate format is not supported by animus against any group, much less transgender or nonbinary individuals.

Much like they did before the district court, Appellees offer nothing but the mere suggestion that Puerto Rico's birth certificate format is supported by animus against any class of individuals. Nevertheless, Appellees present for the first time on appeal the notion that President Trump's Executive Order 14168, Defining Sex: Guidance Federal Agencies, External Partners, and the Public Implementing Executive Order 14158, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, evinces animus against transgender individuals. *Resp. Brief*, at 54-55. Accordingly, to the extent that Appellants' position aligns with the federal government's definition of sex, Appellees proffer, the Government has adopted the Trump administration alleged animus. Id. Without delving into the merit —or lack thereof— of Appellees' opinions on the federal government's actions, this is a red herring. The executive order is not before this Court; Puerto Rico's birth certificate format is. Further, there is no logical or evidentiary basis to impute any animus to the Government,

particularly when the executive order at issue remains valid and merely reflects the federal government's own policy judgment. Puerto Rico has independently adopted its own policies that predate the Executive Order, making any attempt to transfer or attribute animus to the Government from the federal government wholly unfounded.

In any event, there are two gaping holes in this position. First, if one defines the Puerto Rico Civil Code as the starting point for the Puerto Rico's birth certificate amendment procedure, the format predates the allegedly discriminatory executive order by close to five years.[27] In the intervening time between the enactment of the Puerto Rico Civil Code and President Trump's executive order Puerto Rico has had three governors;[28] two Presidents of the Senate and two Speakers of the House from different parties. Despite these changes in the Government's makeup, during all this time, the birth certificate format has remained materially unaltered from what the Arroyo-González court decreed it would be in 2018. Thus, it is absurd to suggest that the Executive Order —assuming that said order harbors the prohibited intent that Appellees proffer it has for the purposes of argumentation only— could somehow taint with its own alleged prohibited animus a birth certificate format that: (a) predates the current administration by at least five years and (b) was issued by a

---

[27] The current Puerto Rico Civil Code was enacted on June 1st, 2020, and became effective on November 28 of that year.

[28] On the other hand, if one begins counting from the date Arroyo-González case was decided, there have been four.

separate governmental entity that the Government has no control over. Second, whatever the executive order decrees, the true genus of Puerto Rico's birth certificate format is simply the <u>Arroyo-González</u> decision and the directions the district court ordered at that point.[29]

Using this unsubstantiated theory of animus, Appellees once again attempt to run from the applicable rational basis standard and assert that even if Appellees do not qualify as a suspect or quasi-suspect class to trigger a heightened degree, this Court should still hold the birth certificate format to a more exacting "intensified scrutiny" as the term was defined in <u>Mass. v. HHS</u>, 682 F.3d 1, 10 (1st Cir. 2012). *Resp. Brief*, at 37-40. However, this argument is unquestionably waived and may not be considered by this Court insofar as Appellees never: (a) cited <u>Mass.</u> court nor (b) mentioned anything resembling "intensified scrutiny" before the district court.[30] Regardless, this argument presupposes a finding of animus that is simply impossible to sustain when viewing the Puerto Rico birth certificate format's procedural history. Additionally, the <u>Mass.</u> court was animated not just by a suspicion of animus against

---

[29] As explained further in Appellants' opening brief, the <u>Arroyo-González</u> opinion explicitly directed the Government to adopt procedures that would allow transgender individuals to change the sex on their birth certificates between "( ) female or ( ) male." <u>Arroyo-González</u>, 305 F.Supp.3d at 335.

[30] With regards to their equal protection claims, Appellees —broadly speaking— presented two general arguments. Namely, Appellees argued that the Puerto Rico birth certificate format discriminated on the basis of sex but could not survive intermediate scrutiny and that even if judged through the rational basis standard the statute was unconstitutional because it could only be explained by animus against nonbinary people. *App.* 194-211

homosexuals but by several other factors concerning the fundamental right to marry and federalism principles that are simply not at issue in this appeal (e.g., that the challenged federal policy meddled in functions generally reserved to the states such as defining marriage as well as "Congress' effort to put a thumb on the scales and influence" Massachusetts's decision on how to "shape its own marriage laws"). Id., at 13.

In the end, Puerto Rico's birth certificates do not have a box for "Gender," only "**Sex**." On that basis, in light of the inescapable biological fact that there are only two sexes it was nature itself not the Government (or Appellants) who chose what options may be listed inside that section of the birth certificate. To wit, even the Arroyo-Gonzalez decision —the case that essentially created Puerto Rico's birth certificate format as it exists today— decreed that amendments for transgender individuals would be issued using male and female sex makers. Within this context, Puerto Rico allows amending the certificate for individuals within the confines of what is possible in a document that lists only *sex* not *gender*.

Currently, in light of the more recent pronouncements from the Supreme Court, be it Skrmetti, Trump, and Stitt,[31] the district court's *Opinion and Order* sails

---

[31] Appellees make much ado about the fact that Stitt is not a proper resolution that the Fowler v. Stitt, 104 F.4th 770 (10th Cir. 2024) opinion was wrong on the merits. Of course, the Eleventh Circuit is yet to rehear the case and consider it in light of Skrmetti, but that is beside the point. Appellants cite Stitt —and to a similar degree Trump— not because it means that Fowler case is

as a desolate ship, unmoored from sound equal protection principles as these have been interpreted by our nation's highest court. Further, it completely disregards the Supreme Court's command for deference to the political process and respect of legislative authority. In so doing, the district court abrogates the legislative prerogatives of the Puerto Rico legislature to create laws that address social and healthcare matters, and of the Government to interpret and enforce said laws. If there is any clear message that the Supreme Court has sent to lower courts in a post Dobbs context is that the era of judicial interference over the democratic process and the people's will on ever increasingly unstable constitutional footing is at an end.[32] On that basis, the district court's *Opinion and Order* must be reversed and Appellees' claims dismissed.

**WHEREFORE,** Appellants respectfully request that this Honorable Court *reverse* the district court's *Opinion and Order* and dismiss Appellees' claims.

---

at a complete end, but rather to underscore the fact that one of the cases that was central to the district court's opinion is no longer good law.

[32] Contrary to what is suggested in Amnesty International's *Amicus Curiae* brief, the federal government's power to executive treaties cannot on its own abrogate this function either. To wit, Amnesty International recognizes that the treaties it references are not self-executing. *Brief of Amicus Curiae Amnesty International Puerto Rico Section, Inc.*, at 3-5. Treaties are international commitments but "not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms." Medellín v. Tex., 552 U.S. 491, 505 (2008) (quoting Igartua-De la Rosa v. U.S., 417 F.3d 145, 150 (1st Cir. 2005).

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico this 9th day of December, 2025.

*s/Omar Andino Figueroa*
**OMAR ANDINO-FIGUEROA**
Solicitor General of Puerto Rico

*s/Frank A. Rosado Méndez*
**FRANK A. ROSADO MÉNDEZ**
Deputy Solicitor General

## CERTIFICATE OF FILING AND SERVICE

**I HEREBY CERTIFY** that on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

In San Juan, Puerto Rico this 9th day of December, 2025.

*s/Frank A. Rosado Méndez*
**FRANK A. ROSADO MÉNDEZ**
Deputy Solicitor General
USCA No. 1209179
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Telephone: (787) 721-2900, ext. 1504
Email: *frank.rosado@justicia.pr.gov*

# CERTIFICATE OF COMPLIANCE WITH RULE 32(G)

1.      This brief complies with the page-limitation of Fed.R.App.P. 32(a)(7)(A):

[x] This reply brief contains 11,013 words an excess of 4,513 words of the 6,500-word limit for reply briefs established in Fed.R.App.P. 32(a)(7)(B), excluding the parts of the brief excluded by Fed.R.App.P. 32(f).

2.      This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B):

[x] This brief contains 11,013 words an excess of 4,513 words of the 6,500-word limit for reply briefs established in Fed.R.App.P. 32(a)(7)(B), excluding the parts of the brief excluded by Fed.R.App.P. 32(f).[33]

[ ] This brief uses a monospaced typeface and contains [state the number of] lines of text.

3.      This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because:

[x] This brief has been prepared in a proportionally spaced typeface using Times New Roman, Size 14.

[ ] This document has been prepared in a monospaced typeface using [state name and version of word-processing program] with [state number of characters per inch and name of type style].

*s/Frank A. Rosado Méndez*
**FRANK A. ROSADO MÉNDEZ**

Dated: December 9, 2025

---

[33] On November 28, 2025 Appellants filed a motion requesting an extension of time to file the Reply and leave to file the Reply in excess of the 6,500 word-limit established by Fed.R.App.P. 32(a)(7)(B). On December 4, 2025, this Court granted Appellants leave to file a Reply brief containing no more than 11,040 words.